

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

          Plaintiff

     v.

STATE OF MICHIGAN, et al.,

        Defendants

_____/

Case No. 77-71100

Detroit, Michigan
Tuesday, June 18, 1996
Judge John Feikens

## WATERSHED TASK FORCE PUBLIC MEETING

BEFORE THE HONORABLE JOHN FEIKENS, FEDERAL JUDGE

TRANSCRIPT ORDERED BY:  TIMOTHY CRONIN (Hamming, Polaczyk & Cronin)

APPEARANCES:

Participants:

Judge John Feikens
Mr. Charles Moon
Dr. Jonathan Bulkley
Mr. James Murray
Mr. Robert Miller
Mr. Timothy Henry
Mr. Chad McIntosh

Recorded by:

Elnora Williams
133 U.S. Courthouse
Detroit, MI  48226

Transcribed by:

Lynn L. Spietz
13810 Courtland
Oak Park, MI  48237

1584

## INDEX

PROCEEDINGS - Tuesday, June 18, 1996                                        3

WATERSHED TASK FORCE PUBLIC MEETING

    Statement by the Court                                          3
    Presentation by Timothy Henry, Associate Director,
        USEPA Region Five                                       7
    Statement by Chad McIntosh, Deputy Director,
        Department of Environmental Quality                    33
    Presentation by Robert Miller, Chief, MDEQ,
        SWQD                                                   35
    Colloquy between the Court and Mr. Miller               52
    Presentation by James Murray, Chief, Wayne
        County Department of the Environment                   54
    Statement by Chad McIntosh                              67
    Statement by Ralph Williamson, Citizen                  67
    Statement by Charles Moon, Court Monitor                68
    Statement by Mayor Canfield, City of Dearborn
        Heights                                                70
    Statement by Dr. Jonathan Bulkley                       73
    Statement by James Murray                               75
    Statement by Steve Gordon, Director, Detroit
        Water and Sewerage                                     77

1          Detroit, Michigan

2          Tuesday, June 18, 1996

3          Morning Session

4              – – –

5     (At about 10:05 A.M. – Court in session on this matter.)

6          THE CLERK:  The Court calls case number 77-71100,

7   the United States of America versus the State of Michigan.

8          THE COURT:  Good morning, everyone.  This is the

9   third of a series of meetings being held under the auspices of

10  this Court to address a watershed approach to the River Rouge

11  Wet Demonstration Project.

12          Today we will hear, principally, from the regulatory

13  agencies.  And after their presentations have been made, an

14  opportunity will be given to the communities and their

15  representatives to raise questions.  Dr. Bulkley will preside

16  over that aspect of the hearing.

17          I'd like to say, as a preliminary statement, the

18  following:  For some years now, and particularly since the

19  governments, both federal and state, have involved this Court

20  in the pollution problems of Southeastern Michigan,

21  particularly in three principal cases, my interest has gone

22  along the line of a watershed approach, as many of you have in

23  considering it, particularly to address the problems of the

24  Rouge River.

25          Instrumental in an approach to the problems of the

3

1  Rouge, which are unlike those of the Detroit River, the Wet

2  Demonstration Project for the river, for the Rouge River, came

3  into being, largely, as a result of congressional action,

4  spearheaded by Congressman Dingell, in providing the necessary

5  seed money to begin that study.  It's a unique study.  It's

6  the only one of its kind in the country.

7         What has been rather disturbing to me, as a federal

8  judge, has been the fact that this crusade for a watershed

9  approach has not, at least in my view, been enthusiastically

10  addressed by the regulatory agencies.  It seems to me that

11  they ought to be giving us real leadership in the address of

12  the correction of pollution problems through watershed

13  approaches.  And it's for that reason, among others, that we

14  would like, this morning, to hear from them.

15         Those of you who have participated in these meetings

16  know that what we are attempting to do, in creating a

17  watershed in the Rouge River basin, is to use existing

18  legislation through the Drain Act, and through its Chapters 21

19  and 22, to create an inter-county drainage district, which

20  could be the mechanism for an address of these problems.

21         One of the interesting goals in the creation of such

22  an inter-county drainage district is that the communities

23  themselves, should this be brought into being, could create

24  its -- their own standards for pollution control, not just on

25  combined sewer overflows, but on non-point source -- non-point

4

1    source pollution, and on other problems.

2          Let me restate that, so that the point is made:    If

3    a watershed approach through the inter-county drainage

4    district petition method, which is permitted by Michigan law,

5    can be accomplished, the individual communities, binding

6    together in this kind of an effort, can create their own

7    pollution standards.

8          It seems to me that the regulatory agencies would

9    want to be a part of that, to have their voice heard in that

10   framework.

11         We all know that there are difficult problems in

12   this approach.   Twenty years ago, it was easy to tackle these

13   pollution problems.   I remember when I first got into the

14   Detroit water and sewerage case, years and years ago -- you

15   heard the case number read just a moment ago, 1977 is the date

16   of the case number -- the golden spigots were still being

17   turned on in Washington, and a lot of federal money was

18   available.   Not so today.   And this makes it very difficult

19   for the communities of Southeastern Michigan, and

20   particularly, the communities in the River Rouge basin, to

21   find the money to accomplish these purposes.

22         And it seems to me that if a watershed approach can

23   be accomplished, the trade-off from the regulatory agencies

24   might well be to give the communities more time to approach

25   the solution to these problems on a watershed basis, and on a

1    watershed permitting basis, more time to accomplish these

2    goals, because they're being asked to do more themselves.

3           Well, that's enough from me for now.  The -- the

4    purpose of this meeting is to obtain from the representatives

5    of the regulatory agencies their points of view, as we look at

6    this watershed approach together.  And for that part of the

7    hearing, I'll tell the matter over to Dr. Bulkley, who will

8    preside.

9           DR. BULKLEY:  Thank you very much, your Honor.

10          At this point, I would like to recognize Mr. Timothy

11   Henry, Associate Director of the Water Division, Region Five,

12   United States Environmental Protection Agency, Chicago,

13   Illinois.  Mr. Henry?

14          MR. HENRY:  I would like to thank the Court, and all

15   the communities represented here today, for the opportunity to

16   speak before you today.

17          I have a prepared text that I will be following.

18   I'm sorry, in advance, that it's as long as it is.  However,

19   we're covering an awful lot of material, and try as I might to

20   cut it -- cut out pieces --

21          THE COURT:  How long is it?

22          MR. HENRY:  It will probably take the better part of

23   half an hour.

24          THE COURT:  Oh, that's not long.

25          MR. HENRY:  It was longer than I thought it would

6

1   be.

2           THE COURT:  You frightened me.

3           MR. HENRY:  It still frightens me, sir.  Thank you.

4           EPA, and the Michigan Department of Environmental

5   Quality, were asked by the Court to provide information in

6   response to a couple of questions that arose in previous

7   hearings on this matter.

8           If I recall, or as I've been told, very

9   specifically, "How clean is clean?" and "How will the

10   regulatory agencies ensure that the Rouge River achieves that

11   target?"

12           I'm sure that there are other questions in the minds

13   of many of you in the audience.  For example:  We've done our

14   part to clean up the river, so why are we here being asked to

15   do more?

16           EPA, and the Michigan Department of Environmental

17   Quality will both make presentations today.  On behalf of EPA,

18   I will take a few moments for a general background

19   presentation on the Clean Water Act regulatory programs with

20   an emphasis on the status of the federal Wet Weather

21   regulatory efforts.  My intent is to provide a common frame of

22   reference.  That is, a common understanding of some of the

23   federal clean water program requirements.

24           The state will follow with a much more detailed

25   presentation, keyed to the requirements that directly affect

1  the Rouge River and the communities within it.  That is

2  appropriate, because DEQ is the regulatory agency authorized

3  by EPA to implement the Clean Water Act water quality and

4  wastewater permitting programs.  As such, it bears the

5  responsibility for making the specific regulatory decisions

6  within the framework established by the act.

7       Additionally, there are, under state laws,

8  requirements and authorities above and beyond the minimum

9  federal requirements, which also affect the situation in the

10 Rouge watershed.

11      Nonetheless, EPA plays a significant role by

12 establishing the national regulatory framework under which

13 Michigan DEQ makes these decisions, and the times, taking

14 direct enforcement actions to insure compliance with the

15 federal requirements.  So before the state makes its

16 presentation, I will take a few minutes to set the stage.

17      In response to the question, "How clean is clean?"

18 one can find an over-arching federal answer in Title 1 of the

19 Federal Water Pollution Control Act Amendment in 1972.  There,

20 Congress said that it is a national objective to restore and

21 maintain the chemical, physical and biological integrity of

22 the nation's waters, and it established the corresponding goal

23 of fishable, swimmable waters by 1983.  Those water quality

24 targets have remained intact in all subsequent amendments of

25 the act.

1    Successive titles in the 1972 act defined the
2  requirements and programs that would get the country to that
3  objective.  Two of these programs, Water Quality Standards,
4  which carried over into the 1972 act from the previous water
5  pollution statute, and the National Pollution Discharge
6  Elimination System, or NPDES Point Source Permitting Program,
7  which was a new creation of the act, are central to today's
8  discussion.
9    One of the points that I want to emphasize in this
10  presentation is the evolution of those water quality control
11  programs.  Although the basic directives of the Clean Water
12  Act have stayed fairly constant, successive amendments of the
13  act have tended to focus the program on the types of problems
14  that were most pressing at that time by establishing specific
15  requirements, fixing compliance dates, and so forth, all
16  leading towards eventual attainment of the goals and
17  objectives set out in the act.  Let me describe what I mean.
18    From the outset, permits issued under the NPDES
19  program were required by the statute to implement minimum
20  technology requirements.  For example, effluent limitations
21  reflecting the application of best practical control
22  technology were required in certain permits, generally, those
23  issued to industrial point sources, by July 1st, 1977.
24  Permits issued to publicly-owned treatment works were, under
25  the 1972 act, required to have contained limits reflecting

1  secondary treatment within roughly the same time frame.

2         In addition, the statute also required that by July

3  1st, 1977, permits contain even more stringent effluent

4  limitations necessary to meet water quality standards

5  established by a state.

6         The initial period at the NPDES program is often

7  called the first round of permitting, and the emphasis of the

8  Water Pollution Control program during this period could be

9  characterized as two-fold:  First, get facilities under

10 permit; and, second, insure that those permits included limits

11 reflecting a minimum level of treatment technology for

12 conventional pollutants.

13        Simply put, there was gross pollution occurring in

14 the form of untreated, unpermitted wastewater discharges, and

15 EPA and the states had to get a handle on it.

16        The 1972 act had required effluent limitations in

17 industrial -- actually, anything other than POTW permits --

18 reflecting application of best available -- best available

19 treatment technology economically achievable, or BAT, by July

20 1st, 1983.

21        BAT was to be a higher level of treatment, with a

22 greater focus on toxic pollutants.  Congress had also

23 established a goal of zero discharge in the 1972 act, and BAT

24 was to be the next step to force the use of treatment

25 technologies and in-plant pollution prevention toward

1    achieving that goal.

2         In keeping with this original direction, Congress,

3    in enacting the 1977 amendments, commonly referred to as the

4    Clean Water Act, directed the agency to move aggressively to

5    establish regulations for industrial point sources to reflect

6    the application of BAT.

7         The second round of permitting, the beginning of

8    which generally coincided with the passage of 1977 amendments,

9    therefore, saw a tightening of permit limits through the

10   establishment of limits on additional pollutants, to reflect

11   this higher standard of treatment.

12        Water quality effects were also increasingly being

13   considered in the establishment of effluent limits, with the

14   focus on -- focus generally on oxygen depleting substances and

15   eutrophication, not toxic effects.

16        As a consequence, many municipalities found

17   themselves having to face limits that were tighter than

18   secondary treatment in order to meet water quality standards

19   in the receiving water.  And in some cases, this required

20   construction of advanced treatment facilities.

21        Between 1977 and the next major amendments to the

22   act in 1987 -- actually, Todd Carey, yesterday, reminded me

23   that there was a major amendment in 1981 which addressed the

24   program he's -- he's most familiar with -- there was an

25   emergence of -- emergence of, nationally, a water quality

11

1    based permitting for toxic pollutants as a priority.

2             Whereas earlier rounds of permit issuance generally

3    focused on achieving minimum levels of treatment technology,

4    and certain fundamental water quality end points, such as

5    dissolved oxygen, the emphasis of the third round of

6    permitting shifted toward protection of water quality from

7    toxic end points.  That is, permits were increasingly

8    including more stringent limits necessary to meet in-stream

9    water quality standards for toxic pollutants and toxic

10   effects.  To get at the cumulative effect of the -- toxic

11   effect of the effluent, the use of whole-effluent toxicity

12   tests, and the establishment of whole-effluent toxicity limits

13   became more widely practiced in the permits program.

14           To support this step in the evolution, EPA issued a

15   policy statement in 1984 entitled, "The Policy for the

16   Development of Water Quality Based Permit Limits For Toxic

17   Pollutants," and guidance -- a guidance document entitled,

18   "The Technical Support Document for Water Quality Based Toxics

19   Control."

20           As the industrial and municipal point sources

21   increasingly came under control in the permit program, the

22   relative importance of wet weather discharges was increasing.

23   And with that, the attention paid to wet weather sources in

24   the NPDES program.

25           EPA continued to work on a regulatory program to

12

1    address storm water discharges, and permits for combined sewer

2    overflows began to be issued, with requirements regarding, for

3    example, minimum capture and treatment levels.

4           With the passage of the 1987 amendments, the Water

5    Quality Act of 1987, Congress affirmed its support for water

6    quality based permitting emphasis of the NPDES program.   In

7    fact, it established a process in section 304(1) complete with

8    milestones and due dates to push the program forward where

9    water quality requirements for priority toxic pollutants were

10   not being achieved.

11          Congress also required states to develop water

12   quality standards for the priority toxic pollutants, and it

13   provided explicit direction and due dates to the agency for

14   the storm water permit program and for municipal wastewater

15   sludge permit program.

16          Another new program established in the 1987

17   amendments dealt with non-point sources of pollution.   Added

18   as Section 319 to the act, it promoted the adoption of non-

19   point source management programs by the states that would

20   ensure the application of best management practices to control

21   non-point source pollution.   The amendment allowed the states

22   to proceed with either a traditional regulatory program for

23   non-point sources, or an non-regulatory program, as

24   appropriate to provide for technical assistance, financial

25   assistance, enforcement, and so forth.   Perhaps significantly


13

1  for our discussion, the amendment clearly stated a preference
2  for the adoption of non-point source programs on a watershed
3  basis.

4          It's been almost 10 years since the last major
5  amendment to the act, and that time has seen EPA, the states,
6  and the regulated community implementing the explicit new
7  requirements of the 1987 amendments, and also adopting new
8  approaches to address the remaining priority problems that are
9  preventing attainment of that objective of the act.  One of
10  those approaches is the watershed protection approach, and I
11  will discuss that more in a few minutes.

12          Before I move on to discuss the wet weather
13  programs, I want to reiterate a point I made in the opening of
14  this, regarding the state and federal rules, and the Clean
15  Water Act regulatory programs.

16          In creating the non -- the NPDES Point Source Permit
17  Program, Congress allowed for -- actually promoted -- the
18  delegation of this program to individual states for their
19  administration, in lieu of federal administration, on
20  demonstration that they'd met certain minimum requirements.
21  Michigan received authorization to run the NPDES Permit
22  Program in 1973.  After state authorization, EPA stepped out
23  of the day-to-day program administration, and took on the role
24  of limited federal oversight to ensure program performance, in
25  compliance with the requirements of the act.

14

1          At the same time, it is important to note that

2     enforcement of NPDES authorities, even for state-issued

3     permits, could not be delegated in the manner of program

4     administration.  Consequently, EPA retained such authority at

5     the federal level, and shares with the state enforcement

6     responsibilities.

7          With regard to water quality, the 1972 act, in

8     Section 303, left the states with the responsibility to

9     establish and maintain water quality standards for their

10    waters.  Congress put EPA in the role of reviewing state water

11    quality standard actions for consistency with the act, but

12    unlike the NPDES program, the standards program did not

13    require delegation from EPA to a state.

14         Michigan has a long history of implementing the

15    NPDES program, and EPA looks to it to craft the specific

16    requirements within the framework provided by the act, and

17    supplemented by its own state authorities to improve water

18    quality conditions within its borders.  EPA's role has evolved

19    from one of strict oversight into one of facilitation and

20    partnership in support of direct state implementation.  EPA

21    maintains its role in defining the federal regulatory

22    framework and enforcing federal requirements where necessary.

23         I'd like to move on now to talk briefly about the

24    wet weather program.

25         One of the areas that has seen much attention since

1  the 1987 amendments has been the control of wet weather point

2  source discharges.

3  　　　　Wet weather flows subject to regulation under the

4  Clean Water Act include combined sewer overflows, or CSOs,

5  which are wet weather discharges from sewer systems designed

6  to transport both sanitary sewage and precipitation runoff;

7  storm water discharges from certain municipal separate storm

8  sewer systems, or MS4s; and storm water discharges associated

9  with industrial activity; and finally, sanitary sewer

10  overflows, or SSOs, which are discharges from sewer systems

11  designed to transport sanitary flows to publicly owned

12  treatment works.

13  　　　　Depending on the cause, sanitary sewer overflows may

14  be triggered by wet weather events, or may occur in dry

15  weather, and may be occasional events, or chronic problems.

16  　　　　I've provided a handout which hopefully most of you

17  have, although I don't think I had enough copies for

18  everybody, which details the storm water and CSO control

19  programs.  I can't go into that level of detail here, but you

20  may wish to refer to it.

21  　　　　Similar to the evolution of the Clean Water Act

22  programs I just described, the control requirements that are

23  now being included in wet weather permits are generally

24  phased, starting with minimum technology requirements,

25  assessing progress, and then building additional controls,

1    perhaps in a series of steps, towards the goal of meeting

2    state water quality standards.

3         With regard to CSO programs, CSOs are point source

4    discharges subject to the NPDES permit requirements, including

5    both technology-based and water quality-based requirements of

6    the Clean Water Act.

7         During the 1980s, awareness of the CSO problem

8    increased, and regulatory agencies developed approaches to

9    controlling CSOs under the NPDES program.

10        To provide guidance to the states, EPA Region Five

11   developed a CSO strategy in 1986, which emphasized operation

12   and maintenance of combined sewer systems to maximize the flow

13   transported to the POTW for treatment.

14        This was to be accomplished through the development

15   of cite-specific operational plants.  Facilities causing water

16   quality problems linked to overflow events would be targeted

17   for additional controls.  At this time, Region Five states

18   were also adopting CSO permitting approaches similar to Region

19   Five.

20        In 1989, EPA developed a national permitting

21   strategy for CSOs in order to encourage CSO control

22   nationwide.  The objectives of the strategy were to ensure

23   that CSO discharges occur -- or if they occur, they are only

24   the result of wet weather.  That is:  To eliminate dry weather

25   overflows.

1       To bring all wet weather discharges into compliance

2   with technology-based requirement of the Clean Water Act and

3   applicable state water quality standards, and to minimize

4   water quality, aquatic biota and human health impact from wet

5   weather overflows.

6       The strategy discussed the use of technology-based

7   controls established in NPDES permits on a best professional

8   judgment basis to meet the requirements of the Clean Water

9   Act.  The strategy also discussed the use of additional cost-

10  effective controls where necessary to meet state water quality

11  standards.

12      In order to implement the national strategy, state-

13  wide permitting strategies were developed for approval by EPA

14  in the early 1990s -- or in early 1990.  In the case of

15  Michigan, the MDNR developed a CSO permitting strategy, and it

16  incorporated approaches to CSO control that the state had been

17  applying in NPDES permits for a number of years, and which

18  continue to form the basis for the state's CSO control

19  program.

20      The Michigan strategy was built around the phased

21  approach, similar to the USEPA strategy.  However, the state

22  strategy provided further definition of expectation regarding

23  the requirements necessary to meet water quality standards.

24      Specifically, the strategy requires that CSOs be

25  either eliminated, or receive adequate treatment.  The state

1   developed designed control levels for use in the absence of
2   cite-specific -- or sufficient cite-specific information.
3   Dischargers would also be provided with the opportunity to
4   demonstrate that other controls would meet the goals of the
5   CSO strategy, including the requirements to meet the water
6   quality standards.
7       In 1994, USEPA issued a national combined sewer
8   overflow policy.  This policy was developed in considerable --
9   with considerable public input, including the results of a
10  national dialogue process.  Participants in the stakeholder
11  group included municipalities, environmental groups, and state
12  and federal regulators.  Under this policy, technology-based
13  requirements for CSOs are somewhat expanded from those in the
14  previous USEPA strategy.  And the handout that I provided you
15  lists those -- lists that guidance.
16      The policy states the permitees with CSO's are also
17  responsible for developing and implementing long-term CSO
18  control programs to meet water quality standards.  The long-
19  term control plan should give highest priority to controlling
20  overflows to sensitive areas, and should include an analysis
21  of alternatives to long-term CSO controls.
22      Two approaches are presented.  First, the
23  presumption approach, in which a specified minimum level of
24  CSO controls would be presumed to meet water quality
25  standards.  The policy states, however, that the presumption

1  approach is not appropriate where the permitting authority
2  determines that such a presumption is not reasonable, in light
3  of information regarding any particular combined sewer system.
4  In other words, if information suggests that water quality
5  standards will not be met in the receiving stream, even after
6  implementation of the minimum controls, this approach would be
7  inappropriate.
8      Alternatively, there is the demonstration approach,
9  under which a permitee may demonstrate that a control program,
10  not meeting the criteria of the presumption approach, is
11  adequate to meet the water quality requirements of the Clean
12  Water Act.
13      To reiterate, both the current national policy and
14  the Michigan CSO strategy provide for a phased approach to
15  reach water quality requirements.  EPA and the state expect
16  that the phased approach will encourage progress in
17  controlling CSOs in the most cost-effective manner.  However,
18  there is no guarantee that completion of initial controls will
19  achieve water quality targets, and therefore, where CSOs
20  continue to cause or contribute to water quality standards
21  violations, permitees may find themselves required to provide
22  additional control.
23      I'll start my discussion of the storm water program
24  with the program that was put in place in the 1987 amendments.
25      The Water Quality Act of 1987 defined different

20

1   compliance date requirements for different categories of storm
2   water dischargers.  Generally speaking, large municipalities
3   and industrial facilities were required to get permits first.
4   Included in this group also are storm water discharges, to
5   quote from Section 402(p)(2)(E) of the act:

6       "...for which the administrator or the state, as the case
7       may be, determines that the storm water discharge
8       contributes to a violation of water quality standards, or
9       is a significant contributor of pollutants to waters of
10      the United States."

11      These discharges constitute phase one of the storm
12  water permit program.  The act also required EPA to publish
13  regulations for the remainder of the storm water discharges as
14  phase two.

15      Storm water discharge requirements are found at
16  Section 402(p) of the Clean Water Act, which was added by the
17  '87 amendments.  And you may wish to refer to part of the
18  handout summarizing the specific requirements of Section 402.

19      On November 16th of 1990, USEPA promulgated final
20  storm water application requirements, which has subsequently
21  become known as the phase one regulations.

22      These regulations, principally at 40 C.F.R., part
23  122.26, established the basis for USEPA's current storm water
24  regulatory program.  The regulations defined those facilities
25  subject to storm water permitting.  They also established the

1    permit application requirements, processes and deadlines for

2    various types of storm water discharges.  Again, these are

3    summarized in your handout.

4           Regulated MS4s, or Municipal Separate Storm Sewer

5    Systems, are those located in incorporated areas with a

6    population of 100,000 or more, located in counties or

7    unincorporated urbanized areas with populations of 100,000 or

8    more, or other municipalities designed or designated by the

9    director due to their interrelationship with other regulated

10   MS4s, such as physical inter-connections, relative location,

11   quantity or type of pollutants discharged through the

12   receiving water.

13          The director may, upon petition, designate storm

14   sewers, located within a storm water management regional

15   authority that includes another regulated MS4.  Such regional

16   authorities may be based on a jurisdictional, watershed, or

17   other appropriate basis.  The regulation allows any person to

18   petition the director to designate an MS4 based on this

19   provision.

20          The regulation also allows any person to petition

21   the director to require a permit for storm water discharge,

22   which contributes to a violation of a water quality standard,

23   or is a significant contributor of pollutants to the waters of

24   the United States.

25          MS4s may also petition the director to reduce the

22

1  census estimates of populations served by separate storm sewer

2  systems to account for the presence of combined systems --

3  combined sewer systems within their area.

4       The regulations require extensive application

5  information from MS4s, which includes demonstration of legal

6  authority; source identification; discharge characterization;

7  and proposed storm water management plans.

8       As part of the discharge characterization,

9  applications include results of storm water outflow analysis

10  and testing for illicit connections to the storm sewers.

11       USEPA considers the management plans to be a

12  critical part of the application, and the basis for developing

13  MS4 permits.  The regulations require that these plans address

14  controls on run-off from commercial and residential areas;

15  illicit discharge identification and removal programs;

16  programs to monitor and control pollutants from municipal land

17  fills, hazardous waste treatment and disposal and recovery

18  facilities; and certain industrial facilities; and programs to

19  reduce pollutants in construction cite runoff.

20       The phase one regulations established application

21  deadlines for storm water permits which were subsequently

22  modified through statutory and regulatory changes, and the

23  final deadlines are included in the handout I've referred to

24  earlier.

25       Since the promulgation of the phase one regulations,

1   EPA and authorized states, have been engaged in storm water

2   permitting, outreach and compliance activities.

3          Individual and general permits have been issued.

4   Workshops and assistance have been provided.  And some

5   compliance actions have been taken.  With respect to MS4s,

6   some, but not all permits have been issued.

7          And I note that in the Rouge River area, Livonia

8   will be the only -- or will be required, based on information

9   I have now, to obtain an MS4 permit upon completion of their

10  sewer separation work, because they'll be over the population

11  part.

12         The 1987 Clean Water Act Amendments required EPA to

13  develop a phase two storm water program by October 1st, 1992,

14  and this date was later amended to October 1st, 1994 by the

15  Water Resources Development Act of 1992.

16         On October 18th, 1984, EPA issued guidance on the

17  statutory phase two compliance deadline, which had passed on

18  October 1st, 1994, and the agency stated that it could not

19  waive the statutory deadline, but recognized that it had not

20  issued implementing regulations.

21         The memorandum stated that EPA's enforcement

22  priorities were focused on phase one dischargers, but noticed

23  -- but noticed -- noted the possibility of third-party suits.

24         On April 7th, 1995, EPA proposed a phase two rule.

25  The final rule was promulgated on August 9th -- August 7th,

24

1   1995, and the rule sets forth a two-tiered approach for the

2   phase two storm water program.

3   Tier one includes any discharger which the director

4   determines contributes to a violation of water quality

5   standards, or is a significant contributor of pollutants to

6   the waters of the United States. Tier one discharges are note

7   -- are required to apply for a permit within 180 days of

8   receipt of notice.

9   Tier two, which is the second tier that we also came

10  up with -- under tier two, other dischargers are required to

11  apply for permits by August 7th, 2001.

12  USEPA has established an Urban Wet Weather Flows

13  Advisory Committee, under the Federal Advisory Committee Act,

14  to provide advice on various wet weather issues. One of the

15  key activities of this group is to develop recommendations to

16  USEPA on a phase two program in order for USEPA to be able to

17  publish a proposed rule in the Federal Register by September

18  of 1997.

19  Among the questions being discussed in developing

20  the phase two framework are: What are the core elements of

21  the phase two program, and how should these be determined; by

22  USEPA or by state programs? What best management practices

23  are recommended? Should phase two be regulatory, or non-

24  regulatory? Should state programs be federally enforceable?

25  How will phase two connect with phase one, particularly if

25

1  it's non-regulatory?  Should areas contiguous with phase one

2  urban areas be treated as phase one, or as phase two?  How

3  should CSO-exempted cities be addressed?  How will water

4  quality be addressed?  How will flow issues be addressed?  How

5  will construction, not in phase one -- that is, that amount,

6  or that disturbing less than five acres, be addressed?  How

7  should multi-jurisdictional linear projects -- highways and so

8  forth -- be managed?  How will watershed management be

9  promoted?  Finally, what about cost, and cost-effectiveness?

10       The FACA Committee is also expected to address

11  issues related to all wet weather programs, such as watershed

12  management, water quality standards and wet weather flows, and

13  monitoring and reporting issues.  As you can see, they're

14  taking on an awful lot.

15       The Municipal Storm Water Regulatory Program is

16  practicing a phased approach in terms of both coverage and

17  requirements.  The use of the phased program is expected to be

18  the most cost-effective way to reach water quality

19  requirements in a state, and thereby satisfy the objective of

20  the Clean Water Act.

21       Finally, I'd like to touch on sedentary sewer

22  overflows.

23       In certain cases, separate sanitary overflows can

24  occur as a result of excessive inflow and infiltration into

25  the system, or insufficient transport capacity, or blockages

26

1    or other operation and maintenance problems.  Generally

2    speaking, SSOs are considered by USEPA in Michigan to be

3    unauthorized discharges, and targeted for enforcement and

4    remediation.

5         However, recent national scrutiny has indicated

6    considerable variability in how NPDES authorities treat SSOs

7    across the country.  In some cases, NPDES permits have

8    authorized discharges from sanitary sewer overflows,

9    particularly from wet weather detention facilities.  The

10   permits may or may not require effluent limits to meet

11   secondary treatment.

12        USEPA and the Urban Wet Weather Flows FACA Committee

13   are currently participating in a national dialogue on

14   approaches to controlling SSO discharges.  The FACA SSO

15   Advisory Committee has developed a draft framework which may

16   become the basis for recommendations to USEPA.

17        The last subject that I want to cover is the

18   watershed approach, just to try to tie some of this together.

19        The states and USEPA have been increasingly using

20   the watershed protection approach over the past several years.

21   The term "watershed protection approach" refers to a way of

22   organizing and coordinating the work associated with

23   protecting and improving water quality.  The watershed

24   approach uses hydrological boundaries, rather than typical

25   political boundaries, to describe the areas in which water

27

1  quality problems are defined and addressed.

2       As a recent EPA guidance document entitled "The

3  Watershed Protection, a State-Wide Approach" states in its

4  executive summary:

5       "The watershed protection approach is a strategy for

6       effectively protecting and restoring aquatic ecosystems,

7       and protecting human health."

8       This strategy has, as its premise, that many water

9  quality and ecosystem problems are best solved at the

10  watershed level, rather than at the individual water body or

11  discharger level.

12       The watershed protection approach has four major

13  features:  Targeting priority problems; a high level of

14  stakeholder involvement; integrated solutions that make use of

15  the expertise and authority of multiple agencies; and

16  measuring success through monitoring and other data-gathering.

17       I would like to note that the watershed protection

18  approach is not an altogether new concept, particularly in

19  Michigan, which has been organizing its NPDES permitting and

20  water quality assessment work along watershed lines for more

21  than a decade.

22       The increased focus on watershed protection at the

23  national level is another step in the evolutionary process

24  I've referred to again and again.  The steps preceding it,

25  which often focused on controlling individual point sources of

28

1  pollution, have been necessary, and in some places sufficient

2  to restore and protect water quality.

3          Where controls on point sources have not been

4  sufficient to reach water quality objectives, the watershed

5  protection approach provides improved opportunity to

6  collectively address the sources of water quality impairment,

7  and correct the problem.

8          That is not to say that the approach should be used

9  as an opportunity to go back and revisit decisions that have

10  been made regarding individual point source controls.  Rather,

11  it provides a mechanism to go forward, building on these past

12  decisions, and drawing together all the remaining parts of the

13  puzzle.

14          As I stated the last time I was here before you, EPA

15  and the states recognize that the remaining steps needed to

16  meet water quality goals in rivers such as the Rouge may be

17  very expensive.

18          We also recognize that they are very much inter-

19  connected, and that if we only look at a subset of the

20  solutions, we may never reach the desired end-point, and we

21  might miss the opportunity for significant cost savings in the

22  process.

23          Watershed protection promotes a holistic view that

24  can help us better reach the water quality goal, and

25  hopefully, recognize overall cost savings in the process.

1          Another area of focus for EPA and the states, which

2     complements the watershed protection approach, is the listing

3     of water bodies that require the development of total maximum

4     daily load calculations, pursuant to Section 303(d) of the

5     Clean Water Act.  This provision has been in the statute since

6     the 1972 act, but it has taken on increased importance in the

7     past several years.

8          In 1992, EPA issued new regulations setting forth

9     more specific requirements for the development and content of

10    the lists and resulting TMDLs.  Simply put, if one can do such

11    a thing, a TMDL is a calculated maximum daily loading rate of

12    a pollutant to a water body that will, if not exceeded, insure

13    that the water body meets the applicable water quality

14    criterion for that pollutant.

15         The TMDL accounts for all sources of the particular

16    pollutant, whether point or non-point, including background,

17    and it includes a margin of safety.

18         A state will allocate the allowable loading, that

19    is, the TMDL, between the various sources, establishing a

20    waste load allocation for the various point sources; a load

21    allocation for the various non-point sources; and retaining a

22    portion of the TMDL for the margin of safety.  In turn, the

23    waste load allocation would define the water quality based

24    permit requirements required for the individual point sources.

25         The TMDL process compliments the watershed

30

1  protection approach, in that it can provide pollutant loading
2  rate targets that are to be applied against all of the sources
3  of a pollutant into the watershed.  Like the watershed
4  protection approach, the TMDL process looks at and integrates
5  all sources of the pollutant.

6          How does the watershed protection approach apply to
7  the Rouge?  In the Rouge watershed, we have already seen major
8  progress in implementing the watershed protection approach.

9          The efforts that have gone into the development of
10 the Remedial Action Plan for the Rouge River area of concern
11 demonstrate all the major tenets of watershed protection:
12 targeting priority problems; a high level of stakeholder
13 involvement; integrated solutions that make use of the
14 expertise and authority of multiple agencies; and measuring
15 success through monitoring and other data gathering.

16         What does the RAP say?  The problems affecting the
17 Rouge stem from a variety of sources:  for example, point
18 sources, both dry and wet; in-place contaminated sediments;
19 habitat degradation; physical modification; non-point sources.

20         The solution to the overall water quality problems
21 in the Rouge requires the application of federal regulatory
22 authorities, which reach some of the problems; state
23 authorities, which reach even more of the problems; local
24 authorities, which -- with which we can reach even more; and
25 voluntary actions to fill the remaining gaps.

1          Finally, the RAP said that we should be looking at

2   storm water controls and that they should be addressed on a

3   watershed-wide basis.

4          And that brings us full circle to why we are here.

5   In April, you were presented with a proposal describing one

6   approach to begin addressing storm water controls on a

7   watershed-wide basis.

8          In summary, there is still work to do to clean up

9   the Rouge River.  The regulatory steps taken to date have

10  resulted in improvements.  Permit conditions for CSO control

11  continue to be implemented.  New requirements in the storm

12  water permitting area will be developed and implements.  These

13  CSO and storm waters will, I would predict, yield their share

14  of water quality improvement.

15         But they probably won't get us all the way there.

16  The watershed approach gives us a mechanism to fit these

17  actions together with other actions in the basin, both

18  voluntary and regulatory, to achieve a complete solution.

19         EPA and the state are responsible for insuring that

20  there is continued progress toward the objective in the Clean

21  Water Act, in the Rouge as well as in other lakes and rivers

22  in Michigan.

23         In delegating the NPDES program, EPA has given the

24  state the responsibility for defining the specific regulatory

25  steps, mixing both federal and state authorities that it

1   wishes to pursue to reach that objective.

2           EPA will provide guidance, and define the regulatory

3   floor, and we will assist the state as possible, but we will

4   continue to look to the state to implement the programs

5   necessary to clean up the river.

6           Thank you.

7           DR. BULKLEY:  Mr. Henry, thank you very much.

8           I think, in the interest of time, we should hold

9   questions at this point for Mr. Henry, and proceed to the

10  State's presentation.  And at this time, I would like to

11  recognize Mr. Chad McIntosh, the Deputy Director of the

12  Department of Environmental Quality for the State of Michigan.

13  Mr. McIntosh?

14          MR. McINTOSH:   Thank you, Dr. Bulkley.  Your Honor,

15  and Mr. Moon, and Dr. Bulkley, I want to again thank you for

16  creating this non-adversarial climate in which we can deal

17  with -- with these issues that are before us.

18          I have to say, though, I'm troubled by hearing some

19  things prior to coming into court today.  Essentially, we've

20  been -- received word that if our presentation isn't

21  acceptable to some of our sister agencies, that perhaps we'll

22  be sued.

23          And I just wanted to state that -- that the non-

24  adversarial approach to this is -- is very important to us.

25  If this whole thing deteriorates into an adversarial approach,

33

1  it won't serve the environment; it won't serve the

2  communities; it won't serve the state. And instead of having

3  our engineers and biologists and such making presentations on

4  how we're approaching this, unfortunately, we'd be reduced to

5  having our attorneys making these types of presentations.

6        Having started off on the negative note, I want to

7  get right back to the positive, because it is -- essentially,

8  you've taken an adversarial situation, and you've created a

9  non-adversarial atmosphere in which we can deal with these

10  issues, and we're very supportive and 100 percent behind that.

11        Your Honor, you talked about leadership early on.

12  Leadership is -- I think you'll be very happy with our

13  presentation, as we talk about the Department of Environmental

14  Quality's approach to watershed management.

15        Leadership, it's not -- it's not that hard to force

16  people to do things. What is -- what is more challenge to

17  leadership is actually having people engage, and encouraging

18  them in an approach in which we can deal -- deal with our

19  problems.

20        And the watershed approach clearly is by far the

21  best way to approach the Rouge, the Rouge's problems. In our

22  view, the watershed approach is -- is -- will hinge on a

23  voluntary participation of the communities involved, and we

24  want to pursue on that.

25        And -- and I'm going to, with the Court's

34

1  permission, I'd like to make two brief introductions, and then

2  we'll get right into our presentation.

3           I'd like to introduce Mark Jones, who recently has

4  joined our Department of Environmental Quality.  He's our

5  director of Southeast Michigan and Detroit, and will be very

6  intimately involved in -- in these type of issues.

7           And right now, I'd like to introduce Bob Miller, who

8  is our Chief of the Department of Environmental Quality,

9  Surface Water Quality Division.  Bob -- Bob is a licensed

10  professional engineer, and -- and he -- he is the one where

11  the responsibility for implementing the NPDES permitting

12  program, and our approach to these issues, thus.

13           And with that, I'm going to help Bob with his

14  presentation by turning the overheads.

15           THE COURT:  Mr. Miller, maybe you could angle that

16  screen just a little bit, so that the focus on this side of

17  the courtroom, on my right, can see it.  We can see it very

18  well, even if it's angled.

19           MR. MILLER:  Let me add, before I start, copies of

20  all those slides are available in this handout.  They're in

21  outline form, but they are copies of the slides.  Anybody that

22  didn't -- didn't get those --

23           THE COURT:  That's fine.

24           MR. MILLER:  Could you just hand them out to

25  everybody?  Thank you.

35

1          Mr. Henry gave a really good introduction to -- to

2    what I'm going to say, and background to this whole issue.

3    It's always interesting to hear the federal perspective on

4    these issues.

5          Usually you can learn a new acronym when you listen

6    to them.  I didn't get a new acronym, but I got a new term

7    that I really like:  An inter-municipal linear project, which

8    in Michigan we call a highway.  But I like that.

9          And, yes, your Honor, as Mr. McIntosh said, I think

10   that you'll find, given your introductory remarks, that what

11   we'll have to say will be in harmony with the concepts that

12   you were laying out.

13         There is no question the way to approach the water

14   environment these days is through the watershed, and the

15   watershed approach.

16         The mission of the Surface Water Quality Division

17   has -- has always been to protect and enhance the quality of

18   the state's surface waters for the benefit of present and

19   future generations.

20         Now, the meaning of this has changed some through

21   the years.  In -- in the early years, basically, people looked

22   at the water quality, the wet stuff flowing through the

23   stream.  But the mission actually relates to the waters, which

24   is really the whole environment of the stream, its ability to

25   support fish, the habitat, what the bottom of it's like, what

36

1  the banks are like.  And this meaning has -- has changed

2  through the years.

3       Now, the way that the mission was accomplished in

4  the early years, before we started talking watersheds, was

5  what we call the programmatic approach.

6       We went out and set water quality standards like Mr.

7  Henry talked about.  We had a monitoring program that

8  monitored to see how we were doing.  We permitted the point

9  source discharges.  We went out with inspectors, and we had an

10  inspection program to inspect those point sources.  We brought

11  enforcement actions in court when we had to.  And then we

12  provided some financial assistance, either by grants or loans,

13  to build sewage treatment plants.

14       And this was the right thing to do at the time, when

15  we started in to water pollution control.  But in the '70s and

16  '80s, as these programs were getting implemented, while we

17  were making great progress, and we were getting control of

18  those point sources, we realized that a lot of our goals were

19  not being met.

20       We, for example, had toxics -- we had toxics in the

21  environment that caused us to put fish advisories out, warning

22  people to limit their consumption of fish.

23       And we found that the streams, while maybe the water

24  was -- was pure going through them, wouldn't support habitats.

25  If you take a stream that -- a trout stream that normally has

37

1  a nice pebbly bottom, it provides food and habitat for the

2  trout, you cover that with sediment and it can become just as

3  sterile as the Mojave Desert is.  It's, in essence, an

4  underwater desert, and nothing grows, nothing survives there

5  because of the habitat.

6          And what we started to realize is that we needed a

7  more holistic approach, and that we had to approach non-point

8  source issues.

9          At the same time, we were also facing a tax

10  revolution, and the business communities, the industries and

11  government were faced with having to try to -- to right-size,

12  or downsize, or to accomplish more with limited dollars.  And

13  all of that moved us toward the watershed approach.

14          Now, in -- in my simple terms, what the watershed

15  approach is, is an intelligent way of collaboratively making

16  decisions, and working together, to protect a reach of stream

17  so that society gets the most bang for its buck.

18          And -- and the words that deserve the emphasis there

19  are, I think it is the intelligent way to approach it.

20  Collaborative, working together with people, so that society

21  gets the most, so that we can, with our limited resources,

22  have the most effect toward improving the water environment.

23          Now, the watershed approach in Michigan -- let me

24  add, before I go on -- there's a one-page definition in the

25  appendix to the handout that I have that is -- is a great

38

1    definition of watershed approach, a lot more detailed than I'm
2    going to go into at this point.  But I would refer you to
3    that.

4           And now, this isn't something brand-new for
5    Michigan.  When we first started our program back in the '60s,
6    we actually had our district boundaries organized along
7    watersheds.

8           As Tim mentioned, our permit -- our NPDES permit
9    discharge program, we've been one of the leaders in the
10   country in terms of going to a basin approach to that.  And
11   that approach says, basically, that we take all of the permits
12   in one watershed, and issue them in a given year.  These
13   permits are renewable every five years, and so over a five-
14   year period, we work our way through all the watersheds in the
15   state, but we do them one watershed at a time, so that we can
16   take that more holistic approach to the discharge permits that
17   we're issuing.

18          Our 319 program has been a program for giving
19   demonstration grants.  I'll talk more about that, but it's
20   been organized on a watershed basis.

21          Our RAP program, or Remedial Action Program, is one
22   -- we've identified 14 areas of concern in the state.  That's
23   areas where the rivers dump into the Great Lakes where there
24   is concern about the -- the water quality, and developed
25   remedial action plans which are the blueprint for what a

39

1  watershed plan would be.  It identifies the problem.  It

2  assesses the nature of the problem.  It sets goals, and then

3  develops an action plan for how you're going to go about to

4  implement those goals on a watershed basis.

5          As Tim mentioned, the feds have been moving toward a

6  watershed approach, what they refer to as a placed-base

7  approach.  And as we've looked forward to the Clean Water Act

8  getting re-authorized in the future, every proposal that I've

9  seen over the last couple of years has included in it some

10  sort of a watershed approach, a requirement for states to

11  develop watershed management plans, or some sort of a

12  watershed approach.

13          But the issue before us is more than just watershed,

14  it's storm water, and storm water, simply, is -- is rain water

15  that is washing over the land, into the river, and ultimately

16  into the lake.

17          When I first came into the water programs, I had --

18  had some civil engineering in college, and I knew about storm

19  sewers and sanitary sewers, and I thought of a storm sewer as

20  conveying something that was nice and clean out there, clean

21  as the driven rain was going down through that storm sewer.

22          But in addition, storm sewers are -- storm water

23  includes the residue from washing the land, washing the yard

24  that has had fertilizer and pesticides applied to it; washing

25  the streets; washing the parking lot that's had cars and oil

40

1   and -- and antifreeze and fluids that have dripped onto it;

2   washing the industry that the rain runs over; washing the pet

3   droppings from where we've walked out animals; washing out the

4   storm sewer from anything that's collected in it since the

5   last rain; washing the agricultural fields that have been

6   applied with pesticides and fertilizers, et cetera.

7           Washing them into the river, and ultimately, into

8   the lakes.  The unique thing about Michigan is the fact that

9   we're the only state where all of our watersheds, essentially,

10  are within our jurisdiction, within our control, are defined,

11  and all go to the Great Lakes.  They don't run to the

12  Mississippi or anyplace else.  They go to the Great Lakes, the

13  most precious water supply in the world.  I mean, we have a

14  real high calling, I think, in this state, in terms of

15  protecting the water environment.

16          I'm going to talk a little about our storm water

17  program now, and I'm going to cover some of our current

18  efforts.  The phase one program, and phase two I won't go into

19  much, because Tim covered those pretty well.  And then some of

20  the available tools that we have for managing storm water.

21          The -- RAP program I mentioned to you.  It is -- it

22  is literally 14 watershed plans that we've already developed

23  in this state.  And there are reports available for people who

24  are interested.  They'd be available through our office,

25  reports on the status of that whole RAP process.  And I won't

41

1 take any more time to go into detail on that.

2      The 319 grants: This is a program where we've given

3 out about $17 million, most of that federal money, some state

4 money, in grants, for the development of non-point source

5 demonstration projects to -- for people to demonstrate how

6 storm water and non-point sources can be controlled to prevent

7 the pollutants from getting into the water supply. And part

8 of that program is information and education dissemination to

9 get the information from the demonstration projects out to the

10 public, so people can learn from it.

11      Another storm water program that we've been deeply

12 involved with is the development of Best Management Practice

13 Manual, and this is our Best Management Practice Manual.

14 Every couple of pages in here is another identification and

15 description of what people can do to control their non-point

16 sources, which most of the time is controlling their storm

17 water discharges. Everything from housekeeping and taking

18 care of construction cites, management practices, vegetation

19 controls, preventing sedimentations, et cetera.

20      The Soil Erosion and Sedimentation Control Program,

21 Act 347 is a program where the state cooperates with and works

22 through local government for the control of sedimentation

23 going to the streams.

24      And then, there's numerous initiatives like the

25 Rouge project. We have the Saginaw Bay project, the Grand

42

1  Traverse Bay project, the Huron River project, which are all

2  attempts to take this holistic watershed approach to

3  protecting those water supplies, water resources.

4      We are currently implementing the phase one program,

5  and I -- I think I'll say no more, because Tim described that

6  accurately, and let's go on to phase two.

7      As Tim described, phase two is getting developed,

8  and there's a federal advisory -- Wet Weather Advisory

9  Committee that's working on developing the requirements for

10 phase two.

11     When those regulations come out, Michigan, I can

12 expect, will implement those.  That won't come until probably

13 about '99, as he mentioned.  And, again, I'll say no more

14 about that, except that we expect to do it when it happens.

15     With respect to how you can regulate storm water,

16 the basic tools that we have available to us at this time are

17 things like individual permits.  That's where we go out and --

18 and of each individual discharger, require a permit, a permit

19 application, and -- and a permit.  Pretty difficult to do,

20 when you're talking about storm water, where you have so many

21 thousands of people and facilities that are implicated in

22 that.

23     We have general permits, which help us deal with

24 those kinds of issues, where we issue a general permit that

25 individuals can then apply for coverage, and the permit is

43

1  basically the same for each similar category of source.

2        We also have permits by rule, where by regulation,

3  we establish a permit, and then somebody gets covered under

4  that permit, just by letting us know that -- that they want to

5  be covered by that particular permit.

6        And then we have various combinations of those, and

7  similar sorts of requirements that we put into permits, we can

8  also put into administrative or court orders by going through

9  a court action.

10        The details on some of the regulatory options that

11  are available in the Rouge complex have been articulately put

12  forth in the Rouge Rive Wet Weather Demonstration Project

13  Supplemental Report, a Municipal Storm Water Discharge

14  Regulatory Strategy.  And in there, they outline and give

15  detail on these, and so I'm not going to try to go into it.

16  If people are interested in that, get a copy from the Rouge

17  Program Office.  I'm sure they're readily available.

18        With respect to the storm water program, Department

19  of Environmental Quality chooses at this point to proceed with

20  the voluntary approaches.  We think that it's prudent to wait

21  until we have the federal requirements for them to be

22  developed, so that we have that guidance.

23        We have staff -- Mr. Murray, and people from across

24  the country are actively involved in trying to help EPA come

25  up with guidance on this tough issue.  And so it makes sense,

44

1   in our mind, for us not to press the regulatory approaches

2   right at this time, until we have an opportunity to see what

3   comes out of that federal process.  And so our approaches now

4   are voluntary approaches.

5           The question has come up about how clean is clean, a

6   way of saying "what's the standards, what's the goals?"  And

7   so I was asked to speak about that for a few moments.

8           And, as Tim said, the water quality standards are

9   the goals.  These standards apply to lakes and streams, not to

10  dischargers.  They are the goal for the water.

11          The standards have the force of law, and they

12  establish minimal acceptable water quality.  And in our minds,

13  it is a minimum.  And it's not a debatable issue for us

14  whether we will at some point meet the water quality

15  standards.

16          Some of the standards are -- are parameter-specific,

17  relating to specific pollutants.  Some are generic.  Some are

18  numeric.  Some are narrative.  They all apply at any flow of

19  the water greater than the drought flow, which means they

20  apply during wet weather, during storm water situations.

21          Specifically, and the next couple slides show what

22  some of the standards are like -- and, again, this is in the

23  handout material, and I won't go into a lot of detail -- but

24  Rule 100 defines uses for which the water are protected.  And

25  the Rouge River is protected for agriculture, navigation,

45

industrial water supply for warm water fishery -- as opposed

to a cold water or a trout fishery -- other indigenous aquatic

life and wildlife, and total body contact in the summertime.

Our water quality standards protect the Rouge for those uses.

We have a dissolved oxygen standard, and that's

based upon providing a habitat that's acceptable for warm

water fish, which would be the case in the Rouge River.

We have standards related to microorganisms.  We

have the E coli standard that people have heard about.  If --

if you're not familiar with, I think it's worth a mention.  E

coli by itself isn't something that's bad.  Our systems are

full of E coli.  But the reason you measure is E coli, because

if you find it in the stream, then you know that there's

probably sewage there.

And it's the other things that are in the sewage

that are the problem for people that will make them sick and

make the water unhealthy.  It's not the E coli itself.

Now, E coli is in the digestive track of all

animals, so it's not just people.  It can be other things

impacting it.  But we have standards for that because it

indicates the presence of human sewage in the -- in the river.

Our water quality standards protect the Rouge River

for physical characteristics, physical properties.  In other

words, turbidity, color, oil, foam, settleable solids,

suspended solids are all part of what is limited to -- to make

46

1    the -- to protect the physical properties of the river.

2           In summary, the water quality standards are a fixed

3    target. Now, and some of the standards are very explicit.

4    Other standards require some interpretation. The course of

5    meeting those standards is something, though, that can be

6    influenced by local interests.

7           We're not about to -- to sit down and talk to people

8    about not meeting the standards, but we are very willing, and

9    in the long run, we want to work with people to develop the

10   approaches to meeting the water quality standards. And that's

11   where the flexibility really exists, and that's where the

12   community has to work together as to how we're going to get

13   there, and how long it's going to take, and what's the best

14   avenue to achieve the water quality standards.

15          What is our vision for the management of wet weather

16   problems? In the long term, we're going to comply with the

17   federal requirements. And we don't know what these will be,

18   so a decision on the nature of any regulatory additions to our

19   program will wait until that point.

20          In the near term, we're going to pursue watershed

21   management approaches to all water quality issues. We're in

22   the process of re-inventing our total water quality program in

23   this state, from that old programmatic approach that I talked

24   about, monitoring, enforcement, inspection, permitting, into

25   one where it is using those as tools as part of a watershed

47

1    plan for every watershed in the state of Michigan.

2           We're talking about maybe 80 major watersheds in the

3    state.  It's tough when you try to move an organization.

4    Organizations don't change easily.  It's a difficult time.

5    It's unchartered territory for us.  But the Department of

6    Environmental Quality, and the Surface Water Quality Division

7    are on a course, and are committed to moving our programs

8    where we're driven by making those intelligent choices

9    collaboratively based on a watershed basis for all of our

10    programs.  That collaboration means working with people and

11    engaging people.  And so we will participate in local

12    voluntary watershed efforts to bring the impaired waters into

13    compliance.

14           In a limited number of cases, we'll bring

15    enforcement actions when we have to.  That's obviously one of

16    the things we can bring to a cooperative table is ·the ability

17    to enforce the law.  And -- and when that's appropriate, we

18    will do that.

19           We'll continue implementing the non-point source

20    program, as long as the -- the federal money holds out, and --

21    and the little state money we put into it holds out, to

22    develop more of the -- of the demonstration projects on how to

23    protect non-point source discharges.

24           We'll continue developing our Best Management

25    Practice Manual that I showed you.  And we will continue

48

1   implementing our Remedial Action Plan, our RAP program.

2           Now, I must tell you that this program is in some

3   trouble.  The -- the federal money for it is drying up, and we

4   -- we basically only have funding to get us through about one

5   more year of our participation in that project.  And already,

6   our participation is down from a dozen people to about four

7   people in supporting this effort.

8           Now, that sounds bleak, but the good news is that as

9   we move toward a watershed approach for our whole division, we

10  won't be counting on just a dozen people to support that, but

11  those RAPs, I believe, will become the framework for how we

12  run our whole program.

13          So we're moving to where the whole division will be

14  supporting it in some sort of a fashion.  But to me, that's

15  one of the -- the RAP program's one of the really valuable

16  programs we have, and we're going to try to keep it alive,

17  despite the dwindling resources for it.

18          This -- this slide -- well, no, there's a good point

19  to be made here.  The -- we're going to encourage people who

20  aren't covered by and required to have an NPDES permit to

21  implement a lot of the provisions that are in there.  And it's

22  a lot of stuff that makes sense.

23          And I refer you to Appendix 3 of my handout, and I

24  won't go through it, but our storm water permits require

25  things like permitting illicit discharges, educating the

1   public on their impacts, getting them to report illegal

2   discharges, et cetera.  And all of those things are things

3   that I think can be a part of a voluntary program as well as

4   our permitted, mandatory programs.

5          This is what my slides would have looked like if my

6   color printer had been working yesterday when I printed them.

7   It printed one slide, and destroyed all the others, so that's

8   why you have a black and white presentation today.

9          I think a good question that people would ask is,

10  "Why are people going to participate in a voluntary program?"

11  And I think that's a good question.  And I've struggled with

12  that, and Chad talked about the concept of leadership, how do

13  you get people engage, as opposed to forcing them into it?

14         And one of the really refreshing things I have found

15  in the last several years that I've been in the water program

16  -- I've been in environmental protection for about 30 years,

17  and it was always forcing people.

18         But when I came into the water program, I found that

19  people care about the water.  They really do.  They care about

20  that river that's flowing through their community.  They've

21  got a cottage on a river, they swim in a river, they fish in a

22  river, they water ski.  I mean, it's -- people care about the

23  water in this state.  And so I think that there is a lot of --

24  there will be a lot of voluntary initiative.  I don't think

25  it's just pie in the sky thinking that we can come up with

50

1  ways that will get people to voluntarily start working on

2  these issues. I mean, it's the right thing to do, and I think

3  people will realize that.

4       I think also that -- that what we do now won't

5  possibly be lost. Anything that's sound water -- watershed

6  approach right now will fit in with whatever federal schemes

7  come down the road. So we're not wasting money by starting at

8  this point.

9       And let me conclude by -- by just a couple sentences

10  of brief summary. The water quality standards is our goal.

11  That's the answer to how clean is clean, in our mind.

12       How we achieve those can best be determined through

13  watershed management principles and approaches. MDEQ is

14  committed to the watershed approach. We'll continue

15  implementing phase one, and when phase two comes down the

16  pike, I'm sure we'll do what we're supposed to do under any

17  federal requirements that come out of that.

18       The MDEQ will encourage and support watershed

19  management initiatives at the local level, and then if

20  voluntary approaches fail, and if they do by that time we'll

21  have some of the federal guidance that we need, then we will

22  step in, and the State will require compliance using broad

23  authorities and powers that are identified in some of the

24  documents that we referred to.

25       With that, thank you.

51

1          DR. BULKLEY:  Mr. Miller, thank you very much, and

2     Mr. McIntosh, thank you very much.

3          Your Honor, these are the presentations that have

4     been requested by the regulatory agencies for toady's hearing,

5     and I would turn the matter to yourself, sir, to the Court.

6          THE COURT:  Mr. Miller, has your group had an

7     opportunity to study the inter-county drainage approach to the

8     formation of a watershed?

9          MR. MILLER:  Yes, we have -- we have looked at that,

10    and we have been involved in -- in the meetings.  We -- we

11    were kind of peripherally involved in the work group that Dr.

12    Bulkley had.  So we have some familiarity with that approach.

13    Now --

14         THE COURT:  Do you wish to comment on it?

15         MR. MILLER:  Well, at this point, yes, I'll comment

16    on it, and my comment is that at this point, that ·is not

17    something that we are advocating or supporting.  We are

18    prepared to work with any group that gets us set up and wants

19    to do it, but the Department, at this point, is not advocating

20    the use of that particular authority.

21         THE COURT:  Why not?

22         MR. MILLER:  Well, because we really feel that we're

23    still at a stage where there is a lot that can be done

24    voluntarily before we start dragging people kicking and

25    screaming into the process.

52

1      THE COURT:  Does that also include an admonition to

2  me not to enforce this lawsuit that you've got pending?

3      MR. MILLER:  Well, I've got to refer to my attorney

4  on that one.

5      THE COURT:  Well, why don't we just finesse that

6  act.  What I'm more interested in knowing is -- is this:  You

7  would not oppose the formation of an inter-county drainage

8  district leading to a watershed approach if the communities in

9  the Rouge basin decide, in their best interests, that that's

10  the thing to do?

11      MR. MILLER:  No.  If the communities decided that

12  was the best thing to do, then we would do all we could to

13  work with them.  I mean, at that -- that is -- that is the

14  heart and soul of what we want to do right now, is get people

15  engaged and work with them.

16      And -- and if -- if you can get people engaged in

17  the process, we think that there's a lot of progress that can

18  be made.  Just educating people you can make so much progress,

19  I think, in this area.

20      THE COURT:  On that basis, would you say that it

21  would be your point of view -- and I -- I don't mean to bind

22  you individually -- but it might be the Agency's point of

23  view, MDEQ's point of view that in the structure of the

24  creation of a watershed, if more time is needed to obtain the

25  goals that we all seek, that you'd be willing to recommend an

53

1   enlargement of time?

2           MR. MILLER:  Yes.  Yes, I -- I clearly believe --

3   and one of my -- on of the things I've learned from my 30

4   years is, what's important is to be directionally correct.  I

5   can remember back in my younger years, arguing with polluters

6   over a few months in a compliance schedule, and that seemed

7   the most important thing in the world at the time.

8           And what I've found is that those months go by

9   pretty fast, and even years go by pretty fast.  And what's

10  really important is to be on the right course.

11          And with respect to meeting the water quality

12  standards, I think that what is important, absolutely, that we

13  work with people to develop schedules, time schedules and

14  plans that -- that keep us headed in the right direction, but

15  that to be generous with respect to time, specific deadlines,

16  I think is highly appropriate.

17          THE COURT:  Well, the questions -- the floor is open

18  to questions from -- from the group, here.  I think this is

19  the important thing.  Mr. Murray?

20          MR. MURRAY:  Your Honor, my name is James Murray.

21  I'm Director of the Wayne County Department of the

22  Environment.  I'd like to take this opportunity to thank EPA

23  and DEQ for -- for their presentation, and also thank them for

24  the cooperation that they've both exercised in working with

25  Wayne County and I, on behalf of the other communities, on

54

1   some very difficult issues.

2           There are still some issues here, though, that leave

3   me confused.  And I'm not sure exactly how we clarify those

4   out, because we are involved -- Wayne County's involved in two

5   lawsuits with the United States Protection Agency, and with

6   the Michigan Department of Environmental Quality, not only on

7   the CSO program in the Rouge valley, but also in the Downriver

8   Wastewater Treatment Plant.

9           We heard presentations today that storm water -- and

10  they have lumped storm water into a number of different

11  categories -- and they talk about voluntary measures about

12  dealing with storm water.  CSOs in this area are induced by

13  storm events.  It wasn't clear to me whether they considered

14  that a storm water program and a voluntary program.

15          Many of us have signed permits, and didn't feel that

16  we were volunteering to spend a billion dollars, or have the

17  choice of spending a billing dollars.  And not that we didn't

18  want to move forward with CSO protection, and that it was an

19  important aspect.  But no one was arguing, except for some

20  maintenance kinds of issues that might have been existent on

21  current combined sewers, that they were discharging in

22  anything but wet weather.

23          And it's a wet weather program, and how we're going

24  to deal with that, that concerns us.  What is the level that

25  we have to treat our discharges to, and what is MDEQ going to

55

1    say in their implementation program to meet water quality

2    standards? You know, how they interpret that, and how they

3    say they would move forward has a great deal of impact on what

4    we might spend locally.

5           The same issue, in a different way, is existent on

6    the Wayne County Downriver Wastewater Treatment System, a

7    system that is a separated sanitary sewer system by and large,

8    that handles sanitary flows from 335,000 people in 13

9    communities. We have discharges in dry weather that have

10   always met -- have traditionally met water quality standards

11   for a long time, since the passage of the Clean Water Act. We

12   have severe problems in wet weather meeting discharge

13   requirements.

14          In the state of Michigan, because of that

15   circumstance, and because it was considered a dry weather

16   program, we were spending $300 million to correct that

17   program, and Mayor Canfield has the distinct pleasure of being

18   in both the Rouge Program and they Wyandotte Program, and yet

19   the state is indicating that maybe these are voluntary

20   programs. I'm sure she will volunteer quite quickly on which

21   direction she's going to choose.

22          I don't think there is a voluntary program as we're

23   dealing with those wet weather discharges that are induced by

24   storm events.

25          Are these part of the storm program, or are they

56

not? Are they separated? Is the phase one program a storm program that is traditionally, in their minds, a storm program? They have rules. They are implementing that. Livonia would have been caught into that, and they would have had some problems, or they would have spent a substantial amount of money complying with it with no indication that their neighbors upstream might have to do anything. In fact, there seems to be some question about whether they should have to do anything, and we should wait. And waiting is good, if we know what we're waiting for, and we know what direction we're going in, and how we're going to achieve that.

Birmingham, essentially, has provided wet weather protection on a CSO program that they're not quite sure what the State of Michigan is going to say. Are they in compliance or not? This is phase one.

And based on how that basin works, when it's completed later on this year, the state might say, yeah, you're in compliance, or no, you're not in compliance. And they have upstream dischargers that are not on the CSO program that will, based on information we have in the Rouge Program Office, not meet water quality standards in their community, but their community residents are spending $30 million to comply with what the state says might be a voluntary program. And I know they're not. And I'm being facetious.

Where will we go with CSO control? Where will we go

57

1    with SSO control?  And I would point out to you there are

2    three or four committees working at the national level.

3              SSO control -- I was amazed that, in this country,

4    there was as much sanitary sewer overflow across the country

5    that there is.  Dallas, Texas has numerous events in dry

6    weather.  We have eliminated that in Michigan, essentially.

7    We have standards that exceed everybody else in the country

8    that I've seen, as we're dealing with SSOs.  The federal

9    government's saying, well, yeah, we ought to have a minimum

10   standard.

11             That minimum standard they're looking at is for a

12   five-year storm.  And if you meet water quality standards as

13   you discharge in a five-year storm, that might be acceptable,

14   is acceptable, maybe, and that's the direction they're going

15   in.

16             We have -- in Michigan, it was a 25-year storm that

17   we chose.  That was how much treatment can you get through

18   this, through what we called the secondary treatment to meet a

19   categorical requirement for discharge in just wet weather.

20             We will meet water quality standards.  Part of this,

21   drops of water, aren't going to go through the system, but

22   when it comes out at the other end of the system, it meets

23   water quality standards.

24             We could do that for a five-year storm, I'm

25   convinced.  The difference in costs to Mayor Canfield could be

1    $10 million alone, just to her community.  Was that a

2    voluntary program, that it was as 25-year storm, as opposed to

3    a five-year storm?

4         And if we are complying with that kind of strict

5    requirement at Wyandotte, what is the City of Detroit and

6    other dischargers upstream going to be required to do?  Or is

7    this, "Well, we'll pick off this group," and oh, we go talk to

8    another group, "Well, you know your neighbors downstream are

9    complying with that, why should you comply with something less

10   than that?"  That doesn't seem like community-based

11   environmental programs.

12        And I'm not trying to blame DEQ or EPA.  I think

13   this has been an evolution of a program that everybody is

14   saying, "Whoa, this is -- we have some problems here.  We have

15   some differences."  And we don't have the golden spigot that

16   you talked to before that we can go achieve these kinds of

17   things and give them to you.

18        The State of Michigan is struggling itself with --

19   with budgets.  The Clean Water Act says that they will monitor

20   rivers as a part of the funding they get from EPA, that they

21   will do use attainability analysis.  Just because you talk

22   about a water quality standard being achieved in the river,

23   some rivers, because of naturally-caused conditions won't meet

24   that water quality standard.  They're supposed to be doing

25   that.

59

1    When I was a member of the Water Resources
2  Commission, I saw a quick dodge taking place. While you're
3  doing the discharge, we're going to designate everything
4  swimmable, fishable, whether it's attainable or not. And
5  because you're the discharger, you're responsible. We don't
6  have the money to go out and do use attainability, why don't
7  you go do it, and prove that our water quality standards
8  shouldn't apply, and how they should apply.

9    You're not telling Mayor Canfield, well, we know
10 you're budget's tight, but you don't have a choice whether you
11 want to do it. Our budget's tight, but we're not going to do
12 it. We have to write permits -- and you do. I mean, if we
13 don't have permits written in this state, we've got a whole
14 different mess on our hands.

15    We don't disagree that budgets are tight all over.
16 But you just can't continually go to the local communities and
17 say, "You're going to have to do what is our responsibility,
18 because we're going to write you a permit, and you're going to
19 have to comply with it."

20    We have talked to the State about taking the Rouge
21 River as an example on a voluntary method, some two years ago,
22 and start working towards a watershed approach that's called
23 TMDLs. That way, we can start taking a look at what is the
24 waste load coming into the river. Not only what is the waste
25 load coming into the river --

60

1          THE COURT:  You're talking about total maximum daily

2    load?

3          MR. MURRAY:  Daily loads, yes, your Honor.  In fact,

4    under the Clean Water Act, any river in the United States

5    that's not expected to meet water quality standards is

6    required to go on a list called 303(d) in the Clean Water Act.

7    And in Michigan, I think there might be some 50 rivers or

8    segments of rivers that are on that list already.  The Rouge

9    isn't one of them.

10         And under the law, if you're on that list, you have

11   to put together this pie chart of where the pollutant is

12   coming from, and whose responsibility is it.  Should Detroit

13   have to regulate, or over-regulate, their DSO -- or CSO

14   discharges to meet a BOD standard, when non-point's not even

15   being considered?

16         And it's -- I don't think we've had the opportunity

17   to take a look at, on a watershed basis, what are the limits

18   in our permit on the Downriver System on CSOs.  They're not

19   there yet, but we think the direction the program has always

20   been going in, traditionally is, we've got to set numbers.

21   water quality standards is a number, and we have to get there

22   some way.

23         And our argument has been, yes, we don't disagree

24   with that, but there's two things that we think we need to do.

25   We have more information on the Rouge than any other river, I

1   think, in the state of Michigan. So we have technical data

2   that allows us to do some things that other places can't do.

3   We have communities that have signed CSO permits, and are

4   implementing billions of -- billion dollar program potential,

5   and they would like to work with their watershed community on

6   -- we should be over-regulated. I know Mayor Canfield doesn't

7   want to wish any ill will on another community, but she surely

8   doesn't want to pay for some other community's responsibility.

9           And if we're going to over-regulate a point source,

10  because of convenience, we could very well be doing that like

11  on the Downriver System. What is going to be the pie chart,

12  and how are you going to go at it? And we would argue that we

13  should be doing that.

14          The part four water quality standards that Bob

15  mentioned just earlier speak to that these are the water

16  quality standards in Michigan, and I was on the commission

17  when the part four standards were going through some changes.

18  And we added to the part four changes that discharges in wet

19  weather are a problem, and citizens should be cautious about

20  using rivers in areas that they're have an impact from storm

21  water.

22          Now, does that mean that the water quality standards

23  recognized that water quality isn't being met in wet weather,

24  and we're not going to enforce it? I don't think the

25  Department's saying that. It's recognizing a real case

1   situation where we should be warning the public as we move

2   toward how we're going to control those problems.

3          There have been numerous places in the country, and

4   everybody has been extolling the merits of the watershed

5   approach, and I'm amongst one of those.

6          My boss does not endorse the -- the use of the drain

7   code at this time, unless the local communities want to say

8   that that is a vehicle that they think that they'd like to

9   work together on.  We think there are vehicles that they can

10  pick and choose that allow them to do that, as well as

11  voluntary programs, and inter-agency agreements.

12         But I'd just like to read to you a couple things

13  about watershed -- and this is put together by Wisconsin as a

14  part of the Great Lakes Initiative.  And there was unanimous

15  agreement -- with a diverse group of enviros, industry,

16  utilities and regulatory people -- unanimous agreement amongst

17  all of them, that the watershed approach was the way to go.

18  There was unanimous agreement that breaking up the pie chart,

19  and assigning responsibility, TMDL process, was the way to go.

20         Unanimous agreement amongst groups like that is not

21  -- it's not easy amongst people that have the same interests,

22  let alone divergent interests.

23         There are numerous studies that show that watershed

24  approach is going to be more cost effective.  And I'm not

25  going to read all the studies, but there are PCB studies in

63

1    Green Bay.  There was the mercury study in Mungen (ph. sp.).

2    There were dioxin studies; phosphorous, which are more

3    traditional; chlorides.

4        And the cost difference, just to give you two

5    examples:  The cost difference, by viewing it on a watershed

6    approach for phosphorous, if you have non-point sources, the

7    cost of controlling phosphorous in non-point sources was $9.64

8    a pound.  And if you did it at the wastewater treatment plant,

9    it was $165 a pound.  This isn't rocket science to figure out.

10    We ought to be doing something a little bit different.

11        The same thing is true for total suspended solids.

12    Best management practices in non-point controls was .008 cents

13    per pound.  One -- eight thousandths of a penny per pound for

14    controlling it on a non-point program, or $4.61 if you were

15    going to do it at the municipality.  And we're -- that's what

16    we're doing right now at municipalities.

17        And we're spending millions of dollars, and we have

18    thousands of pounds of unregulated sources, or other sources,

19    that, as we're putting together our permits, and they do waste

20    load allocations, a lot of people are just attributing --

21    these are background sources.  They're not controllable,

22    they're naturally occurring, which means we don't have

23    control.

24        You heard Mr. Miller explain how storm water picks

25    up these pollutants.  It picks them up not only from the land,

1   but from the air.  The biggest source of mercury problems in

2   the Great Lakes is air deposition, not the Detroit wastewater

3   treatment plant, or most DOTWs.  Not that there's not a source

4   of mercury there that -- that we should be looking at getting

5   at, but not spending billions of dollars for mercury control

6   in the City of Detroit when 50 to 80 percent of it's coming

7   from airborne sources that Steve Gordon can't control.  The

8   federal government can't, their sister agencies can do it.

9           There are obstacles, and I don't want to minimize

10  the obstacles in getting into TMDLs.  Some of the obstacles to

11  doing it, and it's important to realize, are significant.

12          Data is the most significant.  Data is the most

13  numerous on the Rouge.  And we have an opportunity, I think,

14  to work together, and to try to use that data in a community-

15  based program.

16          The watershed approach has pointed out, ·and the new

17  watershed approach -- and I think the things that the State

18  and EPA are saying -- the absolute need to have local

19  stakeholders involved in reiterated in this paper, that the

20  core of the watershed approach is the use of a geographical

21  and resource-based coordination linking water resources with

22  watersheds and the people who live in them.  The watershed

23  approach can be thought as a process to reach a geographically

24  prioritized action plan for protecting and enhancing water.

25  The process examines the comprehensive range of issues

1   affecting the resources and the inter-connectedness between

2   them.

3          Watershed approach emphasizes integrating management

4   through two main concepts:  First, stakeholders are central to

5   decision-making process, not Lansing or Washington, the

6   stakeholders in the local area; and solutions are

7   geographically and resource-based, and reflect an array of

8   factors insecting the area.

9          So, to that end, your Honor, I will conclude my

10  remarks, in that limited enforcement, so far as we've talked

11  -- as I've heard in the presentation, the DNR is going to be

12  -- is amenable to that.

13         And we've seen the limited enforcement at the

14  Downriver Wastewater Treatment Plant.  We've seen it at the

15  City of Detroit.  We've seen it in some other instances where

16  we have wet weather problems that are being characterized much

17  differently, and we're spending millions of dollars, and it's

18  not put into the patterns of what's happening in the

19  watershed, and what's going to use, really be the long-term

20  use and usability of those rivers, and how are you involving

21  the pubic, who's paying for these now, almost 100 percent at

22  the local level.

23         Thank you for the opportunity to comment.

24         THE COURT:  Other questions?  Yes, sir?  Do you want

25  to make a comment?

1    MR. McINTOSH:   I wanted to clarify a point Mr.

2    Murray brought up, because he's lumping storm water control

3    and -- and CSOs together, and I wanted to be clear about our

4    approach on that, because CSOs involves the discharge of raw

5    sewage into our waters.

6         We're involved in several non-voluntary, very much

7    enforcement and compliance actions on CSOs.   You know, we

8    already know about all the Rouge projects, but the Chaptin

9    (ph. sp.) and Martin (ph. sp.) basins in Macomb County, we're

10   going to be coming out with a new permit for the Twelve Towns

11   (ph. sp.) basin.   I just wanted to separate -- to help people

12   understand that we are involved in several enforcement

13   actions, and we're not -- obviously, we love people to

14   volunteer to comply, but when they -- when they don't, and

15   especially in these types of situations where CSO is involved,

16   we're taking very strict non-voluntary actions.    ·

17        THE COURT:   Are there questions to the agency heads

18   here from folk in the audience?   If so, just approach the

19   lectern here, and ask your question.

20        MR. WILLIAMSON:   Judge Feikens, Dr. Bulkley, I'm

21   Ralph Williams, a citizen from Livonia.   I would like to urge

22   that this effort be directed toward getting results.   What we

23   see is a situation that doesn't -- didn't follow normal

24   procedures.

25        Basically, you should have -- we should have started

67

1   out by finding out where the pollutants are, defining them,

2   and then coming up for the plan to set priorities on that.

3        What we see is something that, in cases of wet

4   weather demonstration project, we're told there may be no

5   results.  We're told also, by the DNR, that this is voluntary.

6   And from my observations, we've seen a lot of cases where we

7   built the retention basins without really understanding what

8   the benefits would be.

9        We also have funded many consultants to conduct

10  projects which, in some cases, were only peripheral to

11  cleaning up the Rouge.  Others were basically collating

12  reports from the public library.

13       I just think that, if we would direct it, as has

14  been talked about here, that let's set standards, let's

15  quantify things, and enforce it.  And I think it would go

16  along way, Judge Feikens.  Thank you.

17       THE COURT:  Any other questions?  Mr. Moon, did you

18  want to say something?

19       MR. MOON:  Yes, sir.  I think it's sort of specious

20  to say that we're dealing here in the Rouge River watershed

21  with voluntary actions, as long as this litigation is pending,

22  and as long as we're sitting here on this bench.  I think

23  "voluntary" is not the real term to use.

24       I don't know whether it's significant anyway if you

25  do.  I think that the Court is faced with a situation in which

1  it has an action before it which is asking for action, and I

2  don't know that that can be truly called voluntary.

3        The Court also has before it, I think, a situation

4  of, if we act, against whom do we act?  Who -- who is there

5  before the Court that could solve this problem by itself?

6        I think perhaps the State can, but I think that's

7  somewhat remote.  I think the reason for talking about a

8  watershed is that a watershed entity can solve the problem, in

9  the sense that it includes everything in the watershed.

10 Everything that happens in the watershed is -- is limited by

11 the watershed.  There is no single municipality or group of

12 municipalities in the watershed who can be forced to act

13 effectively.

14        I think the role of the State and the EPA is to

15 make it possible for somebody that's here involved in this

16 litigation to act in a way which will result in water quality,

17 and that -- that entity isn't here.  And the Court has been

18 really struggling to try to help to create an entity, or to

19 encourage the thoughts along the line of creating an entity.

20 And that's, it seems to me, what the regulatory people should

21 work at.

22        They say that they want to -- that the course they

23 take is to achieve the standards to -- to achieve standards

24 can be influenced by local interests, but how's the -- how are

25 local interests going to express that influence, unless they

69

1    have some entity that has jurisdiction over the watershed in

2    order to express them?

3      It's fine for Livonia, or for Detroit or Birmingham,

4    and so on, to express their local interests, but what they do

5    won't help other areas.  And also, what other areas do will

6    prevent them from arriving at water quality.  Livonia can't

7    attain water quality, as long as there are a lot of

8    communities upstream from it in the watershed.

9      And then, the last thing, which I think the State

10   traditionally has helped on, and is going to have to help

11   again, is how do you fund these things?  And I think it may

12   require legislation, or it may require -- certainly, it

13   requires the creation of an entity who can deal with people on

14   the basis of benefit, and can decide who benefits, and who

15   doesn't benefit, and -- and then develop the allocation of

16   funding on the basis of benefit.

17     And, again, unless you have all of the watershed

18   involved in the decision, it isn't going to be an enforceable

19   decision.

20     So I think my understanding, in my discussions with

21   the Court is, we're trying to find somebody that the Court

22   could look to and say, "This is the way it has to be done," or

23   "You have to do it," rather.

24     THE COURT:  Yes, ma'am?

25     MAYOR CANFIELD:  I guess, ultimately, that's what

70

1   the -- probably all of the people who are sitting in the room

2   are thinking about, is, if you do this on a watershed basis,

3   and if it's going to benefit us all by doing it on a watershed

4   basis -- and I'm talking about cost-wise -- then, I think

5   probably most people are at least willing to kind of listen to

6   the concept.

7           But I've attended a number of meetings that -- a

8   group that Mr. Murray is chairing, I guess, is handling, and

9   to decide exactly where we want to go with storm water

10  control.  And I have, I think, made it relatively clear to

11  everybody that if we can take care of it with best management

12  practices, and by that, I don't mean building retention basins

13  -- I like the .8 percent, or something or other he was talking

14  about a lot better -- if we can do those kinds of things, and

15  by cleaning our streets more often, by cleaning catch basins,

16  by those type of things, then we're willing to do a certain

17  amount of it.  It looks like we don't have a heck of a lot of

18  choice.

19          But for -- like example, in the CSO project, we have

20  no idea how much of Detroit's clean-up we're going to pay for.

21  We have no vague idea.

22          In my bill, I just wrote the MDEQ, and sent copies

23  to everybody I can think of, to let them know that, at this

24  point, without interest, our bill is somewhere around from

25  like $120 to $140 million.  That's without storm water.

71

1   That's without doing anything for the storm water.   I -- I

2   really, really can't afford it.

3           And when you're talking about time frames, and

4   you're spreading this over -- I think it's by the year 2005

5   all of the CSOs have to be something done about them, and then

6   I think there was something about 2001 for some permits or

7   something to be in place for the storm water -- you're talking

8   big money that I don't think anybody here can afford.   I don't

9   care how wealthy they are.   It doesn't matter.

10          I don't care how much money their city has.   I don't

11  think they can afford it.   And I know Dearborn Heights cannot

12  afford it.

13          So it does -- that, ultimately -- and I can't speak

14  for everybody -- but ultimately, it does come down to cost for

15  me.   And when you're talking about implementing one more way

16  to clear -- clean up the water, I'm just overwhelmed.   I am

17  truly overwhelmed.

18          I'm not opposed to clean water, to having clean

19  water.   Like I've said before, I mean, that's un-American or

20  something, to say you want dirty water.   It's ridiculous.

21          But there has to be a long enough time frame that

22  the people can afford to pay for it.   There has to be some

23  contributions from the federal government.   There has to be

24  some ways that the federal government is going to fund the

25  State for SRF monies, or there has to be a number of things

1  done before we can afford to take on any more than we've

2  already taken on.

3  We can't afford to take on what's already being

4  mandated that we do, what we already have permits that we have

5  to do, what there are already lawsuits telling us we have to

6  do. We cannot afford to do that.

7  So now, if you add storm water, I truly do not know

8  what will happen. So unless they can do it with things that

9  we are already, in many cases, in many cities, have already

10 put into place, if we put in new buildings, we manage

11 retention ponds, if we -- we try to -- we've just bought five

12 new sweepers to clean our streets and make sure we do a better

13 job of that.

14 We clean our sewers on a regular rotation basis, and

15 we try to do the things that we can do to improve it. We have

16 one of these clean neighborhood programs going on in the City

17 of Dearborn Heights. We will do what we can to assist.

18 But I -- I'm going to state it as clearly as I know

19 how: You have reached, and over-reached what Dearborn Heights

20 can afford. So, thank you.

21 THE COURT: Dr. Bulkley, your views as to the next

22 meeting?

23 DR. BULKLEY: Your Honor, it seems to me several

24 points to consider. First, again, I want to thank the

25 representatives from the federal government, from the state

73

1   government, who I think presented a very complete presentation

2   for the benefit of all of us this morning.

3            And as the Court indicated, this is really the third

4   meeting.  We had a first meeting back in April, where we laid

5   out just an overview of the problem.  We had a meeting in May,

6   at which the technical aspects of the water quality issues, at

7   least a portion of them, were fully presented by the Rouge

8   Program Office.  And now we've had a very full and, I think,

9   frank discussion with regard to the regulatory requirements

10  that are applicable to the surface water in the Rouge basin.

11           Your Honor, it would be my suggestion that we

12  consider the fourth meeting roughly a month from now, and

13  we'll pick a specific date, but to now consider, well, how do

14  we proceed on institutionally addressing and bringing these

15  issues together?

16           One proposal had been placed on the table, and that

17  has not generated a great deal of support.  It was done on a

18  good faith effort.

19           But there are some experiments underway.  It's my

20  understanding that there's some sub-watershed activities

21  ongoing in the Rouge, through the Rouge Program Office, and it

22  may be appropriate to have a report on the -- those

23  activities, and how they may grow or be utilized to address

24  this watershed approach.

25           Also, I think it's very timely, it was brought up

74

1  about the Rouge Remedial Action Plan that's in place, being
2  implemented, and it may be very instructive to have a report
3  on how that plan fits into this whole activity, and how that's
4  institutionally being undertaken.

5  So I think it would be timely to now begin to have
6  the group as a whole consider these institutional approaches.
7  And if it's to be a voluntary approach, how might that take
8  place?

9  Or perhaps a community's wish to volunteer to come
10  together in some way that has not been considered, and that
11  would presumably generate the support of the state and federal
12  agencies.  So I think that that would be the next step, your
13  Honor.

14  MR. MURRAY:  I ask, your Honor, Dr. Bulkley, if we
15  could add to that, also, maybe a presentation by the State on
16  how they feel water quality standards will be achieved in the
17  river, and how they're going to apply -- I know we have
18  federal law operating here, but we also have state law, and
19  how they're going to apply our permits for -- for combined
20  sewer overflow do two things.  One, we're supposed to be
21  completed with most of the construction by 1998/97, have a
22  study, and then, discuss how we're going to go into phase two
23  to meet public health protection.

24  But we also have to write a -- a plan on how we're
25  going to meet water quality standards, and I know Detroit has

1  an earlier date to write that.

2         And we could spend millions of dollars doing that if
3  we don't have any clear direction on what -- what do they mean
4  on how that's implemented, and how that's achieved, and who is
5  responsible for it.  I mean, is Detroit going to write what
6  Dearborn Heights is responsible for?  I don't think Dearborn
7  Heights wants them to write that.

8         Maybe Dearborn Heights wants to write what Detroit's
9  responsible for, or we'd be happy to do parts of that, too.
10  But -- or what the State's responsible for.  I'm sure we could
11  all come up with some things for them to do.

12         But without being facetious, I think we need some
13  clear direction, because our permits mandate that we do that,
14  and that we give them an approveable plan.  And I'm not sure
15  what it is that we should write or direct our consultants to
16  do, and how we go about doing that.

17         And I think, your Honor, Mr. Bulkley, if we could
18  have the State give us a presentation on, Is the river going
19  to meet water quality standards, in their estimation?

20         I know the Huron River, which I know to be in much
21  better shape than the Rouge River, because I've been involved
22  in both of them, that's already on the non-attainment list in
23  the state of Michigan.  The Rouge is not.

24         They are starting to do TMDLs on phosphorous in the
25  Huron River, but we're not even talking about how we do that

76

1    in the Rouge River, or any other kind of pollutant of concern,

2    and we have data that says there are pollutants of concern in

3    the river.

4              So maybe they can explain to us what that process

5    entails, what are the opportunities under TMDLs.  I have some

6    papers that I'm willing to give to them, and how they've been

7    used in other parts of the country.  And how we can generally

8    get stakeholder involvement.  And what are community-based

9    environmental programs, and how do we go about allocating that

10   amongst ourselves, as difficult as that is.  The Downriver

11   communities are struggling with that.  And I think that

12   they're going to achieve that, some time this Court has to

13   help them a little bit.  But that's what we're on about.

14             THE COURT:  In -- in response to your suggestion,

15   I'll ask Dr. Bulkley to confer with the state regulatory

16   agency officials to address your question.

17             MR. MURRAY:  Thank you, your Honor.

18             DR. BULKLEY:  Yes, sir?

19             THE COURT:  Mr. Gordon?

20             MR. GORDON:  Your Honor, Steve Gordon, Director of

21   Detroit Water and Sewerage.

22             I think along that line, I would support Jim's

23   approach.  One of the things I would ask is, we keep hearing

24   about the swimmable, fishable goal.  And it seems to me that

25   the State, and most states, have taken the approach where,

1   there's some pollution here, and so you take care of this, and

2   some pollution there, and you take care of this.

3           It might be interesting to have them -- to take the

4   swimmable, fishable goal, and work from that way back.   In

5   other words, they have no -- that's where we're supposed to

6   end up.   How does that generate from the programs where we

7   are, given the time zone.

8           That is -- is something that would help, I think, a

9   lot of municipalities, in that part of the problems that we

10  see is that we make huge capital investments to solve the

11  problems that are immediate.

12          And then you turn around, and you see the next set

13  of rules that you have to comply with, and had you known that

14  at the time, or had you understood what those regulations

15  were, you may have made those investments in a totally

16  different way that would have solved all the -- all the

17  problems that they're bringing forth at that time in a more

18  economical way.

19          And so by having that kind of understanding, you

20  then begin to understand what the goal is from the top down,

21  not from the bottom up.   And that, to me, we need to have both

22  ends of the spectrum understood.

23          The other thing I would suggest to you, and -- is

24  the Safe Drinking Water Act is now getting into the area of

25  water quality, and watersheds.

78

1          Now, granted, you have to have a water utility

2     taking water from the watershed to be in compliance, but the

3     new Safe Drinking Water Act that is being promulgated as we

4     speak, is coming forth -- and it looks like it will pass --

5     has a watershed area in it.

6          Those things are of concern.  The industry is no

7     longer looking at just the raw water intake.  It is looking

8     beyond just the watershed, it is looking at the total water

9     management.

10         And that takes into this account, as Jim mentioned

11    -- and we have a concern of -- of air deposition.  Things that

12    we can't control, but we need to understand.

13         So I think, as what we're proceeding from is

14    something that the treatment plants and communities and the

15    end of pipe was looked as, that's the solution.  Well, it's

16    not the end of -- it's not the solution.

17         Those plants are the solution to all the problems

18    that they've been given.  And as we work back up, and take a

19    watershed approach, you'll find, for example, the phosphorous

20    answer is at each place that you turn phosphorous into the

21    environment.  And it's a lot cheaper to handle it there.

22         So I think we're on the right track.  My concern is

23    that we don't know where we're supposed to end up with all the

24    programs we've got, and we need that kind of investigation.

25         Thank you.


                              79

1      THE COURT:  Anyone else?  If not, then, a new date,

2  a new meeting date will be set and an agenda will be prepared,

3  and you will all be notified.  If there are no further

4  comments, we'll stand in --

5      MR. MURRAY:  Shall we set the date now, your Honor?

6  Is that possible, while you'd have the main folks here at the

7  beginning?

8      THE COURT:  Dr. Bulkley, would you like to suggest a

9  date?

10     DR. BULKLEY:  I would suggest Tuesday, July 16,

11  10:00 A.M.  We've been meeting on Tuesdays.

12     THE COURT:  So be it.  Tuesday, July 16 at 10:00

13  A.M, and we'll send out notices and an agenda.  Thank you all

14  for coming.  We'll be in recess.

15     (At about 12:05 P.M - hearing concluded.)

— — —

I certify that the foregoing is a correct transcript of the
proceedings held in the above-entitled matter.

DATED:   June 27, 1996

Lynn L. Spietz, Transcriber

80