UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



FILED
JAN - 5 2006
CLERK'S OFFICE
DETROIT

UNITED STATES OF AMERICA,

    Plaintiff and Counter-Defendant,

vs.

Civil Action No. 77-71100
Honorable John Feikens

STATE OF MICHIGAN,

    Defendant and Cross-Plaintiff
    And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT,

    Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES,

et al.
_____/

## OPINION AND ORDER DENYING OAKLAND COUNTY'S MOTION TO REPLACE DWSD'S COURT APPOINTED SPECIAL ADMINISTRATOR FOR LACK OF JUSTICIABILITY

On September 26, 2005, Oakland County filed its Motion to Replace the Detroit Water and Sewerage Department's (DWSD's) Court-Appointed Special Administrator, Mayor Kwame Kilpatrick, with a Joint Management Committee. I GRANT the motions by Macomb County, Oakland County, and the City of Detroit to exceed our normal page limits for briefs, responses, and replies, and I accept the City of Warren's amicus brief. No other party – of whom there are dozens – nor any other individual has submitted anything to this Court regarding this motion.

Because of the relatively small interest the vast majority of the parties appear to have in this matter, as well as the extensive briefing by the few parties that do seem concerned, an oral hearing on this motion would not be useful. Local Rule 7.1(e)(2).

Of paramount importance to my analysis of the motion, I point out that there are two cardinal laws central to the dispute between the Detroit Water and Sewerage Department (DWSD), the United States, the State of Michigan, and all communities in south-eastern Michigan[1] to which DWSD provides water and from which waste-water is removed: <u>a federal statute, the Clean Water Act of 1972, and Article 7 of the Michigan Constitution, adopted in 1961</u>.

The Clean Water Act requires sweeping changes in the ways wastewater is collected and treated, which dramatically affects the quality of water. It also requires that complex permits be obtained from the federal Environmental Protection Agency (the EPA) controlling the ways in which the goals of the statute wold be met. In 1977, when the EPA began its enforcement action against the State of Michigan, the City of Detroit, and DWSD, I became aware of my need to determine how the Clean Water Act impacted the state Constitution's provisions regarding cities in both owning and operating water and sewer treatment systems. Those two laws remain essentially the same today, as do the conflicts between the parties, and I keep this overlying framework in mind when analyzing these disputes.

I note that all those who have made submissions to this Court implicitly recognize my power to entrust to anyone of my choosing the office of Special Administrator. As discussed below, a review of the facts indicates that under Mayor Kilpatrick's Special Administratorship,

---

[1] The case was assigned to my docket and I added all communities under contract with DWSD for sewerage services.

DWSD's compliance has improved dramatically, such that the position of Special Administrator (which is akin to a receiver) is not necessary at this time. Therefore, because I am ending the position of Special Administrator for the present time, I DENY the motion to replace Mayor Kilpatrick as Special Administrator for mootness. As for the remaining requested relief, I DENY the motion because the requests for relief are not ripe.

## FINDINGS OF FACT

### I. History of the Consent Judgments and Special Administratorship

In 1977, the parties to this case entered into a Consent Judgment, but less than a year later, it became clear that compliance would not be achieved easily or quickly. In 1979, I created the position of Special Administrator, because I found that compliance with the Consent Judgment the parties had negotiated, required the exercise of this court's equitable powers. (Opinion of March 21, 1979, Case No. 77-71100, slip op. at 8.)

On March 21, 1979, I selected the Mayor of Detroit to be Special Administrator, stating as my reason for selecting him is that when exercising the federal government's power under the U.S. Constitution to override a State's or City's choices regarding its governance, the doctrine of the separation of powers meant that "great care must be taken to reach a balance that does not summarily deny to such local government the full exercise of its authority over its affairs." (Opinion of March 21, 1979, Case No. 77-71100, slip op. at 8.)

Shortly thereafter, the first amendment to the Consent Judgment was signed, and DWSD operated under it for several years. During those years, I sometimes temporarily suspended the Special Administratorship. When compliance with the Clean Water Act or the Consent Judgments in this case was at risk, however, I have revived the Special Administratorship and again given the Mayor of Detroit the power to swiftly take the necessary actions to achieve

3

compliance. No party has ever objected to my decision to create or suspend the post based on the record of compliance, nor does the current motion challenge that rationale.

## II. Facts Regarding Municipal Government Structure and the Michigan Constitution

The City of Detroit owns the water and sewer system which it operates through DWSD, and thus provides water and sewerage services to its inhabitants. DWSD sells and delivers water and provides sewage disposal services outside of its corporate limits to a large number of willing buyers now numbering nearly four million inhabitants outside the City of Detroit..

The State of Michigan's Constitution, Article 7, §24 reads: "Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facility for supplying [...] water [and] sewage disposal [...] to the municipality and the inhabitants thereof." It continues: "Any city [...] may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village[.]" Id. (emphasis mine.) The State of Michigan's Constitution, Article 7, §34 reads: "provisions of this constitution and law concerning [...] cities [...] shall be liberally construed in their favor."

## III. History of the Kilpatrick Special Administratorship

In 1998, the State of Michigan, in tandem with the EPA, issued a notice of violations of DWSD's permit to operate the sewage plant (permit no MI 0022802). (See Order of Feb 7, 2000, case no. 77-71100, slip op. at 2.) At that time, I appointed a committee to investigate why, after so many years of court oversight, the plant was not able to remain in compliance with federal law and state law. Id. In January of 2000, the committee issued a report, which found that many causes of that non-compliance existed for at least three years. Id. Some short term, unsustainable measures were taken to bring the plant into technical compliance, but it was clear

4

to me that once again, a Special Administrator, vested with the equitable powers of the federal court, would be necessary to bring DWSD into long term compliance. Id. at 3.

When Mayor Kilpatrick came into office, I named him Special Administrator. In two key actions, Mayor Kilpatrick, acting as Special Administrator, ordered both the hiring of Victor Mercado as DWSD's director, and the Infrastructure Management Group, a national corporation based in Maryland, as consultant to DWSD.

## IV. Key Performance Measures During Kilpatrick's Special Administratorship

### A. *Performance of Director of DWSD*

The Wastewater Treatment Plant has not violated its National Pollution Discharge Elimination System (NPDES) permit during Mercado's tenure. I attach hereto and make a part hereof a letter from Phil Argiroff, P.E., Supervisor of Public Wastewater & Drinking Water Unit, Water Bureau, Southeast Michigan District Office, as an Appendix to this Opinion. It speaks for itself. Construction work and other projects required to comply with federal and state law has proceeded largely on schedule. Update to DWSD's Plan for Long-Term Measures to Ensure Compliance with Permit Requirements, Nov. 1, 2005. When difficulties have arisen, Mercado has promptly alerted this Court to any potential problems and reported on his efforts to solve those problems in regular oversight meetings. The formal reports required by the Consent Judgment's have also been completed in a timely fashion. Id.

Mercado has cut DWSD's operating budget by approximately 10 percent without having a negative impact on compliance. Consequently, the increases in water rates during Mercado's tenure have been relatively small, especially in comparison to previous years. DWSD's water and sewerage rates are among the lowest in the nation despite the cost of many required improvements. The reduction in rate increases also has not impeded DWSD's current

compliance with federal and state law. Moreover, the reduction in rate increases has not impeded DWSD's ability to comply with federal and state law in the future, in that DWSD's bond ratings have remained good.

Mercado has proven himself capable of executing the necessary projects to comply with federal and state law while keeping costs low. The ability to keep costs low without jeopardizing DWSD's services is key to the long-term success of DWSD's compliance, because DWSD's difficulties in maintaining compliance with federal and state law has been exacerbated by the continuing controversies over rate increases resulting from heavy infrastructure requirements.

Mayor Kilpatrick has used his Special Administratorship to extend Mercado's contract through the end of 2006.

### B. Infrastructure Management Group's Performance

Significantly, the Infrastructure Management Group (IMG) has assisted Mercado and this Court by providing evaluations of DWSD's contracts and noting opportunities for increased efficiency. Increased efficiency is key to the long-term success of DWSD's compliance, because it helps to ensure that the Consent Judgment's requirements are carried out speedily and at the lowest possible cost. IMG's recommendations have provided vital assistance to this Court in its oversight of compliance activities. For instance, its aid in preparing new template language for "model" contracts is a key step forward toward long-term compliance.

### C. Progress Summary

Thus two key decisions by Mayor Kilpatrick, acting as Special Administrator, the hiring of Mercado and IMG have resulted in significant progress toward compliance with the Clean Water Act. There have been no permit violations, there has been good progress on the

construction of mandatory projects, and financially DWSD is in a position to continue compliance. Under Kilpatrick's leadership, DWSD is now making steady progress toward long-term compliance and the end of this Court's oversight.

## V. Disputed Contracts

The motion also asks for relief regarding several contracts approved by Mayor Kilpatrick as Special Administrator, focusing most strongly on a contract for a regional communications system. All the contracts mentioned were the subject of press reports, which the motion cites. At the time the first press reports regarding these contracts were published, as part of my oversight, I asked this Court's Special Master, F. Thomas Lewand, to investigate each contract and make a report and recommendation to this Court. This investigation is nearly completed.

## VI. The Consortium

The decision of the Rouge River communities in Southeast Michigan to create a forum that successfully handled disputes regarding water quality infrastructure and rates outside of the litigation process marked a turning point in their compliance. Because of its effect, namely, a new commitment to long-term, stable compliance with pollution laws, it paved the way for ending court oversight. United States, et al., v. Wayne County, et al., Order Approving Joint Motion to Terminate the Consent Decree, slip op. at 3 (E.D. Mich. Nov. 28, 2005).

Additionally, in 2001, I invited 40 civic and governmental leaders of Southeast Michigan to become a consortium to address water quality problems. See Order Defining the Role of the Southeast Michigan Consortium (case no. 77-71100), 261 F. Supp. 2d 906, 910 (E.D. Mich. 2003). Participation in the Consortium or in any solution it recommends is entirely voluntary. See United States, et al. v. Wayne County, et al., 280 F. Supp. 2d 726, 728 (E.D. Mich. 2003). Leaders in the business community, the nonprofit community, and from local governments have

7

donated their time to the Consortium, and worked toward resolving disputes and made recommendations for measures that help achieve long-term compliance with the law. This Court is grateful for their extensive service and encouraged by the progress reported at meetings.

**CONCLUSIONS OF LAW**

**I. Justiciability: Mootness and Ripeness**

Even if no party raises issues of justiciability, this Court has a responsibility to examine whether the parties before it are raising a justiciable claim. North Carolina v. Rice, 404 U.S. 244, 245 (1971); Metropolitan Washington Airport Auth. v. Citizens for Abatement of Airport Noise, 501 U.S. 252, 265 n.13 (1991). To avoid dismissal for mootness, an "actual controversy" must be present, and a court must be able to provide a remedy. Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (quoting Steffel v. Thompson, 415 U.S. 452, 459, n. 10 (1974)); Church of Scientology of CA v. United States, 506 U.S. 9, 12 (1992).

Courts must dismiss a case for lack of ripeness unless the Complaint regards an existing and substantial controversy, and not a hypothetical question or possibility of harm. Dixie Fuel Co. v. Comm'r of Social Security, 171 F.3d 1052, 1057 (6th Cir. 1999) (quoting City Communications Inc. v. City of Detroit, 888 F.2d 1081, 1089 (6th Cir. 1989)). In determining whether a claim is ripe, the Sixth Circuit has considered the following factors: "(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and, (3) hardship to the parties if judicial review is denied." Norton v. Ashcroft, 298 F.3d 547, 554 (6th Cir. 2002) (citing Adult Video Ass'n v. US, 71 F.3d 563, 568 (6th Cir. 1995). See also National Park Hospitality Assoc. v. Dept. of the Interior, 123 S.Ct. 2026, 2030 (2003); Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967) (rev'd on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977)).

8

## II. Special Administrator

As a federal judge, I have a power denied to the Michigan legislature and other officers of Michigan's government: the power to override the Michigan Constitution and other state law. The Supremacy Clause of the U.S. Constitution allows me to do this when it is necessary to enforce federal law, which includes the Consent Judgment and its amendments. United States Const. art. VI, ¶ 2. The appointment of a special administrator with the ability to exercise those powers is appropriate when it is "a valid and reasonable means to ensure the dual goals of prompt, meaningful, and full compliance" with the current Consent Judgment and the goal of "extrication of the federal judiciary from the management of state governmental functions." Glover v. Johnson, 934 F.2d 703, 725 (6th Cir. 1991). The Sixth Circuit also teaches the need to ensure that there is "no less intrusive means of bringing about compliance" when appointing a special administrator. Id. at 714.

I have been concerned about the potential intrusiveness of creating a special administrator for DWSD, and thus, when exercising that equitable power, I have respected the principles of our federal system that emphasize the integrity retained by each State, and thus local, government and the respect owed to it by federal authorities. See, e.g., Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 41 (1994); Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993); City of Trenton v. New Jersey, 262 U.S. 182, 186 (1923) (municipalities are subdivisions of state; "within the limits prescribed by the state Constitution," power to own and operate waterworks is frequently conferred by states on municipalities). That doctrine requires me to give weight to the decision of the people of Michigan, expressed in the Michigan Constitution, about the structure and ownership of their government and the place of home rule within it.

9

The plain language of the Michigan Constitution vests the power to operate the Detroit Water and Sewerage Department, both within and outside City limits, with the City of Detroit. Mich. Const. Article VII, § 24. Even if there were any doubt about how to interpret Article 7, § 24, the Michigan Constitution instructs courts to construe that provision liberally in favor of the City of Detroit. Article 7, §34.[2]

In an attempt to balance the need for DWSD to comply with federal law and with the Michigan Constitution's clear statement that ownership and control of the system belongs with the City of Detroit, I chose to create the position of Special Administrator and place the Mayor of Detroit in that role. United States v. City of Detroit, et al., Case No. 77-71100, slip op. at 8 (E.D.Mich. March 21, 1979). The appointment of a Special Administrator is for the express power of allowing him to override the City's charter when necessary to effectuate speedy compliance.[3]

Any decision to allow suburban leaders a measure of control over the Detroit Water and Sewerage Department requires me to use federal power to permit what state law forbids. See U.S. Const. art VI 2. Such an exercise of power would show little respect for the choices of the people of Michigan, and would only be appropriate when the need for a Special Administrator is

---

[2] Read together, these provisions give definitive control of DWSD's operations to the City of Detroit. Even if the lack of court decisions interpreting this provision rendered this an unsettled question (which I do not believe it does given the plain language), and I had to predict how the state's highest court would rule, I can find no legal basis whatsoever for reading these provisions to do anything other than give exclusive control of DWSD operations to Detroit. Mills v. GAF Corp., 20 F.3d 678, 681 (6th Cir. 1994) (when state law is unsettled, a federal court must predict what the state's Supreme Court would rule).

[3] Macomb asserts that the Special Administrator's power is limited by the terms of the Detroit City Charter, and in support of this position, cites the City Charter. (Br. in Supp. 20. ("Therefore, the powers of the Mayor, including those actions taken in his role as Special Administrator, are limited by the terms of the Detroit City Charter.")) This assertion is in error. A federal court does not rely on state law for its powers; on the contrary, the United States Constitution allows the federal government to override state law when necessary to effectuate compliance with federal law. E.g., BFP v. Resolution Trust Corp., 511 U.S. 531, 546 (1994). Thus, the legality of actions taken by this Court's Special Administrator depends solely on congruence with federal, not state or municipal, law.

10

acute and the probable outcome of such an appointment significantly speeds compliance with federal and state water and anti-pollution laws.

Here the facts show a rapid improvement in the operation of DWSD such that the Department is successfully completing or attempting to complete its responsibilities under the Consent Judgments, and, although more work remains, is well on its way to achieving compliance with the Clean Water Act. I find that compliance with federal law no longer regularly requires urgent action. Therefore, I TERMINATE the Special Administratorship, because it is not needed at the present time. As the termination of the Special Administratorship renders the controversy over who this Court selects to fill that role <u>moot</u>, I DENY the motion.

I note that nothing in this Opinion and Order prevents the Mayor of Detroit from requesting that this Court again exercise its own equitable powers, should an urgent situation arise that requires the override of the Cities' charter to effectuate compliance with the Consent Judgment.

## II. Disputed Contracts

Much of the requested relief in the motion deals with contracts that this Court's Special Master is in the process of investigating. The City of Warren and Macomb County have emphasized the need for an evaluator independent of the City to examine those contracts. (City of Warren's Resp., 4; Macomb County Br. in Resp., 2.)

The Special Master is independent of the City, and is in the process of researching and preparing a report for the Court on the contracts at issue. The wide-ranging and at times unspecific briefs indicate that all parties and this Court would benefit from having a clear report and recommendation from the Special Master regarding these contracts. Any specific points that

might remain could then be brought at that time in the normal procedure, i.e., in the form of objections to the Special Master's Report and Recommendation.

In other words, consideration of these issues would greatly benefit from the additional factual development by the Special Master that is underway. The look-back procedure can be used to address any overcharging of the rates, and therefore, there is little hardship to the parties of delaying action until the Special Master can make his reports and recommendations and this Court can act on them. Therefore, because further factual development is needed and the look-back procedure can remedy any hardship, I find the remaining issues in the motion are insufficiently ripe, and DISMISS those claims for lack of justiciability.

## III. Southeast Michigan Consortium for Water Quality

DWSD's long-term compliance with federal law would be better assured if the water quality leaders of this region could develop a process for working out difficulties between DWSD and its customers outside of the litigation process. Although the State Constitution places the right to own and operate the system solely in the hands of the City, the City voluntarily agreed to participate in the Consortium, as did a wide variety of other leaders, including those who represent DWSD's largest customers. I have encouraged this venue for customer participation in hopes that this forum would accustom all the region's leaders to working together to achieve compliance with pollution laws.

None of the dozens of parties nor the amicus assert a lack of progress by the Consortium, other than the movant. My own observations convince me that the Consortium has made progress on key issues. That noted, I will not continue to ask talented leaders in our region to devote their energies to the Consortium unless there is optimism that this is a venue in which further progress can be made. To that end, I request that Timothy O'Brien, the Consortium's

working chairman, and either Charles Hersey or Paul Tait, SEMCOG's officers, who have provided key staff support to the Consortium, report to me on their views of the progress that has been made thus far and what issues remain to be addressed.

**CONCLUSION**

DWSD's record of compliance has improved markedly in the last few years. This means that no Special Administratorship is necessary at the present time. Because no Special Administratorship is presently in existence, the motion to replace the Special Administrator is therefore moot and must be DENIED. The portions of the motion regarding various contracts are not ripe, and must be DENIED. **IT IS SO ORDERED.**

Finally, I look at the long running series of disputes between the City and its customers in their broad historical and legal context. The City of Detroit facilitated the growth of this region when it expanded its sewer and water systems far beyond the bounds of the City at the same time that the Eisenhower administration in the 1950's began building our interstate highways in Michigan.

Now, a half century later, Detroit through the Detroit Water and Sewerage System has built a substantial regional complex which each day and night provides high-quality water to and removes waste water from the homes and industries of over four and one-half million people.

Now, DWSD's system, vital as it is to the health and quality of life in southeastern Michigan, has faced repeated challenges from some suburban communities who are prevented by the state's constitution from having any say in the ownership or operation of DWSD. At the same time, the people of Detroit who provide this valuable service are barred by state law from receiving any financial benefit or profit for doing so. This tension underlies the disputes that continue to come before this court.

This dilemma will not be resolved by legislation or litigation. It demands cooperation on the part of the southeast Michigan communities and the agreement by DWSD to modify the protection given to it by the state's Constitution as a part of a regional settlement.

John Feikens
United States District Judge

Date: January 5, 2006



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
SOUTHEAST MICHIGAN DISTRICT OFFICE



JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR

December 22, 2005

Honorable John Feikens
United States District Court
Eastern District of Michigan
851 Federal Building
Detroit, Michigan 48226

Dear Judge Feikens:

Last year, we offered a brief statement about the construction projects at the Detroit Wastewater Treatment Plant (WWTP) established as essential projects under Section II.D.6 of the Second Amended Consent Judgment (SACJ). The purpose of this letter is to offer an updated statement through 2005. The SACJ required that the Detroit Water & Sewerage Department (DWSD) submit a comprehensive plan for long-term measures to ensure compliance with NPDES permit requirements (Section II.D.3). DWSD's comprehensive plan included the WWTP Program Management contract (PC-744). Under this contract, DWSD conducted detailed needs assessments of the WWTP's primary treatment, secondary treatment, and solids handling facilities, followed by development of needed WWTP improvement projects.

The WWTP Program Management contract resulted in 42 project definition statements. Of these, our office determined that 13 projects were "essential projects" needed to assure compliance at the WWTP. In addition, two projects were combined to form one new project. We have continued to meet routinely with Ms. Louise Lieberman, DWSD, and PC-744 Program Management staff during 2005 to discuss the status of these projects. At this time, construction has been completed for five projects, and the rest of the projects are under construction and on schedule. A detailed list of these essential projects is included as Appendix B2 to DWSD Comprehensive Plan Update, dated October 27, 2005.

In our opinion, the "essential projects" that have been completed or will be completed by the middle of 2006, should significantly help the WWTP ensure long-term compliance with NPDES requirements. We believe that the Court's inclusion of these requirements in the SACJ was most insightful and helpful, and that DWSD's implementation of the WWTP Program Management contract (PC-744) continues to be very effective.

27700 DONALD COURT • WARREN, MICHIGAN 48092-2793
www.michigan.gov • (586) 753-3700
Printed by members of:

Honorable John Feikens
December 22, 2005
Page 2

If you have any questions, please contact me at 586-753-3760.

Sincerely,

*Phil Argiroff*

Phil Argiroff, P.E., Supervisor
Public Wastewater & Drinking Water Unit
Water Bureau
Southeast Michigan District Office


cc:   Dr. Jonathan Bulkley, Federal Court Monitor
      Mr. Gary Fujita, DWSD
      Ms. Louise Lieberman, DWSD
      Ms. Pam Stevenson, DAG
      Mr. Pete Ostlund, DEQ-WB
      Ms. Laura Verona, DEQ-WB
      Ms. Jodi Peace, DEQ-WB
      Ms. Jodie Taylor, DEQ-WB