UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff and Counter-Defendant,

vs.                                                                                                          Civil Action No. 77-71100
                                                                                                                    Honorable John Feikens

STATE OF MICHIGAN,
    Defendant and Cross-Plaintiff
    And Cross-Defendant,

vs.

CITY OF DETROIT, a municipal corporation, and
DETROIT WATER AND SEWERAGE DEPARTMENT,
    Defendant and Cross-Plaintiff,

vs.

ALL COMMUNITIES AND AGENCIES UNDER
CONTRACT WITH THE CITY OF DETROIT FOR
SEWAGE TREATMENT SERVICES, *et al.*

_____

**OPINION AND ORDER REGARDING 800 MHZ
RADIO CONTRACT COST ALLOCATION**

        On December 18, 2006, I issued an order adopting the finding of the Special Master that the approximately $38.8 million paid by the Detroit Water and Sewerage Department (DWSD) to the City of Detroit for its share of the 800mhz radio contract exceeded the amount it should have paid relative to the City of Detroit. Detroit has moved for reconsideration of that decision, and the parties have submitted briefing regarding the proper allocation. As explained below, I find the total charges attributable to DWSD for the radio system total $14,630,000.

**I. MOTION FOR RECONSIDERATION**

        Detroit contends that the Special Master found at the outset that its allocation method was appropriate, and therefore it was inappropriate for this Court to interpret the Special Master's report as finding an improper calculation. (Mot. at 2.) It seeks to have this Court reconsider its

adoption of the finding of improper allocation.

Detroit misstates the Special Master's findings. He stated only that the initial allocation "may" have been appropriate – language Detroit quoted in its motion. However, since Detroit seeks to revisit the Special Master's findings in some detail and precision, I note the Special Master was unequivocal on the point that the Special Administrator's approval of the radio contract was in violation of a standing order of this Court, in that the radio contract was never submitted to the Infrastructure Management Group (IMG) for its review. (Report and Recommendation, 21.) The Special Master also noted that following this Court's order would have resulted in a review of the allocation before the contract was put into place – which I note might have avoided this controversy altogether. I find it very surprising that Detroit wishes me to reconsider the exact findings of the Special Master as to allocation, since that highlights the question of whether this Court ought to adopt his finding regarding disobedience of this Court's order. Despite Detroit's invitation to revisit the report, and because recent oversight meetings demonstrate that DWSD is taking more care in submitting all qualifying contracts for IMG's review, I will not proceed down that path.

I read the Special Master's report as finding that a reallocation of the costs of the radio system ought to be done, and that necessitates the underlying conclusion that the original method of allocation resulted in the Detroit Water and Sewerage Department paying more than its share of the radio system. Therefore, I DENY the motion for reconsideration, and turn to the issues regarding that reallocation.

## II.  STANDING

Detroit argues that Wayne, Macomb, and Oakland counties have no standing to make

filings regarding the radio contract.  (Detroit Br. of January 4, 2007 at 5.)  Detroit's theory is essentially that because the money spent for the radio system would have been spent on other projects that would benefit the counties had the radio contract not been built, there is no effect on the rates.  (Id. at 5-6.)  The lack of effect on the rates, this theory posits, creates an inability of the suburbs to show injury in fact, a requirement explained in cases including Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

This argument is fatally flawed.  At its essence, the radio contract allocation question is a question of whether the DWSD and its customers paid more for the radio system than can be justified given the benefit they receive from the system.  That DWSD would have used the money, or will use any repayment, to fund projects that benefit the paying customers more than the radio system benefits them does not deprive customers of standing; it demonstrates it.  As long as the ratepayers are billed for debt service for a project that insufficiently benefitted them, which is the concern here, those ratepayers are being injured, and therefore meet that requirement for standing.

## III. NON-ALLOCATION ARGUMENTS

In the briefs I requested regarding allocation, the parties make a number of arguments that I do not consider relevant to that question, and I will not address them here.[1]

## IV. ALLOCATION

All parties agree that DWSD paid 60 percent of the infrastructure costs of the radio

---

[1] I will note these arguments range from the reasonable to the laughable (including the suggestion that sewer services are not crucial to restore rapidly in emergency situations, despite the obvious health risks created by either having standing sewage in homes or turning our waterways into sewers).

project, or approximately $38.7 million.  (Detroit Br. of Jan. 4, 2007, 4; Macomb Br. of Jan. 4, 2007, 1; Oakland Br. of Jan. 4, 2007, 2; Wayne Br. of Jan. 4, 2007, 2.)  Before indicating what costs I believe are properly assessed against DWSD, and thus what repayment is needed by the City of Detroit, I wish to make some preliminary observations.

First, any review of these costs indicates an overpayment by DWSD.  One notable example of an unreasonable factor in DWSD's attempted justification of the infrastructure cost allocation is the consideration of operation and maintenance.  (See Field Declaration at 6.)  Operation and maintenance is not considered a capital expense.  See Water Environment Federation, Financing and Charges for Wastewater Systems 28-9 (2004) (discussing operation and maintenance charges as separate from and different from "capital-related budgets."). Therefore, any allocation of radio infrastructure, a capital expense, should not include costs of operation and maintenance of that system, which is handled entirely differently.

On the other hand, it is proper to add to the calculation those costs attributable to the addition of usage by the State of Michigan's Public Safety Communication System (MPSCS).  I understand some suburban customer's argument that because MPSCS is a taxpayer-funded system, and all residents of southeast Michigan are taxpayers, they ought to be allowed to use the state's system for free.  Even if I agreed with the argument, as with many things in life, the fact is that what ought to have happened here and what did happen here are different.  The state government did not agree to allow the City of Detroit and DWSD to attach infrastructure to MPSCS towers, or otherwise benefit from the MPSCS infrastructure, for free.   Instead, there were certain costs to using MPSCS infrastructure, though those costs were vastly lower than would have been necessary to construct a stand-alone system with duplicate towers.  Since

DWSD is responsible for the out-City use that made this accommodation necessary, I must take MPSCS costs into consideration when determining what the overall share of the radio system that should be borne by DWSD.

With those points out of the way, I will turn to what I feel is an appropriate allocation of the system costs for DWSD to bear. I will discuss each point in turn, but begin with a summarizing table:

| **Reason for Cost** | **Amount[2]** |
|---|---:|
| Augmentation of City radio infrastructure with hardware and software to allow it to connect to the MPSCS | $581,000 |
| Provision by the City of equipment to augment existing MPSCS towers to support additional DWSD loading | $900,000 |
| One-time reimbursement fee to the State for MPSCS infrastructure use | $250,000 |
| Cost for DWSD subscribers or state users to use City infrastructure inside Detroit, using usage data, less an allocation for the benefit of the City of Detroit | $6,399,000 |
| Cost of adding three voice channels for MPSCS use | $6,500,000 |
| **TOTAL COST ALLOCATED TO DWSD** | **14,630,000** |
| **TOTAL REIMBURSEMENT** | **24,070,000** |

As explained above, costs attributable to MPSCS should be considered as part of the allocation of DWSD's share of the system. As part of the deal worked out with the State of Michigan, DWSD had to make its system and the MPSCS interoperable. According to the Field declaration, the approximate amount to augment the City's radio infrastructure with the hardware and software it needed to connect to the MPSCS system was $581,000, and therefore I

---

[2] I note these are approximate figures, as were most of the figures in the briefs.

include it in the cost of the DWSD allocation. (Detroit Br. of January 4, 2007, Exh. 1.) Similarly, the equipment needed to make the towers outside of the City limits compatible with carrying DWSD radio calls is appropriately allocated to DWSD, and the Field declaration sets that amount at approximately $900,000. (Id.) The one-time fee required by the State to allow use of the MPSCS infrastructure was $250,000, and for the reasons I have just stated, this too is properly allocated as a DWSD expense.

I now come to the two sizable charges. The first charge is the approximate cost of having DWSD or state users use infrastructure inside the City of Detroit, . Actual usage data for five months showed an average of approximately 18 percent of total call durations were attributable to non-City talkgroups. (Field Declaration 6.) Using that data, the cost for DWSD subscribers to use City infrastructure inside Detroit is approximately $8.1 million, which is appropriately charged to DWSD as a cost. (Id. at 7.) However, I note that even if the calls are being made by non-City talkgroups, since the state of Michigan serves all of the citizens of Southeast Michigan, those calls are likely for the benefit of City residents, at least in part. Therefore, I have adjusted the $8.1 million figure to reflect the City's calculation that 21 percent of the citizens in the service area are City residents, and therefore assumed a cost to DWSD of $6,399,000 for that item.

Finally, I come to the $6.5 million cost of adding voice channels for MPSCS use. The Field declaration stated that the cost of adding three channels that are necessary to accommodate the MPSCS system was approximately $6.5 million. These channels are essentially akin to necessary infrastructure to allow the MPSCS usage, and therefore are appropriately charged to DWSD. (Field declaration, 6-7.)

No other charges appear to me to be appropriate. The total of the above charges is $14,630,000. Given that $38.7 million was what DWSD has paid, the difference is approximately $24,070,000. I hereby ORDER representatives of both the City and DWSD, as well as any other party that wishes to participate, to attend a conference on April 11, 2007 at 2:00 P.M., to determine both the precise (instead of approximate) figure to be repaid, as well as the payment method. I note this Court would be amenable to an agreement that allows this figure to be repaid over time.

## V. CONCLUSION

The total charges attributable to DWSD for the radio system total approximately $14,630,000. A conference regarding possible methods for repayment of the resulting $24,070,000 is hereby set for April 11, 2007. **IT IS SO ORDERED.**

Date:  March 23, 2007                       s/John Feikens
                                            United States District Judge

> Proof of Service
>
> I hereby certify that the foregoing order was served on the attorneys/parties of record on March 23, 2007, by U.S. first class mail or electronic means.
>
>                       s/Carol Cohron
>                       Case Manager