UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                                                Honorable Sean F. Cox

City of Detroit, *et al.*,                                  Case No. 77-71100

      Defendants.

_____/

### OPINION & ORDER
### DENYING MOTION TO INTERVENE AS OF RIGHT (D.E. NO. 2412)

     This matter is currently before the Court on a Motion to Intervene As Of Right filed by

Michigan AFSCME Council 25 ("AFSCME"), a labor union whose members include employees

of the City of Detroit and the Detroit Water and Sewerage Department ("the DWSD"), on

November 14, 2011. (D.E. No. 2412).  Due to the nature and current status of this action (i.e., the

existence of current Clean Water Act violations that pose a serious health, safety and

environmental risk to the people of Southeastern Michigan, and the fact that this Court has

already issued an order for injunctive relief to remedy same), the Court has given the motion

expedited consideration and finds that oral argument would not significantly aid the decisional

process.  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  For the

reasons that follow, the Court shall DENY the Motion to Intervene as untimely.

### BACKGROUND

     This action, which was commenced in 1977 and has been ongoing since that time, has an

incredibly long history that is more fully set forth in this Court's September 9, 2011 Opinion and

Order (D.E. No. 2397).  The Court includes here limited background facts and facts that are relevant to the pending motion.

The Environmental Protection Agency initiated this action in 1977 against various defendants, including the City of Detroit and the DWSD, alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq*.  The violations, which are undisputed, involve the DWSD's waste water treatment plant ("WWTP") and its National Pollutant Discharge Elimination System ("NPDES") permit.  The action was originally assigned to the Honorable John Feikens.  The State of Michigan was later realigned as a party plaintiff and, following numerous motions for intervention which the Court granted, numerous governmental entities were joined as parties.

On September 14, 1977, Judge Feikens entered a Consent Judgment (the "1977 Consent Judgment") establishing a compliance schedule for the DWSD to address and correct the Clean Water Act violations.  It required, among other things, that the DWSD prepare and implement a staffing program detailing its manpower needs.

In 1978, testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment.  On November 21, 1978, Judge Feikens entered an Order appointing Professor Jonathan W. Bulkley as Court Monitor in this action, ordering him to study the operations of the WWTP, report his findings to the Court, and make recommendations to the Court to facilitate compliance with the Consent Judgment.  (D.E. No. 366).

On December 29, 1978, Dr. Bulkley submitted a written report to the Court, that was filed on the publicly accessible docket. ("Dr. Bulkley's 1978 Report").  (D.E. No. 381)  Dr. Bulkley's 1978 Report stated that several activities at the DWSD were not in compliance with the requirements of the 1977 Consent Judgment, including staffing.  As to the area of staffing,

2

Dr. Bulkley's 1978 Report stated:  1) "[T]he current judgment states that on or before July 1, 1978, Detroit shall procure and maintain all persons required to operate and maintain the existing treatment program.  The city is not in compliance with this critical portion of the consent judgment."; 2) "[I]t is clear that major shortfalls have been experienced in terms of experienced personnel in the operations group at the wastewater treatment plant."; 3) "The City has consistently failed to respond in terms of adequate staffing."; 4) "It is imperative that the city take action to obtain qualified personnel to fill the present vacancies above the entry level positions."; 5) "In addition to chronic and severe understaffing, the management of the wastewater treatment plant has been seriously hampered by inefficient city personnel practices."; 6) "Extensive delays of five months or more have been experienced in filling vacant positions above the entry level."; 7) "Inadequate staffing at the Detroit wastewater treatment plant has been an identified problem for more than four years."; 8) "[C]ritical vacancies currently exist at all levels above the entry level position."; 9) "All of these staffing problems are going to be compounded as the facility attempts to achieve the higher plant performance required by the effluent limitations" that are "scheduled to become operational 1 January 1980."  (*Id*. at 58-64).

On March 21, 1979, Judge Feikens issued an order appointing the current mayor of the City of Detroit, Coleman A. Young, as Special Administrator of the DWSD.  (*See* D.E. No. 1848-3).  His Order gave the Special Administrator very broad powers "to perform any act necessary to achieve expeditious compliance with the Consent Judgment" and stated that the Special Administrator shall have all "authority required or necessary for the **complete management and control** of" the WWTP, including entering into and the performance of all contracts and "the **supervision of all employees of the system, including the hiring or**

**dismissal thereof**." (*Id.*) (emphasis added).

After testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment, an Amended Consent Judgment was entered on April 23, 1980, that modified the schedule for achieving compliance with effluent limitations for the WWTP set forth in the DWSD's NPDES Permit.  It required, among other things, that the DWSD maintain all personnel required to operate and maintain the WWTP.

In 1997, the DWSD again fell out of compliance with its NPDES permit and in August 1997, the DWSD reported certain violations of its NPDES permit to DEQ.  Thereafter, Judge Feikens appointed a committee to investigate the causes of the renewed violations.  (*see* D.E. No. 1872).  That committee completed a report of the causes of the noncompliance in January 2000 and that report was filed on the docket. (D.E. No. 1649).  It noted the severity and on-going nature of the DWSD's renewed violations.  It also noted that the problems included a "**chronic inability to adequately staff the skilled trades, engineers and other professional personnel**" and a "**failure to provide adequate programs for training, career development and succession planning**."  (D.E. No. 1649) (emphasis added).

The City of Detroit filed a written response to the 2000 Investigative Report (D.E. No. 1650) wherein it suggested that another appointment of a Special Administrator for the DWSD was needed to achieve short-term compliance:

> DWSD believes that the appointment of an **Administrator of Operations empowered to manage, control and direct** the procurement of all goods and services, **the hiring, compensation and firing of personnel, entering into contracts,** payment for services and the collection of receivables, and to do all things necessary to accomplish the same, would provide a short-term solution to contracting, purchasing and personnel issues.

4

(*Id.* at 24) (emphasis added).

Following the 2000 Investigative Report, on February 7, 2000, Judge Feikens entered an Order appointing Mayor Dennis Archer as Special Administrator. (D.E. No. 1848-4 at 4). The Order appointed Mayor Archer as "Special Administrator of the Detroit WWTP for the purposes of correcting the causes of non-compliance as found by the Committee and the purposes of achieving long-term, sustained compliance with the NPDES permit" and gave him broad powers over the DWSD. The Order then specified various responsibilities delegated to the Special Administrator, including: 1) "**Perform an assessment of training needs to update the training curriculum**," 2) "**Require WWTP training staff to train WWTP personnel exclusively**," 3) "**Revisit existing union contracts and civil service rules so that people outside the civil service system are able to compete with those inside the system for advanced positions**," 4) "**Rewrite job descriptions** to make them compatible with those that exist in external job markets, i.e., both private and public," 5) "**Review existing union contracts and civil service rules and develop recommendations to make compensation and compensation increases similar to those that exist in the external market, including the use of performance evaluations in granting merit pay increases**," and 6) "**Develop recruiting strategies to attract employees from outside the civil service**. (*Id.* at 8-9) (emphasis added).

On August 30, 2000, Judge Feikens entered a Second Amended Consent Judgment ("SACJ") that set forth yet another compliance schedule for the DWSD to address and correct the NPDES permit violations. (SACJ, D.E. No. 1688).

In December 2001, Judge Feikens entered an Order transferring authority of the Special Administrator to the newly elected mayor, Kwame Kilpatrick, effective January 1, 2002.

On January 5, 2006, Judge Feikens terminated the Order appointing Mayor Kilpatrick as Special Administrator, concluding that the DWSD's record of compliance had improved in the last few years.  (D.E. No. 1872).

His belief that progress was being made, however, did not last long.  On May 2, 2008, Judge Feikens issued an "Order For Briefing Regarding Compliance."  (D.E. No. 2122).  Judge Feikens stated that "Human resources is the greatest area of current concern in terms of sustaining compliance" and noted:

> A recent study undertaken at my direction by [IMG] found that eight percent of the current management and lead operations positions at the WWTP are vacant, and 79 percent of the current staff in those positions will be eligible to retire with full pension benefits by the end of 2009.  The current WWTP operations staff eligible to retire with full retirement benefits rises to 83 percent by 2012.  The problem extends through the mid-level positions in WWTP operations, where 73 percent of the positions are filled by someone eligible to retire with full benefits in 2009 – and that number increases to 81 percent by 2012.

> There is a similar crisis brewing with the WWTP maintenance staff.  Of the management and lead maintenance positions at the WWTP, 25 percent are currently vacant, and 100 percent of the current staff in those positions will be eligible to retire with full benefits by the end of 2009.  The senior maintenance staff ranks are facing a similar situation: 36 percent of the positions are currently vacant, and 63 percent of the current staff in those positions are eligible for full retirement benefits in 2009- the percentage increased to 88 percent by 2012.  This problem is compounded by the fact that, as reported by [IMG], DWSD pays significantly below-market rates for a vast swath of positions.  Since the WWTP is the biggest facility of its kind in the county, and thus demands more than usual from its staff, this is especially glaring . . . Therefore, there is ample reason to believe that a wave of retirements will result in vacancies in positions that are vital to compliance.  Moreover, the current personnel levels and salaries assume the rates cover the costs of service.  Failure to adequately support the costs of providing the service through appropriate rate levels may very well exacerbate the personnel crisis that is brewing.

(*Id*. at 5-6).  Judge Feikens ordered the City to respond to his concerns in writing.

In responding to that May 2, 2008 Order, the City stated that it had retained IMG to prepare a report addressing various issues.  (D.E. No. 2130).  That report from IMG, titled "DWSD Succession Plan Final Report, November 30, 2007," was attached as Exhibit A to the City's brief.  (D.E. No. 2130-3).  Notably, in that report, IMG repeated its finding that it had reported to Judge Feikens during the past year:

> The physical improvements at the wastewater treatment plant and CSO stations, which were required under Section II of the SACJ and identified as the remedies to address and eliminate the technical causes of non-compliance in the Committee's report, have either been completed or have been initiated and are expected to be satisfactorily completed.
> Other remedies that are more people related or that involve organizational and governance issues continue to be troublesome and could possibly **jeopardize sustained compliance.  Staffing elements including hiring, career development, succession planning, and compensation remain partially unresolved.  Little has been achieved in some of these areas due to the City of Detroit personnel practices, bargaining unit agreements and civil service constraints**.

(*Id*. at 2) (emphasis added).  IMG further stated that these "systemic problems" "need to be addressed in the long term." (*Id.*).

The report found several problems in terms of human resources and staffing.  IMG noted that there is "an alarmingly low number of certified operators for the size and complexity of the DWSD wastewater treatment plant, which is one of the largest wastewater treatment plants in the country." (*Id*. at 8).  **It also found that civil service rules and union rules and agreements compound the problems with recruiting and retaining qualified staff**.  (*Id*. at 10-11).  It stated that "[i]n terms of governance, City Council maintains control over all employment matters.  **All employees of DWSD, with the exception of the Director and Deputy Director,**

7

fall under the City of Detroit Civil Service.  **Job descriptions, pay rates and classifications are all subject to input and approval by the Civil Service Commission (CSC)**," and "**[a]ny changes to job descriptions must also be reviewed by unions**."  (*Id.*) (emphasis added). Because of these constraints, the DWSD has "**limited control over who gets hired, what they get paid and job classification revisions**."  (*Id.*) (emphasis added).

The recommendations by IMG also included **restructuring numerous civil service classifications at the DWSD**.  The report explained: "**Many of the current job descriptions are outdated, and do not reflect the current or future skills needs of DWSD**" and that **IMG recommended that the "job descriptions and qualifications" for 17 different types of job positions within the DWSD be redeveloped**.  (D.E. No. 2130-3 at 15) (emphasis added).

As Judge Feikens had predicted, 2009 proved to be a difficult year for the DWSD and in September 2009, the DWSD again fell out of compliance with its NPDES permit.  On November 12, 2009, DEQ issued a Notice of Violation to the DWSD for NPDES permit violations for exceeding the limits for discharge of Total Suspended Solids ("TSS") in the months of September and October 2009. On April 14, 2010, DEQ issued a Second Notice of Violation to the DWSD which alleged that the violations identified in the November 12, 2009 Violation were continuing.

Judge Feikens requested that Dr. Bulkley, the Court's appointed Monitor, investigate the renewed NPDES violations and report to the Court.  On June 15, 2010, Dr. Bulkley provided a written report to the Court (the "2010 Bulkley Report"), which was filed on the docket.  (D.E. No. 2296).  In that report, Dr. Bulkley stated that "DWSD has been cited for significant violations for seven consecutive months (September, 2009 – March, 2010)."  (D.E. No. 2296 at

2).  Dr. Bulkley further stated "[i]t is apparent that the current permit violations are similar to the problems that have occurred since the issuance of the original Consent Judgment in 1977."  (*Id.* at 4).  He continued by stating that "[t]he nine (9) causes identified in the January 12, 2000 Report of the Committee of Investigation are very similar to certain of the issues that appear to be contributing to the current Total Suspended Solids NPDES violations from the DWSD's wastewater treatment plant."  (*Id.*).  The 2010 Bulkley Report concluded "[t]he changes implemented in 2000 were apparently insufficient to maintain compliance over the long term, as evidence by the recurring solids build up problem and the related permit violations.  **It may be appropriate to consider more fundamental corrective measures to address the institutional problems which are adversely impacting the performance of DWSD's wastewater treatment plant**."  (D.E. No. 2296) (emphasis added).

Following the renewed violations in 2009, the Engineering Society of Detroit was asked to assess and identify immediate emergency corrective steps and a sustainable, long-term remediation strategy for the DWSD.  On July 26, 2010, its written report, the "Engineering Society of Detroit Consensus Action Report Detroit Water & Sewerage Department Waste Water Treatment Plant: The Road To Compliance And Beyond" (the "Consensus Action Report") was submitted to the City.  (Appendix to Opin. & Order No. 8).  The Consensus Action Report was also provided to the Court, and to the DEQ, by the City.  (*Id.* at 1).

The Consensus Action Report stated "[a] critical problem facing DWSD and WWTP is lack of sufficient qualified personnel" and that this "stark reality" drives home the importance of human resources.  (*Id.* at 7).  Nevertheless, it found serious problems with existing human resources services provided to the DWSD, stating that the City of Detroit's Human Resources

9

Department "has provided inconsistent or nonexistent services to DWSD in the past." (*Id*. at 8).

It stated that there "is little, if any, on going training of plant supervision personnel" and "[t]here

is no succession planning for plant supervision personnel." (*Id.* at 7). Further addressing human

resources problems, it stated:

> Faced with its own staff reduction of over 34%, Human Resources fully
> understands the challenges. The current process barriers driven by real or
> perceived **requirements due to city ordinances, civil service rules and
> procedures, requisition practices and collection bargaining agreements have
> impacted the ability of the Human Resources Department to fill the
> personnel needs of DWSD and WWTP**. Workings between DWSD and HR are
> bureaucratic in nature and the process challenges each face in carrying out their
> responsibilities with the other have not been fully shared. Each has legitimate
> reasons why the process has not been successful, but joint problem-solving efforts
> have not yet occurred.
>
> Putting any fault assessment aside, the lack of an effective succession
> planning process has again resulted in workarounds that increase the risk of
> noncompliance due to lack of qualified personnel.

(*Id*. at 8) (emphasis added).

On November 29, 2010, after Judge Feikens retired, this case was reassigned to this

Court. (D.E. No. 2323).

In February of 2011, the City, along with the above counties, determined that a more

empowered Board would enhance the DWSD's ability to comply with its NPDES permit and the

Clean Water Act. (*See* 2/11/11 Stipulated Order, D.E. No. 2334, at 1) ("[T]he parties agree that

the DWSD's ability to comply with environmental laws and its NPDES Permit will be enhanced

by the Board's exercise of its powers and authority to the fullest extent of the law.")

The Stipulated Order provides that Board members must have at least seven years of

experience in a regulated industry, a utility, engineering, finance or law and that the Board will

be compensated. (*Id.*). It further provides that the Board "will be supported by certain staff

having expertise in the fields of law, finance, and technology pertinent to DWSD operations (i.e. engineering and/or water or wastewater operations)." (D.E. No. 2334 at 2). The Stipulated Order further provides that "[w]ithin six months of the date of this Order, any party may file a motion with the Court to demonstrate that the [DWSD] is in substantial compliance with its NPDES Permit and the consent judgments of this Court. If the Court is satisfied that substantial compliance has been achieved, it shall dismiss this lawsuit." (*Id.*).

In compliance with the February 11, 2011 Stipulated Order, on April 1, 2011, Mayor Bing appointed a new Board that the parties believe is equipped to lead the DWSD to achieve sustained compliance with the Clean Water Act. On July 27, 2011, the Board amended its by-laws, to incorporate the provisions of the Stipulated Order.

Effective July 8, 2011, the City, the DWSD and DEQ entered into the ACO, aimed at achieving compliance with the DWSD's NPDES permit and the Clean Water Act. (D.E. No. 2365-1). The ACO contains provisions that impact staffing at the DWSD, such as:

> The DWSD shall develop a Staffing Plan to establish a minimum staffing level for the WWOG that includes DWSD employees and contractual skilled trades, identify the basis for determining the number of maintenance and operations staff necessary to properly operate and maintain the Detroit WWTP and CSO facilities and a strategy for successful succession planning and training to ensure competent staff.

(D.E. No. 2365-1 at 9).

On July 25, 2011, the City filed a "Motion to Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365). In that motion, the City noted that the DEQ and the DWSD had recently entered into an ACO. The City asserted that the DWSD had made substantial progress toward achieving full compliance with its NPDES permit and the Clean

11

Water Act and asked the Court to dismiss this action.

On August 8, 2011, Oakland County and Macomb County each filed motions opposing the City's Motion to Dismiss wherein they argued that collective bargaining agreements and work rules were preventing the DWSD from achieving compliance with the Clean Water Act and the consent agreements reached in this action and asked this Court to order relief from union agreements and work rules.  (D.E. Nos. 2374 & 2375).

On September 9, 2011, this Court denied the City's Motion to Dismiss in a 44-page Opinion & Order, that included numerous factual findings, several of which relate to collective bargaining agreements, union work rules and job descriptions.  (*See, e.g*,. D.E. No. 2397 at 31-33).  In denying the City's Motion, this Court noted that after executing the ACO on July 8, 2011, the DWSD self-reported new violations of its NPDES permit to the DEQ and that the violations were the same kind of violations that have been occurring throughout this action.  (*Id.* at 41).  The Court further found that "the DWSD's violations of its NPDES permit and the Clean Water Act are serious and continuing and present a serious health, safety and environmental risk to the people of Southeastern Michigan." (*Id*. at 37).  The Court then stated:

> [T]his Court concludes that, in order to achieve *long-term* compliance with the Clean Water Act, other less intrusive measures, over many years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required.  The record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to sustained compliance that have been identified by experts and acknowledged by the City, the DWSD will remain in this recurring cycle and will never achieve sustained compliance with its NPDES permit, the ACO, and the Clean Water Act.
> *The Court further concludes that an effective equitable remedy to achieve sustained compliance will require this Court to order structural changes regarding the DWSD that will likely override the City of Detroit's Charter, its local ordinances, and/or some existing contracts.*

12

. . . .

Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a current member of the Board (to be chosen by the Board) to meet and confer and, within 60 days of the date of this order, propose a plan that addresses the root causes of non-compliance that are discussed in this Opinion & Order. In making such recommendations to the Court, these individuals *shall not* be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts. If the local officials fail to devise and propose a workable solution to remedy the underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will order a more intrusive remedy on its own.

(*Id*. at 42-43). The Court ordered the above individuals to submit their proposed plan no later than November 4, 2011. (*Id.* at 44).

There was considerable media coverage of this Court's September 9, 2011 Opinion & Order. Newspaper articles covering the Opinion & Order appeared on the front pages of both the Detroit Free Press and the Detroit News. For example, an article that appeared on the front page of the Detroit Free Press stated that "U.S. District Judge Sean Cox ordered Detroit officials Friday to disregard union contracts, local ordinances and even the city charter in their efforts to clean up pollution at the city's sewage plant on the Detroit River." (*See* Ex. A to Opinion & Order). Union leadership was quoted in the article:

"He seems to be suggesting that some type of dictatorship can solve this," said John Riehl, president of AFSCME Local 207, which represents Detroit Water and Sewerage Department works. The union will fight the order, Riehl said.

(*Id.*). Numerous other local newspapers also featured articles and editorials discussing this Court's September 9, 2011 Opinion & Order.

Neither AFSCME nor any of the other 19 unions that represent employees of the DWSD sought to intervene after this Court issued its September 9, 2011 Opinion & Order.

Following this Court's September 9, 2011 Opinion & Order, the city leaders and BOWC

13

member identified therein met to devise and propose a workable solution to remedy the underlying root causes of noncompliance ("the Root Cause Committee").   On November 2, 2011, the Root Cause Committee submitted a written proposed "Plan of Action" to the Special Master in this action, which the Special Master then submitted to the Court on that same date. (Docket Entry No. 2409).  The Root Cause Committee *spent considerable time* in developing the their proposed Plan of Action.  The Root Cause Committee members noted that they were "permitted to solicit and receive input from various sources" with knowledge of the DWSD and utility operations and noted that they received input from: 1) the Detroit City Council; 2) the Board of Water Commissioners; 3) DWSD Management Staff; 4) **Union Representatives**; 5) Management-side Labor Counsel; 6) Industry Professionals; 7) Current DWSD Vendors; 8) a Rate Consultant; and 9) Regulatory Agency Input.  (D.E. No. 2409-1 at 2) (emphasis added).

On November 4, 2011, this Court issued an Order (Docket Entry No. 2410), wherein this Court found that the proposed Plan of action adequately addresses the majority of the root causes of non-compliance outlined in this Court's September 9, 2011 Opinion & Order.  This Court therefore adopted the Plan of Action proposed by the Root Cause Committee and ordered its implementation.

Although the Root Cause Committee agreed that certain changes to existing collective bargaining agreements need to occur, despite earnest efforts, the Committee could not agree on how to achieve the necessary changes.   Because the proposed Plan of Action did not adequately address collective bargaining issues, the Court considered the issue on its own:

> Based on the record in this case, the Court concludes that certain CBA provisions and work rules are impeding the DWSD from achieving and maintaining both short-term and long-term compliance with its NPDES permit and the Clean Water Act.  Given that the Committee was unable to agree on a

14

proposed solution for remedying these impediments to compliance, this Court shall order its own remedy.

. . . .

The Court has carefully considered all options and concludes that the least intrusive means of effectively remedying these impediments to compliance is to: 1) keep all current CBAs that cover DWSD employees in force, but strike and enjoin those current CBA provisions or work rules that threaten short-term compliance; and 2) Order that, in the future, the DWSD shall negotiate and sign its own CBAs that cover only DWSD employees, and prohibit future DWSD CBAs from containing certain provisions that threaten long-term compliance.

Specifically, the Court hereby **ORDERS** that:

1.    The Director of the DWSD, with the input and advice of union leadership, shall develop a DWSD employee training program, a DWSD employee assessment program, and a DWSD apprenticeship training program.

2.    Any City of Detroit Executive Orders imposing furlough days upon City employees shall not apply to DWSD employees.

3.    The DWSD shall act on behalf of the City of Detroit to have its own CBAs that cover DWSD employees ("DWSD CBAs").  DWSD CBAs shall not include employees of any other City of Detroit departments.  The Director of the DWSD shall have final authority to approve CBAs for employees of the DWSD.

4.    The Court hereby strikes and enjoins any provisions in current CBAs that allow an employee from outside the DWSD to transfer ("bump") into the DWSD based on seniority.  Future DWSD CBAs shall adopt a seniority system for the DWSD that does not provide for transfer rights across City of Detroit Departments (ie., does not provide for "bumping rights" across city departments).

5.    DWSD management must be able to explore all available

15

means and methods to achieve compliance with its NPDES permit and the Clean Water Act. DWSD CBAs shall not prohibit subcontracting or outsourcing and the Court hereby strikes and enjoins any provisions in current CBAs that prohibit the DWSD from subcontracting or outsourcing.

6.   DWSD CBAs shall provide that excused hours from DWSD work for union activities are limited to attending grievance hearings and union negotiations, with prior notification to DWSD management. The Court strikes and enjoins any current CBA provisions to the contrary.

7.   DWSD CBAs shall include a three-year time period pertaining to discipline actions.

8.   The Director of the DWSD shall perform a review of the current employee classifications at the DWSD and reduce the number of DWSD employee classifications to increase workforce flexibility. Future DWSD CBAs shall include those revised employee classifications.

9.   DWSD CBAs shall provide that promotions in the DWSD shall be at the discretion of management and based upon skill, knowledge, and ability, and then taking seniority into account. The Court strikes and enjoins and current CBA provisions to the contrary.

10.   Past practices on operational issues shall not limit operational changes initiated by management with respect to DWSD CBAs.

11.   The Court strikes and enjoins any provisions in existing CBAs that prevent DWSD management from assigning overtime work to employees most capable of performing the necessary work within a classification, at the discretion of management. DWSD CBAs shall provide that

16

management has the discretion to assign overtime work to employees most capable of performing the necessary work within a classification, at the discretion of management.

12.    Any existing work rules, written or unwritten, or past practices that are contrary to these changes are hereby terminated.

13.    The Court enjoins the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes arising from the changes ordered by this Court.  The Court also enjoins the unions from filing any grievances, unfair labor practices, or arbitration demands over disputes arising from the changes ordered by this Court.

(Docket Entry No. 2410 at 4-7).

On November 14, 2011, AFSCME filed the instant Motion to Intervene as of Right. (Docket Entry No. 2412).  AFSCME also asks the Court to issue a preliminary injunction, enjoining this Court's November 4, 2011 Order from being implemented.  In addressing the timeliness of its motion, AFSCME's Motion To Intervene As Of Right simply states:

The application of AFSCME is timely.  The Court Order issued by the Court to which AFSCME takes exception was issued on November 4, 2011, less than two weeks prior to the filing of this petition.

(D.E. No. 2412 at 8).

Due to the nature and current status of this action (i.e., the existence of current Clean Water Act violations that pose a serious health, safety and environmental risk to the people of Southeastern Michigan, and the fact that this Court has already issued an order for injunctive relief to remedy same), the Court has given this motion expedited consideration.

**ANALYSIS**

17

Rule 24(a) of the Federal Rules of Civil Procedure entitles certain parties to intervene in a lawsuit as of right and provides in pertinent[1] part that upon timely motion, the court must permit anyone to intervene who:

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P.24(a).

The Sixth Circuit has explained that a proposed intervenor must establish four factors before being entitled to intervene: (1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention; and (4) the parties already before the court cannot adequately protect the proposed intervenor's interest. *Coalition to Defend Affirmative Action v. Granholm,* 501 F.3d 775, 779 (6th Cir. 2007).

It is the proposed intervenor's burden to "prove each of the four factors; failure to meet one of the criteria will require that the motion to intervene be denied." *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989).

The timeliness of a motion to intervene is a "threshold issue." *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011). Here, this Court's analysis begins, and ends, with timeliness.

"An application for permissive or intervention of right must be timely." *Michigan Assoc.*

---

[1]FED. R. CIV. P. 24(a) also provides for intervention of right where a person is "given an unconditional right to intervene by a federal statute." Here, however, the Motion to Intervene does not seek intervention based upon an unconditional right to intervene by any federal statute.

*for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir. 1981); *Stotts v. Memphis Fire Dept.,*
679 F.2d 579, 582 (6th Cir. 1982). "If untimely, intervention must be denied." *Id.* In
determining whether intervention is timely, courts consider several factors, including: 1) the
length of time preceding the application for intervention during which the proposed intervenor
knew or reasonably should have known of his interest in the case; 2) the point to which the suit
has progressed; 3) the purpose for which intervention is sought; 4) the prejudice to the original
parties due to the proposed intervenor's failure after he knew of or reasonably should have
known of his interest in the case to apply promptly for intervention; and 5) the existence of
unusual circumstances militating against or in favor of intervention. *Michigan Assoc. for
Retarded Citizens,* 657 F.2d at 105; *Stotts,* 679 F.2d at 582; *Grubbs,* 870 F.2d at 345.

   The above factors were considered and applied in *Michigan Assoc. for Retarded Citizens*,
*supra.* That action was a class action "commenced to improve the plight of approximately eight
hundred mentally handicapped persons who reside at the Plymouth Center for Human
Development, an institution located at Plymouth, Michigan." *Michigan Assoc. for Retarded
Citizens,* 657 F.2d at 104. "In March 1978 District Judge Charles W. Joiner issued a preliminary
injunction which, among other things, created a group of monitors who were directed to observe
and inspect conditions at the center and to report to the court on a monthly basis." *Id.* Eighteen
months following the commencement of the action, the "original parties entered into a
stipulation concerning the future of the Plymouth Center." *Id.* "Judge Joiner wrote that, 'This
stipulation was the result of countless hours of difficult work, and was motivated . . . by a
genuine concern for the welfare of the . . . individuals who reside at the Plymouth Center.'
Judge Joiner entered a comprehensive memorandum opinion, order and decree" in accordance

with the stipulation.  *Id.*  The district court's opinion contemplated a significant reduction in the population of the Plymouth Center, which would reduce the number of persons employed by the center.  The district court's opinion also required "more stringent employment standards, training programs to increase employee skills and the development of employee disciplinary policies and procedures."  *Id.*

Following the entry of the district court's opinion, AFSCME, whose members include employees of the Plymouth Center, filed a motion seeking to intervene in the action.  The district court denied that motion as untimely and the Sixth Circuit affirmed.  In denying the motion to intervene as untimely, the district court explained:

> An essential element . . . of intervention . . . is a timely application by the person seeking to intervene.  **In this case, [the Union's] motion was made 20 months after the inception of the litigation, and 1 month after the entry of this court's Memorandum Opinion, Order and Decree**.  Allowing intervention at this point would seriously delay the parties' ability to implement the provisions of the Consent Decree, and this delay would necessarily work to the detriment of the individuals for whose welfare this suit was instituted.
>
> [The Union] asserts, however, that the reason it postponed making its motion to intervene was the fact that it did not consider the interests of the employees to be adversely affected by the interim orders issued by this court. [The Union] maintains that the remedial provisions of the Consent Decree, however, adversely affect the employees' interests, and for this reason intervention should be allowed.
>
> This court is aware of the concern which [the Union] has for the career futures of the employees it represents, and it is sympathetic to those concerns. **This is not, however, a situation in which the employees and their bargaining representative were caught totally unaware of the possibility that the rights of the Center's residents would have to be protected by means which affect conditions of employment at the Center**.  Indeed, the first order entered by this court (on March 3, 1978) affected staffing, patient-staff ratios, and other aspects of treatment which impacted on employment conditions.  Moreover, this case has generated a great deal of public concern and scrutiny, and has thus received extensive media coverage.

*Id.* at 105 (emphasis added).  In finding the motion untimely, the court stressed that AFSCME

20

filed the motion after entry of the Consent Decree even though it had previously been aware of the broad scope of the litigation.  *Id.*

The above timeliness factors were also analyzed in *Stotts, supra*.  That action was a class action alleging that the hiring and promotion policies of the Memphis Fire Department were racially discriminatory.  *Stotts,* 679 F.2d at 580.  "After three years of internecine discovery and over four months of intense negotiations, a consent decree settled the action."  *Id.*  "[T]wo weeks after the court preliminarily approved the decree, eleven non-minority fireman filed a motion to intervene alleging that the decree operated as reverse discrimination against non-minority firemen."  The district court "found that the proposed intervenors had adopted a 'wait-and-see' posture with respect to the litigation and ruled that the motion to intervene was untimely."  *Id*. at 581.  In affirming the district court's ruling, the Sixth Circuit found that the district court properly considered the length of time during which the proposed intervenors actually knew or reasonably should have known of their interest in the action.  *Id*. at 582-83.  It noted that several newspaper articles published in the Memphis area "apprised the proposed intervenors of the Stotts action months before the 1980 Decree was announced."  *Id*.  It further explained that "[t]he risk that the Stotts action may affect the Fire Department's promotion procedure was inherent from the outset of the litigation" and that "an awareness of the action, therefore, was knowledge that the litigation created a risk that the promotion procedure may be affected."  *Id.*

The court also concluded that consideration of prejudice to the original parties weighed against intervention, noting that a "good bit of value" would be lost if implementation of the decree was delayed.  *Id*. at 584.  The court explained that any delay would prejudice class members and that the City would suffer prejudice because the "Fire Department's ability to

function would have been jeopardized by the delay sought by the proposed intervenors." The court also considered the "public interest in efficient, effective firefighting services." *Id*. at 584-85.

In considering the unusual circumstances factor, the Sixth Circuit noted that the district court "has continuing jurisdiction to modify the 1980 Decree should its operation become unreasonable," and it found that fact to be "an important, unusual circumstance militating against allowing intervention." *Id*. at 585. The Sixth Circuit also found that an "additional factor which weighed against allowing intervention was the months of settlement negotiations and the three years the case had been pending" and that the district court's consideration of those circumstances was proper. *Id*.

This Court concludes that consideration of the timeliness factors in the context of this case weighs against allowing AFSCME to intervene.

## 1.     Knowledge Of Interest In Case

The first factor, the length of time preceding the application for intervention during which the proposed intervenor knew or reasonably should have known of his interest in the case, is the most significant factor here and weighs heavily against intervention.

The DWSD has been under federal court oversight since 1977. This case has garnered considerable media attention over the past four decades. As reflected in the background section of this Opinion & Order, **the risk that orders in this action may affect collective bargaining agreements and union work rules, as they relate to the DWSD, has been apparent for decades**. For example, the record reflects that:

> 1)     Beginning in 1977, consent judgments were entered in this action that
>         include provisions impacting staffing and employment conditions at the

22

DWSD.

2)    Beginning in 1978, Judge Feikens hired an environmental expert, Dr. Bulkley, to study operations at the WWTP and make recommendations to the Court on how to best facilitate compliance.  Dr. Bulkley's 1978 Report reported numerous concerns with staffing at the DWSD.

3)    Following Dr. Bulkley's 1978 Report, in 1979 Judge Feikens took the extraordinary action of appointing the current Mayor of the City of Detroit as Special Administrator of the DWSD, giving him very broad powers, including all "authority required or necessary for the complete management and control of" the WWTP, including entering into and the performance of all contracts and "the supervision of all employees of the system, including the hiring or dismissal thereof."  (D.E. No. 1848-3).

4)    After the DWSD again fell out of compliance, in 2000 Judge Feikens appointed a committee to investigate the root causes of compliance and the committee's report detailed several problems regarding staffing including the "failure to provide adequate programs for training, career development and succession planning."  (D.E. No. 1649).

5)    On February 7, 2000, Judge Feikens appointed Mayor Dennis Archer as Special Administrator, giving him very broad powers over the DWSD and specifically delegating him tasks that impact collective bargaining agreements and union work rules, such as:  "Perform an assessment of training needs to update the training curriculum," "Require WWTP training staff to train WWTP personnel exclusively," "Revisit existing union contracts and civil service rules so that people outside the civil service system are able to compete with those inside the system for advanced positions," "Rewrite job descriptions," "Review existing union contracts and civil service rules and develop recommendations to make compensation and compensation increases similar to those that exist in the external market, including the use of performance evaluations in granting merit pay increases," and "Develop recruiting strategies to attract employees from outside the civil service."   (D.E. No. 1848-4 at 8-9).

6)    After Judge Feikens ordered the City to submit a brief regarding compliance in 2008, the City filed a brief that attached a report from a consultant, IMG.  That report, which was submitted to the Court and filed on the docket, stated "remedies that are more people related or that involve organizational and governance issues continue to be troublesome and could possibly jeopardize sustained compliance.  Staffing elements including hiring, career development, succession planning, and compensation remain partially unresolved.  Little has been achieved in

some of these areas due to the City of Detroit personnel practices, bargaining unit agreements and civil service constraints." The report submitted to the Court also found several problems in terms of human resources and staffing and found that civil service rules and union rules and agreements compound the problems with recruiting and retaining qualified staff. (*Id*. at 10-11). It stated that " Job descriptions, pay rates and classifications are all subject to input and approval by the Civil Service Commission (CSC)," and "[a]ny changes to job descriptions must also be reviewed by unions." (*Id*.). Because of these constraints, the DWSD has "limited control over who gets hired, what they get paid and job classification revisions." (*Id.*). The recommendations by IMG included restructuring numerous civil service classifications at the DWSD. The report explained: "Many of the current job descriptions are outdated, and do not reflect the current or future skills needs of DWSD" and that IMG recommended that the "job descriptions and qualifications" for 17 different types of job positions within the DWSD be redeveloped. (D.E. No. 2130-3 at 15).

7) After the DWSD fell out of compliance again in 2009, the Court asked Dr. Bulkley to submit a report to the Court. Dr. Bulkley's 2010 Report stated that the changes ordered by the Court thus far were insufficient to maintain compliance and advised the Court that "[i]t may be appropriate to consider more fundamental corrective measures to address the institutional problems which are adversely impacting the performance of DWSD's wastewater treatment plan." (D.E. No 2296).

Like the situation in *Stotts*, an awareness of this action was knowledge that the litigation created a risk that collective bargaining agreements and work rules may be affected. Nevertheless, this action proceeded for more than 34 years without AFSCME seeking to intervene.

In addition, there is no question that AFSCME had actual knowledge, no later than September 9, 2011, that its interests would likely be impacted by orders that would be issued in this case on an expedited basis.

On August 8, 2011, after the City of Detroit had filed its Motion to Dismiss, Oakland County and Macomb County each filed briefs opposing the City's motion wherein they argued that collective bargaining agreements and work rules were preventing the DWSD from achieving

compliance with the Clean Water Act, and the consent agreements reached in this action, and asked this Court to order injunctive relief from union agreements and work rules. (D.E. Nos. 2374 & 2375).

In denying the City's Motion to Dismiss, this Court issued a 44-page Opinion & Order on September 9, 2011. The Opinion & Order included numerous factual findings as to the root causes of non-compliance, several of which relate to collective bargaining agreements and union work rules. (*See, e.g,*. D.E. No. 2397 at 31-33). In denying the City's Motion, this Court noted that after executing the ACO on July 8, 2011, the DWSD self-reported new violations of its NPDES permit to the DEQ and that the violations were the same kind of violations that have been occurring throughout this action. (*Id.* at 41). This Court further found that "the DWSD's violations of its NPDES permit and the Clean Water Act are serious and continuing and present a serious health, safety and environmental risk to the people of Southeastern Michigan." (*Id*. at 37). The Court explained:

> [T]his Court concludes that, in order to achieve *long-term* compliance with the Clean Water Act, other less intrusive measures, over many years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required. The record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to sustained compliance that have been identified by experts and acknowledged by the City, the DWSD will remain in this recurring cycle and will never achieve sustained compliance with its NPDES permit, the ACO, and the Clean Water Act.
> *The Court further concludes that an effective equitable remedy to achieve sustained compliance will require this Court to order structural changes regarding the DWSD that will likely override the City of Detroit's Charter, its local ordinances, and/or some existing contracts.*
> This Court does not arrive at this conclusion lightly. As noted above, Judge Feikens attempted several less intrusive measures, over several decades, but those less intrusive measures have not enabled the DWSD to achieve sustained compliance. In addition, although the City has had ample opportunity to devise and implement its own solutions to the underlying causes of

25

noncompliance that have been identified and discussed since the inception of this case, to date, it has not proposed or implemented a plan that has sufficiently addressed those root causes.

To be fair, the City has been constrained in the measures it has proposed or implemented to date because the City is bound by various provisions of the City's Charter and ordinances, and existing contracts, that prevent *the City* from making fundamental changes in the identified problem areas.

*This Court*, however, has broad equitable power to order any relief necessary to achieve compliance with the Clean Water Act and this Court *is not* constrained by the provisions of the City's charter or ordinances. *Weinberger,* 456 U.S. at 318; *Perkins,* 47 F.3d at 216.

This Court appreciates that its broad equitable authority is to be "tempered by precepts of comity and federalism." *Kendrick* , 740 F.2d at 437.   As then-Judge (now Justice) Stephen Breyer explained in *Metropolitan District Commission*,[2] considerations of comity and federalism, however, do not give a state or municipality the legal power to violate federal law or to continue violations of the Clean Water Act over a thirty-four year period.  *United States v. Metropolitan District Commission*, 930 F.2d at 136.  Maintaining the status quo is not an option.

Nevertheless, this Court is mindful that remedies that override state or local law should be narrowly tailored and that, to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law.

Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a current member of the Board (to be chosen by the Board) to meet and confer and, within 60 days of the date of this order, propose a plan that addresses the root causes of non-compliance that are discussed in this Opinion & Order.  In making such recommendations to the Court, these individuals *shall not* be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts.

(*Id*. at 42-43) (emphasis in original).  The Court ordered the above individuals to submit their

proposed plan by a set date –  no later than November 4, 2011.  (*Id.* at 44).  The Court also

cautioned that "If the local officials fail to devise and propose a workable solution to remedy the

underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will

---

[2]*United States v. Metropolitan District Commission*, sometimes referred to as the Boston Harbor case, is another case involving Clean Water Act violations continuing over many years.

order a more intrusive remedy on its own."  (*Id*. at 43).

The import of this Court's order, and the urgent need to remedy the ongoing violations, was widely reported in the media.  Newspaper articles covering this Court's September 9, 2011 Opinion & Order appeared on the front pages of both the Detroit Free Press and the Detroit News.  An article that appeared on the front page of the Detroit Free Press stated that "U.S. District Judge Sean Cox ordered Detroit officials Friday to disregard union contracts, local ordinances and even the city charter in their efforts to clean up pollution at the city's sewage plant on the Detroit River.  He also set a 60-day deadline to do it or 'this court will directly order a more intrusive remedy,' Cox wrote in an order in a pollution lawsuit that has been running for 34 years."  (*See* Ex. A to Opinion & Order).  AFSCME leaders, who were quoted in such articles, were well aware of the situation.

Nevertheless, neither AFSCME nor any of the other 19 unions that represent employees of the DWSD sought to intervene after this Court issued its September 9, 2011 Opinion & Order.  Rather, union representatives met with members of the Root Cause Committee to voice their views and adopted a "wait-and-see" approach, like the proposed intervenors in *Michigan Assoc. for Retarded Citizens* and *Stotts*.[3]

---

[3]This case can readily be distinguished from the situation in *Grubbs*, where the proposed intervenors "had no way of knowing" in advance that the district court might select a remedy that would impact their interests.  *Grubbs*, 870 F.2d at 346.  Unlike the situation in *Grubbs*, this Court issued an Opinion & Order that: 1) made factual findings as to the root causes of non-compliance, several of which relate to collective bargaining agreements and union work rules; 2) noted that experts in this action have recommended changes to collective bargaining agreements, work rules and job descriptions in order to remedy the violations; and 3) made it clear that, if the Root Cause Committee did not propose a plan that adequately addressed the root causes of non-compliance, the Court "will order a more intrusive remedy on its own."

27

In other words, although AFSCME had full knowledge of this Court's September 9, 2011 Opinion & Order on the day that it was issued, and its potential ramifications, it chose not to seek to intervene during the 60-day period that the Root Cause Committee was developing their proposed Plan of Action. AFSCME did not move to intervene until November 14, 2011 – after the Root Cause Committee had submitted their proposed Plan of Action and after the Court had issued its November 4, 2011 Order. AFSCME's delay following the September 9, 2011 Opinion & Order was more than twice as long as AFSCME's delay in *Michigan Assoc. for Retarded Citizens*, which was held to be untimely.

**2.     Purpose For Which Intervention Is Sought**

The Court's analysis as to this factor is constrained by AFSCME's failure to comply with the rule governing motions to intervene. Pursuant to FED. R. CIV. P. 24, a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." FED. R. CIV. P. 24(c). Under the Federal Rules of Civil Procedure, the only pleadings that may be filed in a civil action are: 1) a complaint; 2) an answer to a complaint; 3) an answer to a counterclaim designated as a counterclaim; 4) an answer to a crossclaim; 5) a third-party complaint; 6) an answer to a third-party complaint; and 7) if the court orders one, a reply to an answer. FED. R. CIV. P. 7(a). Although AFSCME's motion states a "proposed pleading" is attached to its motion (*See* Docket Entry No. 2412 at 8), no proposed pleading was attached.[4] The Court concludes that this factor weighs against intervention.

---

[4] AFSCME's brief appears to indicate that AFSCME seeks to intervene in order to assert § 1983 claims against the Court and have the Court rule on such claims (*see* D.E. No. 2412 at 19, asking the Court to declare that its own Order "constitutes a taking of private property without just compensation in violation of the Takings Clause of the United States Constitution.").

28

3.      **Prejudice To Original Parties And Unusual Circumstances**

As in *Stotts*, this Court concludes that consideration of prejudice to the original parties, and to the public, also weighs against intervention.

The EPA initiated this action to address violations of the Clean Water Act, the objective of which is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  It is undisputed that, over the course of the past four decades, the DWSD has had serious and recurring NPDES permit violations, which constitute violations of the Clean Water Act.  This Court has found that the DWSD's violations of its NPDES permit and the Clean Water Act "present a serious health, safety and environmental risk to the people of Southeastern Michigan."  (9/9/11 Opinion & Order at 37).

Since July, 2011, the DWSD has been in violation of its NPDES permit and the July 8, 2011 ACO.  Pursuant to the July 8, 2011 ACO, the DWSD is assessed, on a daily basis, significant monetary fines for violations.  Such fines will ultimately be passed along to the DWSD's customers.

This Court has already concluded that certain collective bargaining provisions and work rules are impeding the DWSD from achieving compliance with its NPDES permit and the Clean Water Act and issued an order enjoining those provisions.  If the Court's Order is not implemented immediately, the DWSD's ability to function and reach compliance with its NPDES permit, the ACO, and the Clean Water Act will be jeopardized.[5]  That would prejudice

---

[5]For example, this Court's November 4, 2011 Order enjoins any provisions in collective bargaining agreements that allow an employee from outside the DWSD to transfer ("bump") into the DWSD based on seniority.  On November 16, 2011, Mayor Bing delivered a state of the city address, advising that the City of Detroit is currently in a serious financial crisis.  City leaders

29

the City of Detroit, the DWSD and its customers, the general public, and the DEQ – the entity currently charged with enforcing the DWSD's NPDES permit, which has spent *considerable resources* monitoring the DWSD over many years.

**4.      Point To Which This Suit Has Progressed**

The final factor to consider is the point to which the suit has progressed.  "[T]imeliness is not merely determined by the time between the filing of the complaint and the motion to intervene, but rather by what steps occurred along the litigation continuum during that period of time." *Johnson v. City of Memphis*, 73 Fed.Appx. 123, 132 (6th Cir. 2003); *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000).  Extensive progress in a district court action weighs against intervention.  *Id*.; *Blount-Hill*, 636 F.3d at 285.

Here, both the time between the filing of the complaint and the motion to intervene, and the extent to which the action has progressed, weigh heavily against intervention.  AFSCME filed the instant motion more than 34 years after the complaint was filed.

More importantly, there has been extensive progress in this case during the past four decades.  The EPA initiated this action in 1977 against the City of Detroit and the DWSD, alleging violations of the Clean Water Act.  By virtue of various court orders, other parties were joined in this action, including governmental entities who receive wholesale services from DWSD.  At numerous times during the pendency of this action, various mayors of the City of Detroit were appointed as Special Administrators and given broad powers to take numerous

---

have announced that the City may need to layoff up to 2,000 additional city employees.  If that were to occur, absent this Court's Order, employees laid off in other city departments – who have no knowledge, experience or training in wastewater operations – would be able to bump DWSD employees with such skills and institutional knowledge.

actions – including actions that impact collective bargaining agreements, work rules, and job descriptions at the DWSD.  During the past four decades, Judge Feikens and the City of Detroit also had experts investigate the underlying root causes of the DWSD's noncompliance and make recommendations to the Court as to the changes needed in order for the DWSD to achieve compliance – including recommendations impacting collective bargaining agreements, work rules, and job descriptions.  The parties have also entered into numerous settlement agreements, stipulated orders, and consent judgments.  (*See* Docket Entry No. 2371 at 4-5) (listing numerous settlement agreements and consent judgments in this action.).  All of these events, coupled with the extensive passage of time, weigh heavily against intervention.

## CONCLUSION & ORDER

For the reasons set forth above, **IT IS ORDERED** that AFSCME's Motion to Intervene As Of Right (Docket Entry No. 2412) **IS DENIED.**

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  November 18, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 18, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager