77-71100 US V City of Detroit





FILED
MAY 10 2012
CLERK'S OFFICE
DETROIT

# Director's Compliance Report

May 4 2012

This report is issued pursuant to an Order of the Honorable Sean F. Cox dated November 4, 2011 in United States of America v City of Detroit, et al. (Case No. 77-7110). In that order, among other things, the Court directed the Director of the Detroit Water and Sewerage Department ("DWSD") to issue a Report of Compliance with the Administrative Consent Order ("ACO") and the Clean Water Act. In addition to highlighting the Department's compliance efforts, this report would also provide the Department with the opportunity "...to submit additional recommendations or changes that are necessary to achieve long-term compliance."

**Sue F. McCormick**
*Director*

**Matthew A. Schenk**
*Chief Operating Officer*

**Darryl A. Latimer**
*Deputy Director*

# Table of Contents

1. **Introduction**

2. **Six month compliance report re ACO** ........................................................................................
   a. Summary of the 2 quarterly compliance reports
   b. Update on PC 781 / Bio-solids Management Plan
   c. Summary of Requested ACO Modifications Submitted to the MDEQ

3. **Any identified barriers to achieving long-term compliance** ...........................................
   a. Status on making structural changes to DWSD
      i. Collective Bargaining
      ii. Standing up the new divisions – new hires
   b. Continued areas of inter-connectivity with the City
      i. Purchasing Clearances
      ii. Civil Service Commission
      iii. Ability for DWSD to create an Autonomous Finance Function
      iv. Swaps. The cost of the Financial Stability Agreement negotiations on ratepayers.

4. **Additional recommendations / changes needed to the Court's order** ............................
   a. The EMA Project
      i. Purpose / Scope
      ii. Timeline
   b. Suggestions of Future Relief we may need including:
      i. Rate Settlement Agreement
      ii. Ability to Create our own Defined Contribution Retirement Plan
   c. Request to make additional Recommendations at a later date

5. **Next Steps** ...................................................................................................................................

**Exhibits:**

(1) DWSD's January 30, 2012 ACO Quarterly Compliance Report
(2) DWSD's April 30, 2012 ACO Quarterly Compliance Report
(3) DWSD Executive Summary of Bio-Solids Symposium
(4) Goldman Sachs Memo re: Impact of Moody's Downgrade on 2012 Sewer Bond Financing
(5) Scope of Service for the EMA Operational Assessment Contract

# 1. Introduction

I appreciate this opportunity to provide an interim compliance report to the Court, as well as the Board of Water Commissioners, the Mayor, and the Detroit City Council. I have now been with DWSD for four months and I have a much better understanding of the organization and an appreciation for our strengths, weaknesses, and opportunities for improvement. I have used these first few months to not only begin an internal assessment of the organization, but I have begun the work of laying a foundation for a future state for DWSD that can provide all of us with a sense of shared accomplishment.

Through this compliance report, I will highlight the following areas: (1) An update on the Department's compliance with the ACO and Clean Water Act, (2) DWSD's progress in implementing the November 4, 2011 Court order and the Root Cause Committee's Plan of Action, (3) the process to identify additional recommendations or changes that are needed to achieve long-term compliance, and (4) next steps.

# 2. Six month compliance report re ACO

### a. Summary of the 2 quarterly compliance reports

Over the last six months since the Court issued its November 4 Order, the wastewater treatment plant (WWTP) has been substantially compliant with the Administrative Consent Order (ACO) and the NPDES permit with a few limited exceptions. Our equipment availability, dewatering and disposal capacities, and other key indicators have all been compliant and water quality discharged from the WWTP has been mostly compliant with the NPDES permit No. MI0022802. The WWTP experienced several slight exceedances of cyanide over this period during wet weather events which is a result of existing plant configuration and increased incineration. DWSD is assessing treatment process modifications that will prevent these spot exceedances during wet weather and is working cooperatively with MDEQ through this process.

While more detailed information is included in the two attached Administrative Compliance Order quarterly reports dated January 30 (Exhibit 1) and April 30 (Exhibit 2), this narrative summary is intended to provide the Court with a clear and concise overview of DWSD's compliance efforts and accomplishments.

### i. Maintaining Solids Handling Capacity

The WWTP has consistently maintained sufficient dewatering capacity over the last six months. The WWTP has 34 dewatering units, including 22 belt filter presses and 12 centrifuges. While the number of available or working units can change significantly during the day, the WWTP has recently reached a peak of 30 out of 34 units available for service. The plant regularly has over 20 dewatering units available, which is a significant improvement from when the Corrective Action Plan was submitted in August of 2010. At that time, the plant had only six units available for service and had to deploy rental dewatering units for dewatering. Since November 2011, the available dewatering capacity as a monthly average has been 889 dry tons per day (dtpd) as compared to the ACO requirement to maintain capacity not less than 500 dtpd. Keeping in mind

that the solids process includes both dewatering and disposal, DWSD has achieved and is maintaining substantial compliance with solids dewatering capacity.

The belt filter replacement project, PC 787, will replace the existing 22 belt filter presses over the next three years with high quality heavy-duty machines that will all be the same size and model number. The replacement belt filter presses will be a better match for the application, and with improved maintenance and operations, these new machines should well serve the WWTP and support sustained compliance for the next twenty years. Improvement to support systems for the dewatering areas is also included in this critical project, and these improvements should further assist the plant achieve sustained compliance with dewatering operations.

### ii. Maintenance

A dedicated Preventive Maintenance Section, which did not exist when the August 2010 Corrective Action Plan was submitted to MDEQ, has been established to focus on equipment and facility preventive maintenance services throughout the WWTP and Combined Sewer Overflow (CSO) facilities. The Wastewater Operations Group ("WWOG") has a goal of performing 75% of all required preventive maintenance evolutions each month. Over the first quarter of 2012, 66% of all preventive maintenance work orders were completed.

Also, during the last quarter, 76% of maintenance service hours were directed toward planned work; a significant improvement over the more reactive, unplanned maintenance services of the prior several years. Our WWTP maintenance operations have adopted the goal of performing 80% of the maintenance work in a planned or scheduled basis, leaving 20% for unplanned or emergency situations.

In addition to the preventive maintenance program, the WWTP is proceeding with a predictive maintenance program to identify predictive early-stage equipment conditions that need to be addressed in order to avoid equipment failure or more expensive emergency repairs. The predictive tools include oil analysis, vibration testing of rotating equipment, and thermography, or thermal imaging of larger electrical assets to identify developing "hot spots". Also, work is continuing on a comprehensive and updated Operations and Maintenance (O&M) Manual for all existing equipment and facilitates with final completion slated for on or before January 1, 2013 in accordance with the ACO.

I am confident the job design analysis being performed by EMA will assist in bringing forth a clear strategic vision for maintenance not only at the WWTP, but within DWSD's other plants and operations that rely on timely and effective maintenance. The role of EMA will be discussed in greater detail in Section 4(a) of this report.

### iii. Management

DWSD is conducting an organizational assessment that will detail recommended changes to the organizational structure, including the supervisory and management structure at the WWTP. Additional discussion of management changes to date and the organizational assessment being conducted by EMA will occur in Sections 3 and 4 of this report.

An Operations Performance Plan that provides management metrics and targets for measuring operational performance of the Wastewater Operations Group has been developed in accordance with the ACO and is currently being reviewed by MDEQ.

### iv. Staffing

DWSD has maintained staffing for the Wastewater Operations Group (WWOG) at the levels identified in the MDEQ-approved Staffing Plan since submittal of the Plan in July 2011. That current minimum staffing level was established at 645 employees. DWSD has also prepared and submitted a WWOG Succession Plan and Training Program to MDEQ which has been approved. In accordance with that MDEQ-approved program, DWSD has developed a pilot Wastewater Operator Certification Training Program, a Cross Training and Employee Rotation Schedule, and a Manager/Supervisor Mentoring Training Program.

As stated above, EMA is now starting their assessment of DWSD's operations, including the WWTP. We anticipate recommended improvements from this analysis that will likely affect the number of required employees. If necessary, DWSD will submit a request for ACO modification to MDEQ to bring the Staffing Plan in line with best practices recommendations.

### v. Capital Planning Process

DWSD prepared and submitted a plan to MDEQ which defined DWSD's capital planning process as it relates to the WWTP. The centerpiece of our approach is to conduct a Needs Assessment every three years that takes a comprehensive look at the WWTP, CSO facilities, and wastewater pumping stations throughout our collection system. This is consistent with the current ACO requirement to perform a tri-annual Needs Assessment, with the next one scheduled for completion on or before August of 2013. DWSD has initiated this assessment, which will be performed by DWSD staff. The results of the Needs Assessment will be used to help guide our capital replacement schedule for critical assets in a planned manner.

The other main component of the WWOG's capital planning process is the Scheduled Replacement Program. At the center of this program is a detailed database of all major assets at the WWTP. The database includes pertinent information such as asset age, anticipated lifecycle, and other relevant information that will help guide the planned assessment and replacement of aged assets. The combination of the Needs Assessment and Scheduled Replacement Program will provide DWSD management with the needed information to make informed and timely decisions for capital investments, which has been identified as one of the root causes of failure. DWSD is awaiting comments from MDEQ on the Capital Planning Process plan that has already been submitted.

### vi. Purchasing

DWSD has made strides in improving the ability to acquire goods and services needed to maintain permit compliance, in large part due to the revised procurement practices included in the November 4th Order. More work remains, especially standing up the Purchasing division and

responsibility within DWSD. The Board of Water Commissioners is scheduled to hold a Board Workshop session on May 9, 2012 to discuss the Procurement Policy attached to the Root Cause Committee's Action Plan in the November 4 Order. Based upon that review, the Board will set a timeframe for formal adoption of the policy so that we can begin our implementation phase which will involve developing the related operational procedures and technology necessary to apply, monitor and enforce the policy.

The WWTP has been developing strategic parts and services requisitions to establish period agreements which can span 3 to 5 years. In this manner, DWSD will be able to secure competitively procured parts and services on an as-needed basis in a cost-effective manner that assures timely delivery of quality parts. This approach to parts and services directly reduces the time that equipment is rendered unavailable for service due to lack of available parts, which translates to increased equipment availability and processing capacity.

### b. Update on PC 781 / Bio-Solids Management Plan

As the Court is aware, DWSD has been very focused on the issue of bio-solids management as it is a significant factor in operational cost to the system and compliance with the ACO and NPDES permit. This is one of the most critical near term decisions DWSD faces. In discussions with the Board of Water Commissioners and preliminary review of initial responses to PC 781, I recommended an alternative approach to our bio-solids management strategy that invited our major customer communities to join the evaluation team and restarted the procurement process.

In late March of this year, DWSD hosted a bio-solids symposium in Romulus. At the symposium, we invited national experts in academia and utility management from across the country to discuss different options for the handling and disposal of our bio-solids. MDEQ, Detroit City Council, and the BOWC were also invited and represented at the symposium. An executive summary of that symposium is attached to this report as Exhibit 3.

Based upon the valuable input received from the two-day symposium, DWSD is aggressively developing requests for proposals for air emission upgrades to the incinerators in Complex II, and for the implementation of bio-solids dryer technology. Concurrently, DWSD is continuing to perform rehabilitation work on the incinerators in Complexes I and II to increase daily disposal capacity and unit availability under capital contract PC 774. Regardless of future technology implemented, the Complex I and Complex II incinerators will be prime means of solids disposal at least until March 2016 when the Environmental Protection Agency's new Sewage Sludge Incinerator regulations go into effect.

DWSD is proceeding to identify, evaluate and implement long-term bio-solids disposal solutions that will provide the WWTP with sufficient capacity and flexibility to manage solids over the next 20 years in a cost effective, environmentally appropriate manner. These technologies will be identified as part of the DWSD Long-Term Solids Disposal Plan (LTSDP) to be submitted in accordance with the ACO. The schedule for the LTSDP was to be submitted to MDEQ in June of this year. However, due to the review of our approach

and the results of the symposium, DWSD has requested an extension an extension of time to comply with this requirement.

### c. Summary of Requested ACO modifications submitted to the MDEQ

DWSD has had preliminary communications with MDEQ and, pursuant to those communications, has submitted a request for modification of the ACO as follows:

- An extension of time to the current June 1, 2012 submittal requirement for a schedule to develop a Long-term Solids Disposal Plan, which will allow DWSD to incorporate recommendations from the bio-solids symposium, develop and advertise contract documents for bio-solids disposal, and continue with long-term alternative bio-solids disposal evaluation and planning
- Elimination of the annual average solids inventory limitation of 750 dry tons per day (dtpd) to allow DWSD to operate its dewatering equipment more efficiently in compliance with the NPDES permit
- Revision of the requirement to regularly renovate the C-II centrifuges from ten thousand operational hours to eighteen thousand operational hours, in accordance with the recommendations of the DWSD maintenance contractor, thereby increasing the availability of more dewatering equipment
- Elimination of the Steering Committee requirement (commonly referred to as "EECO") which has been rendered unnecessary by virtue of the creation of the Human Resources, Purchasing and Law Divisions within DWSD, in accordance with the November 4 Court Oder, and
- An extension of time to update and resubmit the Purchasing metrics and targets, which recognizes the need to organizationally create and staff the above-referenced Divisions, and to then develop and implement the more detailed procurement process with associated metrics and targets

DWSD anticipates further possible modifications to the ACO upon completion of EMA's assessment and recommendations for DWSD going forward, especially in terms of staffing since we anticipate a significant restructuring recommendation.

## 3. Any identified barriers to achieving long-term compliance

In this section of the report, I will summarize many of the tasks that are required to fully implement the Court's November 4, 2011 order. Specifically, DWSD is undertaking the required actions to negotiate new collective bargaining agreements with its employees, to stand up the new administrative divisions within DWSD, and to generally move toward a more self-sustaining model of operations. As I summarize these important steps, it is also necessary to point out a few significant business issues that needed to be addressed to move the Utility forward that impacted our ability to finalize more aspects of the Court order.

First, as the Court is aware, DWSD and the City of Detroit have been pursuing the issuance of new debt on behalf of the sewer system to provide for $180 million in new capital projects and the elimination of risk exposure to prior financial swap transactions. The State of Michigan expressed concern with the transaction for quite some time and held off on authorizing us to move forward to the market. I am pleased to report that in the last two weeks, we have received approval from the State to proceed with our bond transaction and we are currently working with the State to complete our review of the business case for terminating all of the outstanding swaps.

Secondly, I am happy to report that DWSD reached agreement with the customer communities on the three year look-back calculation for the years 2007/2008 through 2009/2010. This was a very long and arduous process that resulted in what I believe is a very fair and equitable agreement that addresses many areas of valid customer concern with prior business practices. I have publicly thanked the participants in the look-back committee and want to take this opportunity to again express my sincere appreciation for their input and involvement in that productive process. It is anticipated that a revised rate settlement agreement will be presented to the Board of Water Commissioners at its May 27 meeting to implement this agreement.

With this background in mind, I would like to next address the subject of implementation of specific provisions of the November 4, 2011 Court order.

### a. Status on making structural changes to DWSD

While not all staffing changes have been required by a court order, it is important to note a few positions that are newly created that will help the Department's efforts to improve operations. First, as the Court is aware, we added the position of Chief Operating Officer / Chief Compliance Officer at the beginning of April, 2012. Since Matt Schenk has come on board, he has been helpful in working on the Sewer system's needed bond issue, which should be consummated by the end of June. In addition, he is leading the Department's internal negotiating team on new collective bargaining agreements and he is working through some of the negotiations with the City of Detroit necessary to implement the other provisions of the November 4 Order that will be discussed in greater detail below.

On May 14 DWSD will welcome another new employee into the position of Director of Security/Integrity Officer. Mr. Barnett Jones joins DWSD after a distinguished career in Public Safety and will be instrumental in helping us not only strengthen our existing security operation but also to establish an internal affairs function within DWSD to investigate allegations of wrongdoing and make recommendations for corrective actions.

#### i. Collective Bargaining

DWSD hired outside counsel back in March of this year to assist the department in developing its own identity in union negotiations. Mr. Steven Schwartz, joined

the City of Detroit's negotiating team to insure that DWSD had its own distinct voice at the table as the City finalized benefit negotiations. The intent was for benefit negotiations to be finalized and carried forward as we stepped into DWSD negotiations on standalone contracts. However, as the City of Detroit's negotiations became more complicated with the signing of the Financial Stability Agreement, it became clear to me that DWSD would have to undertake its own negotiations immediately and across all issues.

Therefore, on April 26, 2012, DWSD invited all twenty of the unions that represent employees of DWSD to a negotiation kick-off meeting. That meeting was attended by fifteen of the twenty unions and went very well in terms of our ability to fulfill information requests that the unions had previously made of our negotiating team. We are now preparing to hold individual negotiating sessions with each of the unions moving forward. That process starts in earnest today.

There are a few complicating factors to our ability to proceed with negotiations that are important to bring to the Court's attention. First, there are approximately four unions that have filed actions at the Sixth Circuit Court of Appeals to challenge the Court's November 4 order. This is significant because it is very unlikely that the appeal will be resolved prior to the expiration of the existing collective bargaining agreements on June 30, 2012.

The second complication is that the City of Detroit has filed four union clarification petitions at MERC that purport to sever existing unions that represent both DWSD and non-DWSD city employees in an attempt to implement the terms of this Court's order. This creates a certain amount of ambiguity, however, because the Court's November 4 order enjoins MERC from exercising any jurisdiction over the terms of the order.[1]

DWSD has been advised that there is significant cost benefit to remaining within the City of Detroit coverage pool for employee health insurance. With the City's schedule for negotiations uncertain, a continued tie to the City in benefits administration is a third complication in resolving negotiations timely.

ii. **Standing up the new divisions – new hires**

I am pleased to report that the first hires to stand up our own divisions occurred on April 30, 2012. On that date, DWSD brought on seven new employees, in the positions of Human Resources Generalists. These HR professionals will be critical to our overall efforts to separate our HR functions from the City of Detroit and to develop a more responsive HR staff to the needs of the utility. After these seven staff members move through their two week orientation schedule, they will then work with existing management staff to review the applications that we

---

[1] "The Court enjoins the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes arising from the changes ordered by this Court. The Court also enjoins the unions from filing any grievances, unfair labor practices, or arbitration demands over disputes arising from the changes ordered by this Court. " November 4 order, para 13, p. 7.

received for HR Technicians so that we can hire this next component of the Human Resources staff. We will still need to perform an assessment on what DWSD will do with the Payroll function and Benefits Administration over time, though we will likely continue to utilize the City for the immediate near term.

On April 19, 2012, DWSD completed the posting for our Corporation Counsel position. That advertisement is currently posted on the DWSD website (www.dwsd.org) and there are advertisements for the position within the Michigan Municipal League, the Detroit Legal News, and Michigan Lawyers Weekly. In addition, the advertisement has been shared with the Michigan Association of Municipal Attorneys ("MAMA") list serve. It is our expectation to interview candidates during the month of May with a goal to make a hiring decision by June 1.

### b. Continued areas of inter-connectivity with the City

The process of standing up our own divisions is a complex matter that requires reviews of several different processes internally and developing an understanding of the external interactions that impact those matters. What is clear is that there will need to be a series of discussions with numerous City Departments to clarify all related aspects of separating the Finance, Human Resource, Legal, and Procurement functions of DWSD from the City of Detroit. This process is by no means complete, but I wanted to draw the Court's attention to a sampling of the types of items that we have encountered in attempting to implement the November 4 order, but perhaps without language in the order that is explicit enough to accomplish what we believe was the Judicial intent.

#### i. Purchasing Clearances

While the Order is quite clear in my view that the Detroit Purchasing Ordinance does not apply to DWSD, there have been varying interpretations of the language of that order with respect to some City of Detroit processes related to contracting. For example, Section 18-5-13 of the Detroit City Code provides that "No bid shall be accepted from or contract awarded to any person who is in arrears to the city upon debt or contract ..." This is a subsection of the Detroit Purchasing ordinance, but also has a state law foundation in MCL 117.5(1)(f) which provides that a City does not have the power "... to make a contract with, or give an official position to, one who is in default to the city."

Without arguing the merits of the policy at issue in this provision, it is the implementation of this requirement that triggers the review of the City of Detroit's Finance Department. The current interpretation is that DWSD must still comply with the City of Detroit's clearance procedure to insure that this requirement is met. DWSD, on the other hand, believes that it can comply with the MCL 117.5(1)(f) requirement by providing standard language in all DWSD

contracts providing for set-off rights should we ultimately determine that a vendor is in fact in default on an obligation to the City.

ii. **Civil Service Commission**

The November 4 order was very clear with respect to the need for DWSD to set up its own Human Resources function and move away from City HR to address our operational needs. In addition, the order provided very detailed instructions with respect to some required and some unacceptable collective bargaining agreement language and terms as DWSD negotiates its own collective bargaining agreements. The specificity with respect to union negotiations is very significant in light of the fact that almost 80% of DWSD employees are members of unions and are covered by collective bargaining agreements.

It is important to note at the same time that more than two hundred fifty DWSD employees are subject to Civil Service rules as non-union civil servants. I draw this to the Court's attention for two reasons. First, Section 6-505 of the Detroit City Charter provides that "The Human Resources Department is headed by a six (6) member Civil Service Commission." This is significant because the Civil Service Commission is inextricably linked to the City of Detroit's Human Resources Department and would still be in a position to adjudicate grievance and/or arbitration matters for non-union civil servants of DWSD if there is not greater clarity provided over the intended interaction between DWSD and the Civil Service Commission. Second, some of DWSD's existing collective bargaining agreements provide that union employees may take advantage of the Civil Service Commission's grievance and arbitration process to address disciplinary actions. Third, the Civil Service Rules also regulate work hours and levels of benefits for non-union staff. Looking at these issues, together, therefore, there may be a need to clarify the relationship between DWSD and the Civil Service Commission to fully implement the Court's intent to allow DWSD to handle its own HR functions.

iii. **Ability for DWSD to Create an Autonomous Finance Function**

Similar to the issues cited above with respect to Purchasing and Human Resources, there is another previously unidentified problem with separating DWSD's own Finance function from the Detroit Finance Department. This issue arises in two circumstances at the present time, and is further complicated when one considers the overlap between the terms of the City Charter, the City Code, and the Financial Stability Agreement. The first area of potential concern is Section 6-305 of the Detroit City Charter which provides for the duties of the City Treasurer. Specifically, Section 6-305(2) provides that the City Treasurer shall "have custody of all moneys, funds and securities of the city, keep accounts of them and deposit them as directed by law or ordinance." While the November 4 order makes clear, again, that DWSD is expected to operate its Finance function independently of the City Finance Department, the order does not expressly say that DWSD shall hold its own revenues and expenses in its own name. We are

presently exploring the possibility of achieving the objective of the Order through an Account Control Agreement incorporated into the Trust Agreement required by our new bond issue, but I wanted to draw the Court's attention to this issue in case further clarification is needed in the future.

Similarly, the November 4 order does not make express reference to DWSD's autonomous role within the finance function with respect to issuing of debt on behalf of DWSD. This is an area of particular concern because the Financial Stability Agreement expressly provides that approval of the Financial Advisory Board is required for reviewing existing debt structures and for approval of new debt transactions after July 20, 2012.[2] I believe it was the Court's intent that decisions to issue bonds related to the capital needs of DWSD plant operations should be vested in the DWSD BOWC. If DWSD is to free of the cumbersome process contained within the Financial Stability Agreement, again, there may be a need for additional clarification.

### iv. Swaps. The cost of the Financial Stability Agreement negotiations for ratepayers.

Back in December of 2011, DWSD and the City of Detroit approached the State of Michigan for approval to issue bonds on behalf of the Sewer system for a total of $500 million in new debt and up to $400 million for refunding. This amount was approved by Detroit City Council by resolution on July 19, 2011.

However, the State of Michigan's Department of Treasury raised concerns with the transaction and withheld approval for DWSD to proceed with the bond transaction and our intent to terminate the eleven swaps that are in effect. At the time, the Utility was concerned that a Termination Event may have occurred or was likely to occur with the continued discussions of the City of Detroit's financial situation and the State's review of the City's financial condition. The significance of a Termination Event was that it could have required an immediate cash call upon DWSD on the market value of the swaps (approximately $280 million by valuation of March 27, 2012). DWSD also had concern that the threat of a Termination Event could have resulted in a downgrade of the system's debt and, therefore, an increase in the cost of borrowing to rate payers.

Regrettably, DWSD's concerns were found to be valid when Moody's downgraded the System's debt by over one full grade and placed the System on a negative outlook after the City of Detroit signed its Financial Stability Agreement with the State of Michigan on April 4, 2012.[3] Fortunately, neither Fitch nor S&P have followed Moody's lead on the downgrade to this point.

---

[2] Section 1.5(c)&(d) of the Financial Stability Agreement, pp. 13-14.
[3] On April 9, 2012, Moody's Investor Service downgraded the Sewer System's senior lien credit rating from A1 to Baa1 and second lien from A2 to Baa2.

Nevertheless, according to the attached report from Goldman Sachs (Exhibit 4), the cost of the Sewer System's proposed bond issue has now increased by $42 to $66 million over the life of the bonds as a result of the State of Michigan's delay in approving our bond transaction. Of even greater frustration, after working with the Michigan Department of Treasury's own swap advisor, the advisor agrees that the transaction that DWSD initially proposed remains the most cost effective alternative for addressing the swap liability.

## 4. Additional recommendations / changes needed to the Court's order

As the Court is aware, I have now completed my fourth month as Director of DWSD. While I believe much has been accomplished over these past few months, there is still much to be done. I believe it was recognized in the November 4 order that as DWSD moves forward on the path of increased self-sufficiency, standing up new organizational capacity must occur alongside improving current organizational capacity in order to assure long term compliance in an effective and cost efficient manner. Standing up new capacity in DWSD involves putting the right people (positions) together with good business processes and practices and leveraging technology where possible. Support from departments in the City now being stood up as functions within DWSD will not be dramatically improved without improved and integrated systems and business processes. Time constraints in the order and factors affecting the operating environment of the City necessitate moving quickly to determine the optimum path for implementation. Therefore, in this section of the report, I am going to highlight what DWSD is focused on for the next ninety days and areas where I currently see the need for additional discussion with the Root Cause Committee, the Board of Water Commissioners, and the Court as we move DWSD forward.

### a. The EMA Project

Organization Optimization Assessment

In April I engaged EMA, Inc., a recognized expert in assisting water and sewer utilities with technology and management consulting and services, to conduct a 90 day operational assessment of DWSD. EMA, Inc. has performed more than 400 assessments such as this and has an experience in helping to identify cost savings in their client's O&M budgets averaging more than 20%. While the cost savings do not occur instantly, they are significant and could reach or exceed $100 million per year in the case of DWSD. The optimization assessment will compare DWSD to world class utility providers and identify effectiveness gaps, provide a calculation of the competitive opportunity gap, identify barriers to achieving that gap and provide a business case and work plan to close the gap. These key outcomes of the operational assessment are key components of moving DWSD along a strategic course to achieve

and maintain compliance with the November 4, order and the Clean Water Act while assuring an effective and competitive operation. I have attached the scope of work from EMA's contract so the Court can review the deliverables that DWSD will obtain.

i. **Purpose / Scope**

While the ultimate purpose of the EMA project is to make DWSD more effective and capable of achieving and maintaining compliance with the Clean Water Act, benchmarking against world class utilities and identifying the gaps in effectiveness and competitiveness will detail the operational cost savings that are available to be achieved. Identifying the potential competitive gain from our efforts is key to considering transition payments and efficient compliance payments within the existing cost structure.

Through the assessment process EMA will deliver significant items that will impact and advance our efforts to comply with the order, including: the future organizational structure, all required job classifications based on multi-skilled staff, identify staffing levels by classification, answer questions related to training and certification program needs and outline a performance management approach.

Most importantly, the approach EMA utilizes for assessment and subsequent implementation is one that is rich with employee engagement. I believe it is this approach, consistent with the values that I have brought to the leadership of DWSD that is critical to our employees embracing change as we move to implementation.

ii. **Timeline**

EMA began work in mid-April with kick off meetings to introduce the assessment approach to the DWSD Management Team and Union Leadership. During the last two weeks of April, additional communication meetings were held throughout DWSD in all of the different work areas to assure employees were aware of the assessment approach, process and timeline. During this same two week period, schedules for interviews of employees from each of the DWSD job classifications were being scheduled. Employees were nominated by management, the Union leadership or self nominated. All employees who requested to be interviewed were accommodated for scheduled interviews.

Interviews will occur during the first two weeks in May. Concurrently, EMA will be evaluating technology systems including enterprise software systems, customer information systems, work management systems and GIS. A first priority has been established for review of the enterprise systems supporting finance, procurement and human resources.

EMA's assessment will be substantially complete in June with a final report due by mid-July, 2012. The final report will include a high level implementation plan including an estimated schedule with recommendations covering the following sections:

(1) A Competitive assessment and gap analysis comparing DWSD with similar organizations including private operators and industry best practices.

(2) Benchmark analysis of DWSD current service delivery against similar organizations including private operators and industry best practices.

(3) Cost analysis including direct versus indirect costs and estimated return on investments.

(4) Recommended key performance indicators.

(5) Organizational structure assessment and recommendations including opportunities to enhance employee training and flexibility.

(6) Partnership and collaboration recommendations considering other internal City departments and external entities.

(7) Inventory and asset management recommendations.

(8) Technology recommendations.

(9) Productive operations recommendations.

(10) Service level recommendations

(11) High level implementation plans, estimated implementation time frames and savings goals.

(12) Communication plan for staff and unions.

It is my expectation that at the end of this ninety day assessment, I will have the tools in place to develop a more detailed and focused roadmap to DWSD's future state.

b. **Suggestions of Future Relief we may need including:**

Obviously, as a result of this initial assessment there will be additional work that must be done to implement those recommendations agreed upon by DWSD management and the Board of Water Commissioners. Therefore, I am requesting that the Court allow DWSD the flexibility of returning to the Court with additional suggestions for how the Court could assist DWSD with its efforts to achieve long-term compliance based upon the analysis and recommendations that will be forthcoming from EMA.

In addition to the EMA work, there are some other areas that will need some additional review before I can make a full recommendation to the Court.

i. **Rate settlement agreement**

There has been a tremendous amount of work that has occurred with respect to the Rate Settlement agreements over time, and the inclusion of our customer communities in that process has been welcomed and greatly appreciated. As we move forward with exploring such concepts as the Efficient Compliance Payment, including review of a Payment in Lieu of Taxes concept, and rate simplification, it is important for everyone to be mindful that there may need to be some modifications made to the Court's order regarding the Rate Settlement Agreements.

ii. **Ability to create our own Defined Contribution retirement plan**

The Court's November 4, 2011 Order makes clear that DWSD is to begin its own collective bargaining agreement negotiations and move forward with setting up its own Finance team. The Order does not, however, expressly speak to DWSD's interaction with the City of Detroit's General Retirement System. This is significant because DWSD envisions that its future employee compensation model will include a Defined Contribution Plan as we move away from the traditional Defined Benefit Plan approach that has been used in the past.

I am raising the issue in the Director's Compliance Report because I believe that it is important for the Court to be aware that the City of Detroit adopted the 1998 Defined Contribution Plan[4] by ordinance in November of 2001 which was subsequently modified based upon input from the Internal Revenue Service in November of 2003. Despite the ordinance being on the books for over a decade, however, the General Retirement System of the City of Detroit has yet to implement the ordinance and create the plan. As a result, DWSD does not currently have a mechanism to offer a Defined Contribution Plan to current employees or new hires without some additional clarification from the Court. In the meantime, I am working with the Mayor's office to try to gain a better historical understanding of why the 1998 ordinance has yet to be implemented.

In addition to the questions about the ability of DWSD to offer our employees a Defined Contribution Plan retirement option instead of the City of Detroit's traditional Defined Benefit Plan, DWSD also needs to focus on quantifying and understanding our true OPEB liability and begin to work on a strategy to address that liability.

c. **Request to make additional recommendations at a later date**

Pursuant to the November 4, 2011 Order, the Court clearly envisioned that within six months, the Director would be in a position to make recommendations, if

---

[4] The Ordinance is referred to as the 1998 Defined Contribution Plan because the plan is open to City of Detroit employees who were on the payroll on or after July 1, 1998.

needed, on additional changes to the Court's order to provide increased opportunities to achieve long-term compliance. Specifically, the order provided:

> Within 6 months from the date of this Order (by May 4, 2012), the Director of DWSD shall prepare a written Report of Compliance with the ACO that identifies any current or anticipated barriers to long-term compliance with the ACO and the Clean Water Act ("the Directors Report of Compliance"). The Director of the DWSD shall include within that report any additional recommendations or changes that are necessary to achieve long-term compliance.

Throughout this report, I have attempted to draw the Court's attention to the progress that DWSD has made over the past four months that I have served as Director. I have been able to identify some areas and broad discussion topics that require additional review in an effort to determine whether new recommendations are needed. In working through that process, I will be receiving the initial ninety-day assessment report from EMA by mid-July. That report should help me to identify where DWSD needs greater focus to move towards best practices in the utility industry. Upon receiving that report, and spending the next few months examining the additional areas identified above, I believe that I will be in a better position to make clearer and more concrete recommendations for changes to the Court's Order to help DWSD achieve long-term compliance.

## 5. Next Steps

I am recommending a three phase approach to provide feedback to the Court in follow-up to this Director's Compliance Report. First, pursuant to the Court's November 4 order, I will provide copies of this report to the Board of Water Commissioners, the Mayor, the Detroit City Council, the Michigan Department of Environmental Quality, and the Special Master in order to provide all of them with the opportunity to submit written comments on this Report within the next thirty days.

Second, I will continue to review the matters highlighted throughout this report, together with the final EMA report, the lessons learned through the collective bargaining agreement negotiating process, and the comments received from the stakeholders listed above, over the next 90 to 120 days. During this timeframe, I will also attempt to gain a better understanding of the practical implications of the Financial Stability Agreement upon the day-to-day operations of DWSD.

Third, in preparing the final report of compliance, I will provide specific recommendations for changes to the Court's Orders, as the Court has requested. In order to do a thorough job on this final report, however, I am requesting that the Court consider modifying its November 4 order to provide me with an additional sixty days to complete the final report in recognition that my appointment occurred 60 days after the issuance of the November

order. Therefore, I am proposing that the final report be issued on October 4, 2012 instead of on August 4, 2012.

I appreciate the opportunity that the Court has provided me to issue this Director's Compliance Report and I look forward to receiving feedback from the stakeholders.

Respectfully submitted,

Sue F. McCormick
Director,
DWSD

Attachments

CC:  The Honorable Dave Bing, Mayor
     The Honorable Detroit City Council
     The Board of Water Commissioners
     Mr. Dan Wyant, Director, Michigan Department of Environmental Quality