UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                     Honorable Sean F. Cox

City of Detroit, *et al.*,          Case No. 77-71100

      Defendants.
_____/

**OPINION & ORDER DENYING
SECOND MOTIONS TO INTERVENE FILED BY
LOCAL 207 & SAAA (D.E. NO. 2493) AND COUNCIL 25 (D.E. NO. 2499)**

This matter is currently before the Court on a Second Motion to Intervene filed by Local 207 of the American Federation of State, City and Municipal Employees ("AFSCME") (hereinafter "Local 207") and the Senior Accountants, Analysts and Appraisers Association ("SAAA"), and on a Second Motion to Intervene filed by AFSCME Council 25 (hereinafter "Council 25"). Both motions have been fully briefed and the Court finds that oral argument would not significantly aid the decisional process. The Court shall decide the motions without oral argument. *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. For the reasons that follow, the Court shall DENY both motions to intervene as untimely.

**BACKGROUND**

This action, which was commenced in 1977 and has been ongoing since that time, has an incredibly long history that is more fully set forth in this Court's September 9, 2011 Opinion and

1

Order (D.E. No. 2397).  The Court includes here limited background facts and facts that are relevant to the pending motions.

The Environmental Protection Agency initiated this action in 1977 against various defendants, including the City of Detroit and the DWSD, alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq*.  The violations, which are undisputed, involve the DWSD's waste water treatment plant ("WWTP") and its National Pollutant Discharge Elimination System ("NPDES") permit.  Among other things, the EPA's Complaint alleged that "the number of personnel employed [at the WWTP] has not been sufficient, [and] personnel are not adequately trained."  The action was originally assigned to the Honorable John Feikens.  The State of Michigan was later realigned as a party plaintiff and, following multiple motions for intervention which the Court granted, numerous governmental entities were joined as parties.

On September 14, 1977, Judge Feikens entered a Consent Judgment (the "1977 Consent Judgment") establishing a compliance schedule for the DWSD to address and correct the Clean Water Act violations.  It required, among other things, that the DWSD prepare and implement a staffing program detailing its manpower needs.

In 1978, testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment.  On November 21, 1978, Judge Feikens entered an Order appointing Professor Jonathan W. Bulkley as Court Monitor in this action, ordering him to study the operations of the WWTP, report his findings to the Court, and make recommendations to the Court to facilitate compliance with the Consent Judgment.  (D.E. No. 366).

On December 29, 1978, Dr. Bulkley submitted a written report to the Court, that was filed on the publicly accessible docket. ("Dr. Bulkley's 1978 Report").  (D.E. No. 381)  Dr. Bulkley's

2

1978 Report stated that several activities at the DWSD were not in compliance with the requirements of the 1977 Consent Judgment, including staffing.  As to the area of staffing, Dr. Bulkley's 1978 Report stated:  1) "[T]he current judgment states that on or before July 1, 1978, Detroit shall procure and maintain all persons required to operate and maintain the existing treatment program.  The city is not in compliance with this critical portion of the consent judgment."; 2) "[I]t is clear that major shortfalls have been experienced in terms of experienced personnel in the operations group at the wastewater treatment plant."; 3) "The City has consistently failed to respond in terms of adequate staffing."; 4) "It is imperative that the city take action to obtain qualified personnel to fill the present vacancies above the entry level positions."; 5) "In addition to chronic and severe understaffing, the management of the wastewater treatment plant has been seriously hampered by inefficient city personnel practices."; 6) "Extensive delays of five months or more have been experienced in filling vacant positions above the entry level."; 7) "Inadequate staffing at the Detroit wastewater treatment plant has been an identified problem for more than four years."; 8) "[C]ritical vacancies currently exist at all levels above the entry level position."; 9) "All of these staffing problems are going to be compounded as the facility attempts to achieve the higher plant performance required by the effluent limitations" that are "scheduled to become operational 1 January 1980."  (*Id*. at 58-64).

On March 21, 1979, Judge Feikens issued an order appointing the current mayor of the City of Detroit, Coleman A. Young, as Special Administrator of the DWSD.  (*See* D.E. No. 1848-3).  His Order gave the Special Administrator very broad powers "to perform any act necessary to achieve expeditious compliance with the Consent Judgment" and stated that the Special Administrator shall have all "authority required or necessary for the **complete**

3

**management and control** of" the WWTP, including entering into and the performance of all contracts and "the **supervision of all employees of the system, including the hiring or dismissal thereof**." (*Id.*) (emphasis added).

Among other things, as Special Administrator, Coleman A. Young petitioned the Court for instructions when a labor union whose members include employees of the DWSD (Local 207) objected to the DWSD making changes to shift schedules in order to meet the requirements of the 1977 Consent Judgment. (*See* D.E. No. 2440-2). The union's February 22, 1980 response to the petition recognized that future rulings in this action were likely to impact union interests and that the City could ask the Court to violate or modify union contracts:

> If the City of Detroit can use the broadening mandate of a training program to sanction violations of the contract, and of the Public Employment Relations Act, then the Court may well face other labor relations disputes in the near future. The Master Agreement provides restrictions on discipline, promotions, layoffs and bumping, working conditions, work classifications, and many other terms and conditions of employment. There are literally hundreds of grievances involved in these issues, and on any one of them, **the City could petition the Court for further instructions to violate or modify the contract.**

(D.E. No. 2440-3 at 8) (emphasis added).

After testing at the WWTP revealed that the DWSD failed to comply with the terms of the 1977 Consent Judgment, an Amended Consent Judgment was entered on April 23, 1980, that modified the schedule for achieving compliance with effluent limitations for the WWTP set forth in the DWSD's NPDES Permit. It required, among other things, that the DWSD maintain all personnel required to operate and maintain the WWTP.

In 1997, the DWSD again fell out of compliance with its NPDES permit and in August 1997, the DWSD reported certain violations of its NPDES permit to DEQ. Thereafter, Judge

4

Feikens appointed a committee to investigate the causes of the renewed violations. (*see* D.E. No. 1872). That committee completed a report of the causes of the noncompliance in January 2000, and that report was filed on the docket. (D.E. No. 1649). It noted the severity and on-going nature of the DWSD's renewed violations. It also noted that the problems included a "**chronic inability to adequately staff the skilled trades, engineers and other professional personnel**" and a "**failure to provide adequate programs for training, career development and succession planning**." (D.E. No. 1649) (emphasis added).

The City of Detroit filed a written response to the 2000 Investigative Report (D.E. No. 1650) wherein it suggested that another appointment of a Special Administrator for the DWSD was needed to achieve short-term compliance:

> DWSD believes that the appointment of an **Administrator of Operations empowered to manage, control and direct** the procurement of all goods and services, **the hiring, compensation and firing of personnel, entering into contracts,** payment for services and the collection of receivables, and to do all things necessary to accomplish the same, would provide a short-term solution to contracting, purchasing and personnel issues.

(*Id.* at 24) (emphasis added).

Following the 2000 Investigative Report, on February 7, 2000, Judge Feikens entered an Order appointing Mayor Dennis Archer as Special Administrator. (D.E. No. 1848-4 at 4). The Order appointed Mayor Archer as "Special Administrator of the Detroit WWTP for the purposes of correcting the causes of non-compliance as found by the Committee and the purposes of achieving long-term, sustained compliance with the NPDES permit" and gave him broad powers over the DWSD. The Order then specified various responsibilities delegated to the Special Administrator, including: 1) "**Perform an assessment of training needs to update the training**

5

curriculum"; 2) "**Require WWTP training staff to train WWTP personnel exclusively**"; 3)
"**Revisit existing union contracts and civil service rules so that people outside the civil
service system are able to compete with those inside the system for advanced positions**"; 4)
"**Rewrite job descriptions** to make them compatible with those that exist in external job
markets, i.e., both private and public"; 5) "**Review existing union contracts and civil service
rules and develop recommendations to make compensation and compensation increases
similar to those that exist in the external market, including the use of performance
evaluations in granting merit pay increases**"; and 6) "**Develop recruiting
strategies to attract employees from outside the civil service**.   (*Id*. at 8-9) (emphasis added).

On August 30, 2000, Judge Feikens entered a Second Amended Consent Judgment
("SACJ") that set forth yet another compliance schedule for the DWSD to address and correct the
NPDES permit violations.  (SACJ, D.E. No. 1688).

In December 2001, Judge Feikens entered an Order transferring authority of the Special
Administrator to the newly elected mayor, Kwame Kilpatrick, effective January 1, 2002.

On January 5, 2006, Judge Feikens terminated the Order appointing Mayor Kilpatrick as
Special Administrator, concluding that the DWSD's record of compliance had improved in the
last few years.  (D.E. No. 1872).

His belief that progress was being made, however, did not last long.  On May 2, 2008,
Judge Feikens issued an "Order For Briefing Regarding Compliance."  (D.E. No. 2122).  Judge
Feikens stated that "Human resources is the greatest area of current concern in terms of
sustaining compliance" and noted:

A recent study undertaken at my direction by [IMG] found that eight percent

6

of the current management and lead operations positions at the WWTP are vacant,
and 79 percent of the current staff in those positions will be eligible to retire with full
pension benefits by the end of 2009.  The current WWTP operations staff eligible to
retire with full retirement benefits rises to 83 percent by 2012.  The problem extends
through the mid-level positions in WWTP operations, where 73 percent of the
positions are filled by someone eligible to retire with full benefits in 2009 – and that
number increases to 81 percent by 2012.

There is a similar crisis brewing with the WWTP maintenance staff. Of the
management and lead maintenance positions at the WWTP, 25 percent are currently
vacant, and 100 percent of the current staff in those positions will be eligible to retire
with full benefits by the end of 2009.  The senior maintenance staff ranks are facing
a similar situation: 36 percent of the positions are currently vacant, and 63 percent
of the current staff in those positions are eligible for full retirement benefits in 2009-
the percentage increased to 88 percent by 2012.

This problem is compounded by the fact that, as reported by [IMG], DWSD pays
significantly below-market rates for a vast swath of positions.  Since the WWTP is
the biggest facility of its kind in the county, and thus demands more than usual from
its staff, this is especially glaring . . . Therefore, there is ample reason to believe that
a wave of retirements will result in vacancies in positions that are vital to
compliance.  Moreover, the current personnel levels and salaries assume the rates
cover the costs of service.  Failure to adequately support the costs of providing the
service through appropriate rate levels may very well exacerbate the personnel crisis
that is brewing.

(*Id*. at 5-6).  Judge Feikens ordered the City to respond to his concerns in writing.

In responding to that May 2, 2008 Order, the City stated that it had retained IMG to
prepare a report addressing various issues.  (D.E. No. 2130).  That report from IMG, titled
"DWSD Succession Plan Final Report, November 30, 2007," was attached as Exhibit A to the
City's brief.  (D.E. No. 2130-3).  Notably, in that report, IMG repeated its finding that it had
reported to Judge Feikens during the past year:

The physical improvements at the wastewater treatment plant and CSO
stations, which were required under Section II of the SACJ and identified as the
remedies to address and eliminate the technical causes of non-compliance in the
Committee's report, have either been completed or have been initiated and are
expected to be satisfactorily completed.

Other remedies that are more people related or that involve organizational and
governance issues continue to be troublesome and could possibly **jeopardize**

> **sustained compliance. Staffing elements including hiring, career development, succession planning, and compensation remain partially unresolved. Little has been achieved in some of these areas due to the City of Detroit personnel practices, bargaining unit agreements and civil service constraints**.

(*Id.* at 2) (emphasis added). IMG further stated that these "systemic problems" "need to be addressed in the long term." (*Id.*).

The report found several problems in terms of human resources and staffing. IMG noted that there is "an alarmingly low number of certified operators for the size and complexity of the DWSD wastewater treatment plant, which is one of the largest wastewater treatment plants in the country." (*Id.* at 8. **It also found that civil service rules and union rules and agreements compound the problems with recruiting and retaining qualified staff**. (*Id.* at 10-11). It stated that "[i]n terms of governance, City Council maintains control over all employment matters. **All employees of DWSD, with the exception of the Director and Deputy Director, fall under the City of Detroit Civil Service. Job descriptions, pay rates and classifications are all subject to input and approval by the Civil Service Commission (CSC)**," and "**[a]ny changes to job descriptions must also be reviewed by unions**." (*Id.*) (emphasis added). Because of these constraints, the DWSD has "**limited control over who gets hired, what they get paid and job classification revisions**." (*Id.*) (emphasis added).

The recommendations by IMG also included **restructuring numerous civil service classifications at the DWSD**. The report explained: "**Many of the current job descriptions are outdated, and do not reflect the current or future skills needs of DWSD**" and that **IMG recommended that the "job descriptions and qualifications" for 17 different types of job positions within the DWSD be redeveloped**. (D.E. No. 2130-3 at 15) (emphasis added).

8

As Judge Feikens had predicted, 2009 proved to be a difficult year for the DWSD and in September 2009, the DWSD again fell out of compliance with its NPDES permit.  On November 12, 2009, DEQ issued a Notice of Violation to the DWSD for NPDES permit violations for exceeding the limits for discharge of Total Suspended Solids ("TSS") in the months of September and October 2009. On April 14, 2010, DEQ issued a Second Notice of Violation to the DWSD which alleged that the violations identified in the November 12, 2009, Violation were continuing.

Judge Feikens requested that Dr. Bulkley, the Court's appointed Monitor, investigate the renewed NPDES violations and report to the Court.  On June 15, 2010, Dr. Bulkley provided a written report to the Court (the "2010 Bulkley Report"), which was filed on the docket.  (D.E. No. 2296).  In that report, Dr. Bulkley stated that "DWSD has been cited for significant violations for seven consecutive months (September, 2009 – March, 2010)."  (D.E. No. 2296 at 2).  Dr. Bulkley further stated "[i]t is apparent that the current permit violations are similar to the problems that have occurred since the issuance of the original Consent Judgment in 1977."  (*Id*. at 4).  He continued by stating that "[t]he nine (9) causes identified in the January 12, 2000 Report of the Committee of Investigation are very similar to certain of the issues that appear to be contributing to the current Total Suspended Solids NPDES violations from the DWSD's wastewater treatment plant."  (*Id*.).  The 2010 Bulkley Report concluded "[t]he changes implemented in 2000 were apparently insufficient to maintain compliance over the long term, as evidence by the recurring solids build up problem and the related permit violations.  **It may be appropriate to consider more fundamental corrective measures to address the institutional problems which are adversely impacting the performance of DWSD's wastewater**

**treatment plant**." (D.E. No. 2296) (emphasis added).

Following the renewed violations in 2009, the Engineering Society of Detroit was asked to assess and identify immediate emergency corrective steps and a sustainable, long-term remediation strategy for the DWSD. On July 26, 2010, its written report, the "Engineering Society of Detroit Consensus Action Report Detroit Water & Sewerage Department Waste Water Treatment Plant: The Road To Compliance And Beyond" (the "Consensus Action Report") was submitted to the City. (*See* D.E. No. 2400, Appendix at 8). The Consensus Action Report was also provided to the Court, and to the DEQ, by the City.

The Consensus Action Report stated "[a] critical problem facing DWSD and WWTP is lack of sufficient qualified personnel" and that this "stark reality" drives home the importance of human resources. (*Id*. at 7). Nevertheless, it found serious problems with existing human resources services provided to the DWSD, stating that the City of Detroit's Human Resources Department "has provided inconsistent or nonexistent services to DWSD in the past." (*Id*. at 8). It stated that there "is little, if any, on going training of plant supervision personnel" and "[t]here is no succession planning for plant supervision personnel." (*Id.* at 7). Further addressing human resources problems, it stated:

> Faced with its own staff reduction of over 34%, Human Resources fully understands the challenges. The current process barriers driven by real or perceived **requirements due to city ordinances, civil service rules and procedures, requisition practices and collection bargaining agreements have impacted the ability of the Human Resources Department to fill the personnel needs of DWSD and WWTP**. Workings between DWSD and HR are bureaucratic in nature and the process challenges each face in carrying out their responsibilities with the other have not been fully shared. Each has legitimate reasons why the process has not been successful, but joint problem-solving efforts have not yet occurred.
> Putting any fault assessment aside, the lack of an effective succession

10

planning process has again resulted in workarounds that increase the risk of noncompliance due to lack of qualified personnel.

(*Id*. at 8) (emphasis added).

On November 24, 2010, after Judge Feikens retired, this case was reassigned to this Court.  (D.E. No. 2323).

In February of 2011, the City, along with the above counties, determined that a more empowered Board would enhance the DWSD's ability to comply with its NPDES permit and the Clean Water Act.  (*See* 2/11/11 Stipulated Order, D.E. No. 2334, at 1) ("[T]he parties agree that the DWSD's ability to comply with environmental laws and its NPDES Permit will be enhanced by the Board's exercise of its powers and authority to the fullest extent of the law.").

The Stipulated Order provides that Board members must have at least seven years of experience in a regulated industry, a utility, engineering, finance or law and that the Board will be compensated.  (*Id*.).  It further provides that the Board "will be supported by certain staff having expertise in the fields of law, finance, and technology pertinent to DWSD operations (i.e. engineering and/or water or wastewater operations)."  (D.E. No. 2334 at 2).  The Stipulated Order further provides that "[w]ithin six months of the date of this Order, any party may file a motion with the Court to demonstrate that the [DWSD] is in substantial compliance with its NPDES Permit and the consent judgments of this Court.  If the Court is satisfied that substantial compliance has been achieved, it shall dismiss this lawsuit."  (*Id*.).

In compliance with the February 11, 2011, Stipulated Order, on April 1, 2011, Mayor Bing appointed a new Board that the parties believe is equipped to lead the DWSD to achieve sustained compliance with the Clean Water Act.  On July 27, 2011, the Board amended its by-

11

laws, to incorporate the provisions of the Stipulated Order.

Effective July 8, 2011, the City, the DWSD and DEQ entered into the ACO, aimed at achieving compliance with the DWSD's NPDES permit and the Clean Water Act. (D.E. No. 2365-1). The ACO contains provisions that impact staffing at the DWSD, such as:

> The DWSD shall develop a Staffing Plan to establish a minimum staffing level for the WWOG that includes DWSD employees and contractual skilled trades, identify the basis for determining the number of maintenance and operations staff necessary to properly operate and maintain the Detroit WWTP and CSO facilities and a strategy for successful succession planning and training to ensure competent staff.

(D.E. No. 2365-1 at 9).

On July 25, 2011, the City filed a "Motion to Dismiss and for Relief from the Second Amended Consent Judgment." (D.E. No. 2365). In that motion, the City noted that the DEQ and the DWSD had recently entered into an ACO. The City asserted that the DWSD had made substantial progress toward achieving full compliance with its NPDES permit and the Clean Water Act and asked the Court to dismiss this action.

On August 8, 2011, Oakland County and Macomb County each filed motions opposing the City's Motion to Dismiss wherein they argued that collective bargaining agreements and work rules were preventing the DWSD from achieving compliance with the Clean Water Act and the consent agreements reached in this action and **asked this Court to order relief from union agreements and work rules**. (D.E. Nos. 2374 & 2375).

On September 9, 2011, this Court denied the City's Motion to Dismiss in a 44-page Opinion & Order, that included numerous factual findings, several of which relate to collective bargaining agreements, union work rules and job descriptions. (*See, e.g,*. D.E. No. 2397 at 31-33). In denying the City's Motion, this Court noted that, after executing the ACO on July 8,

2011, the DWSD self-reported new violations of its NPDES permit to the DEQ and that the

violations were the same kind of violations that have been occurring throughout this action. (*Id.*

at 41). The Court further found that "the DWSD's violations of its NPDES permit and the Clean

Water Act are serious and continuing and present a serious health, safety and environmental risk

to the people of Southeastern Michigan." (*Id*. at 37). The Court then stated:

> [T]his Court concludes that, in order to achieve *long-term* compliance with the Clean Water Act, other less intrusive measures, over many years and many attempts, having proved unsuccessful, more fundamental and intrusive corrective measures are required. The record in this case establishes that, unless more fundamental corrective measures are taken to address the institutional and bureaucratic barriers to sustained compliance that have been identified by experts and acknowledged by the City, the DWSD will remain in this recurring cycle and will never achieve sustained compliance with its NPDES permit, the ACO, and the Clean Water Act.
> *The Court further concludes that an effective equitable remedy to achieve sustained compliance will require this Court to order structural changes regarding the DWSD that will likely override the City of Detroit's Charter, its local ordinances, and/or some existing contracts.*
>
> . . . .
>
> Accordingly, the Court shall ORDER the Mayor of the City of Detroit (and/or his designee), the City Council President and President Pro Tem, and a current member of the Board (to be chosen by the Board) to meet and confer and, within 60 days of the date of this order, propose a plan that addresses the root causes of non-compliance that are discussed in this Opinion & Order. In making such recommendations to the Court, these individuals *shall not* be constrained by any local Charter or ordinance provisions or by the provisions of any existing contracts. If the local officials fail to devise and propose a workable solution to remedy the underlying causes of the recurrent violations of the Clean Water Act in this case, this Court will order a more intrusive remedy on its own.

(*Id*. at 42-43) (emphasis in original). The Court ordered the above individuals to submit their

proposed plan no later than November 4, 2011. (*Id.* at 44).

There was considerable media coverage of this Court's September 9, 2011, Opinion &

13

Order.   Newspaper articles covering the Opinion & Order appeared on the front pages of both the Detroit Free Press and the Detroit News.  For example, an article that appeared on the front page of the Detroit Free Press stated that "U.S. District Judge Sean Cox ordered Detroit officials Friday to disregard union contracts, local ordinances and even the city charter in their efforts to clean up pollution at the city's sewage plant on the Detroit River."  (*See* Ex. A to Opinion & Order).  One union was quoted in the article:

> "He seems to be suggesting that some type of dictatorship can solve this," said John Riehl, president of AFSCME Local 207, which represents Detroit Water and Sewerage Department works.  The union will fight the order, Riehl said.

(*Id.*).  Numerous other local newspapers also featured articles and editorials discussing this Court's September 9, 2011, Opinion & Order.

Neither AFSCME nor any of the other unions that represent employees of the DWSD sought to intervene after this Court issued its September 9, 2011, Opinion & Order.

Following this Court's September 9, 2011, Opinion & Order, the city leaders and BOWC member identified therein met to devise and propose a workable solution to remedy the underlying root causes of noncompliance ("the Root Cause Committee").   On November 2, 2011, the Root Cause Committee submitted a written proposed "Plan of Action" to the Special Master in this action, which the Special Master then submitted to the Court on that same date. (Docket Entry No. 2409).  The Root Cause Committee *spent considerable time* in developing their proposed Plan of Action.  The Root Cause Committee members noted that they were "permitted to solicit and receive input from various sources" with knowledge of the DWSD and utility operations and noted that they received input from: 1) the Detroit City Council; 2) the Board of Water Commissioners; 3) DWSD Management Staff; 4) **Union Representatives**; 5)

14

Management-side Labor Counsel; 6) Industry Professionals; 7) Current DWSD Vendors; 8) a

Rate Consultant; and 9) Regulatory Agency Input.  (D.E. No. 2409-1 at 2) (emphasis added).

The RCC's proposed Plan of Action contained numerous recommended changes to the DWSD.

In addition, it also recognized that additional changes or relief may be needed as the plan is

implemented.  (*See* D.E. No. 2410-1 at 2).

On November 4, 2011, this Court issued an Order (Docket Entry No. 2410), wherein this

Court found that the proposed Plan of action adequately addresses the majority of the root causes

of non-compliance outlined in this Court's September 9, 2011, Opinion & Order.  This Court

therefore adopted the Plan of Action proposed by the Root Cause Committee and ordered its

implementation.

Although the Root Cause Committee agreed that certain changes to existing collective

bargaining agreements need to occur, despite earnest efforts, the Committee could not agree on

how to achieve the necessary changes.   Because the proposed Plan of Action did not adequately

address collective bargaining issues, the Court considered the issue on its own:

> Based on the record in this case, the Court concludes that certain CBA
> provisions and work rules are impeding the DWSD from achieving and maintaining
> both short-term and long-term compliance with its NPDES permit and the Clean
> Water Act.  Given that the Committee was unable to agree on a proposed solution for
> remedying these impediments to compliance, this Court shall order its own remedy.
> . . . .
>
> The Court has carefully considered all options and concludes that the least intrusive
> means of effectively remedying these impediments to compliance is to: 1) keep all
> current CBAs that cover DWSD employees in force, but strike and enjoin those
> current CBA provisions or work rules that threaten short-term compliance; and 2)
> Order that, in the future, the DWSD shall negotiate and sign its own CBAs that cover
> only DWSD employees, and prohibit future DWSD CBAs from containing certain
> provisions that threaten long-term compliance.

15

Specifically, the Court hereby **ORDERS** that:

1.    The Director of the DWSD, with the input and advice of union leadership, shall develop a DWSD employee training program, a DWSD employee assessment program, and a DWSD apprenticeship training program.

2.    Any City of Detroit Executive Orders imposing furlough days upon City employees shall not apply to DWSD employees.

3.    The DWSD shall act on behalf of the City of Detroit to have its own CBAs that cover DWSD employees ("DWSD CBAs"). DWSD CBAs shall not include employees of any other City of Detroit departments. The Director of the DWSD shall have final authority to approve CBAs for employees of the DWSD.

4.    The Court hereby strikes and enjoins any provisions in current CBAs that allow an employee from outside the DWSD to transfer ("bump") into the DWSD based on seniority. Future DWSD CBAs shall adopt a seniority system for the DWSD that does not provide for transfer rights across City of Detroit Departments (ie., does not provide for "bumping rights" across city departments).

5.    DWSD management must be able to explore all available means and methods to achieve compliance with its NPDES permit and the Clean Water Act. DWSD CBAs shall not prohibit subcontracting or outsourcing and the Court hereby strikes and enjoins any provisions in current CBAs that prohibit the DWSD from subcontracting or outsourcing.

6.    DWSD CBAs shall provide that excused hours from DWSD work for union activities are limited to attending grievance hearings and union negotiations, with prior notification to DWSD management. The Court strikes and enjoins any current CBA provisions to the contrary.

7.    DWSD CBAs shall include a three-year time period pertaining to discipline actions.

16

8.      The Director of the DWSD shall perform a review of the current employee classifications at the DWSD and reduce the number of DWSD employee classifications to increase workforce flexibility. Future DWSD CBAs shall include those revised employee classifications.

9.      DWSD CBAs shall provide that promotions in the DWSD shall be at the discretion of management and based upon skill, knowledge, and ability, and then taking seniority into account. The Court strikes and enjoins and current CBA provisions to the contrary.

10.     Past practices on operational issues shall not limit operational changes initiated by management with respect to DWSD CBAs.

11.     The Court strikes and enjoins any provisions in existing CBAs that prevent DWSD management from assigning overtime work to employees most capable of performing the necessary work within a classification, at the discretion of management. DWSD CBAs shall provide that management has the discretion to assign overtime work to employees most capable of performing the necessary work within a classification, at the discretion of management.

12.     Any existing work rules, written or unwritten, or past practices that are contrary to these changes are hereby terminated.

13.     The Court enjoins the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes arising from the changes ordered by this Court. The Court also enjoins the unions from filing any grievances, unfair labor practices, or arbitration demands over disputes arising from the changes ordered by this Court.

(D.E. No. 2410 at 4-7).

17

This Court's November 4, 2011 Order, as recommended by the RCC, provides for a mechanism for the DWSD to seek any additional or modified relief necessary for long-term compliance.  The Court ordered the Director of the DWSD to prepare a report – "the Director's Compliance Report" – wherein the DWSD could include any additional recommendations or changes that are necessary to achieve long-term compliance.  (*See* 11/4/11 Order at 9).

Beginning on November 14, 2011, unions whose members included employees of the DWSD[1] began filing motions seeking to intervene in this action.

On November 14, 2011, Council 25 filed a motion seeking to intervene in this action. (D.E. No. 2412).  This Court gave that motion expedited consideration, and denied the motion in an Opinion & Order issued on November 18, 2011.  (D.E. No. 2413).

Thereafter, on November 28, 2011, Local 207 and SAAA filed a joint motion seeking to intervene in this action.  (D.E. No. 2415).  This Court gave that motion expedited consideration, and denied the motion in an Opinion & Order issued on December 13, 2011.  (D.E. No. 2422).

The three unions who filed those first two motions seeking to intervene, Local 207, SAAA, and Council 25, appealed this Court's rulings to the United States Court of Appeals for the Sixth Circuit.   They also filed a petition for mandamus in the Sixth Circuit, along with a motion seeking a stay of proceedings in this action.

In an Order issued on December 21, 2011, the Sixth Circuit denied the petition for mandamus.   It also denied the motion for a stay in this action, finding that petitioners had "not made a strong showing of abuse of discretion" by this Court in its determination that motions to

---

[1]As of November 4, 2011, there were twenty different unions whose members included employees of the DWSD.

intervene was untimely.  (D.E. No. 2425 at 4).  The Sixth Circuit also concluded that "in view of

the continuing violations found by the district court, the parties to this action and the public

would be harmed by a stay of the district court's injunction pending this appeal."  (*Id.*).  Thus, the

City and the DWSD continued to implement the changes ordered by this Court.

On December 29, 2011, the International Union of Operating Engineers, Local 324

("Local 324") filed a motion seeking to intervene in this action. (D.E. No. 2427) and on January

4, 2012, Local 2200 of the United Automobile, Aerospace and Agricultural Implement Workers

of America (Wastewater Treatment Plant Supervisors) ("Local 2200") filed a motion seeking to

intervene in this matter.  (D. E. No. 2429).  This Court denied both of those motions in an

Opinion & Order issued on February 23, 2012.  (D.E. No. 2445).  Both Local 324 and Local

2200 appealed this Court's ruling.

On January 10, 2012, a contractor that does business with the DWSD also filed a motion

seeking to intervene in this action, in order to assert claims against the DWSD.  The Court denied

that motion in an order issued on January 11, 2012.  (D.E. No. 2436).

Local 324 and Local 2220 later voluntarily dismissed their appeals of this Court's orders

denying their motions to intervene as untimely.

The Sixth Circuit heard oral argument on the remaining appeals filed by Local 207,

SAAA, and Council 25 on October 9, 2012, but the court has not yet issued a decision.

Meanwhile, on September 24, 2012, the DWSD filed a motion seeking clarification of

this Court's November 4, 2011 Order (D.E. No. 2473).  That motion contained several requests.

After full briefing by the parties, on October 5, 2012, this Court issued an Opinion &

Order that granted the motion in part, denied the motion in part, and ordered supplemental

briefing regarding certain requests.  (D.E. No. 2489).

On October 15, 2012, Local 207 and the SAAA filed a Second Motion to Intervene. (D.E. No. 2493).  On November 1, 2012, Council 25 filed its own Second Motion to Intervene. (D.E. No. 2499).  These motions have since been fully briefed by the parties.

## ANALYSIS

Rule 24(a) of the Federal Rules of Civil Procedure entitles certain parties to intervene in a lawsuit as of right and provides in pertinent[2] part that upon timely motion, the court must permit anyone to intervene who:

> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a).

Rule 24(b) governs permissive intervention and provides in pertinent[3] part that "[o]n timely motion," the Court may allow invention to anyone who "has a claim or defense that shares with the main action a common questions of law or fact."  Fed. R. Civ. P. 24(b).

Rule 24 also provides that any motion to intervene "must state the grounds for

---

[2] FED. R. CIV. P. 24(a) also provides for intervention of right where a person is "given an unconditional right to intervene by a federal statute."  Here, however, the Second Motions to Intervene do not seek intervention based upon an unconditional right to intervene by any federal statute.

[3] FED. R. CIV. P. 24(b) also provides for permissive intervention where a person is "given a conditional right to intervene by a federal statute."  Here, however, the Second Motions to Intervene do not seek intervention based upon a conditional right to intervene by any federal statute.

intervention and must be accompanied by a pleading that sets out the claim or defenses for which intervention is sought."  Fed. R. Civ. P. 24(c).

The Sixth Circuit has explained that a proposed intervenor must establish four factors before being entitled to intervene: (1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the case; (3) the proposed intervenor's ability to protect their interest may be impaired in the absence of intervention; and (4) the parties already before the court cannot adequately protect the proposed intervenor's interest.  *Coalition to Defend Affirmative Action v. Granholm,* 501 F.3d 775, 779 (6th Cir. 2007).

It is the proposed intervenor's burden to "prove each of the four factors; failure to meet one of the criteria will require that the motion to intervene be denied."  *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989).

"An application for permissive or intervention of right must be timely."  *Michigan Assoc. for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir. 1981); *Stotts v. Memphis Fire Dept.,* 679 F.2d 579, 582 (6th Cir. 1982).  "If untimely, intervention must be denied."  *Id.*  In determining whether intervention is timely, courts consider several factors, including:  1) the length of time preceding the application for intervention during which the proposed intervenor knew or reasonably should have known of his interest in the case; 2) the point to which the suit has progressed; 3) the purpose for which intervention is sought;  4) the prejudice to the original parties due to the proposed intervenor's failure after he knew of or reasonably should have known of his interest in the case to apply promptly for intervention; and 5) the existence of unusual circumstances militating against or in favor of intervention.  *Michigan Assoc. for Retarded Citizens,* 657 F.2d at 105; *Stotts,* 679 F.2d at 582; *Grubbs,* 870 F.2d at 345.

21

Notably, the timeliness of a motion to intervene is a "threshold issue" as to both intervention as of right and permissive intervention. *Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011); Fed. R. Civ. P. 24(b).

As such, in analyzing the proposed intervenors' original motions seeking to intervene in this action, this Court began with the threshold inquiry of whether the motions were timely.

In rather lengthy opinions, this Court considered the above timeliness factors and concluded that they all weighed against allowing Local 207, SAAA, and Council 25 to intervene in this action. (*See* D.E. Nos. 2413 & 2422).

Now, almost a year after this Court denied their motions to intervene as untimely, Local 207, SAAA, and Council 25 are again seeking to intervene in this action. Given that this Court denied their original motions to intervene on the threshold inquiry of timeliness, and that as proposed intervenors they have the burden of establishing all factors, including timeliness, one would expect these second motions to devote considerable attention to timeliness. They do not.

To the contrary, Local 207 and SAAA's Second Motion to Intervene addresses the timeliness factor in a single sentence:

> 16.     As there is now no question of timeliness, Local 207 and the SAAA renew
>          their motion to intervene.

(D.E. No. 2493 at 4). After noting that this Court denied their initial motion seeking to intervene as untimely, their supporting brief then states:

> The same basis is, however, not available here. The Court has not decided the
> DWSD's motion and both the EPA and the City have rightly asked for additional
> briefing time. There can thus be no timeliness issue here.

22

(*Id.* at 5).  Their Reply Brief then asserts that "the DWSD has failed to show" that their Second

Motion to Intervene is untimely but does not address any of the above timeliness factors that are

applied in this circuit.  (D.E. No. 2506).

Council 25's Second Motion to Intervene addresses the timeliness factor in a single

paragraph:

> 29.   The herein Motion seeking intervention is timely in consideration that the
> Court has issued an Order allowing parties until November 9, 2012 in which
> to object to DWSD's motion for clarification of the Court's November 4,
> 2012 Order.

(D.E. No. 2499 at 6).  Council 25's Motion fails to address any of the above timeliness factors

that are applied in this circuit.

In responding to these motions, the DWSD asserts that the proposed intervenors are

simply ignoring the legal standards for timeliness in the Sixth Circuit.  It contends that the

pertinent question is when the proposed intervenors knew or should have known of their interest

in this case – not whether their interests would be affected in the specific ways they now claim.

(D.E. No. 2503 at 17; D.E. No. 2508 at 17).  It further asserts that these second motions should

be denied because this Court's previous determinations as to the untimeliness of the applications

for intervention are the law of the case.

The Court agrees that, in these second motions seeking to intervene, the proposed

intervenors have ignored the legal standards for timeliness that apply in the Sixth Circuit.  As

explained below, even if this Court were to conclude that the law-of-the-case doctrine[4] does not

---

[4]"Under the law-of-the-case doctrine, rulings made at one point in the litigation should
continue to govern in subsequent stages of that litigation.*"  Neimi v. NHK Spring Co., Ltd.*, 543
F.3d 294, 308 (6th Cir. 2008).  The doctrine seeks to prevent the continued litigation of settled
issues, thus promoting stability in the decision-making process and judicial economy.  *United*

preclude this Court from reaching a different conclusion, this Court remains convinced that consideration of the timeliness factors weighs heavily against intervention at this very late stage of the litigation.

**1.      The Length Of Time Preceding The Application For Intervention During Which The Proposed Intervenors Knew Or Reasonably Should Have Known Of Their Interest In This Case**

Although neither of the pending motions directly addresses this first factor, the proposed intervenors appear to suggest that their second motions are timely because they were not aware of their interests in the specific relief requested by the DWSD's September 24, 2012, motion until the motion was actually filed and they filed their second motions to intervene shortly after the DWSD filed that motion.  The proposed intervenors' motions and briefs, however, do not direct the Court to any legal authority to support such a position.  And this Court finds that argument fundamentally flawed.

This critical first timeliness factor looks at the "length of time preceding the application during which the proposed intervenors knew or reasonably should have known of their **interest in the case**."  *Blount-Hill v. Zelman,* 636 F.3d 278, 284 (6th Cir. 2011) (emphasis added).

As the cases discussed in this Court's prior opinions denying intervention illustrate, a party is required to seek to intervene as soon as they know, or reasonably should know, that its rights or interests **may be affected** by the litigation.  (*See* D.E. No. 2413 at 19-22; D.E. No. 2422 at 19-23).  A party need not have knowledge of the precise manner in which its interests will be affected; it need only be "aware of the risk" that its interests "may be affected by the litigation"

_____

*States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990).  This Court previously denied the proposed intervenors' motions to intervene in this action on timeliness grounds and, to date, the Sixth Circuit has not reversed that ruling.

24

and that its interests "may not be fully protected by the existing litigants." *Stotts v. Memphis Fire Dept.*, 679 F.2d 579, 582-83 (6th Cir. 1981); *see also Blount-Hill*, 636 F.3d at 285-86; *Michigan Assoc. for Retarded Citizens v. Smith*, 657 F.2d 102, 105 (6th Cir. 1981); *Creusere v. Board of Educ. of the City Sch. Dist. of the City of Cinncinnati*, 88 Fed. A'ppx 813 at 825, 2003 WL 23156643 (6th Cir. 2003); *S.H. v. Strickrath*, 251 F.R.D. 293, 299-300 (S.D. Ohio 2008); *United States v. Tennessee*, 260 F.3d 587, 594 (6th Cir. 2001).

As explained previously, this Court concludes that the risk that this action may affect the proposed intervenors' rights – including rights related to collective bargaining agreements and work rules, terms and conditions of employment – has been apparent for decades. (*See* D.E. No. 2413 at 22-28; D.E. No. 2422 at 23-30).[5] Thus, although the interests of the proposed intervenors in this action may be heightened because of the relief requested in the DWSD's September 24, 2012, motion, their interests in this litigation are not new. *Creusere*, 88 Fed. App'x at 825. To allow the proposed intervenors to intervene now, literally decades after they were first aware that their interests would likely be affected in this case, simply because they have directed the Court to an additional request that may impact their rights, would be to condone the very "wait-and-see approach" that the Sixth Circuit has condemned. *Stotts,* 679 F.2d at 584 n.3; *see also Blount-Hill,* 636 F.3d at 286; *United States v. Certain Land Situated in City of Detroit,* 361 F.3d 305, 311 (6th Cir. 2004); *United States v. Tennessee*, 260 F.3d at 594.

This Court continues to believe that this first, and significant, timeliness factor weighs

---

[5]In addition, Macomb County's Response Brief opposing Local 207 and SAAA's Second Motion to Intervene sets forth additional facts that this Court was unaware of, with supporting documentary evidence, establishing that Local 207 was aware that its interests would likely be affected by this litigation. (D.E. No. 2501).

heavily against allowing Local 207, SAAA, or Council 25 to intervene in this action.

**2.      Purpose For Which Intervention Is Sought**

Pursuant to FED. R. CIV. P. 24, a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." FED. R. CIV. P. 24(c). Under the Federal Rules of Civil Procedure, the only pleadings that may be filed in a civil action are: 1) a complaint; 2) an answer to a complaint; 3) an answer to a counterclaim designated as a counterclaim; 4) an answer to a crossclaim; 5) a third-party complaint; 6) an answer to a third-party complaint; and 7) if the court orders one, a reply to an answer. FED. R. CIV. P. 7(a).

Here, neither Local 207 and SAAA's Second Motion to Intervene nor Council 25's Second Motion to Intervene[6] are accompanied by a proposed pleading. Given that this Court previously highlighted the failure to attach a proposed pleading, and discussed the limited pleadings allowed under the Federal Rules of Civil Procedure (*see, e.g.*, D.E. No. 2413 at 28, noting Council 25's failure to attach a proposed pleading), the Court concludes that this failure is not simply a technical oversight.

Moreover, the motions themselves reflect that neither Local 207 and SAAA nor Council 25 are seeking to intervene in order to file a complaint, a third-party complaint, or any other pleading allowed by the Federal Rules of Civil Procedure.

Accordingly, the Court continues to conclude that this factor does not weigh in favor of intervention.

───────────────

[6]Paragraph 48 of Council 25's motion, and the one-paragraph brief in support of its motion, reference an attached proposed pleading (*see* D.E. No. 2499 at 9) but the docket reflects that no attachments or exhibits were filed with Council 25's Second Motion to Intervene and supporting brief. In addition, Council 25's Motion does not identify the nature of any pleading it seeks to file in this action.

26

3.      **The Point To Which This Suit Has Progressed**

Another factor to consider is the point to which this suit has progressed.  The "purpose of the timeliness inquiry is to prevent 'a tardy intervenor from derailing a lawsuit within sight of the terminal" and, for this reason, "a motion to intervene filed during the final stages of a proceeding is not favorably viewed."  *United States v. BASF-Inmont Corp.*, 52 F.3d 326, 1995 WL 234648 at *2 (6th Cir. 1995).

This Court's November 11, 2012, Opinion & Order denying intervention explained that this factor also weighs against allowing intervention at this late stage of this case – which has spanned four decades:

> The final factor to consider is the point to which the suit has progressed.  "[T]imeliness is not merely determined by the time between the filing of the complaint and the motion to intervene, but rather by what steps occurred along the litigation continuum during that period of time."  *Johnson v. City of Memphis*, 73 Fed.Appx. 123, 132 (6th Cir. 2003); *Stupak-Thrall v. Glickman*, 226 F.3d 467, 475 (6th Cir. 2000).  Extensive progress in a district court action weighs against intervention.  *Id.*; *Blount-Hill*, 636 F.3d at 285.
>
> Here, both the time between the filing of the complaint and the motion to intervene, and the extent to which the action has progressed, weigh heavily against intervention.  AFSCME filed the instant motion more than 34 years after the complaint was filed.
>
> More importantly, there has been extensive progress in this case during the past four decades.  The EPA initiated this action in 1977 against the City of Detroit and the DWSD, alleging violations of the Clean Water Act.  By virtue of various court orders, other parties were joined in this action, including governmental entities who receive wholesale services from DWSD.  At numerous times during the pendency of this action, various mayors of the City of Detroit were appointed as Special Administrators and given broad powers to take numerous actions – including actions that impact collective bargaining agreements, work rules, and job descriptions at the DWSD.  During the past four decades, Judge Feikens and the City of Detroit also had experts investigate the underlying root causes of the DWSD's noncompliance and make recommendations to the Court as to the changes needed in order for the DWSD to achieve compliance – including recommendations impacting collective bargaining agreements, work rules, and job descriptions.  The parties have also entered into numerous settlement agreements, stipulated orders, and consent

27

> judgments.  (*See* Docket Entry No. 2371 at 4-5) (listing numerous settlement agreements and consent judgments in this action.).  All of these events, coupled with the extensive passage of time, weigh heavily against intervention.

(D.E. No. 2413 at 30-31).

In addition, the process made during the past year since that Opinion & Order was issued further militates against intervention.  On November 4, 2011, this Court ordered the implementation of the RCC's Plan of Action, which was developed by local leaders to remedy the recurring violations of the Clean Water Act in this case.  During the past year, significant progress has been made in implementing the November 4th Order including, but not limited to: 1) the DWSD hired a permanent Director, after having been without one since June 30, 2008, who began work in January of 2012; 2) the DWSD also hired a Chief Operating Officer/Chief Compliance Officer, a newly created position, who began work in April 2012; 3) the DWSD has established its own Human Resources Division; 4) the DWSD has hired its own General Counsel; 5) the DWSD, and the newly empowered Board of Water Commissioners ("BOWC"), have been operating under the new procurement policy established by the RCC; and 6) the DWSD has entered into new DWSD-specific collective bargaining agreements with eleven of the twenty unions that represent DWSD employees.  In fact, this Court anticipates that the Director's Final Compliance Report will be able to be filed in a few short months and, soon after that, this action will likely be dismissed.

Accordingly, this Court continues to conclude that the point to which this suit has progressed weighs against intervention.

## 4.    Prejudice To Original Parties And Unusual Circumstances

Finally, the Court also concludes that the final factor to consider, potential prejudice to

28

the original parties and unusual circumstances, also weighs against intervention for the same

reasons set forth in this Court's prior opinions:

> As in *Stotts*, this Court concludes that consideration of prejudice to the original parties, and to the public, also weighs against intervention.
>
> The EPA initiated this action to address violations of the Clean Water Act, the objective of which is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. It is undisputed that, over the course of the past four decades, the DWSD has had serious and recurring NPDES permit violations, which constitute violations of the Clean Water Act. This Court has found that the DWSD's violations of its NPDES permit and the Clean Water Act "present a serious health, safety and environmental risk to the people of Southeastern Michigan." (9/9/11 Opinion & Order at 37).
> . . . .
>
> This Court has already concluded that certain collective bargaining provisions and work rules are impeding the DWSD from achieving compliance with its NPDES permit and the Clean Water Act and issued an order enjoining those provisions. If the Court's Order is not implemented immediately, the DWSD's ability to function and reach compliance with its NPDES permit, the ACO, and the Clean Water Act will be jeopardized. That would prejudice the City of Detroit, the DWSD and its customers, the general public, and the DEQ – the entity currently charged with enforcing the DWSD's NPDES permit, which has spent *considerable resources* monitoring the DWSD over many years.

(*See* D.E. No. 2413 at 29-30).

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Local 207 and SAAA's Second

Motion to Intervene, and Council 25's Second Motion to Intervene, are DENIED AS

UNTIMELY.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: December 6, 2012

29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                 Honorable Sean F. Cox

City of Detroit, *et al.*,             Case No. 77-71100

      Defendants.
_____/

**PROOF OF SERVICE**

      I hereby certify that a copy of the foregoing document was served upon counsel of record

on December 6, 2012, by electronic and/or ordinary mail.

                                     S/Jennifer McCoy
                                     Case Manager