**Moody's downgrades Detroit's GOULT bonds and COPs to Caa1 from B3 and GOLT bonds to Caa2 from Caa1; Water and Sewage Revenue Senior and Second Lien Bonds downgraded to Baa3 and Ba1**

**Negative outlook assigned to all ratings**

Moody's Investors Service has downgraded the City of Detroit's (MI) General Obligation Unlimited Tax (GOULT) and Certificates of Participation (COPs) ratings to Caa1 from B3, and has also downgraded the city's General Obligation Limited Tax (GOLT) rating to Caa2 from Caa1. These downgrades reflect the city's ongoing precariously narrow cash position and a weakened state oversight framework following the repeal of Public Act 4 (PA 4). The city's GO, COPs and GOLT ratings have been removed from review for possible downgrade and the outlook has been revised to negative. The negative outlook on the GO, COPS and GOLT ratings is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of state oversight as challenges to Public Act 72 (PA 72) persist following the repeal of PA 4, and the city's ongoing inability to implement reforms necessary to regain financial stability.

Concurrently, Moody's has downgraded the ratings for the Detroit Water and Sewage Enterprise Revenue debt one notch to Baa3 (Senior Lien) and Ba1 (Second Lien) as the rising risk of a city bankruptcy filing brings ongoing uncertainty regarding the treatment of these securities in the event of a filing. Ratings for the Detroit Water and Sewage Enterprise Revenue Bonds have been removed from review for possible downgrade and the outlook has been revised to negative. The negative outlook for the water and sewer debt is based on the increasing possibility that the city could file for bankruptcy over the next 12 to 24 months.

**Strengths**

-Focused and dedicated executive management team supported by a strong working relationship with the Governor's office

-State oversight provided by Michigan Public Act 72

-Escrowed bond proceeds available following successful completion of the MFA financing deal

**Challenges**

- Weak liquidity profile, requiring active cash flow management techniques, including debt refinancing, to meet operating needs

-Ongoing state oversight of the city's finances which may result in appointment of an emergency financial manager, which is the first step to filing for bankruptcy

-Challenges to timely implementation of restructuring provisions outlined in the Financial Stability Agreement; ongoing political instability

-Potential termination payment due for swap agreements issued in conjunction with Certificates of Participation

**DETAILED CREDIT DISCUSSION**

1

ILLIQUID CASH POSITION PERSISTS DESPITE ONGOING RESTRUCTURING EFFORTS

Liquidity is a key predictor for a potential default or bankruptcy and the city's projections of a negative cash position within one month, along with a persistently narrow cash position despite ongoing reform efforts, raises the risk of a potential default or bankruptcy filing. The city's cash balance declined by $143 million in fiscal 2012, with an ending cash position of $1.9 million as of June 30th, according to preliminary, unaudited figures. The decline in the city's cash position is attributed to overstated income tax collections, prior year property tax distributions, prior year pension contributions, an ongoing Detroit Department of Transportation subsidy and a carryover of prior year vendor payments. The positive cash position at the close of fiscal 2012 was due in part to the infusion of $50 million of refinancing proceeds from the city's Series 2012 Distributable State Aid sale for self-insurance expenditures.

In the current fiscal year 2013, the city has publically stated that, absent an infusion of proceeds from the escrowed funds set aside by the state following the completion of the MFA deal, its cash position may fall to a negative position by December 2012. The city and state finalized the Milestone Agreement, which specifies the terms upon which escrowed bond proceeds will be released to the city and is in accordance with the Financial Stability Agreement (FSA) signed by both parties. The FSA defined oversight by which the state seeks to assist the city in restoring fiscal health. Under the Milestone Agreement, $10 million in escrowed proceeds was set to be released to the city on November 20, 2012, following city council's approval of three contracts. However, one of the three contracts was not approved, so the state did not release the funds. The city subsequently announced plans to furlough non-revenue generating employees to offset the loss of bond proceeds. Per the Milestone Agreement, the state is scheduled to release $20 million of escrowed proceeds on December 14, 2012 following city council approval of previous terms plus additional contracts and the city's completion of certain restructuring actions. The city is also working to amend its fiscal 2013 budget to account for personnel savings that were included but not realized due to delayed implementation. Further adjustments or cost reductions may be required should the city not receive the $20 million in December.

REPEAL OF PA 4 RESULTED IN WEAKER STATE OVERSIGHT STRUCTURE AND LEGAL CHALLENGES TO ENACTED PERSONNEL REFORMS

Recent changes to the state oversight framework for distressed local governments in Michigan creates additional uncertainty and thus added pressure on the already challenged financial position of the City of Detroit. On November 6, 2012 residents in the State of Michigan voted in a statewide referendum to repeal PA 4. Per the State of Michigan Attorney General, the repeal has resulted in reversion to PA 72, the previous legislation that governed remedies for distressed local governments in Michigan. PA 72, while still providing the state authority to oversee distressed governments, provides a weaker legal framework for state oversight. The repeal of PA 4, and subsequent loss of key tools for rectifying financial stress in local governments, has resulted in the city's loss of the ability to amend collectively bargained contracts going forward. While there has been no immediate financial or operational impact on the city following the repeal, the city notes that legal challenges, both ongoing and yet-to-be-filed, could negatively impact fiscal 2013 budget projections if previous actions taken under PA 4 are reversed. Further, as challenges to the validity of PA 72 continue, the potential loss of a statutory framework for state oversight of Detroit could place additional pressure on the city's rating.

While incorporating much of the same framework and tools afforded to local governments in PA 72, PA 4 expanded the consent agreement provisions, providing additional restructuring tools to governments that agree to this form of state oversight, including the City of Detroit. The city used the expanded powers under PA 4 to impose city employment terms on many unionized employees, estimating annualized savings from the new employment terms at $102 million. The city is now projecting approximately $60 million in savings

2

from these new employment terms in fiscal 2013, but noted that the Detroit Police Officers Association has filed a challenge to the new terms, arguing that the repeal of PA 4 negates the city's authority to circumnavigate the collective bargaining process. Management expects other unions to file similar suits. Successful challenges could result in higher personnel expenditures for the city in the current fiscal year and beyond, which would likely strain the city's already narrow cash position.

In addition to the challenge to acts taken pursuant to PA 4, there is a separate legal challenge to the validity of PA 72 following the repeal of PA 4. The suit challenging PA 72 was filed on September 26, 2012 on behalf of city councils for the cities of Pontiac, Flint and Benton Harbor MI, alleging that the appointment of Emergency Financial Managers under PA 72 was invalid. These cities state that PA 72 was replaced, and therefore eliminated, following the enactment of PA 4. If successful, and PA 72 is invalidated, Michigan would no longer have a framework for state assistance for distressed local governments for the first time since 1990, absent new legislation. Favorably, legislators have been developing proposals for a new framework for municipalities in distress.

ONGOING POLITICAL INSTABILITY AND OPERATING STRUCTURE CHALLENGES DETRIMENTAL TO IMPLEMENTATION OF FSA

Ongoing political instability, along with unexpected challenges in implementing key components of the Financial Stability Agreement (FSA), is impeding the city's ability to focus on restructuring initiatives which are crucial for achieving balanced financial operations. The city continues to implement its operational reform program pursuant to the agreement laid out in the FSA. The program is aimed at right sizing the city's operations following years of revenue and population declines, focusing on nearly all areas of city government. The Financial Stability Board, which oversees the implementation of the FSA, has cited slower than expected progress in implementing key reforms. The city noted that it has run into unexpected challenges during its implementation, including ongoing legal challenges from various stakeholders, personnel challenges stemming from unfilled and under-filled positions, difficulty in procuring goods and services necessary to implement reforms, along with an antiquated information technology structure and the inability to receive legislative support for key reforms.

The challenges are likely to be exacerbated by continued turnover in executive positions and ongoing disagreements between city departments. Reforms in the city's lighting and transit departments, as well as the police department, could be delayed following the departure of key personnel. Additionally, the city's Corporation Counsel may continue to challenge the validity of the Financial Stability Agreement. She recently opined against city council approval of one of three contracts necessary to fulfill the new Milestone Agreement between the city and the state. As previously discussed, the approval of all three contracts was a condition to release $10 million of escrowed proceeds to the city. Favorably, the Mayor's office and the Governor's office continue to communicate regularly and work together to resolve the city's financial and operational challenges. Both have demonstrated a strong commitment to the city and the continuation of this commitment, along with the working relationship between the governments, will continue to be a subject of ongoing credit reviews. To the extent that actions of City Council or other city leaders undermine the cooperative relationship, the city's ability to regain financial stability could be delayed.

UNCERTAINTY OF OUTCOMES FOLLOWING POTENTIAL BANKRUPTCY FILING DRIVES RATING ACTIONS FOR ENTERPRISE DEBT

The city's precarious cash position, along with uncertainty surrounding state oversight, challenges to implementing the Financial Stability Agreement and ongoing political instability, all point to an increase in the potential for a bankruptcy filing by the city. The ratings for the city's GO, COPs and GOLT debt reflect the possibility that in a bankruptcy filing these bonds would likely be treated as unsecured and subject to a

default because of the automatic stay under the bankruptcy code. The ratings of the city's water and sewer enterprise debt reflects our view that losses are unlikely, although how the bonds continue to perform in a potential bankruptcy remains uncertain.

PA 72 states that an Emergency Financial Manager may authorize a local government to proceed under Title 11 of the U.S. Bankruptcy Code, unless this authorization is disapproved by the local emergency financial assistance board within 60 days after notice has been received by the board. Despite having the legal framework in place for a filing, no Michigan municipality has successfully filed for bankruptcy, which leaves little precedent for potential treatment of Detroit's outstanding debt obligations in event of a Chapter 9 filing. Generally speaking, unsecured claims, like general obligation pledges, are subject to the automatic stay and may not result in full recovery in a bankruptcy proceeding. Placement of the GO, COPs and GOLT ratings reflect the possible delay and potential loss to bondholders in the event of a filing by the city.

The rating distinction between the city's general obligation ratings and revenue ratings incorporate the statutory protections afforded to revenue bondholders at the federal and state level, including the possible exemption of special revenue bonds from the automatic stay provision triggered by a Chapter 9 bankruptcy filing and the statutory lien granted to revenue bondholders in the State of Michigan, although how a Michigan court would apply these rules remains highly uncertain. The exemption from the automatic stay, if applied, could result in revenue bondholders continuing to receive timely payments subsequent to a bankruptcy filing, and the rating of the water and sewer bonds reflects the lower probability of default to bondholders than the city's general obligation pledges.

The potential outcomes for revenue bondholders subsequent to a bankruptcy filing range from timely payments made in full to delayed payments that are eventually reduced, with little guiding precedent to predict likely outcomes. While the general guiding principles listed above provide a framework for the potential treatment of securities in the event of a bankruptcy filing, the ultimate question of timeliness of payment and potential diminishment of repayment rests with the individual bankruptcy court. The ultimate application of these standards in an individual municipal bankruptcy filing is uncertain given the governing equity standard applied in bankruptcy proceedings. Additional factors, such as willingness to pay, ability to pay and the existence of additional secured creditors, could also have an impact on bondholder repayment.

**Outlooks**

The negative outlook on the GO, COPS and GOLT ratings is based on the increasing possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of state oversight as challenges to PA 72 persist following the repeal of PA 4, and the city's ongoing inability to implement reforms necessary to regain financial stability. The negative outlook for the water and sewer debt is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months.

**What Could Change the GO, GOLT and COPs Ratings – UP (or removal of the negative outlook)**

- Material operating surpluses, achieved through structurally balanced financial results that will carry forward to future fiscal years

- A material improvement in the city's unrestricted cash and investment position such that the city continues to be less dependent on cash flow borrowing

-Improved liquidity and cash management such that the city's ability to ensure timely debt service payments are not in question

4