**City of Detroit**
Water and Sewerage Department
Board of Water Commissioners

735 Randolph Street
Detroit, Michigan 48226-2830
Phone: 313-224-4704 TTY:311
Fax: 313-224-6067
WWW.DETROITMI.GOV

March 13, 2013

<u>Hand Delivered</u>

David M. Ottenwess
Ottenwess, Allman & Taweel, PLC
535 Griswold Street, Ste 850
Detroit, MI 48226

RE: DWSD Root Cause Committee's Final Report

Dear Mr. Ottenwess:

Pursuant to the initial direction provided by Federal District Court Judge Sean F. Cox in his orders of September 9, 2011, November 4, 2011, and December 14, 2012, the Root Cause Committee has continued to meet not less than monthly since September of 2011.

The attached final report from the Root Cause Committee is intended to lay out a viable conceptual plan for moving DWSD forward in the face of an uncertain future. This plan is provided in advance of the Director's Final Compliance Report so that the concepts can be discussed publicly with a goal towards developing consensus that will allow for a stipulated order of dismissal of United States v City of Detroit (Case No. 77-71100) at the appropriate time.

I request your assistance in submitting this Report to the Court.

Sincerely,

James G. Fausone
Chair
Board of Water Commissioners

CC: Charles Pugh, Council President
Gary Brown, Council President Pro-tem
Jack Martin, Chief Financial Officer, City of Detroit
Sue McCormick, Director, DWSD
Matt Schenk, COO/CCO, DWSD

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

**Statement of the Situation:**

The State of Michigan is conducting a financial review of the City of Detroit (the "City" or "Detroit") and has made a recommendation that there exists a financial emergency and has entered into a consent agreement (the "Financial Stability Agreement") with the City of Detroit. While that review took place under the former Public Act 4, the new Emergency Manager Law would ratify that consent agreement and allow for the Governor's Appointment of an Emergency Financial Manager as one of four options that could be considered for Detroit.

A lack of financial stability within the City of Detroit has continued to hamper the operations of the City of Detroit, and by extension Detroit Water and Sewerage Department ("DWSD"). The financial situation of Detroit has caused two rounds of bond rating downgrades, a declaration of default under various financing documents, the incurrence of additional indebtedness by DWSD to resolve these defaults and ultimately higher costs of capital for DWSD and higher rates for its customers. Continued erosion of the financial position of Detroit and DWSD will continue to negatively impact DWSD's ability to achieve long-term compliance.

The significance of this issue has taken on urgency over the past months as media reports have increased concerning the possible appointment of an Emergency Manager and the possibility of bankruptcy under the State's new emergency manager law. In recent weeks, DWSD has received verbal and written correspondence from various vendors questioning DWSD's ability to meet its financial commitments. This includes construction contractors, chemical providers, temporary staffing companies, and developers of projects that are critical to long-term compliance. Explaining DWSD's independent finance function as articulated within the November 4, 2011 Court Order and further defined through clarifications in October and December of 2012 has not satisfied all vendors that their dealings with DWSD would be adequately protected from the financial risks of the City of Detroit. These emerging issues threaten compliance and DWSD's daily operations.

On several occasions, the State Treasurer has indicated that DWSD is a valuable asset of the City of Detroit that could be used to help solve some of the City's financial problems. Recent changes in the language of the new Emergency Manager Law as well as the City's recent hiring of an investment bank, Miller Buckfire & Co., and financial and operational advisors, Conway McKenzie, provide further evidence of the intentions of the State and City to explore all options in addressing Detroit's fiscal crisis, which could include monetizing DWSD through a private sale or other transactions.

The Root Cause Committee originally identified the need to define value to the City of Detroit in recognition of its ownership of the Detroit Water and Sewerage Department in the November 2011 Root Cause Committee Report. At the time, the Committee indicated that more time was necessary to explore the concepts of an Efficient Compliance Payment and/or a Payment In Lieu of Taxes ("PILOT") as a way to incentivize the City to make the politically difficult decisions that would be necessary to assist DWSD in achieving both short and long-term compliance.

1

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

During the intervening year, there has been little progress on the concepts of the PILOT or Efficient Compliance Payment as the Rate Settlement Agreements currently stand as a barrier to moving the concept forward. Additionally, to date DWSD has failed to demonstrate the appropriate business case.

In addition to these impediments to implementing the PILOT and Efficient Compliance concepts, there are still several aspects of the Court's November 4, 2011 order that DWSD has been unable to implement within the existing organizational and legal structure for the Department. Further, the City's financial distress has directly negatively impacted DWSD's bond rating, making it more expensive for DWSD to borrow money to fund capital projects needed to insure long-term compliance.

In light of the current dialog about the City obtaining value for DWSD, and the ongoing barriers to achieving long-term compliance, the Root Cause Committee supports as the best option for the City of Detroit, the customers of DWSD, and their citizens, the exploration of a more autonomous DWSD operational model that would be designed to provide a recurring revenue stream to the City of Detroit, enhance DWSD's operational and legal independence from the City, better insure compliance and preserve the City of Detroit's long-term ownership of the system.

### Background Research:

The Root Cause Committee has looked at several operational models in communities for Water and/or Wastewater services as non-City Departments including the New York Municipal Water Authority, the Citizens Energy Group of Indianapolis, DC Water, the Lansing Board of Water and Light, The Notheast Ohio Regional Sewer District, and the Louisville Board of Water Works.

The New York Municipal Water Authority was established by state law as a separate authority from the City of New York to manage the water and wastewater services for area residents. The Authority has a seven member board comprised of 4 ex officio New York City Directors, two mayoral appointments and one gubernatorial appointment. The Authority holds the assets of the system pursuant to a lease agreement with the City and makes annual lease payments into the City's general fund based upon a capped formula tied to total indebtedness.

Indianapolis sold its public utility groups to Citizens Energy Group in 2011. CEG holds the assets as a not-for-profit public trust and is managed by a private board of directors. Pursuant to Indiana state law, there is a 7 member Board of Trustees that nominates its own successors who shall be confirmed by the Mayor. That Board of Trustees, in turn, appoints the members of the Board of Directors who runs CEG. The sale of the water and wastewater services to CEG by the City of Indianapolis included CEG assuming $1.5 billion of current indebtedness for a total price of approximately $1.9 billion, netting the City of Indianapolis approximately $425 million to fund general fund expenses.

DC Water was created as an independent authority pursuant to a statute enacted in 1996. Under that framework, there is an independent board of directors created that has autonomy over all operations of DC Water with very limited exceptions. The 11 member board is appointed by the Mayor

2

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

as follows: 6 members who live in D.C., no more than 4 of whom can be DC employees, and 5 members nominated by the neighboring customer communities. The Board must receive Mayoral and District Council approval for any sale of a plant facility or any privatization of the entire plant operations. Also, DC retains all access rights to the waterfront on all DC Water property. DC Water makes an annual PILOT payment to Washington, D.C. in accordance with the terms of a five year MOU, currently set at approximately $25 million per year. All assets of DC Water were transferred to DC Water and are held by DC Water on an interim basis until such time as all revenue bonds are repaid. The Board Chair was delegated with the power to conduct a study on turning DC Water into a "true regional authority" with a recommendation for how to compensate DC for its historic investment in the System.

In Louisville, the Louisville Metro Mayor appoints all Board members and serves as an ex officio member. The Board is bi-partisan with an equal number of representatives from each political party. The Board has total autonomy to make all decisions impacting operations of the utility with no other governmental oversight from the Metro Government. Annually, the utility pays a return on equity or dividend to its shareholder (Louisville). By way of example, in 2011 there was a 3.75% rate increase and the Utility was able to pay an 8.2% dividend to Louisville Metro comprised of $18 million in cash plus unbilled water and fire protection services to the government of $14.6 million, despite a reduction in utility revenues. It is important to note that current state law in Michigan would prohibit a model that provides free services to any customer.

In Lansing, the Board members are appointed by the Mayor with Council ratification. The Board has full and final authority over all matters affecting the operation of the utility including contracting, rate setting, capital planning, hiring a Director, etc. The only item that requires further Council approval in Lansing is the sale of surplus real property, which requires 6 votes of Council. Again, in exchange for the independence, the Lansing Board of Water and Light pays a return on equity back to the City's general fund annually that roughly approximates the computation of a payment in lieu of taxes on its facilities. Currently, that payment is set at 5% of sales for the next five years. That payment was most recently increased by a unanimous vote of the Board in 2012.

The Northeast Ohio Regional Sewer District ("NEORSD") was created by order of District Court Judge George McMonagle in April, 1972 in response to a lawsuit involving violations of the Clean Water Act. Prior to the Court's involvement, the Sewer District was owned and operated by the City of Cleveland and served multiple jurisdictions, including the thirty-seven co-parties to the case. Through the Litigation, Judge George McMonagle ordered the transfer of assets by the City to a newly created public authority in Ohio. The Court further ordered that the NEORSD Articles of Incorporation be filed by the City of Cleveland by a date certain. The revised Board composition for NEORSD included representatives of Cleveland as well as the customer communities.

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

**Principles for Consensus Approach:**

In light of the City's and DWSD's current situation and after reviewing these models, we feel that implementing a hybrid operating model taking elements of Louisville, Lansing, DC Water, Northeast Ohio, and New York is in the best interest of DWSD's long-term compliance. The principals behind this new model would include:

(1) Achieving both Short and Long-term Compliance through financial stability and greater autonomy;
(2) Insulating DWSD and its customers from the financial distress and credit risk currently associated with the City of Detroit;
(3) Providing a framework for improving DWSD's credit rating, thereby reducing the cost of prospective debt service and increasing the availability of capital;
(4) Creating a more proactive and accountable DWSD governance and management structure better able to address the operational needs of the utility and its customers and capable of pursuing strategic opportunities to lower overall cost and improve service and compliance;
(5) Providing a rate of return or ongoing revenue stream to the City of Detroit's General Fund; and
(6) Protecting the City of Detroit's ultimate ownership of the DWSD system; and
(7) Providing for operational and governance stability for DWSD and its Management Team.

In coming to this conclusion, we have consulted with outside counsel possessing expertise in municipal finance and bankruptcy law, as well as experience with the creation and operation of public authorities. Consultation with finance professionals provided a preliminary financial evaluation of the benefits of this proposal for DWSD's customer base.

**Financial Considerations:**

Preliminary work done by DWSD's rate consultant has provided a very broad range for what a potential Payment in Lieu of Taxes could generate in terms of an annual revenue stream for the City of Detroit. The preliminary estimate, ranged from $15 million to $70 million based upon all property located within the City of Detroit. Looking at the issue in greater detail will be necessary, but for purposes of this discussion $50 million is a reasonable assumption for an interim baseline payment. The appropriateness of this notional amount or an alternative figure will require validation through the hiring of appraisers and/or through a valuation opinion provided to the City and confirmed through a financial consulting firm hired by the DWSDA.

In addition, the preliminary financial review of the impact of a new operational structure for DWSD that addresses the seven points outlined on the previous page, could result in an improvement of DWSD's cost of capital in the bond market by roughly 75 basis points. Looking at the impact of those numbers on the proposed DWSD capital needs over the next ten years, together with the potential impact of that rating on current bond refunding candidates could generate a positive cash benefit annually, improving to approximately $50 million per year after ten years.

4

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

### Prospective Operational Model:

The Root Cause Committee supports implementing a new operating model for DWSD in which DWSD will operate pursuant to the following principles (as partially depicted in the diagram on page 10 of this report). The Root Cause Committee recommends that the parties in interest negotiate and support a stipulated order for dismissal that will direct the implementation of this operating model over a nine-to-twelve month timeframe.

(1) DWSD will operate as a stand-alone public Authority, with the DWSD Director and/or the Board of Water Commissioners holding final approval authority over all matters related to DWSD's operations. This will include, but not be limited to, the power to sue and be sued in its own name, the power to rename DWSD; the power to contract in its own name, to hold property in its own name, and to recognize the new Authority as a successor employer to the City of Detroit, etc.;

(2) The Assets of DWSD will be moved to the new DWSD Authority by way of a two-step process. First, pursuant to proposed articles of incorporation attached to a stipulated order of dismissal and on a timeline set forth in the stipulated order, the City will create two new public authority entities – DWA (i.e. Detroit Water Authority) and the new DWSD Authority (retaining its current board configuration). Pursuant to the stipulated order of dismissal, the City would approve the transfer of the assets to DWA by a date certain, likely ten months following the entry of the final order. Second, the DWA would enter into a lease agreement with the new DWSDA. In consideration of the transfer of assets to the DWA, the City of Detroit would receive an annual PILOT payment in accordance with Section 4, below.

(3) The lease between DWA and DWSDA will be negotiated by the City and DWSD subsequent to the stipulated order, completed and approved by the City 30 days prior to the transfer of assets to DWA. The lease would be structured as a capital lease and term will be tied to the length of DWSD's bonded indebtedness and would automatically extend as new bonds are issued by DWSDA and DWSDA remains in compliance with the terms of the lease. In lieu of a lease payment, DWSDA would make a PILOT payment to the City through the DWA.

(4) The computation of the PILOT Payment would be a payment in lieu of taxes on all real property located within the City of Detroit at recognized appraised valuation. This payment can also follow an approach used in other communities where the initial PILOT calculation is then converted into a percentage of DWSD rate revenue and future payments would then follow the same percentage of sales. We understand and acknowledge that the final value of the PILOT Payment will require analysis and valuation beyond the time frame currently available to the Root Cause Committee. Specifically, the City's financial advisors will need time to review the data as well as gathering assessments for all of the DWSD assets located within Detroit. However, the Root Cause Committee believes that the minimum annual

5

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

interim payment should not be less than $50,000,000.00, and the Root Cause Committee's recommendation of this transaction is premised on this assumption. Further consultation with the Root Cause Committee would be needed if: (i) this minimum annual value was not anticipated to be achievable, (ii) if other provisions of this transaction materially affected the anticipated economic benefit to the General Fund, or (iii) if the City determines an alternative transaction could convey greater value to all parties;

(5) The interim baseline payment shall continue until such time as the DWSDA obtains a further valuation analysis and determines that in lieu of the PILOT payment, the DWSDA should enter into a modified lease agreement with the DWA upon different financial terms, including alternates form of payment, but under no circumstances no less favorable to the City's general fund than the interim baseline payment.

(6) The City of Detroit will have certain negotiated remedies should DWSDA fail to make payment or otherwise default on the lease, including a springing reverter interest in the Assets of DWSD transferred to the DWA that will vest upon the DWSD Authority being awarded the Platinum award by the National Association for Clean Water Agencies (NACWA) for achieving five consecutive years of compliance with the Clean Water Act. After that springing interest vests, DWA's lease with the DWSDA would immediately terminate should any of the following events occur:
   a. DWSD ceases to operate as a public utility serving Southeastern Michigan,
   b. DWSD ceases to pay the City of Detroit its annual payment as outlined in #4 above,
   c. The BOWC votes by a unanimous vote to return the assets to the City,

(7) The new DWSDA shall have all powers of a public body corporate in Michigan including, but not limited to:
   a. Issue taxable and tax exempt revenue bonds;
   b. Apply for and receive loans from local, private, State and/or Federal sources including SRF loans;
   c. Implement the powers delegated by prior Court orders; and
   d. Act on its own with respect to local ordinances and regulations that impact DWSD operations (i.e. downspout disconnects, etc.);

(8) Appointment power for the two new public authorities is recommended to be as follows. The Mayor shall maintain the authority to appoint the DWSDA in the same manner as is articulated in the February 2011 Stipulated order except that the Root Cause Committee recommends that one of the four Mayoral appointments shall be made from a list of three names presented by the Detroit City Council. It is recommended that the DWA board consist of the following five ex officio members: The Detroit City Council President, the Mayor of the City of Detroit, the Oakland County Water Resource Commissioner, the

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

Macomb County Public Works Commissioner, and the Wayne County Executive, Further, the by-laws of the DWSDA and the DWA shall include provisions to allow for the appointment of additional Board Members for major customers upon a super-majority vote of each body.

(9) The Detroit City Council shall annually appoint an individual to serve as a Customer advocate for Detroit retail customers who shall be retained by DWSD in accordance with compensation approved by the Director or the BOWC in accordance with the DWSD Procurement Policy;

(10) All other powers granted or reserved to the City of Detroit, the Mayor, or the City Council with respect to DWSD under the Charter, State Statutes, or Court orders that are not expressly continued in the stipulated order for dismissal will be eliminated for so long as the DWSDA continues to operate.

(11) The DWSDA shall serve as its own plan administrator with respect to the establishment of a Defined Contribution Plan. Current DWSD Defined Benefit members, retirees, and beneficiaries, and future DWSDA employees may continue to participate in the City of Detroit's General Retirement System, consistent with their applicable collective bargaining agreements and/or terms and conditions of employment until such time as the DWSDA determines to establish its own retirement system. Any such action shall be at a minimum cost neutral to the General Retirement System and the General Fund, as mutually determined by the City and DWSDA.

(12) The City of Detroit use of the new payment stream will be unrestricted and the City may encumber or otherwise monetize all or a portion of that revenue stream.

(13) In addition, the Root Cause Committee recommends that the DWSD initiate a request of the State Legislature to adopt an amendment to the Revenue Bond Act to provide for the establishment of a statutory trust. This legislation would be consistent with and clarify the legal structure and credit worthiness of the enterprise and revenues of DWSD A.

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

### Interim Relief:

In recommending a stipulated order of dismissal that would outline a nine-to-twelve month implementation timeframe for the establishment of the necessary Public Authorities and the transfer of assets to occur, the Root Cause Committee acknowledges that the proposed future stipulated order of dismissal of this case will need to provide some clarity on how DWSD is to operate during the intervening time period and the ongoing interaction and flow of funds and provision of services between the City and DWSD. This is particularly significant in light of the potential appointment of an Emergency Financial Manager ("EFM") by the Governor. Amongst the potential recommendations an EFM could make to the Governor would be a bankruptcy filing under the new Emergency Manager Law scheduled to take effect on March 27, 2013.

The Root Cause Committee supports DWSD continuing to operate pursuant to the prior interim orders of this Court, including the November 4, 2011, October 5, 2012, and the December 14, 2012 interim orders. In addition, the Root Cause Committee recognizes that should the Governor appoint an Emergency Financial Manager, the EFM can assume all of the duties of both the legislative and executive branch of City Government. Therefore, the Root Cause Committee recommends that for this intervening period of time, approvals for items recommended by DWSD that currently require City Council approval under the interim orders shall be deemed to be approved if authorized by either the Detroit City Council or the EFM during the interim period until such time as the Authority structure is implemented.

### Conclusion:

The future of DWSD is of critical importance to the City of Detroit, the customers of DWSD, and the regulating agencies of the State of Michigan and the Federal Government. As a result, it is the recommendation of the Root Cause Committee that the implementation of this Root Cause Report shall be subject to discussion and recommendation of the parties to the Court action, including the City of Detroit, the State of Michigan, the BOWC, the DWSD Management, and the customer base as represented by the Wayne County Executive, the Macomb County Public Works Commissioner, and the Oakland County Water Resource Director.

## ROOT CAUSE COMMITTEE REPORT
### March 13, 2013

We, the undersigned, hereby submit this Plan, as presented, to the Special Master upon our recommendation that the Court accept this proposal.

Jack Martin
Chief Financial Officer
Mayor's Office, City of Detroit

James Fausone
Chairman
Board of Water Commissioners

Sue F. McCormick
Director
DWSD

Charles Pugh,
President
Detroit City Council

Gary Brown
President Pro Tem
Detroit City Council

Matthew Schenk
Chief Operating & Compliance Officer
DWSD

ROOT CAUSE COMMITTEE REPORT
March 13, 2013

