# EXHIBIT C



6 MPER ¶ 24061, 6 Michigan Pub. Employee Rep. ¶ 24061, 1993 WL 13698747

Page 1

Michigan Employment Relations Commission

MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES

No. UC88 B-14

No. C88 L-331

1993 MERC Lab Op 345

May 11, 1993

**Related Index Numbers**

36.36 Forms of Clarification or Modification, Position Reclassification
43.412 Job Content and Scheduling, Job Description, Job Classifications
74.31 Types of Orders, Cease and Desist
74.32 Types of Orders, Restoration of Status Quo Ante

**APPEARANCES:**

For the Public Employer: Samuel E. Baker, Director of Employee Relations

For the Clerical-Technical Union: Finkel, Whitefield & Selik, P.C., by Bradley T. Raymond

For the Administrative-Professional Association: White, Beekman, Przybylowicz, Schneider & Baird, P.C., by James J. Chiodini

**Case Summary**

Letter of agreement binding clerical-technical union and university to hire outside consultant to conduct jointly funded classification study did not privilege university to transfer employees from clerical-technical bargaining unit to units represented by other unions. Record failed to establish intent by either party to be bound by consultant's recommendations or that consultant would make final decisions on unit placements. However, where disputed unit changes also resulted in classification, title and grade changes which have been in effect for more than four years, MERC concluded that cease and desist order, rather than unit clarification or restoration of status quo, was the appropriate remedy.

**Full Text**

**Decision and Order**

On December 11, 1992, Administrative Law Judge Bert H. Wicking issued his Decision and Recommended Order on Remand in the above cases pursuant to Sections 10 and 13 of the Public Employment Relations Act (PERA), 1947 PA 336 as amended by 1965 PA 379 and 1973 PA 25, MCL 423.210, 423.213, MSA 17.455(10), MSA 17.455(13).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The original Decision and Recommended Order of the Administrative Law Judge recommending dismissal of both the charge against Respondent Michigan State University and the unit clarification petition was issued on May 29, 1991. On April 24, 1992, we remanded to the Administrative Law Judge for reconsideration in light of our decision in *Michigan State University,* 1992 MERC Lab Op 120. In his Decision and Recommended Order on Remand, the Administrative Law Judge reaffirmed his original conclusions.

Charging Party Clerical-Technical Union filed timely exceptions to the Administrative Law Judge's Decision and Recommended Order on Remand on January 4, 1993. Intervenor Michigan State University Administrative-Professional Association, MEA/NEA, filed timely cross-exceptions and a response to Charging Party's exceptions on January 19, 1993. A timely reply to the cross-exceptions was filed by Charging Party on February 3, 1993. The Employer did not file a response to the exceptions or cross-exceptions.

We have reviewed the exceptions and briefs in light of the record. For reasons set forth below, we disagree with the conclusion of the Administrative Law Judge that Respondent acted lawfully in transferring employees from Charging Party's unit to other bargaining units after the conclusion of a classification study conducted by an outside consulting firm.

**Facts**

Charging Party represents a bargaining unit of clerical and technical employees of the Employer and Intervenor a bargaining unit of non-supervisory administrative and professional employees. Supervisory employees in these categories are currently represented by a third labor organization, not a party to this case. The record establishes that historically classifications have been assigned to bargaining units according to whether they qualify as "administrative" "professional," "clerical" or "technical" employees as defined by the federal Fair Labor Standards Act.

On September 22, 1983 Charging Party and the Employer signed a letter of agreement binding them to hire an outside consultant to conduct a jointly-funded classification study. Charging Party, who had urged the study, agreed to contribute a maximum of $62,500. The letter of agreement stated that the purpose of the study was to establish "programs of classification, salary and evaluation which will establish and maintain equitable internal and external patterns of comparability." No other union participated in this agreement or the funding of the study. However, the study was to review all current administrative professional and supervisory positions as well as positions within the clerical-technical unit. Approximately 4,000 positions were involved.

On January 10, 1984, the Employer put out a request for proposal for the study. This request for proposal stated:

The Administration is undertaking this study to improve these systems to assist in attracting and retaining the most qualified staff possible in the market area and within resources available. The employee groups listed are represented by separate unions. Any recommendations must recognize the unit boundaries so that positions are placed in the appropriate units.

The consultant will be asked to propose: (a) the position of jobs within the organization; (b) wage rate differentials as measured against the market, and (c) uniform standards in recognition of legal responsibilities.

The consulting firm hired was Peat Marwick. In its August 1, 1985, proposal Peat Marwick indicated that in defining the differences between clerical, technical, supervisory, administrative and professional employees it would use criteria established by the Fair Labor Standards Act, the National Labor relations Board, state labor

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

relations laws (i.e. PERA), and accepted practices within the industry.

The Peat Marwick proposal was accepted jointly by Charging Party and the Employer on January 30, 1986. In their acceptance letter, the parties stated:

It is clearly understood that the University and the Clerical-Technical Union are co-contractors, for the study.(sic). In entering into this agreement, the University does not waive its managerial and decision making responsibilities for the classification system nor does the union abrogate its right to bargain on specific features of that system.

A joint labor management committee was set up to assist Peat Marwick with the study. Combined minutes from committee meetings conducted on April 10, 16 and 21, 1986 include the following:

Soltysiak (a Peat Marwick representative) was asked whether the study will move classifications from one bargaining unit to another. He responded that the consultants will develop definitions for each job family, e.g. clerical, professional, supervisory. Job analysis and preparation of classification descriptions may result in recommended changes to job family assignments. However the effective movement of a classification(s) from one bargaining unit to another is subject to negotiations. The consultants cannot dictate such movements.

Peat Marwick issued its initial draft of the classification study in May, 1987. This draft included recommendations for placement in one of the four bargaining units involved for each position covered by the study.

In August, 1987, the Employer, the Charging Party, Intervenor and the union representing supervisors reached a written agreement on an appeals procedure. Appeals were heard by a panel consisting of three management representatives, one representative from each union, and a Peat Marwick representative. Under the appeals procedure, employees were permitted to appeal (1) the classification to which they had been assigned (2) the title to their classification; or (3) the content of specifications for their classification. They were not allowed to appeal their bargaining unit assignment directly, although all parties to the appeal procedure recognized that changes in classification or in the specifications for the classification might result in change in bargaining unit assignment.

Peat Marwick submitted its final report at the end of August, 1987.

On January 28, 1988, the Employer wrote the Charging Party to state that it was "accepting for potential implementation the new classification descriptions, individual placements, grade levels, and FLSA/bargaining unit determinations, as developed by Peat Marwick and amended directly or indirectly by the Phase I appeals or by the University in the future." The letter concluded, "acceptance of the study products described above does not abrogate the University's right to amend these products in the future."

In February, 1988, the Charging Party filed the instant unit clarification petition, asserting that due to the Employer's "qualified acceptance" of the results of a classification study, the bargaining unit status of certain positions was in dispute.

In November, 1988, the Employer sent out notices to employees notifying them of changes in job title, grade level, and bargaining unit. The letter stated that the classification placement was effective March 1, 1988 and the bargaining unit placement effective October 21, 1988.

As to bargaining unit placement, the Employer admitted that not all placements were in accord with the consultants' recommendations or were the result of an appeal. The Employer reviewed at least some placements and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

altered them on its own initiative. Approximately 162 positions formerly in Charging Party's unit were transferred to other units, either by change in classification, creation of a new classification, or transfer of an entire existing classification to another unit. Other positions formerly in other bargaining units were transferred to Charging Party's unit; however, Charging Party suffered a net loss in positions.

The Peat Marwick study also included salary recommendations based in part on labor market conditions. There was a clear agreement by the parties that these were only recommendations. The parties subsequently bargained and reached agreement on all salary issues.

Charging Party filed the instant charge on December 27, 1988.

**Discussions and Conclusions of Law**

As we reaffirmed in *Michigan State University,* 1992 MERC Lab Op 120, 123, bargaining unit placement is neither a mandatory subject of bargaining nor a matter of managerial prerogative but a matter reserved to the Commission by Section 13 of PERA. Detroit Fire Fighters v. Detroit, 96 Mich App 543 (1980). See also *Northern Michigan University,* 1989 MERC Lab Op 139. That is, an employer may not alter bargaining unit placement unilaterally or after bargaining to impasse, but must either obtain the union's agreement to changes in bargaining unit composition or obtain an order from this Commission by filing a unit clarification proceeding.

The record here indicates that although both the Employer and Charging Party expected some changes in bargaining unit assignment to ultimately result from the study, the parties did not agree or anticipate that the consultant would make the final decisions on unit placement. The evidence is that the Employer considered that it had the right to make such placement changes unilaterally based on its past practice of moving positions from one unit to another and the language of the contract between the Employer and the Charging Party. The Employer carefully reserved this "right" and in fact the record indicates that it made some placement decisions that were neither recommended by the consultant nor agreed to by Charging Party. As for the Charging Party, despite its extensive involvement in the study, there is simply insufficient evidence of an agreement to be bound by the consultant's recommendations or even the appeal committee's decisions regarding unit placement. We therefore agree with the Charging Party that the Employer acted unlawfully in removing positions from the Charging Party's unit without its agreement.

In determining the remedy in this case, however, we cannot ignore the prior case of *Michigan State University, Safety Services,* 1978 MERC Lab Op 871, which held that the Employer had the right to unilaterally move positions from one unit to another over a union's objections because of the past practice and because of contract language allowing the Employer to "eliminate or change a classification." In our decision at 1992 MERC Lab Op 120, we overruled this part of *Safety Services.* However, it is reasonable to assume that the Employer in this instance relied on *Safety Services,* in determining the rights of the parties.

Moreover, it is clear that the bargaining unit changes cannot be separated from the other changes, e.g. classification, title and grade changes, which resulted from the study and which have now been in effect for more than four years. The result of an order to return the positions removed from Charging Party's unit would be hopeless confusion. We decline to order the relief sought by Charging Party or to clarify the unit as requested. Instead, we issue the following order:

**Order**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Respondent Michigan State University, its officers and agents, shall hereby cease and desist from removing positions from the bargaining unit represented by Charging Party Clerical-Technical Union of Michigan State University in the absence of either specific agreement by that union or an order of the Commission. In addition, Respondent shall post the attached notice to employees in appropriate places on the Respondent-Employer's premises for a period of thirty consecutive days.

The unit clarification petition in UC88 B-14 is hereby dismissed.

**Decision and Recommended Order on Remand**

On April 24, 1992 the Michigan Employment Relations Commission remanded these cases to Administrative Law Judge Wicking for reconsideration in light of the Commissions findings in Case No. C89 J-296 (February 20, 1992) wherein it was determined that Michigan State University had no right to remove positions from the Clerical Technical Union's bargaining unit without the Union's consent.

Upon reconsideration, it is determined that I would come to the same conclusions, for these reasons.

1) The Charging Party, the University and the Administrative Professional Union agreed to a review of hundreds of jobs at the University to determine where (which bargaining unit) they should most appropriately be placed. All Parties contributed to funding this project.

2) Relying upon this agreement, the University embarked on an extensive review, through an outside consultant, involving thousands of manhours of review. There was no protest from any affected Union, nor any announcement that the Clerical-Technical Union would file an unfair labor practice charge if they lost any positions to another union.

3) When decisions were made to shift some positions from one bargaining unit to another, the Charging Party had the right to take exception through an agreed to process that was established to consider placement of these positions. The Charging Party, at all times had the right to come to the Commission to seek unit clarification. They did not.

4) When the Charging Party determined that, as a result of this extensive study, on balance they had lost more positions from the Office Clerical-Technical Union than they had gained, they cried foul (Unfair Labor Practice). The Commission has quite agreed.

5) There is something amiss to allow the Charging Party to kick over the apple cart at this stage of the proceedings because: They, and everyone else, agreed to the study; they, and everyone else, had a method of redress through the internal procedures and MERC's unit clarification procedures---which weren't used; they shouldn't now be heard, that as a matter of law they can refuse the whole deal, and come to MERC to complain of illegal shifting of bargaining unit positions.

6) If MERC wants to find Michigan State University's extensive study illegal, it is suggested they so order. I see nothing wrong.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.