# **Exhibit B**

# MEMORANDUM OF UNDERSTANDING
## REGARDING THE FORMATION OF THE GREAT LAKES WATER AUTHORITY

The following memorandum of understanding (MOU) represents a framework for the establishment by the City of Detroit, Oakland County, Wayne County and Macomb County (each, an "Incorporating Municipality") of a regional water and sewer/stormwater authority to be called the Great Lakes Water Authority, pursuant to Act 233 of 1955 (Act 233), to operate, control, and improve both the Water Supply and Sewage Disposal Systems (Systems) owned by the City and presently operated by the Detroit Water and Sewerage Department (DWSD). This framework describes terms to be incorporated into articles of incorporation which shall be presented to the City and the legislative bodies of the Counties as soon as practicable, for approval or disapproval no later than October 10, 2014. The Authority shall be established upon adoption of the articles of incorporation by the City and the legislative body of at least one County, and the publication and filing of the articles of incorporation as provided in Act 233.

## GOVERNANCE

The Board of the Authority shall be comprised of six voting members:
- Two members appointed by the Mayor of the City
- One member appointed by each County which adopts the articles of incorporation
- One member resident of a service area outside the territories of the three Counties appointed by the Governor

In the event that Wayne, Oakland or Macomb County does not adopt the articles of incorporation the Governor shall also appoint a Board member resident in the service area within that County. Board members shall have four year, staggered terms, with no more than two members' terms expiring in same year. Each Board member shall serve at the will of and may be removed by the appointing authority.

The Board shall act by simple majority vote, except that a supermajority (5/6) shall be required for:
- Appointment of the Authority's general manager/executive director
- Approval of rates, fees and charges and rate-setting protocols
- Issuance of debt, which shall be revenue-backed debt
- Approval of annual operating budget
- Annual approval of a rolling Five Year Capital Improvement Plan

- Adoption of a procurement policy, which will include the terms on which any aspect of the operations of either System may be privatized
- Approval of a Lease of the Systems from the City
- Removal of any Board member for cause.

All Board members shall possess minimum education and professional experience standards, to wit: at least seven years of experience in a regulated industry, a utility, engineering, finance, accounting or law.

Compensation of Board members shall be determined by a supermajority vote of the Authority Board, and shall be consistent with the practices for other large public utilities.

## LEASE

The City shall lease the Systems (except the Detroit local system infrastructure) to the Authority for an initial term of 40 years, extendable to at least match the term of any outstanding bonds of the Authority. Consideration for the Lease shall be the $50 million common-to-all charge per year (not subject to further Board approval) to be held by the Authority in the funds described below and used at the City's direction and discretion to fund any or a combination of the following: Detroit local system infrastructure improvements, debt service associated with such improvements or the City's share of the cost of common-to-all improvements. The parties agree that no Lease shall be entered into if the payment in consideration for the Lease would cause the Systems to be unable to provide a reasonable level of service, satisfy its debt obligations and adhere to the rate structure set forth in the Plan of Adjustment. Initially, 45% of the charge shall be allocated to Water Supply System customers and 55% shall be allocated to Sewage Disposal System customers, such allocation to be subject to review and adjustment by the Board every three to five years consistent with the method of allocation of other common-to-all charges between the two Systems, provided, that no such adjustment shall reduce the availability of such revenues to pay debt service on bonds issued to finance Detroit local system improvements below the level in anticipation of which such bonds were issued.

## KEY FINANCIAL TERMS

The Authority shall have no taxing power.

A financial obligation of the Authority shall be the financial obligation of the Authority only and not a financial obligation of an Incorporating Municipality or a constituent municipality except to the extent a municipality which is a wholesale customer may have liability in that capacity.

The State shall allow the Authority to use the Michigan Finance Authority to issue bonds on behalf of the Authority.

The Authority's common-to-all rate structure shall include:
- The $50 million annual charge to be deposited with the Authority and applied, at the City's direction and discretion, (i) in the case of funds to be used for pay-as-you-go Detroit local system improvements, in a separate subaccount within the Authority's Construction Fund or Extraordinary Repair and Replacement Reserve Fund, as appropriate, for the related System, to be dedicated to Detroit local system infrastructure improvements; and/or (ii) in the case of funds to be applied to the payment of debt service on Authority bonds (either debt service allocable to Detroit's share of the cost of common-to-all capital improvements or to bonds issued by the Authority to finance Detroit local system improvements) to the appropriate Debt Service Account.
- $4.5 million in 2014/15 and an amount equal to .5% of base budgeted operating revenues per year thereafter, for deposit to an independently-administered Water Residential Assistance Program fund to provide assistance to indigent residential customers throughout the Systems who agree to take appropriate actions to reduce consumption.

The existing recognitions of the City's ownership and system support in the water and sewer system rate structures (return on equity for water and per settlement for sewer) will be frozen and continue at $26.216 million per year [$20,700,000 as the rate of return for the water system and $5,516,000 pursuant to settlements for the sewer system] during the term of the Authority.

The transfer of the Systems to the Authority shall not cause impairment of tax treatment of outstanding DWSD bonds. New debt and refunding bonds shall be issued pursuant to the Revenue Bond Act (PA 94 of 1933) or other statutory authority.

The MOU is predicated in part upon the assumption that the Bankruptcy Court will approve the terms of the City's Sixth Amended Plan of Adjustment (as it may be modified, supplemented or amended) (the "Plan of Adjustment") allocating liability to DWSD for funding the City's frozen General Retirement System (GRS) pension plan (the Pension Liability) and the City's settlement of claims associated with the swaps for its Pension Obligation Certificates, and for payments relating to debt service on DWSD's allocated share of liability on the New B Notes attributable to the GRS VEBA and Pension Obligation Certificates. The financial analysis

undertaken by the parties assumes that the Authority will issue bonds to prepay its Pension Liability or identify other savings should such financing prove to be infeasible and the Pension Liability is paid over the schedule provided in the Plan. Within 90 days after the establishment of the Authority, the Authority, working with the City and the Investment Committee of the GRS (Investment Committee) shall develop a process to reach agreement on the dollar amount which the Authority would need to deposit with the GRS as a one-time payment in lieu of the Pension Liability payments payable at the rate of $42.9 million per year (not including $2.5 million in annual administrative expenses or the one-time restructuring cost payment of $20 million in 2014/15) over nine years pursuant to the Plan of Adjustment. Notwithstanding the foregoing, nothing in this MOU modifies, or purports to modify, the obligations of DWSD as set forth in the Plan of Adjustment, and the Authority shall assume and comply with such obligations.

The Investment Committee established for the GRS pursuant to Section 13g of the Public Employee Retirement System Investment Act (MCL 38.1133g) (PERSIA) is obligated to receive and approve summary annual report, a public document prepared pursuant to Section 13(3) of PERSIA. It is the expectation of the parties that the Investment Committee will provide the Authority with a copy of each summary annual report prior to the formal approval of such report. The parties understand that the summary annual report will continue to (a) track DWSD retirees, deferred retirees, and active vested members, pension benefits paid and actuarial accrued liabilities separately from other GRS members and (b) shall allocate to the DWSD/Authority an undivided interest in GRS administrative expenses and in each investment and class of investment in the GRS, to enable the Authority to verify the appropriateness of allocations to the Authority. For each fiscal year commencing from and after July 1, 2023, on its normal schedule for determining the current fiscal year's contributions to GRS, GRS shall determine whether DWSD's/Authority's unfunded accrued actuarial liability on a market value of assets basis for its component of the frozen GRS plan ("DWSD GRS Component II UAAL") is fully funded at 100%. If DWSD GRS Component II UAAL is funded at 100% or more, no contributions for the current fiscal year will be required from the Authority. If DWSD GRS Component II UAAL is less than 100% funded, then the Authority shall make such level annual contributions to GRS as necessary to amortize such shortfall over 5 years at an interest rate equal to the then current GRS investment return assumption.

Each System, as a whole, is assumed to experience revenue requirement increases of not more than 4% for each of the first ten years under Authority management. The rates and

percentage increases for different customers may vary in order to meet their specific revenue requirements.

The Authority shall commit to and adopt reporting practices which provide transparency in system operations and management. By Fiscal Year 2017 the Authority shall adopt a two year operating budget.

The City and each wholesale customer shall retain complete responsibility for all obligations associated with their individual revenue requirements.

The Authority shall make every effort to employ individuals and contract with vendors from throughout the service areas.

OPERATION AND MANAGEMENT OF DETROIT AND OTHER LOCAL SYSTEMS

The City shall have the right to continue to operate and retain employees to operate, maintain, repair and improve the local system in Detroit, including capital improvements and repairs, and billing and collection services and any other services or may contract with the Authority or another third party for all or a portion of those or other functions. The City shall continue to develop the capital improvement program for the Detroit local system infrastructure and may elect to administer the maintenance and improvements to that system, and in any event, will direct the expenditure of the funds dedicated for those purposes. Billing and collection shall be managed such that the statutory lien on net revenues created by the Revenue Bond Act applies to payments received by the Authority or its trustee from Detroit local system customers and the Authority will have the power to enforce the collection of such payments. The Authority will finance Detroit local system improvements through the issuance of Authority bonds under the Revenue Bond Act, with the debt service to be allocated solely to Detroit local system ratepayers. City local rates may fund the Rate Stabilization Fund, contemplated by prior rate settlement agreements but as yet unfunded, from a portion of improved local collections until the accumulated balance is sufficient to stabilize rates and reduce delinquencies. The City will adopt metering or other practical methods of measuring water loss in the Detroit local system.

The Authority may provide services and issue bonds to finance improvements for other local systems within its service areas on the same basis.

CAPITAL IMPROVEMENTS

The State agrees to identify ways to facilitate access and eligibility for the Authority to the Clean Water State Revolving Fund and Drinking Water State Revolving Fund (collectively, SRF), grants and other sources of State funding to mitigate the cost of improvements for the

Systems and local system improvements, particularly for the areas of greatest health and environmental need, and commits to using its best efforts to facilitate such funding for the Authority. The City will determine priorities for capital improvements to the Detroit local system.

TREATMENT OF EXISTING CONTRACTS

Unless otherwise agreed by the parties, the City will assign all customer contracts to the Authority, which shall assume the same.

The Authority shall be a successor employer to DWSD for those employees transferring to the Authority, and will assume and honor DWSD's collective bargaining agreements for those employees.

Existing DWSD vendor contracts shall be assigned to and assumed by the Authority.

EVALUATION AND TRANSITIONAL/TRANSACTIONAL COSTS

The State's Competitive Grant Assistance Program (CGAP) provides incentive-based grants to stimulate smaller, more efficient government and encourage mergers, consolidations, and cooperation between two or more qualified jurisdictions. The program is focused on stimulating projects between two or more qualified jurisdictions that are creating new mergers, consolidations, and/or cooperative efforts/collaborations of existing services.

The State agrees to give priority consideration to a grant from any of the parties to this MOU to assist with payment of transactional costs associated with establishing and transferring the Systems to the Authority.

The City shall retain Veolia to undertake an assessment of the Systems and make recommendations to assist the parties in evaluating operating models, capital requirements and savings opportunities, with no commitment by DWSD, the City or the Authority to enter into a contract with Veolia to operate, manage or maintain the Systems. The Authority will be free to adopt ideas generated by such assessment and recommendations without any further obligation to Veolia. In the event the Authority is formed and a CGAP grant is received, sufficient of such funds shall be used to reimburse the City for the cost of the Veolia assessment.

MANAGEMENT OF THE SYSTEMS FOR BENEFIT OF CUSTOMERS

It is the parties' expectation that the Authority will use its best efforts to manage the Systems for the benefit of all Authority customers. Upon commencement of operations the Authority will review and revise as necessary the DWSD water and wastewater Master Plans. In reviewing those plans the Authority will use its best efforts to optimize the capacity of the water supply system and optimize and maximize the capacity of the wastewater system to treat flow so that operational economies of scale may be realized. The Board will take into account

the needs of the region in planning and operating the water and wastewater systems and will strive to become the provider of choice for southeastern Michigan and consider incentives for customers to utilize the system for their water supply needs and wastewater flow.

## TERMINATION OF AUTHORITY OR WITHDRAWAL FROM MEMBERSHIP

Any withdrawing Incorporating Municipality shall remain liable for any contractual obligations it has to the Authority. Upon withdrawal of an Incorporating Municipality, the Governor shall thereafter appoint the member of the Board previously appointed by the withdrawing Incorporating Municipality; such member shall be a resident of the service area previously represented by the withdrawing Incorporating Municipality.

The City will forego its consideration for the Lease if it withdraws from the Authority.

## CONDITIONS PRECEDENT TO TRANSFER

This MOU is subject to the negotiation and execution of definitive documentation and the receipt of all required consents and approvals required for the transactions contemplated herein, including, but not limited to, the following:

The Incorporating Municipalities shall have established the Authority and the Board will have adopted an ordinance or resolution addressing all matters for which an ordinance is required to permit the contemplated transaction and operation of the Systems by the Authority.

The Authority and the City shall have negotiated a Lease, an agreement regarding the operation and management of the Detroit local system effective on the transfer date, and an agreement relating to the provision of services on a transitional basis by the City to the Authority.

The Authority shall have secured all necessary permits and other approvals to operate the Systems.

The City will have received approvals required under PA 436 of 2012 and will have a confirmed plan of adjustment that contemplates the creation of the Authority.

The City shall have secured the consent to the transfer of the Systems to a regional authority from the credit enhancers and a majority of the holders of DWSD bonds.

*Tender Financing and Creditor Settlement Terms regarding Transfer*

The Authority shall, in connection with its assumption of or substitution for outstanding DWSD bonds, covenant to:

- maintain compliance with DWSD's three-part combined coverage requirements of 1.20, 1.10 and 1.00 for senior lien, second lien, and SRF junior lien

- indebtedness, respectively, for both additional bonds test and rate covenant purposes; and
- maintain, pursuant to such ordinances or indentures, a flow of funds consistent with Act 94, in the following order of priority required by Act 94: (x) operation and maintenance expenses of the related System, and (y) debt service on all bonds payable from net revenues of the related System before making deposits to other accounts in the flow of funds; and
- comply with the provisions of the Bankruptcy Court Order dated August 25, 2014 approving the DWSD tender and new money financing, including but not limited to paragraph 24 thereof [requiring the method of making the pension payments to the frozen defined GRS plan].

The Authority shall also have(I) received (a) an opinion of nationally recognized bond counsel to the effect that the transfer of the Systems to the Authority and assumption of the outstanding DWSD bonds, in and of themselves, will not materially impair the tax-exempt status of the interest on such bonds; and (b) confirmation from one or more nationally recognized rating agencies that the bonds, after assumption or substitution by the Authority are rated not less than the then-current rating on the bonds; (II) demonstrated the ability of each System, under the additional bonds test described above, to issue at least One Dollar of additional indebtedness at each level of priority; and (III) provide in the Lease or other relevant agreement that any lease or other payment by the Authority to the City's general fund or other fund at the City (other than payments for customary services historically provided by the City to DWSD that constitute operation and maintenance expenses under the related DWSD Ordinance and payments in respect of pension obligations to be paid as operation and maintenance expense consistent with the Bankruptcy Court Order referred to above) shall be subordinated to all payments on the DWSD bonds assumed by the Authority.

STATEMENT REGARDING STATE COMMITMENTS

In agreeing to the terms of this MOU, the Representatives understand that the State will undertake all efforts, subject to all legal requirements, to facilitate the transaction as relates to consideration of permit matters (including a transfer of the current NPDES permit and associated Administrative Consent Order without material change to existing requirements), and applications for grant or loan funding. The State agrees to make such efforts.

**PLAN OBJECTIONS**

Upon execution of the MOU the Counties represented by the signatories to this MOU which have filed objections to the Plan of Adjustment shall each immediately withdraw with prejudice their objections to the Confirmation of the Plan of Adjustment.

**COUNTERPARTS**

This MOU may be executed in counterparts.

**PLAN OBJECTIONS**

Upon execution of the MOU the Counties represented by the signatories to this MOU which have filed objections to the Plan of Adjustment shall each immediately withdraw with prejudice their objections to the Confirmation of the Plan of Adjustment.

**COUNTERPARTS**

This MOU may be executed in counterparts.

**EXECUTION BY REPRESENTATIVES**

**CITY OF DETROIT**

_____
Kevyn D. Orr
Emergency Manager

_____
Mike Duggan
Mayor

**WAYNE COUNTY**

_____
Robert A. Ficano
County Executive

**OAKLAND COUNTY**

_____
L. Brooks Patterson
County Executive

**MACOMB COUNTY**

_____
Mark A. Hackel
County Executive

**STATE OF MICHIGAN**

_____
Rick Snyder
Governor
September 9, 2014