EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                  Honorable Sean F. Cox

v.

                                     Case No. 77-71100

City of Detroit, *et al.,*

        Defendants.

_____/

## THE CITY OF DETROIT'S AND
## THE DETROIT WATER AND SEWERAGE DEPARTMENT'S
## RULE 60(b)(6) MOTION FOR RELIEF

The City of Detroit and its Water and Sewerage Department (the "City") move this Court for relief under Federal Rule of Civil Procedure 60(b)(6) because the City risks noncompliance with this Court's December 15, 2015 Order and the Court's earlier orders addressing the City's obligations under the Clean Water Act.

The City is currently a defendant in two state lawsuits, each of which challenges the City's drainage fee assessed upon users of the City's combined sewage system. The City assesses this fee in order to comply with Clean Water Act regulations that require it to charge users of the system for the operation and maintenance of facilities treating and disposing of infiltration and inflow – including, but not limited to, surface water runoff and storm water. Relying on the Michigan Constitution and existing case law, the two lawsuits seek to declare the fee an unlawful tax that can only be charged upon voter approval.

Here, the City must assess the fee under federal law.  Were the fee ruled a "tax," the City would not be able to charge it at all because the City is already assessing taxes at the maximum amount allowed by charter and no other basis exists under state law for assessing the charge (regardless of voter approval). Thus, the City finds itself between Scylla and Charybdis, facing either the prospect of violating federal law by not charging a federally-mandated fee that has been ruled an unlawful tax or violating state law by charging a fee that state law prohibits it from assessing.  Created by the City's obligations under federal law, this conflict is appropriately addressed by this federal Court, which has overseen the City's mandates under the Clean Water Act for decades and can determine whether the federal regulations preempt the state law claims against the City.  For these reasons (and those stated in the accompanying brief), the City respectfully requests that this Court reopen this matter and grant its Rule 60(b)(6) motion.

Respectfully submitted,

**MILLER CANFIELD PADDOCK AND STONE, P.L.C.**

By: /s/  *Sonal Hope Mithani*
Sonal Hope Mithani (P51984)
Attorneys for the City of Detroit
101 N. Main Street, 7th Floor
Ann Arbor, MI  48104
734.668.7786
mithani@millercanfield.com

May 3, 2017

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

       Plaintiff,                  Honorable Sean F. Cox

v.

                                     Case No. 77-71100

City of Detroit, *et al.,*

       Defendants.

_____/

**BRIEF IN SUPPORT OF THE CITY OF DETROIT'S AND
THE DETROIT WATER AND SEWERAGE DEPARTMENT'S
RULE 60(b)(6) MOTION FOR RELIEF**

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES....................................................................... ii

CONCISE STATEMENT OF ISSUE PRESENTED.............................................v

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................vi

INTRODUCTION ...................................................................................1

LEGAL AND FACTUAL BACKGROUND ......................................................3

    The City's Court-Ordered Compliance under the CWA.............................3

    The City's Drainage Fee..............................................................6

    The Headlee Amendment to the Michigan Constitution..............................8

    Taxes v. Fees: The Three-Factor Test Established under *Bolt v. City of Lansing* .................................................................................9

    The Storm Water Fee Cases Decided Under the Headlee Amendment.......10

    The Pending Headlee Actions against the City ..........................................11

    The Conflict between the Federal Rules and Headlee ................................13

ARGUMENT ........................................................................................15

    I.    Rule 60(b)(6) Relief is Appropriate. .................................16

    II.    Conflict Preemption Precludes the Application of Headlee to the City's  Drainage Fee....................................................20

CONCLUSION .....................................................................................24

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Beerbower v. United States*,
   592 F.Supp. 67 (E.D. Mich. 1984) ...................................................................... 20

*Bolt v. City of Lansing*,
   459 Mich. 152, 587 N.W.2d 264 (1998) ................................................... 9, 10, 11

*City of Detroit v State of Michigan*,
   538 F. Supp. 1169 (E.D. Mich. 1982) ....................................................... 4, 17, 18

*City of Detroit v. City of Highland Park*,
   878 F.Supp. 87 (E.D. Mich. 1995) ...................................................................... 24

*City of Detroit v. State of Michigan*,
   803 F.2d 1411 (6th Cir. 1986) .............................................................. 3, 4, 14, 22

*City of Warren v. City of Detroit*,
   495 F.3d 282 (E.D. Mich. 2007) ......................................................................... 22

*County of Jackson v. City of Jackson*,
   302 Mich. App. 90, 836 N.W.2d 903 (2013) ....................................................... 11

*Cox Communications Cent. II, Inc. v. City of Broken Arrow, Okla.*,
   Case No. 02-CV-741-PJ, 2003 WL 26095331 (N.D. Okla. Mar. 11, 2003) ........ 20

*Farina v. Nokia, Inc.*,
   625 F.3d 97 (3d Cir. 2010) .................................................................................. 21

*Graham v. Kochville Twp*,
   236 Mich. App. 141, 599 N.W.2d 793 (1999) .................................................. 9, 10

*Hines v. Davidowitz*,
   312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ................................................. 20

*Int'l Paper Co v. Ouellette*,
   479 U.S. 481, 107 S.Ct. 805 (1987) .................................................................... 22

*Johnson v. Bell*,
    605 F.3d 333 (6th Cir. 2010) ......................................................................... 16-17

*M. Nahas Co., Inc. v. First National Bank of Hot Springs*,
    739 F. Supp. 1338 (W.D. Ark. 1990) ...................................................................21

*McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.*,
    298 F.3d 586 (6th Cir. 2002) .............................................................................2

*Michigan South Cent. Power Agency v. Constellation Energy Commodities Group, Inc.*,
    466 F.Supp.2d 912 (W.D. Mich. 2006) ..............................................................20

*Nationwide Bldg. Maintenance, Inc. v. Reich*,
    14 F.3d 1102 (6th Cir. 1994) ............................................................................22

*NE Hub Partners, L.P. v. CNG Transmission Corporation*,
    239 F.3d 333 (3d Cir. 2001) ..............................................................................16

*Newcomb v. Brennan*,
    558 F.2d 825 (7th Cir. 1977) ..............................................................................6

*Olle v. Henry & Wright Corp.*,
    910 F.2d 357 (6th Cir. 1990) ............................................................................ 17

*Pension Ben. Guar. Corp. v. Boury, Inc.*,
    No. 5:02CV161, 2008 WL 2803798 (N.D.W.V. Jul. 18, 2008) ..........................19

*Pliva, Inc. v. Mensing*,
    131 S.Ct. 2567, 180 L.Ed.2d 580 (2011) ..................................................... 21, 22

*Schoolcraft Memorial Hosp. v. Michigan Dept. of Community Health*,
    570 F.Supp.2d 949 (W.D. Mich. 2008) ..............................................................18

*Thompson v. Bell*,
    580 F.3d 423 (6th Cir. 2009) ............................................................................17

*United States v. City of Detroit*,
    777 F. Supp. 1365 (E.D. Mich. 1991) ...............................................................18

*United States v. Commonwealth of Kentucky*,
    252 F.3d 816 (6th Cir. 2001) ............................................................................19

*United States v. Stevenson*,
   834 F.3d 80 (2d Cir. 2016) ......................................................................20

**Constitutions**

U.S. Const. Art. VI, cl. 2 ..........................................................................20

MCLA Const., Art. 9, §31 ..........................................................................9

**Statutes**

33 U.S.C. § 1284(b)(1)(A) ............................................................. 4, 13, 22

**Regulations**

40 CFR §35.905 ..........................................................................................5

40 CFR §35.929 ........................................................................................14

40 CFR §35.929-2 ............................................................................ 4, 5, 23

40 C.F.R. §35.929-1 ...................................................... 4, 14, 13, 22

40 CFR §35.965 ........................................................................................14

40 CFR §35.2105 ......................................................................................14

40 CFR §35.2005 ........................................................................................5

40 CFR §35.2140 .......................................................... 4, 5, 13, 14, 22, 23

40 CFR. §35.2214 ....................................................................................14

**Rules**

Federal Rule of Civil Procedure 60(c)(1) ...............................................17

Federal Rule of Civil Procedure 60(b)(6) ....................................... passim

## CONCISE STATEMENT OF ISSUE PRESENTED

For the past 40 years, the City of Detroit and its Water and Sewerage Department have been subject to litigation and court orders mandating their compliance with the Clean Water Act and regulations promulgated under that Act.  As part of its ongoing obligations under federal law, the City is required to maintain a user charge that covers the City's system costs related to surface water runoff and storm water flows.  In accordance with this obligation, the City has been charging a drainage fee to parcel owners within its limits. Now, these owners have brought state law claims against the City seeking to invalidate the fee in its entirety as an unconstitutional "rain" tax, thereby jeopardizing the City's ability to maintain ongoing compliance with its federal obligations to (1) maintain a user charge system to recover its costs, and ultimately, (2) comply with its obligations under the Clean Water Act to treat, dispose and manage its combined sewage overflows (which include surface water runoff and storm water).  Given this inherent conflict between federal and state law, should the Court grant the City's Rule 60(b)(6) motion to reopen this matter and issue a ruling regarding the preemptive effect of federal regulations vis-à-vis the specific state law claims?

The City and its Water and Sewerage Department Answer:       Yes.

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

Federal Rule of Civil Procedure 60(b)(6)

*Olle v. Henry & Wright Corp.*, 910 F.2d 357 (6th Cir. 1990)

*Thompson v. Bell*, 580 F.3d 423 (6th Cir. 2009)

*United States v. Commonwealth of Kentucky*, 252 F.3d 816 (6th Cir. 2001)

U.S. Const. Art. VI, cl. 2

*Pliva, Inc. v. Mensing*, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011)

*Beerbower v. United States*, 592 F.Supp. 67 (E.D. Mich. 1984)

*City of Detroit v. State of Michigan*, 803 F.2d 1411 (6th Cir. 1986)

**INTRODUCTION**

Defendant the City of Detroit and the Detroit Water and Sewerage Department (together, the "City") seeks what it knows is the extraordinary relief of having this Court (under Federal Rule of Civil Procedure 60(b)(6)) clarify its prior orders, including its December 15, 2015 Order, regarding the City's obligations under the Clean Water Act ("CWA") because it fears that potential rulings in pending state litigation may ultimately force it to abandon its federally-mandated user charge system for drainage. This would place the City in direct violation of the CWA regulations that were incorporated by this Court in its prior orders and create a conflict between the City's obligations under state and federal law.

Specifically, the City has been sued by various parcel owners in the City, each of whom alleges that the City's drainage fee (which satisfies the federal requirement to assess a user charge) is an unconstitutional tax under the Headlee Amendment to the Michigan Constitution. As a result, these challengers claim that as an unconstitutional tax, the drainage fee cannot be assessed upon them without a vote of the majority of the City's electors. If the electors then failed to approve an assessment of the fee, the City would be prohibited from charging its residents anything for the drainage services that it provides – drainage services that it must provide and charge for under the CWA regulations. Even if approved by the electors, federal regulations prohibit the drainage fee from being assessed as an ad

1

valorem tax.  Worse, once declared an "unconstitutional tax," the City will not be able to assess the drainage charge in any form – ad valorem or other – because the City is already taxing its maximum allowable mill limit per its Charter, and it has no legal mechanism available that would allow it to exceed that taxable limit.

Given (1) the two pending Headlee challenges that have been filed against the City (and the fact that more are anticipated), and (2) the ensuing risks to the City's ability to charge its drainage fee as ordered and required under law, the City respectfully requests that this Court re-open this litigation and provide it with direction regarding the City's obligations under the CWA regulations. Specifically, the City requests that the Court grant the City's request for Rule 60(b)(6) relief by reopening the case and issuing an order clarifying the preemptive effect that the CWA, the CWA regulations and this Court's prior orders have on state law challenges to the validity of the drainage fee and any other equitable relief deemed necessary to enforce preemption.[1]

---

[1] The City does not seek an advisory opinion regarding matters of state law.  An advisory opinion would provide a ruling regarding "questions that cannot affect the rights of litigants in the case" before this Court. *See McCurry ex rel. Turner v. Adventist Health System/Sunbelt, Inc.*, 298 F.3d 586, 597 (6th Cir. 2002).  Whether and how the City complies with the Clean Water Act is squarely before this Court, and certainly, in its most recent December 15, 2015 Order, this Court retained jurisdiction to "oversee, enforce and ensure compliance with the terms of [the December 2015 Order] and its prior remaining orders. (Order ¶7, ECF # 2572.) Indeed, the City has an obligation to notify this Court of circumstances that could lead to non-compliance with the Court's orders and the CWA.

2

## LEGAL AND FACTUAL BACKGROUND

**The City's Court-Ordered Compliance under the CWA**

As the Court is aware, the City and this Court share a long history regarding the City's compliance with the CWA. In an opinion addressing the City's ability to charge its drainage fee to a "user" of the City's system, the United Court of Appeals for the Sixth Circuit relayed parts of this history, discussing the City's combined sewage treatment operation (which includes commingled storm water and sanitary waste water) along with the City's repeated failure to properly charge any user of the City's sewerage system for storm water flows. *City of Detroit v. State of Michigan*, 803 F.2d 1411, 1412 (6th Cir. 1986).

This Court's relationship with the City's treatment of combined sewage overflows (including storm water) began in 1977, when the State of Michigan and the Environmental Protection Agency ("EPA") filed the instant action. These parties claimed that the City did not comply with the Federal Water Pollution Control Act (commonly known as the CWA), which legally required the City to render full secondary treatment to storm water flows. *Id.* at 1413. Ultimately, through a consent judgment issued by this Court, "Detroit was required to make massive improvements to provide full secondary treatment to flows received at its plant" including combined sewage overflows consisting of storm water. *Id.* at 1412-13, 1417. The City was also ordered to adopt a user charge system to charge

3

ratepayers for treatment and management of storm water flows (*Id.* at 1413) because this is what federal regulations required.

More specifically (and as the Sixth Circuit acknowledged), "[t]hese improvements were financed by revenue bonds supported by user and customer rates and state and ***federal grants***." *Id.* at 1417 (emphasis added). The City was required to adopt a "user charge system," *id.* at 1413, because

> [t]he FWPCA, 33 U.S.C. § 1284(b)(1)(A) [the CWA], prohibits the Administrator of the EPA from approving any grant for treatment works "unless he shall first have determined that the applicant (A) has adopted or will adopt a system of charges to assure that each recipient of waste treatment services within the applicant's jurisdiction, as determined by the Administrator, will pay its proportionate share . . . of any waste treatment services provided by the applicant . . ."

*City of Detroit v State of Michigan*, 538 F. Supp. 1169, 1170 (E.D. Mich. 1982) (quoting 33 USC §1284(b)(1)(A)).[2]  The City's obligation to adopt the user charge system is mandatory under federal law.  The user charge system ensures coverage of the costs of operating and maintaining the improvements that were funded by the EPA for the purposes of regulating and bettering waste water treatment. The user charge system must cover the costs of operation and maintenance for all flow not directly attributable to users – i.e., infiltration and inflow.  *See* 40 CFR §35.929-2(d)(now 40 CFR §35.2140(e)); 40 CFR §35.929-1(a) (now 40 CFR

---

[2] The regulations at 40 C.F.R. §35.929-1 previously described acceptable user charge systems. *Id.* These same user charge system requirements are now located in 40 CFR §35.2140.

§35.2140). These flows include surface water runoff and storm water. *See* 40 CFR §35.905 (now 40 CFR §35.2005)).  The costs related to infiltration and/or inflow must be distributed among all users of the City's sewage system based on any combination of factors including but not limited to flow volume, land area, or number of hookups. *See* 40 CFR §35.929-2(d)(now 40 CFR §35.2140(e)).

This Court most recently recognized the City's obligation to develop rates and the need to assess these drainage fees in its December 15, 2015 Order:

> b.    .  .  . the Board of Water Commissioners .  .  . shall periodically establish retail rates within the City.  These rates shall be developed to satisfy the revenue requirements established by the Authority for water and sewer service as well as the expenses of operating the local water and sewer infrastructure . . . . In doing so, the City may continue and/or modify its customary practices for the establishment of rates for water and sewerage (including drainage) charges.

> e.    . . . The Board of Water Commissioners shall continue to exercise its existing authority under the City Charter to assess drainage fees, charges or assessments to the users of the City's local water and combined sewer and drainage infrastructure because these charges are necessary and critical to ensure that the City is able to continue to comply with (i) its regulatory requirements under NPDES Permit No. MI0022802 to treat and dispose of the City's combined sewage overflows and (ii) its obligations under the Clean Water Act.

(Order ¶2(b), (e), ECF # 2572) (emphasis added).  In this most recent order, this Court also acknowledged the City's ability to set these drainage charges under any legally acceptable method, including a method based in part "on the impervious area of each parcel of land assessed a drainage charge," noting that this would

5

provide a user with a transparent and equitable method for calculating the drainage charge "associated with managing, operating and improving the combined sewer and drainage infrastructure respectively allocable to each user." *Id.* ¶2(e).

**The City's Drainage Fee**

The 1974 Charter of the City of Detroit authorizes the City to assess water, sewerage and drainage service charges.[3] Passed on November 6, 1973, the 1974 Charter became effective on July 1, 1974 and thus, arguably provides pre-Headlee authorization to charge the City's drainage fee (s*ee infra*, at 8). (Ex. **A**, 1974 Charter Excerpts.) Chapter 15 of the 1974 Charter is titled "Water and Sewerage." (*Id.*) Section 7-1502 of this chapter requires the City, through its board of water commissioners, to "supply water, drainage, and sewerage services within and outside of the city." (*Id.* §7-1502.) This section also allows the City to "periodically establish equitable rates to be paid" in connection water, drainage or sewerage services. Section 7-1503 limits the rates to be charged by requiring that the only be used to pay expenses incurred in the provision of water, drainage and

---

[3] This Court may take judicial notice of a municipal charter. *See*, *e.g.*, *Newcomb v. Brennan*, 588 F.2d 825, 829 (7th Cir. 1977) ("We hold that matters of public record such as state statutes, city charters, and city ordinances fall within the category of 'common knowledge' and are therefore proper subjects for judicial notice.").

sewerage services.[4]  In accordance with these provisions, the City started charging a very nominal drainage fee in 1975. (Ex. **C** (DWSD Drainage Charge Questions and Answers at 2).)

After being sued by the EPA to treat and dispose of its combined sewage overflows and to establish a more robust user charge system in order to cover the total costs of treatment, the City eventually adopted a drainage fee that covered all of its surface water runoff and storm water treatment costs.  The City charged customers based on meter size or impervious acreage (if acreage had been provided by a parcel owner).  There were five classes of customers charged based on impervious acreage.  (*Id.* at 2-3.)

Post-bankruptcy, the City undertook steps to revise its drainage charge to ensure that <u>all</u> persons who contributed surface and storm water runoff to the City's systems were being charged the same base rate as applied to the measured impervious acreage of each person's parcel.[5]  (*Id.* at 4.)  In 2015, the City obtained

---

[4] The City's Charter was most recently revised in 2012 (the "2012 Charter") but the 2012 Charter contains identical provisions to those found at §§7-1502 and 7-1503 of the 1974 Charter.  *See* 2012 Charter, §§7-1202 and 7-1203 (Ex. **B**).

[5] Notably, neither "flow" nor "number of hook-ups" provide a gauge for measuring runoff; rather, they measure sewage flow.  Although it would be acceptable under federal law to use these to allocate surface and storm water runoff, at least one state circuit court judge has concluded that sewage flow is too far removed from surface and storm water runoff to serve as an appropriate proxy for runoff.  *See* Transcript on November 8, 2016 Hearing in *Shaw et al. v. City of Dearborn*, Continued on next page.

GIS flyover data for the entire City and was able to determine the impervious acreage allocable to each parcel contributing surface water and storm water flow to the City's systems.  (*Id.* at 8.)  The City also calculated a new drainage "per-acre" rate that reflected the revenue requirements assigned to the City by the Great Lakes Water Authority and the City's expenses in operating the local retail system. (*Id.* at 1-2.)  In October 2016, the City started charging an impervious acreage rate to 22,000 parcels that have been relying on the City's drainage system but have never been charged the fee.  (*Id.* at 2, 4.)  Recently, the City decided to phase-in these and other existing drainage customers who have not been paying a "per-acre" rate so that ultimately, all parcel owners will be paying a drainage fee based on a uniform rate as applied to an impervious acreage that is specific as to each parcel. (Ex. **D** (4/13/17 Resolution).)

**The Headlee Amendment to the Michigan Constitution**

The Headlee Amendment states in pertinent part:

Units of local government are  . . . prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

---

*Continued from previous page.*

Wayne County Circuit Court Case No.13-014215-CB at 134-39 (169-page transcript to be provided upon request).

MCLA Const., Art. 9, §31.  Under this provision (along with §32), a person may challenge whether a municipal charge is a valid regulatory fee or an unconstitutional tax.  Excluded from Headlee analysis is the levying of any tax that was authorized by law or charter when Headlee was ratified in 1978.  In the last decade, several lawsuits have been filed against scores of municipalities challenging the propriety of the fees these communities charge for the services they provide.  A Headlee claim is usually "all or nothing" because it seeks to invalidate a charge in its entirety.

## Taxes v. Fees: The Three-Factor Test Established under *Bolt v. City of Lansing*

*Bolt v. City of Lansing*, 459 Mich. 152, 587 N.W.2d 264 (1998), is the seminal case addressing the constitutionality of municipal fees challenged under Headlee.  In *Bolt*, the Michigan Supreme Court decided that there is no bright-line test for distinguishing between a valid user fee and an unconstitutional tax. Instead, the Court established three primary criteria to distinguish between a fee and a tax. *Id.* at 160-61.  First, the fee must serve a regulatory purpose and not exist primarily to generate revenue.  *Id*. at 161.  A fee may be used to raise money as long as it supports an underlying regulatory purpose. *Graham v. Kochville Twp*, 236 Mich. App. 141, 152, 599 N.W.2d 793 (1999). Second, a user fee must be proportionate to the necessary costs of the service rendered or the benefit conferred.  *Bolt*, 459 Mich. at 161-62, 587 N.W.2d 264.  Third, the fee should be

voluntary, meaning that the payer must be able to refuse or limit its use of the service or benefit. *Id.* at 162.   A municipality ***does not*** need to meet all three criteria in order to find that an assessed charge is a fee and not a tax. *Graham*, 236 Mich. App. at 151, 599 N.W.2d 793.

**The Storm Water Fee Cases Decided Under the Headlee Amendment**

Two Michigan cases – *Bolt* and *County of Jackson v City of Jackson* – specifically address the imposition of "storm water" fees and evaluate these fees using the three-factor test.  In *Bolt*, the City of Lansing imposed a storm water fee (based in part on a parcel's impervious area) on 100% of its residents to pay primarily for the separation of the last of its combined storm and sanitary sewer systems, but also for the management of its separated storm water flows.  *Bolt*, 459 Mich. at 155, 587 N.W.2d 264.   Approximately 75% of Lansing's wastewater disposal system was separated, with only 25% of the system being combined like the City's.  *Id.* at 154-55, n.3.   Thus, many of the people being charged the fee were not benefitting from the separation.  This "lack of correspondence between the charges and the benefit conferred," along with the absence of any regulatory requirements regarding the storm water, led the Court to find that Lansing's charge

was a "rain tax" rather than a regulatory fee. *Id.* at 163, 166. The Court therefore ruled the charge violated the Headlee Amendment.[6] *Id*. at 169.

In *County of Jackson v. City of Jackson*, 302 Mich. App. 90, 836 N.W.2d 903 (2013), the plaintiff sought to invalidate Jackson's storm water fees. Like Lansing, Jackson had a separated (not combined) sewer system. Its fee (also based in part on a parcel's impervious area) did not charge residents for any costs related to the treatment and disposal of combined sewage. *Id.* at 94. The *County of Jackson* court held that Jackson's fees (which included a flat-rate storm water management charge for all residential properties in the City) were unconstitutional taxes under Headlee because, inter alia, the City did not treat the property owners' storm water runoff and thus provided no service to the property owner. *Id.* at 103. This failure factored into the Court's finding that Jackson's charge did not provide a particularized benefit to each property owner. *Id*. at 103-104.

**The Pending Headlee Actions against the City**

Relying primarily on *Bolt* and *County of Jackson*, City ratepayers have claimed that the City's drainage fee is an unlawful storm water tax. At least two lawsuits have been filed against the City and the City expects more.

---

[6] Lansing did not treat storm water nor did it "consider the presence of pollutants" that would contribute to the need for any treatment prior to the storm water's disposal. *Id.* at 166. The City differs in this regard insofar as the costs covered by the drainage fee are for the treatment of storm water flows and the operation and maintenance of the facilities that provide treatment.

The first lawsuit – *Michigan Warehousing et al. v City of Detroit*, Wayne County Circuit Court Case No. 15-010165-CZ – was filed in August 2015 and served on September 11, 2015.  The plaintiffs in *Warehousing* are a purported class of non-residential drainage customers who have paid an impervious acreage rate since July 2013.  This purported class alleges that it has unfairly shouldered the costs of the City's drainage system relative to other customers who were charged based on their meter size or not charged at all.  Among the seven claims it has asserted is a Headlee Amendment claim that seeks a declaration that the City's drainage fee is an unconstitutional storm water tax and under *Bolt*, may not be charged at all.  (Ex. **E** (*Warehousing* Second Amended Complaint ¶¶ 4, 49-54).)

The City filed a motion for summary disposition to dismiss several of the claims, including the Headlee claim, as a matter of law.  That motion was denied in its entirety in September 2016.  The case has been stayed pending the City's right to appeal certain issues as a matter of right and simultaneously, the City sought leave to appeal the denial of its motion to dismiss the Headlee Claim.  The Michigan Court of Appeals granted leave to appeal and briefing was concluded on April 4, 2017.  Before the Court of Appeals is the City's argument that conflict preemption precludes the application of Headlee in this particular case.[7]

---

[7] The City also argued that it has pre-Headlee charter authority to charge the drainage fee and thus, it is not subject to Headlee analysis at all.

The second lawsuit – *Binns et al. v. City of Detroit et al.*, Court of Appeals Case No. 337609 – was filed in the Michigan Court of Appeals (which shares original jurisdiction of Headlee matters) on March 28, 2017 and appears to be brought on behalf of a class of residential and non-residential customers who were first assessed the city's per-acre drainage charge starting in October 2016. These persons are also alleging that the City's drainage fee is an unlawful storm water tax under the principles of *Bolt* and thus, should not be charged in its entirety. (Ex. **F** (*Binns* First Amended Complaint ¶¶ 11-12, 46-50, 54).) The City, in its defense against this claim, will seek to dismiss the plaintiffs' Headlee claim because, in part, conflict preemption precludes the application of Headlee in this instance.

**The Conflict between the Federal Rules and Headlee**

The user charge system – by regulation – could be ad valorem or based on actual use. See 40 CFR §35.929-1 (now 40 CFR §35.2140). But according to the applicable federal regulations, the City is ***prohibited*** from relying on an ad valorem system because to do so, the City needed to have a dedicated ad valorem tax system for the maintenance of waste water treatment works as of December 27, 1977. *See* 33 USC §1284(b)(1)(A); 40 CFR §35.929-1(b) (now 40 CFR §35.2140(b)) ("If . . . the grantee did not have a dedicated ad valorem tax on December 27, 1977, meeting the requirements of paragraphs (b)(1) through (b)(3) of this section, the grantee ***shall*** develop a user charge system based on actual use

under §35.929-1(a)")(emphasis added). As the federal courts already established, the City had no federally acceptable user charge system in place prior to 1980 and certainly not one that was ad valorem. *City of Detroit*, 803 F.2d at 1412. Thus, the City was (and still is) required to develop a user charge system based on actual use under 40 CFR §35.929-1(a).[8] It cannot – by law – rely on an ad valorem system.

If the City's drainage fee is ruled an unlawful tax under Headlee, the City will have no choice but to impose (upon voter approval) an ad valorem tax, which would violate federal law. If this occurs, the City is subject to noncompliance provisions under which the EPA could seek to disallow those costs covered by the federal grant (thus, requiring the City to refund costs covered by the grant). Noncompliance could render the City ineligible for future federal assistance or future EPA grants. *See* 40 CFR §35.929; 40 CFR §35.965.[9] And if the ad valorem tax is not approved by the voters (a likely outcome in a City with an already impoverished and declining tax base), then the purposes of the federal law – to

---

[8] *See also* 40 CFR §35.929-1(b)(now 40 CFR §35.2140(b)).

[9] Under today's federal regulations, the City still has an obligation to maintain the required user charge system for the design life of the system funded by the grant. *See* 40 CFR. §35.2214 (Grantee Responsibilities). Grant recipients are subject to debarment or suspension for noncompliance. 40 CFR §35.2105. The EPA has concluded that "user charge system requirements continue to apply even though the Title II construction grant was awarded many years ago," noting that "the Title II construction grant requirements for the user charge system remain *as long as the treatment works are operational*." (Ex. **G** (February 17, 2000 EPA Memo (emphasis added)).)

ensure funding for the continued operation and maintenance of federally-financed improvements to eliminate water pollution with respect to wet weather flows – will be thwarted.  As a result, the City's ability to meet the CWA obligations (reiterated in this Court's December 15, 2015 Order) would be fatally compromised.[10]

Even more problematic is the fact that if a state court concludes that the drainage fee is an unlawful "tax," the charge (regardless of whether it is approved by voters and regardless of whether it is assessed on an ad valorem basis or in its current configuration) is a tax per se.  It is then arguably subject to the mill limits set forth in the City's Charter.  The City is already charging the maximum number of mills allowed in its Charter and there is no other legal basis under which the City may levy the drainage fee in order to cover its costs related to its drainage obligations.[11] Because the City's federally-mandated drainage fee may be ruled an unconstitutional tax that it ultimately cannot charge, the City now seeks relief.

## ARGUMENT

Although the potential conflict between the Headlee Amendment and the City's federal obligations initially arose in state court, it is, as a threshold matter, wholly appropriate for this Court to grant relief under Rule 60(b)(6) because the City's existing duties under <u>federal</u> law create the conflict.   Federal courts have

---

[10] Not addressed is the risk that the City would have to *refund* this fee to all drainage customers, resulting in hundreds of millions of dollars in liability.

[11] For FY 2017, these costs are in excess of $151 million.  (Ex. **C** at 6.)

issued rulings that preclude state law claims based on federal preemption <u>prior</u> to the claims being decided.[12]  When viewed as a whole, the City's obligations under the CWA and accompanying regulations, the original intent of this Court's prior orders, and the potential conflicts presented by the Headlee Amendment all demonstrate that the City will not be able to comply with its federal obligations if subject to a Headlee claim (or any other state law claim challenging the mere fact of the fee).  As a result, conflict preemption applies and should preclude the application of Headlee and other similar claims to the City's drainage fee.

## I.     Rule 60(b)(6) Relief is Appropriate.

This Court should grant the City's request for relief under Rule 60(b)(6). Rule 60(b)(6) permits this Court to "relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason [not enumerated] that justifies relief." Fed. R. Civ. P. 60(b)(6).  ". . . Rule 60(b), which is inherently equitable in nature, empowers district courts to revise judgments when necessary to ensure their integrity" and in particular, Rule 60(b)(6) "confers upon the district court a broad equitable power to do justice." *Johnson v. Bell*, 605 F.3d 333, 336 (6th Cir. 2010) (quotations omitted). Generally speaking, the Rule applies "in

---

[12] *See*, *e.g.*, *NE Hub Partners, L.P. v. CNG Transmission Corporation*, 239 F.3d 333 (3d Cir. 2001) (reversing lower court ruling that dismissed preemption claim as "unripe" because state process could be preempted and plaintiffs did not need to wait until outcome was achieved before claiming preemption).

exceptional or extraordinary circumstances . . ." and "as a means to achieve substantial justice when something more than one of the grounds contained in Rule 60(b)'s first five clauses is present." *Olle v. Henry & Wright Corp.*, 910 F.2d 357, 365 (6th Cir. 1990) (quotations omitted). "The 'something more,' then, must include unusual and extreme situations where principles of equity *mandate* relief." *Id.* (emphasis in original). "The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all of the facts." *Thompson v. Bell*, 580 F.3d 423, 442 (6th Cir. 2009) (quotations omitted).[13]

When this Court was previously asked to address a claim related to the City's drainage fee, *see City of Detroit v. State of Michigan*, 538 F.Supp. 1169 (E.D. Mich. 1982), the Court concluded that because "[a]n important item in the EPA's complaint was the failure of DWSD to implement a proper user charge

---

[13] A Rule 60(b)(6) motion need only be filed within a "reasonable time" after entry of judgment. Fed. R. Civ. P. 60(c)(1). This motion was brought within a reasonable time following the issuance of this Court's December 15, 2015 Order. The lower state court did not deny the City's dispositive motion in *Warehousing* until September 2016 and the City has been in settlement discussions with the plaintiffs in that case since that time (although no settlement has been reached as of the date of this filing). Because *Binns*, filed on March 28, 2017, also seeks to challenge the entirety of the drainage fee as an unconstitutional tax, the City now faces a greater risk of a ruling that would preclude the City from charging the drainage fee and recovering its costs and would, thus, create noncompliance.

system required by Title II of the [Federal Water Pollution Control Act]" the Court

could exercise jurisdiction over issues relating to the City's usage charge system

through its ancillary powers. *Id.* at 1173.  This understanding remained the same

almost a decade letter when the Court stated that it has

> jurisdiction over the implementation of wet weather combined sewer
> overflow standards established in the proposed NPDES permits,
> including the time and manner in which the parties must deal with wet
> weather flow violations. . . . To the extent that issues presented . . . .
> impact on or affect the time and manner in which Detroit and the
> communities it serves must meet the goal of secondary treatment of
> wet weather flows, I have jurisdiction over these issues, as this goal
> remains a part of the original 1977 case.

*United States v. City of Detroit*, 777 F. Supp. 1365, 1368 (E.D. Mich. 1991).

Finally, this Court expressly retained jurisdiction as recently as December 2015 to

ensure compliance with its orders.  (Order ¶7, ECF # 2572.)

Although this instant case is closed, this Court's interest remains the same as

it was earlier when it elected to hear certain claims.  It is particularly appropriate,

in fact, for this Court (and not a state court) to address the issues in this motion,

including whether preemption exists because if it does, then the City's drainage fee

is "beyond the state's authority in the first place."  *Schoolcraft Memorial Hosp. v.*

*Michigan Dept. of Community Health*, 570 F.Supp.2d 949, 956 (W.D. Mich.

2008).    The City has sought relief from the state courts' application of the

Headlee Amendment to its drainage fee (by arguing conflict preemption in the

applicable state proceedings), but only this <u>federal</u> Court (given its familiarity with

the City's CWA obligations and its understanding of federal law) is best poised to determine what the City's <u>federal</u> obligations must be vis-à-vis Headlee. **Thus, this Court need not (and should not) defer to the state courts and abstain from ruling on preemption**. *See United States v. Commonwealth of Kentucky*, 252 F.3d 816, 826 (6th Cir. 2001) (court did not need to defer to pending state proceeding and abstain from finding preemption because abstention was only warranted if issues in state proceeding did not involve federal law, and state law rules affecting DOE's obligations under Atomic Energy Act did, in fact, involve federal law).

The City is in the precarious position of being forced into non-compliance with not only the terms and intent of the rulings this Court has made over the last 40 years, but also the plain language of federal regulations governing the City's obligations under the CWA. Potential noncompliance with an order has been recognized as "adequately extraordinary circumstance" to warrant Rule 60(b)(6) relief. *Pension Ben. Guar. Corp. v. Boury, Inc.*, No. 5:02CV161, 2008 WL 2803798, at *2 (N.D.W.V. Jul. 18, 2008)(granting Rule 60(b)(6) motion to reopen case based on alleged noncompliance with court's prior order). Without a clear understanding of how federal law affects the application of Headlee to the City's drainage fee, the risk of federal non-compliance looms over the City. Thus, Rule 60(b)(6) relief is appropriate.

## II.    Conflict Preemption Precludes the Application of Headlee to the City's Drainage Fee.

The Supremacy Clause of the United States Constitution provides that federal law takes precedence over state law.  U.S. Const. Art. VI, cl. 2.  Precedence can manifest either through express preemption, field preemption or conflict preemption.  "Conflict preemption exists if there is an actual conflict between federal and state law, or where compliance with both is impossible."  *Michigan South Cent. Power Agency v. Constellation Energy Commodities Group, Inc.*, 466 F.Supp.2d 912, 924 (W.D. Mich. 2006) (finding that conflict preemption barred state-based contract claim).  "Where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' conflict preemption bars the state law-claim."  *Id.* (*quoting Hines v. Davidowitz* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).[14]

---

[14] The fact that Headlee is part of the state constitution is irrelevant to this Court's preemption analysis.  Federal courts readily find that federal law preempts provisions in state constitutions.  *See*, *e.g.*, *Beerbower v. United States*, 592 F.Supp. 67, 68 (E.D. Mich. 1984) (federal taxation and income withholding preempts equal protection clause in Michigan Constitution); *United States v. Stevenson*, 834 F.3d 80, 87 (2d Cir. 2016) (preempting provision of New York State Constitution to the extent that it prevented forfeiture under federal law); *Cox Communications Cent. II, Inc. v. City of Broken Arrow, Okla.*, Case No. 02-CV-741-PJ, 2003 WL 26095331, at *8 (N.D. Okla. Mar. 11, 2003) (federal law preempted requirement contained in the Oklahoma Constitution to the extent it conditioned the renewal of a cable franchise upon a vote); *M. Nahas Co., Inc. v. First National Bank of Hot Springs*, 739 F. Supp. 1338, 1341-42 (W.D. Ark. 1990) (National Bank Act preempted Arkansas Constitution provision regarding usury).

This case is very much like *Pliva, Inc. v. Mensing*, 131 S.Ct. 2567, 2577-78, 180 L.Ed.2d 580 (2011), in which the United States Supreme Court held that federal regulations preempted state law.   In *Pliva*, state law required drug manufacturers to revise their labels for generic drugs and provide a "safer label" that informed users of the risk of long-term use of the drugs.   But, federal regulations specifically required the manufacturers to keep the labels the same as the labels for the corresponding brand name drug.  The Supreme Court concluded that conflict preemption applied because it was impossible for the drug manufacturers to comply with state law because "[i]t was not lawful under federal law for the [m]anufacturers to do what state law required of them."  *Id.* at 2577. The Supreme Court also concluded that it was not obligated to take into account possible actions by a federal agency in deciding conflict preemption, meaning that even if the FDA could have assisted the drug manufacturers in generating a label that complied with state law, federal law still preempted state law:

> [P]reemption analysis should not involve speculation about ways in which federal agency and third-party actions could potentially reconcile federal duties with conflicting state duties.   When the "ordinary meaning" of federal law blocks a private party from independently accomplishing what state law requires, that party has established preemption.

*Id.* at 2578-2580; *see also Farina v. Nokia, Inc.*, 625 F.3d 97, 133 (3d Cir. 2010) (entire lawsuit was conflict-preempted because state law claims (and their objectives) upset the balance struck by the FCC in setting its regulatory standards).

*Pliva* argues for a finding of conflict preemption in this matter, i.e., specifically that Headlee challenges to the City's drainage fee are subject to conflict preemption. Here, the "preemptive scope of the Clean Water Act necessarily includes all laws that are inconsistent with the 'full purposes and objectives of Congress'" in enacting the legislation including the "establish[ment of] an all-encompassing program of water regulation." *Int'l Paper Co v. Ouellette*, 479 U.S. 481, 492, 499, n.20, 107 S.Ct. 805, 815 (1987). The CWA clearly requires the creation of a user charge system. 33 USC §1284(b)(1)(A). Published in the Code of Federal Regulations, the EPA's CWA regulations "have the force and effect of law." *Nationwide Bldg. Maintenance, Inc. v. Reich*, 14 F.3d 1102, 1105 (6th Cir. 1994). These regulations specifically require that the City base its user charge system on actual use (and <u>not</u> ad valorem taxation). These regulations expressly tell the City how it must measure actual use for infiltration and inflow (including storm water and surface water). *See* 40 C.F.R. §35.929-1(a) (now 40 CFR §35.2140); 40 CFR §35.929-1(b) (now 40 CFR §35.2140(b)). The City's duty to comply with these federal regulations was reinforced by the Court in its earlier orders. *See City of Detroit*, 803 F.2d at 1413.[15]

---

[15] This case is inapposite *City of Warren v. City of Detroit*, 495 F.3d 282 (E.D. Mich. 2007) in which the Court ruled that the consent judgment in this case lacked the power to supersede Michigan statute because it was reached through agreement and not positive law. Here, the City relies not on the earlier consent judgment, but
*Continued on next page.*

22

The Headlee Amendment, on the other hand, presents many obstacles to the City being able to maintain this mandated user charge system.  No matter how distinguishing the facts surrounding the City's drainage fee are, there is certainly more than a speculative risk that the City's drainage fee will be ruled a "tax" given the state courts' prior holdings in *Bolt* and *County of Jackson.*  Indeed, although the federal regulations allow the City to rely on "land area" as a means to measure infiltration and inflow (*see* 40 CFR §35.929-2(d)(now 40 CFR §35.2140(e))), Michigan courts have ruled unconstitutional at least two storm water fees that were based, in part, on impervious acreage.  Again, the City maintains that its situation is distinct from that in *Bolt* and *County of Jackson* because it is obligated to provide treatment and disposal services for combined overflows consisting of both sewage and storm water and it is obligated to charge for those services.  But there is no guarantee that a state court will view storm water treatment and disposal as a particularized benefit for which each person must pay a fee as opposed to mere "rain management" – an alleged community benefit that must be covered by the City's general fund instead and thus, should be funded by a tax.

Here, the plain language of the CWA regulations requires the City to adopt a user charge system that is based on actual use and recovers the costs related to the

---

*Continued from previous page.*

rather the express language in the CWA <u>and</u> its regulations and court orders that were not subject to consent.

operation and maintenance of systems dealing with surface water runoff and storm water.  The City's drainage fee satisfies this obligation.  However, state law claims now seek to invalidate the drainage fee in its entirety and to preclude the City from charging any fee related to the treatment, disposal and management of surface water runoff and storm water.  If the City complies with a state law ruling that finds its charges an unlawful tax under Headlee, the City will violate its duties under federal law to charge the drainage fee based on actual use.  If the City continues to comply with federal law by charging (in any form) a drainage fee that has been ruled an unlawful tax, it will be violating state law.  This is the very definition of "conflict preemption."

## CONCLUSION

Relief under Rule 60(b)(6) is granted in extraordinary situations.  The City's predicament is, in fact, extraordinary.  The possibility of the City's non-compliance with federal law (including its obligation to fund the costs of the very treatment and disposal obligations that were originally at issue in the complaint that launched this proceeding) and this Court's orders warrants this Court's reopening of this matter to determine the preemptive effect of the CWA requirements in this particular case.  Indeed, "state law cannot prevent a federal judge from enforcing his judgments."  *City of Detroit v. City of Highland Park*, 878 F.Supp. 87, 89 (E.D. Mich. 1995) (holding that Headlee did not preclude

24

federal court from enforcing its prior judgment).  For these reasons and those stated above, the City respectfully requests that this Court reopen this matter and provide it with a ruling regarding the preemptive effect of its prior orders and the City's federal obligations under the CWA regulations vis-à-vis state law challenging the inherent validity of any drainage fee imposed by the City to cover the costs of treating, disposing and managing its infiltration and inflow (including but not limited to surface water runoff and storm water), and any other equitable relief deemed necessary to enforce a preemption ruling.  In the alternative, the City respectfully requests a status conference and/or oral argument to address the substantive issues raised in this motion.

Respectfully submitted,

**MILLER CANFIELD PADDOCK AND STONE, P.L.C.**

By: /s/  *Sonal Hope Mithani*
Sonal Hope Mithani (P51984)
Attorneys for the City of Detroit
101 N. Main Street, 7th Floor
Ann Arbor, MI  48104
734.668.7786
mithani@millercanfield.com

May 3, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2017 I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system which will provide notification to all counsel of record.

MILLER CANFIELD PADDOCK AND STONE, P.L.C.


By:  /s/ Sonal Hope Mithani
     Sonal Hope Mithani (P51984)
     Attorneys for the City of Detroit
     101 N. Main Street, 7th Floor
     Ann Arbor, Michigan  48104
     734.668.7786
     mithani@millercanfield.com

29052455.2\022765-00215

# EXHIBIT A

# CHARTER

## OF THE

# CITY OF DETROIT



**As Adopted by Vote of the
People on November 6, 1973**

**EFFECTIVE JULY 1, 1974**

## N? 735

**Available for Sale at the
Office of Detroit City Clerk**

**JAMES H. BRADLEY**

**1304 City-County Building
Detroit, Michigan 48226**

# CHARTER

OF THE

# CITY OF DETROIT

————

## HOME RULE CITIES

**The power to adopt this Charter was conferred by Act 279, Public Acts 1909 (now Chapter 49, of the Compiled Laws of the State of Michigan, 1929, and Chapter 49 of Michigan Statutes Annotated)**

————

**Adopted by Vote of the People of the City of Detroit**
**November 6, 1973**

**Filed with the Secretary of State**
**November 30, 1973**

**EFFECTIVE JULY 1, 1974**

# PART I

# THE CHARTER

**Editor's note.** — The Charter of the City of Detroit was adopted by vote of the people on November 6, 1973. It was filed with the Secretary of State on November 30, 1973 and became effective July 1, 1974.

The authority of the city to adopt a Home Rule Charter is found in the Home Rule Act of Michigan, Act 279, Public Acts of 1909, codified as chapter 49 of title 5 of Michigan Statutes Annotated and chapter 117 of the Compiled Laws of 1948.

A uniform system of capitalization has been employed and a frontal analysis has been added for the convenience of the user and appropriate footnotes have been inserted. Otherwise, the Charter is set out herein as originally adopted by the people.

**Home Rule Act.** — For state law authorizing city to revise its Charter and establishing procedure therefor, see M.S.A., §§ 5.2096 to 5.2099 (C.L. 1948, §§ 117.17 to 117.20). As to authority of city to amend its Charter and procedure therefor, see M.S.A., §§ 5.2100 to 5.2105 (C.L. 1948, §§ 117.21 to 117.26). As to requirement that Charter comply with general law of the state, see M.S.A., § 5.2116 (C.L. 1948, § 117.36).

## TABLE OF CONTENTS

*Page*

Preamble and Declaration of Rights ........................... 9

**Articles**

1. Establishment of City Government ........................... 10
2. General Provisions ........................................ 11
3. Elections ................................................ 15
4. Legislative Branch ....................................... 17

   **Chapters**

   1. The City Council ...................................... 17
   2. Auditor General ...................................... 22
   3. Ombudsman ........................................... 23
   4. City Planning Commission ............................. 25

5. The Executive Branch: The Mayor and General Provisions .......... 26
6. The Executive Branch: Staff Departments ........................ 28

   **Chapters**

   1. Budget Department .................................... 28
   2. Planning Department .................................. 28
   3. Finance Department ................................... 30
   4. Law Department ...................................... 32
   5. Personnel Department ................................. 33

7. The Executive Branch: Programs, Services and Activities ........... 38

   **Chapters**

   1. General Provisions .................................... 38
   2. Responsibilities in Health and Sanitation ............... 39
   3. Arts ................................................ 40
   4. Building ............................................. 40
   5. Community and Economic Development .................. 41

1

**Articles**                                                                                     *Page*

    6.  Consumer Affairs .......................................... 41
    7.  Environmental Protection ................................. 42
    8.  Fire ..................................................... 42
    9.  Historical ............................................... 44
  10.  Human Rights ........................................... 44
  11.  Police .................................................. 45
  12.  Public Lighting ......................................... 50
  13.  Recreation .............................................. 51
  14.  Transportation .......................................... 51
  15.  Water and Sewerage ..................................... 52
  16.  Zoological Park ......................................... 53

8.  Planning and Financial Procedures ............................... 53

**Chapters**

    1.  Planning Procedures ..................................... 53
    2.  Budgets ................................................ 54
    3.  Administration of Budgets ............................... 56
    4.  Property Taxation ....................................... 57
    5.  Borrowing .............................................. 59
    6.  Special Assessments ..................................... 60

9.  Miscellaneous Provisions ...................................... 61

**Chapters**

    1.  Community Government .................................. 61
    2.  Council of the Arts ...................................... 63
    3.  Regulatory Power and Review ............................ 63
    4.  Specific Responsibilities ................................. 64
    5.  Specific Powers ......................................... 65
    6.  Retirees' Representation ................................. 67

10.  Courts ....................................................... 67
11.  Retirement Plans ............................................. 68
12.  Initiative and Referendum ..................................... 69
13.  Schedule .................................................... 71
Index ........................................................... 77

2

# PREAMBLE

# AND

# DECLARATION OF RIGHTS

---

## Preamble

## Declaration of Rights

### ARTICLE 1.

#### Establishment of City Government.

§ 1-101. City government.
§ 1-102. General powers.
§ 1-103. Liberal construction.
§ 1-104. Boundaries.

### ARTICLE 2.

#### General Provisions.

§ 2-101. Qualifications for elective and appointive officers.
§ 2-102. Term of office.
§ 2-103. Oath of office.
§ 2-104. Severability.
§ 2-105. Definitions.
§ 2-106. Standards of conduct.
§ 2-107. Dismissal proceedings.
§ 2-108. Pay plans.
§ 2-109. Reimbursement.
§ 2-110. General provisions for multi-member bodies.
§ 2-111. Rule-making.

### ARTICLE 3.

#### Elections.

§ 3-101. City elections.
§ 3-102. Election commission.
§ 3-103. The city clerk.
§ 3-104. State law to apply.
§ 3-105. Elective offices of the city.
§ 3-106. Geographical basis for electing council members.
§ 3-107. Nominating petitions.
§ 3-108. Nominees.

### ARTICLE 4.

#### The Legislative Branch.

#### Chapter 1. The City Council.

§ 4-101. The city council.
§ 4-102. Meetings.
§ 4-103. Selection of council president.
§ 4-104. Filling council vacancies.
§ 4-105. Rules and journal.
§ 4-106. Quorum.
§ 4-107. Voting.
§ 4-108. Investigation.
§ 4-109. Investigative powers.
§ 4-110. Council clerk.

## DETROIT CITY CODE

§ 4-111. Control of property.
§ 4-112. Prohibition on interference in administration.
§ 4-113. City action requiring an ordinance.
§ 4-114. Ordinance procedure.
§ 4-115. Immediate effect.
§ 4-116. Emergency ordinances.
§ 4-117. Ordinances and resolutions after adoption.
§ 4-118. Veto.
§ 4-119. Council personnel.
§ 4-120. Special counsel.

### Chapter 2. Auditor General.

§ 4-201. Auditor general.
§ 4-202. Deputy auditor general.
§ 4-203. Term of office.
§ 4-204. Employees.
§ 4-205. Powers and duties.
§ 4-206. Limitations.

### Chapter 3. Ombudsman.

§ 4-301. Ombudsman.
§ 4-302. Term of office.
§ 4-303. Vacancy.
§ 4-304. Salary.
§ 4-305. Staff.
§ 4-306. Definition.
§ 4-307. Jurisdiction.
§ 4-308. Powers of investigation.
§ 4-309. Delegation of powers.
§ 4-310. Correspondence from person detained.
§ 4-311. Consultation required.
§ 4-312. Reports.
§ 4-313. Duty to report illegal acts.
§ 4-314. Obstruction.
§ 4-315. Immunity.
§ 4-316. Limitations.
§ 4-317. Remedies cumulative.
§ 4-318. Referendum.

### Chapter 4. City Planning Commission.

§ 4-401. City planning commission.
§ 4-402. Powers and duties.
§ 4-403. Staff assistance.

## ARTICLE 5.

### The Executive Branch: The Mayor and General Provisions.

§ 5-101. The mayor.
§ 5-102. The executive branch.
§ 5-103. Mayoral appointments.
§ 5-104. Other mayoral powers.
§ 5-105. Appointment of deputies.
§ 5-106. Powers and duties of department directors.
§ 5-107. Powers of a department deputy.
§ 5-108. Deputy mayor.
§ 5-109. Succession to office.

## ARTICLE 6.

### The Executive Branch: Staff Departments.

### Chapter 1. Budget Department.

§ 6-101. Budget department.
§ 6-102. Powers and duties.
§ 6-103. Management audits.

# CHARTER

## Chapter 2. Planning Department.

§ 6-201. Planning department.
§ 6-202. Advance planning.
§ 6-203. Current planning.
§ 6-204. Definition.
§ 6-205. Public hearings.
§ 6-206. Executive planning council.
§ 6-207. Meetings.
§ 6-208. Duties.

## Chapter 3. Finance Department.

§ 6-301. Finance department.
§ 6-302. Departmental divisions.
§ 6-303. Accounts division.
§ 6-304. Assessments division.
§ 6-305. Treasury division.
§ 6-306. Purchasing division.

## Chapter 4. Law Department.

§ 6-401. Law department.
§ 6-402. Qualifications.
§ 6-403. Civil litigation.
§ 6-404. Penal matters.
§ 6-405. Advice and opinions.
§ 6-406. Form of documents.
§ 6-407. Drafting.
§ 6-408. Special counsel.
§ 6-409. Other duties.

## Chapter 5. Personnel Department.

§ 6-501. General purpose.
§ 6-502. Personnel department.
§ 6-503. Personnel director and deputy.
§ 6-504. Qualifications.
§ 6-505. Civil service commission.
§ 6-506. Non-discrimination.
§ 6-507. Employee organization.
§ 6-508. Labor relations.
§ 6-509. Classification of positions.
§ 6-510. Examinations.
§ 6-511. Validation.
§ 6-512. Recruitment and advancement.
§ 6-513. Employee grievances.
§ 6-514. Jurisdiction.
§ 6-515. Payrolls.
§ 6-516. Residence.
§ 6-517. Classified service.
§ 6-518. Transfers and promotions to exempt positions.
§ 6-519. Consolidation of entities.

# ARTICLE 7.

## The Executive Branch: Programs, Services and Activities.

### Chapter 1. General Provisions.

§ 7-101. Existing programs, services and activities.
§ 7-102. Assignment of authorized functions.
§ 7-103. Advisory commissions.
§ 7-104. Change in number of authorized functions.

### Chapter 2. Responsibilities in Health and Sanitation.

§ 7-201. Health.
§ 7-202. Sanitation.

## DETROIT CITY CODE

### Chapter 3. Arts.

§ 7-301. Department.

### Chapter 4. Building.

§ 7-401. Duty under zoning law.
§ 7-402. Applications filed under zoning law.
§ 7-403. Board of zoning appeals.
§ 7-404. Duty under other regulatory laws.
§ 7-405. One-stop service.

### Chapter 5. Community and Economic Development.

§ 7-501. Department(s).

### Chapter 6. Consumer Affairs.

§ 7-601. Departments.
§ 7-602. Powers.
§ 7-603. Consumers council.

### Chapter 7. Environmental Protection.

§ 7-701. Department.
§ 7-702. Advisory commission.

### Chapter 8. Fire.

§ 7-801. Department.
§ 7-802. Departmental divisions.
§ 7-803. Duties.
§ 7-804. Fire marshal.
§ 7-805. Advisory commission.
§ 7-806. Promotions.

### Chapter 9. Historical.

§ 7-901. Department.

### Chapter 10. Human Rights.

§ 7-1001. Department.
§ 7-1002. Commission.
§ 7-1003. Budget.
§ 7-1004. Duties.
§ 7-1005. Powers.
§ 7-1006. Appeals.
§ 7-1007. Remedies cumulative.

### Chapter 11. Police.

§ 7-1101. The police department.
§ 7-1102. Board of police commissioners.
§ 7-1103. Duties of the board of police commissioners.
§ 7-1104. Staff.
§ 7-1105. Chief of police.
§ 7-1106. Duties of the chief of police.
§ 7-1107. Discipline.
§ 7-1108. Complaints.
§ 7-1109. Resolution of complaints.
§ 7-1110. Division of police personnel.
§ 7-1111. Deputy director.
§ 7-1112. Recruitment and entry into service.
§ 7-1113. Powers and duties.
§ 7-1114. Promotions.
§ 7-1115. Examinations.
§ 7-1116. Employees.
§ 7-1117. Patrolmen employed by governmental and educational institutions.
§ 7-1118. Police reserves.

# CHARTER

## Chapter 12. Public Lighting.

§ 7-1201. Department.
§ 7-1202. Qualifications.
§ 7-1203. Commission.
§ 7-1204. Powers and duties.

## Chapter 13. Recreation.

§ 7-1301. Department.
§ 7-1302. Advisory commission.

## Chapter 14. Transportation.

§ 7-1401. Department.
§ 7-1402. Advisory commission.
§ 7-1403. Intelligence division.
§ 7-1404. Limitations.

## Chapter 15. Water and Sewerage.

§ 7-1501. Department.
§ 7-1502. Powers.
§ 7-1503. Limitation on funds.

## Chapter 16. Zoological Park.

§ 7-1601. Department.

# ARTICLE 8.

## Planning and Financial Procedures.

### Chapter 1. Planning Procedure.

§ 8-101. Comprehensive plan.
§ 8-102. Periodic review.
§ 8-103. Council procedure.
§ 8-104. Purpose of the plan.

### Chapter 2. Budgets.

§ 8-201. Fiscal year.
§ 8-202. Capital agenda.
§ 8-203. Annual budget.
§ 8-204. The budget.
§ 8-205. Form of appropriation.
§ 8-206. Public hearing.
§ 8-207. Amendment before adoption.
§ 8-208. Budget adoption.
§ 8-209. Effect of budget adoption.
§ 8-210. Amendments after adoption.
§ 8-211. Transfer of appropriations.

### Chapter 3. Administration of Budgets.

§ 8-301. Work programs and allotments.
§ 8-302. Limit on obligations and payments.
§ 8-303. Penalties for violation.
§ 8-304. Obligations to be met by subsequent appropriation.

### Chapter 4. Property Taxation.

§ 8-401. Power.
§ 8-402. Assessors' duties.
§ 8-403. Collection of property taxes.

### Chapter 5. Borrowing.

§ 8-501. General power.
§ 8-502. Limitations on borrowing.
§ 8-503. Specific kinds of borrowing.

DETROIT CITY CODE

§ 8-504. Use of borrowed funds.
§ 8-505. Execution of obligation.
§ 8-506. Tax exempt.

### Chapter 6. Special Assessments.

§ 8-601. Power to assess.
§ 8-602. Special assessments to finance transit facilities.
§ 8-603. Procedure ordinance.
§ 8-604. Assessment lien.
§ 8-605. Contest of assessment.

## ARTICLE 9.

### Miscellaneous Provisions.

### Chapter 1. Community Government.

§ 9-101. Definition and authorization.
§ 9-102. Approval of the voters.
§ 9-103. Study commission.
§ 9-104. Powers and duties.
§ 9-105. Effect upon advisory commissions.

### Chapter 2. Council of the Arts.

§ 9-201. Council of the arts.

### Chapter 3. Regulatory Power and Review.

§ 9-301. Regulatory power.
§ 9-302. Appellate review.
§ 9-303. Limitations on a franchise.
§ 9-304. Standard provisions of a public utility franchise.

### Chapter 4. Specific Responsibilities.

§ 9-401. The board of review.
§ 9-402. Hospitals.
§ 9-403. Revision question.
§ 9-404. Schools.

### Chapter 5. Specific Powers.

§ 9-501. Eminent domain.
§ 9-502. Enabling legislation.
§ 9-503. Historic areas and landmarks.
§ 9-504. Library.
§ 9-505. Penalties.
§ 9-506. Rents, tolls, excises and taxes.
§ 9-507. Service fees.
§ 9-508. Tax credits.
§ 9-509. Utilities.

### Chapter 6. Retirees' Representation.

§ 9-601. Retirees' representation.

## ARTICLE 10.

### Courts.

§ 10-101. Courts.

## ARTICLE 11.

### Retirement Plans.

§ 11-101. City's duties.
§ 11-102. Continuation of existing plans.
§ 11-103. Principles applicable in administering plans.
§ 11-104. Information required before benefit increase.

## CHARTER

### ARTICLE 12.

#### Initiative and Referendum.

§ 12-101. Initiative and referendum.
§ 12-102. Petitions.
§ 12-103. Time of filing.
§ 12-104. Duties of city clerk.
§ 12-105. Insufficient petitions.
§ 12-106. Suspension of ordinance.
§ 12-107. Procedure.
§ 12-108. Submission to voters.
§ 12-109. Amendment, repeal and re-enactment.
§ 12-110. Submission by council.
§ 12-111. Similar or conflicting measures.
§ 12-112. Repeal or amendment of ordinance in effect.

### ARTICLE 13.

#### Schedule.

§ 13-101. Effect on existing city legislation.
§ 13-102. Continuation of public and private rights.
§ 13-103. Rights of officers and employees.
§ 13-104. Effective date.
§ 13-105. Employees benefit plan.
§ 13-106. Condemnation.
§ 13-107. Fire and police pension committees.
§ 13-108. Police fund.
§ 13-109. Initial appointments.
§ 13-110. Successor officers.
§ 13-111. General provision.
§ 13-112. Submission of the Charter.

## PREAMBLE AND DECLARATION OF RIGHTS

### Preamble

Desiring to secure and extend our liberties as members of a democratic community; recognizing our common needs as well as those special needs of our city for programs which aid in the development and enrichment of our most important resource — human life and talent; and desiring to create a framework of government in which all can participate, by which policy objectives reflecting the people's will can be fashioned, and through which officials can be elected and held accountable; we, the people of Detroit, with gratitude for God's blessings, adopt this Charter for the government of the City of Detroit.

### Declaration of Rights

1. City government is a service institution.

The city shall provide for the public peace and health and for the safety of persons and property in the city.

The people have a right to expect aggressive action by the city's officers in seeking to provide residents with decent housing; excellence in education; job opportunities; clean air, clean waterways and a sanitary city; proper care for all physical or mental health problems; reliable, convenient and comfortable transportation; recreational facilities and organized programs of recreational activities; and cultural enrichment, including libraries and art and historical museums.

9

**Sec. 7-1404. Limitations.**

The following limitations shall apply relative to transportation:

1. The city may not sell or in any way dispose of any property needed to continue the operation of any city-owned public utility furnishing transportation service, unless approved by a majority of city voters voting on the question at a regular or special election.

2. The city may not grant any public utility franchise for transportation services which is not subject to revocation at the will of the city council unless the proposition is first approved by ⅗ of city voters voting on the question at a regular or special election.

3. All contracts, franchises, grants, leases or other forms of transfer in violation of this section shall be void and of no effect against the city.

### Chapter 15. Water and Sewerage.[5]

**Sec. 7-1501. Department.**

The water and sewerage department is headed by a 7-member board known as the board of water commissioners. The members of the board shall be appointed by and serve at the pleasure of the mayor. The term of membership on the board is 4 years and not more than 2 members' terms expire each year.

A member must be a citizen of the United States and a resident of Michigan. At least 4 members of the board must be residents of Detroit.

The board shall appoint, with the approval of the mayor, a director and a deputy director for the department. The director and deputy director serve at the pleasure of the board.

**Sec. 7-1502. Powers.[6]**

Under the direction of the board, the department shall supply water, drainage and sewerage services within and outside of the city.

The board shall periodically establish equitable rates to be paid: (a) By the owner or occupant of each house or building using water, drainage, or sewerage services; and (b) by any person, municipality, or public or private agency making a wholesale purchase of water, drainage or sewerage services from the city.

Unless otherwise provided by contract, the unpaid charges for water, drainage, and sewerage services, with interest, shall be a lien of the city upon the real property using or receiving them.

The board may make all necessary adjustments in the collection of water, drainage or sewerage charges.

The board may be given additional authority to establish rates by ordinance.

Upon the request of the mayor the board shall advise the various agencies of the city on matters involving water resource management.

---

5 **Home Rule Act.** — For state law as to city's authority to establish and maintain water and sewage systems, see M.S.A., § 5.2079.

**City Code.** — For ordinance provisions as to sewers and sewage disposal, see ch. 56 of City Code. As to water generally, see ch. 65.

6 **Water liens.** — Absent specific statutory authority, a city may not make charges for water a lien on the property served, notwithstanding provisions for doing so in a home rule Charter. Home Owners' Loan Corp. v. City of Detroit, 292 Mich. 511, 290 N. W. 888. (Annotation from prior Charter)

**Sec. 7-1503. Limitation on funds.**

All monies paid into the city treasury from fees collected for water, drainage or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest or principal of any obligations issued to finance the water supply and sewage disposal facilities of the city, and shall be kept in separate funds.

### Chapter 16. Zoological Park.[7]

**Sec. 7-1601. Department.**

The zoological department is headed by a 5-member commission. The members of the commission shall be appointed by and serve at the pleasure of the mayor.

The term of membership on the commission is 4 years, and not more than 2 members' terms expire each year.

The commission shall appoint, with the approval of the mayor, the zoological director and a deputy zoological director. The director and the deputy director serve at the pleasure of the commission.

The zoological department shall maintain and operate the city's zoological parks.

### ARTICLE 8.

### Planning and Financial Procedures.

### Chapter 1. Planning Procedure.

**Sec. 8-101. Comprehensive plan.**

The mayor shall propose and the city council shall approve, with the modifications it deems necessary, a master plan of policies for the social, economic and physical development and conservation of the city ("plan" or "master plan").

**Sec. 8-102. Periodic review.**

After approval of the plan, the mayor shall annually propose any amendments necessary to keep the plan current and the city council shall consider the mayor's proposed amendments and make the modifications in the plan that it deems necessary.

**Sec. 8-103. Council procedure.**

The city council shall conclude its action on the plan annually by December 1. Interested persons and groups shall be given notice and an opportunity to be heard by either the city council, the city planning commission, or other committee of the city council, before approval of the plan or any amendments to the plan.

---

7 City Code. — For ordinance provisions as to parks generally, see ch. 48 of City Code.

# EXHIBIT B

## ARTICLE 7. THE EXECUTIVE BRANCH: PROGRAMS, SERVICES AND ACTIVITIES

### CHAPTER 10. RECREATION

**Sec. 7-1001.   Department.**

The Recreation Department shall operate recreational facilities, offer and carry on organized programs of recreational activities in the city, and, to the extent possible, coordinate all recreational programs and facilities being offered in the City.

**Sec. 7-1002.   Advisory Commission.**

An advisory commission for recreation, comprised of not fewer than eight (8) districts, shall be created under section 7-103.  Seven (7) of the members shall be appointed, one (1) each, from the non at-large City Council districts.

## ARTICLE 7. THE EXECUTIVE BRANCH: PROGRAMS, SERVICES AND ACTIVITIES

### CHAPTER 11. TRANSPORTATION

**Sec. 7-1101.   Department.**

The Transportation Department shall:

1.      Own, maintain, and operate a public transportation system above, on, or below the surface of the ground, or in any combination thereof, utilizing technology known or to be developed;

2.      Operate the system within the city and to a distance outside the City as permitted by law;

3.      Exercise or recommend the exercise of other functions and powers provided by law or ordinance, including the specific powers of the City to finance transportation under sections 8-401, 8-503(4), and 8-602 of the Charter.

**Sec. 7-1102.        Advisory Commission.**

An advisory commission for transportation shall be created pursuant to section 7-103.  The Commission shall be composed of at least seven (7) members, one selected from each non at-large district.

**Sec. 7-1103.        Intelligence Division.**

The Director of the Transportation Department may appoint an Intelligence Division, exempt from Article 6, Chapter 4.

**Sec. 7-1104.   Limitations.**

The following limitations shall apply relative to transportation:

1.      The City may not sell or in any way dispose of any property needed to continue the operation of any city-owned public utility furnishing transportation service, unless approved by a majority of city voters voting on the question at a regular or special election.

2.      The City may not grant any public utility franchise for transportation services which is not subject to revocation at the will of the City Council unless the proposition is first approved by three-fifths (3/5) of city voters voting on the question at a regular or special election.

3.      All contracts, franchises, grants, leases or other forms of transfer in violation of this section shall be void and of no effect against the City.

## ARTICLE 7. THE EXECUTIVE BRANCH: PROGRAMS, SERVICES AND ACTIVITIES

### CHAPTER 12. WATER and SEWERAGE

**Sec. 7-1201.   Department.**

The Water and Sewerage Department is headed by a seven (7) member board known as the Board of Water Commissioners.  The members of the Board shall be appointed by and serve at the pleasure of the Mayor.  No member of the Board shall be a City official or employee, or a principal or employee of a contractor of the City.  The term of membership on the Board is four (4) years and not more than two (2) terms expire each year.

A member must be a citizen of the United States and a resident of Michigan.  At least four (4) members of the Board must be residents of Detroit.

The Board shall appoint, with the approval of the Mayor, a Director and a Deputy Director for the department.  The Director and Deputy Director serve at the pleasure of the Board.

## Sec. 7-1202.   Powers.

Under the direction of the Board, the department shall supply water, drainage and sewerage services within and outside of the city.

The Board shall periodically establish equitable rates to be paid:

1.   By the owner or occupant of each house or building using water, drainage, or sewerage services; and

2.   By any person, municipality, or public or private agency making a wholesale purchase of water, drainage or sewerage services from the City.

Unless otherwise provided by contract or state law, the unpaid charges for water, drainage, and sewerage services, with interest, shall be a lien of the city upon the real property using or receiving them.

The Board may make all necessary adjustments in the collection of water, drainage or sewerage charges.

The Board may be given additional authority to establish rates by ordinance.

Upon the request of the Mayor the board shall advise the various agencies of the city on matters involving water resource management.

## Sec. 7-1203.   Limitation on Funds.

All moneys paid into the city treasury from fees collected for water, drainage or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest of principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds.

## Sec. 7-1204.   Limitation on Sale of Assets.

The following limitations shall apply relative to water and sewerage:

1.   The City shall not sell or in any way dispose of any property needed to continue the operation of any city-owned public utility furnishing water and sewerage service, unless approved by a majority of city voters voting on the question at a regular or special election.

2.   The City shall not grant any public utility franchise for water and sewerage services which is not subject to revocation at the will of the City Council unless the proposition is first approved by three-fifths (3/5) of city voters voting on the question at a regular or special election.

3.   All contracts, franchises, grants, leases or other forms of transfer in violation of this section shall be void and of no effect against the city.

## ARTICLE 7. THE EXECUTIVE BRANCH: PROGRAMS, SERVICES AND ACTIVITIES

### CHAPTER 13. ZOOLOGICAL PARK

### Sec. 7-1301.   Department.

The Zoological Parks department is headed by the Zoological Director. The Zoological Parks Department shall maintain and operate the City's zoological parks directly or pursuant to an operating agreement.

### Sec. 7-1302.   Commission.

The Zoological Parks Commission shall advise the department on general program goals for the zoological parks. The Commission shall consist of five (5) members. The members of the Commission shall be appointed by and serve at the pleasure of the Mayor. The term of membership on the Commission is four (4) years, and not more than two (2) members' terms expire each year.

## ARTICLE 7.  THE EXECUTIVE BRANCH: PROGRAMS, SERVICES AND ACTIVITIES

### CHAPTER 14. TELEVISION CHANNELS

### Sec. 7-1401.   Cable Television Channels.

The City of Detroit shall operate and maintain its television channels for the benefit of the citizens of the City of Detroit. These cable television channels are public assets.  Any ordinances related to the City's cable television channels shall not be inconsistent with this chapter.

### Sec. 7-1402.   Executive Oversight, Operation and Management.

The Executive branch shall be responsible for the management, operation and oversight of the City's television channels.

### Sec. 7-1403.   Channel Use.

# EXHIBIT C



# Detroit Water and Sewerage Department Drainage Charge Questions and Answers

## Table of Contents
(*Click on the category name to go immediately to that section*)

Understanding the Drainage Charge
Billing and Program Implementation
Infrastructure and Storm Water Management
Drainage Credits and Green Infrastructure
General Information

## Understanding the Drainage Charge

### 1. What is drainage? Why does DWSD charge for rain and snow runoff?

Each year, billions of gallons of storm water and snowmelt flow from rooftops, parking lots and similar hard, impervious surfaces into Detroit's combined sewer system. Impervious surfaces are roofs, driveways, parking lots and similar hard surfaces (including compacted gravel and soil) that limit the ability of storm water to soak into the ground. The less impervious area on your parcel, the lower your drainage charge.



Drainage that runs from impervious surfaces is contaminated with dirt and debris which flows into the same pipe as wastewater and must be treated at the city's wastewater treatment plant and our combined sewer overflow control facilities (CSOs) before it can be released back into the environment. DWSD has the largest single-site municipal plant in the world, treating 10 billion gallons of drainage each year, costing more than $125 million annually.

### 3. What do drainage charges pay for? How do they compare with other U.S. cities?

Like many older communities in the U.S., Detroit has a combined sewer system. Federal and State mandates have required DWSD to invest more than $1 billion in CSO control facilities to help prevent untreated combined sewer overflows into waterways to preserve water quality in the southeast Michigan region. Fees from drainage charges pay for capital, operations and maintenance costs for the CSOs, wastewater treatment plant and combined sewer system components.

Detroit's drainage charge is among the highest in the country largely due to strict environmental regulations, the massive amounts of storm water that enter the combined sewer system, and the decrease in population over the past several decades. Many suburban or newer communities have separate storm water systems and may charge for drainage through other sources, such as property taxes. The cost of treating sewerage and drainage is typically higher than that of water which comes from a natural source. Like most utilities, DWSD is obligated by law to incur these costs to comply with environmental regulations.

**4. How are drainage charges calculated? How is DWSD changing its drainage charge billing?**

Drainage charges are calculated using the following formula:

> **Drainage charge = Total impervious surface area of the parcel**
> **x Impervious acre rate (dollars per acre per month)**

Historically, customers were billed for drainage by property class (e.g., industrial, commercial, residential). Unless updated information was available, residential customers were charged for drainage based upon meter size, which served as a proxy for parcel size. Non-residential customers were charged based on a tiered class average percentage of impervious area associated with their property.



Using City Assessor's data and flyover views, DWSD identified 22,000 parcels that had not previously been billed for drainage. Many of the parcels do not have a DWSD water account, and therefore were not in DWSD's billing system. Most of these parcels (except faith-based) will be charged $750 per impervious acre or $0.017 cents per impervious square foot beginning in October 2016 which will be reflected in the November, 2016 bill. The new parcels **will not be back-billed.** Billing new parcels helps create a more equitable method that will assist DWSD in maintaining lower rates allowing customers to pay less. For more information, watch the DWSD Drainage Charge Program video.

Orange and green parcels were not billed for drainage prior to October 2016.

By the year 2018, all DWSD customers will pay drainage charges based on impervious surface. Customers can verify their impervious acreage using the DWSD Parcel Viewer available at www.detroitmi.gov/drainage. Industrial customers with billing that was based on meter size, will move to the new impervious surface rate in January 2017. Commercial properties will move to the new rate in April, 2017, and tax-exempt properties (excluding faith-based) in June 2017. Residential properties will move to the impervious surface rate in October 2017, while faith-based properties will be moved in January of 2018. Customers will continue at their present rate until the new impervious surface rates for their class takes effect. Transition credits will be applied over the next two fiscal years following specific class rate conversion to mitigate potential bill impacts.

**5. Is this a new charge?**

No. Since 1975, DWSD customers have been paying for drainage as part of their water and sewer bills.



**6. What is the current drainage rate?**

Prior to October 2016, residential customers and non-residential customers for which DWSD did not have updated property information were charged for drainage based upon meter size. Non-residential customers were charged based on a tiered class average percentage of impervious area associated with their property (see chart). For those customers who received new parcel letters, most of these parcels (except faith-based) will be charged $750 per impervious acre or $0.017 cents per impervious square foot with accruals starting October 2016.

| Class* | Description | Rate Per Unit (Meter Size or Impervious Acre) |
|---|---|---|
| Fixed Fee Low | Meter Size – 5/8" to 1" | $20.36 |
| Fixed Fee High | Meter Size > 1" | $190.56 |
| Class 1 | 10-24% Impervious Area | $149.97 |
| Class 2 | 25-49% Impervious Area | $326.41 |
| Class 3 | 50-74% Impervious Area | $546.95 |
| Class 4 | Standard | $635.19 |
| Class 5 | 75 – 100% Impervious Area | $771.91 |
| Base Rate | | $882.19 |

*Wayne County and the Michigan Department of Transportation are charged drainage charges under settlement agreements.

## Billing and Program Implementation

**1. How does the drainage charge impact residential customers?**

Most residents pay $20.36 per month and will continue to do so until October 2017, when they are phased into the new impervious acreage rate. The average Detroit home has 0.04 impervious acres including their rooftop, garage roof and driveway. Future bill impacts will depend on the amount of hard, impervious surface on your property. Residents with the average amount of impervious area or less will see reductions in their drainage charge over the next three years, while residential properties with more impervious area will be subject to bill increases.

**2. How did DWSD determine which customers would be transitioned first? Why not move all customers at the same time?**

There are over 380,000 parcels in the city of Detroit and DWSD bills more than 200,000 customer accounts for drainage services. To convert all accounts to impervious acreage at once with a uniform rate could overwhelm existing customer service resources and cause expenses to increase dramatically, adversely affecting the impervious area rate for the following year. Opting for a phased-in approach which gives customers time to prepare for the new rate while not overwhelming the system, avoids adverse impact on the DWSD billing system. This includes billing of previously unbilled parcels, phased transition of billing based on impervious area basis (and not meter size), and the elimination of the property class to group customers already billed on an impervious area basis.





While the move to impervious area billing by property class will be completed by January 2018, the application of transition credits will extend to 2020 for customers converted later in the phasing schedule. This staging ensures all customers are treated similarly through the transitioning process.

### 3. Why weren't customers previously charged for all parcels?

DWSD merged City Assessor parcel data and aerial flyover data to identify all impervious surfaces in the city of Detroit. Over 22,000 parcels were identified as containing impervious surfaces that were not billed for drainage. Many customers received letters regarding to one or more of these parcels. Effective October 2016, the parcels will be charged at a rate of $750 per impervious acre per month, or $0.017 cents per impervious square foot per month. Customers will not be back-billed. Owners of parcels with less than 0.02 impervious acres will not be charged for drainage. Customers can verify their impervious acreage using the DWSD Parcel Viewer at www.detroitmi.gov/drainage. Bills are prepared by parcel number with a unique account number. Customers with multiple parcels may receive a bill for each parcel owned, and are encouraged to contact DWSD to consolidate their bills.

### 4. Why some customers are charged one way for current parcel(s) and a new way for other parcel(s)?

Starting in October, 2016, more than 20,000 new parcels will be charged a drainage rate of $750 per impervious acre per month. Existing parcels will be billed at their current rate until their parcel type moves to the new billing under the phasing plan. Customers who have properties billed under different customer classes may temporarily pay different rates until all customer groups transition to the uniform rate. By 2018, all non-governmental customers will pay the same uniform drainage rate based on impervious surface. If an existing bill is based on acreage associated with multiple parcels and the customer receives notification letters indicating those parcels will now be billed separately, DWSD encourages customers to contact the department to consolidate bills or change the impervious acreage associated with the current bill.

### 5. What is the frequency of billing?

Drainage charges will be included on the customer's monthly sewer bill. Customers without a sewer bill will receive a drainage only monthly bill.

### 6. Can DWSD consolidate parcels?

Yes. Beginning in 2017, DWSD will be able to fully implement bill consolidation. Visit the Drainage website: www.detroitmi.gov/drainage, email us at drainage@detroitmi.gov, or call 313-267-8000 and follow the prompts to speak with a customer care specialist.

### 7. How does the new drainage rate impact the water and sewer components of a bill? Will the drainage bill be separate from the water bill?

The new drainage rate will be based solely on impervious acreage. It will not impact water and sewer charges. In some instances, the drainage portion of the bill will be separate. This will only occur in cases where there are no water and sewerage accounts associated with that parcel. All drainage charges are specifically identified on the bill.



**8. If I disconnect my water service, can I avoid a drainage bill?**

If you disconnect your water service, you will still receive a drainage bill based on the impervious area on your property which generates rain and snow runoff. However, drainage charge may be mitigated by reducing storm water flow into the DWSD combined sewer system. More information is available on www.detroitmi.gov/drainage.

**9. If drainage charges decrease with the new rate, will customers receive a back-credit?**

DWSD will be working forward from this point. There will only be compensation for parcels that were billed based on inaccurate data after the roll-out commenced on October 1, 2016. There will be no back billing or crediting for changes in the impervious area rate.

**10. I received a three-year back bill earlier this year.  Can this be reversed?**

Contact DWSD at: drainage@detroitmi.gov or by telephone at 313-267-8000. Please have your bills and account information handy.

**11. Why are parking lots being charged?**

Parking lots have a large amount of impervious area on their property. All properties that drain to the city's combined sewer system will be charged for their share of drainage costs.

**12. What is being done for gas stations?**

Gas stations, like other customers, may implement storm water management practices on-site to receive drainage credits. DWSD recognizes that some customer properties like gas stations are limited in their on-site options to manage storm water. DWSD is working in future phases of the Drainage Charge Credit program to offer offsite storm water management credits for such establishments.

**13. How can an apartment or condo have all drainage billed to the association?**

DWSD has consolidated billing solutions for apartments, condo owners and homeowner association management. Email DWSD at: drainage@detroitmi.gov with supporting documentation of all owned parcels. Be sure to include the name to which all bills should be sent to allow for a consolidated bill. Customers can also call 313-267-8000 and follow the prompts to speak directly with a drainage specialist.

**14. Are multifamily apartment buildings classified as commercial?**

Most apartment buildings or properties utilized as apartments are classified in the City Assessor's records as commercial. However, some properties may be classified as residential, industrial or tax-exempt. Ultimately, drainage charges for all property classes will be moved to a uniform rate based on impervious acreage. Timing of this transition will occur based on the classification of your property. For questions, call 313-267-8000 and follow the prompts to speak directly with a drainage specialist for more information.

**15. How much advance notice are customers given prior to the next program phase?**

The goal of DWSD is to provide customers with a three-month notice prior to receiving their first bill.



**16. Can property owners challenge the rate per impervious acre?  Can a site visit be arranged?**

Property owners can challenge the number of impervious acres reported in their bill, but not the charge per acre. The rate has been approved by the Board of Water Commissioners. A site visit to verify imperviousness can be arranged if the customer provides a reasonable basis. Visit the drainage website to obtain a drainage survey form. Email supporting documentation to drainage@detroitmi.gov or call 313-267-8000 and follow the prompts to speak with a customer care specialist.

**17. Can a customer receive a refund for discrepancies associated with the reevaluation of property?**

If there is a determination that the data DWSD has provided for a new parcel is incorrect, there will be a credit issued for that parcel dating from October 1, 2016.

**18. Why was 0.02 impervious acres identified as the limit for not charging drainage?**

Customers will not be charged for parcels with less than 0.02 impervious acres. 0.02 impervious acres is roughly equal to a 30 by 30 feet space. DWSD identified this space as a fair amount to truncate as a margin of error for flyover views.

**19. What is the revenue requirement? Is this program part of DWSD's cost savings goals?**

For fiscal year 2017, DWSD's drainage revenue requirement – including $125 million-plus in operation costs and costs for implementing the program, drainage credits, etc. – will exceed $151 million. If everyone pays their share of the drainage charge, DWSD can decrease rates and help all customers pay less. DWSD is a city retail operation focused on delivering core services to Detroit residents and businesses. Since January, 2016, DWSD no longer services wholesale suburban customers. DWSD will leverage synergies and productivity where possible.

**20. Is the City of Detroit, the Land Bank, state and county properties, and roads and railroads charged?**

All parcels in Detroit with impervious area will be charged for drainage services. Every retail customer is billed for drainage services using the same methodology. The City of Detroit, the Land Bank and other government owned parcels are billed in the same manner as private property. Wayne County and State of Michigan roads and highways are charged pursuant to settlement agreements entered into Federal Court in 1989.

**21. Is the 83/17 CSO allocation between Detroit and the suburbs renegotiable?**

The 83/17 cost allocation provision was written into a Federal Court Order in 1999. The provision states that DWSD shall charge customers within the City of Detroit 83%, and customers outside the City of Detroit 17%, of CSO related capital and operation and maintenance costs. Detroit has started conversations with appropriate parties as a prelude to renegotiation of the allocation provision.

**22. Can Detroit obtain additional funding from the Great Lakes Water Authority (GLWA) to help address this situation?**

GLWA like DWSD, must establish rates that allocate cost recovery responsibilities across its different customers. The methods used to allocate the costs reflect judgments and customer demands under a zero-



sum situation where costs not collected from one customer must be recovered by other customers. Accordingly, additional funding to lower costs for Detroit will mean higher costs for other retail customers. Detroit is participating in GLWA's customer outreach processes to ensure that costs are allocated appropriately.

### 23. Do other communities across the U.S. and Michigan impose drainage charge rates based on impervious area?

Yes. As federal storm water management regulations become more stringent for communities across the country, implementation of storm water management and impervious surface charges become more prevalent. Detroit has charged for drainage services since 1975 and is authorized by its charter to bill for drainage services. Communities in Philadelphia, Northeast Ohio Regional Sewer District (Cleveland), and Washington D.C. are all areas that are developing efficient systems for managing storm water and impervious area based charges.

### 24. What are the various debt types? How does debt impact the drainage charge?

DWSD's debt service related expense is $59.8 million and is essentially the (GLWA held) mortgage payment on facilities that are in place to handle wet weather flows. This debt service expense relates to both municipal bond issues and to state revolving fund loans. Bad debt is simply uncollectable bills. This is a debt that DWSD likes to keep as low as possible.

### 25. Can DWSD adsorb bad debt costs?

DWSD is legally obligated to recover the costs, so not recovering these costs is not an option. Accordingly, if bad debt is forgiven for some customers, remaining customers will be inequitably required to pay for those that have not paid for services.

### 26. Once all parcels are being billed and bad debt is reduced, what is the projected annual rate?

If everyone pays their share of the drainage charge, DWSD can decrease the rate and help all customers pay less. The rate is projected to decline 32% through fiscal year 2019.

### 27. Are there opportunities for economic development and jobs creation opportunity here?

Yes.  DWSD is working with city departments and area partners to implement contractor training and provide workforce development services for implementing green infrastructure projects. As positions become available, they will be posted on the City of Detroit website.

### 28. How often will flyover data be refreshed and updated? Are the parcel lines on flyover views that DWSD uses the same as the assessor's database?



DWSD and the City Assessor will update flyover data every other year. Customers can verify their impervious acreage using the DWSD Parcel Viewer.



**29. How will I stay informed about the drainage program? Is there any communications or outreach planned?**

Regularly visit www.detroitmi.gov/drainage for program updates, scheduled meetings and workshops. You can always email drainage@detroitmi.gov or call 313-267-8000 and follow the prompts to speak with a drainage specialist. DWSD is implementing a comprehensive outreach and communications program for drainage. The program will include advertising, print materials, videos and presentations, press and social media. DWSD will host regular customer meetings engaging residential and non-residential customers, faith-based and nonprofit organizations, academia, business associations and community groups. Most online content is accessible via mobile devices.

## Infrastructure and Storm Water Management

**1. What is an impervious surface? How is impervious acreage determined? How can I customers see impervious acreage?**

Impervious surfaces are roofs, driveways, parking lots and similar hard surfaces (including compacted gravel and soil) that limit the ability of storm water to soak into the ground. The less impervious area on your parcel, the lower your drainage charge.

In 2015, there was an aerial flyover of the City of Detroit. Using aerial photography, impervious areas on each property were determined. Customers can view their property's impervious area by searching your address in the DWSD Parcel Viewer on www.detroitmi.gov/drainage.

**2. Are unimproved lots considered impervious? Will they be charged for drainage?**

A lot that does not include impervious surfaces will not be charged for drainage.

**3. Are swimming pools considered impervious?**



No. Since rainfall on a swimming pool is contained, it does not count as an impervious surface. In-ground or above-ground pools do not count as impervious. However, any walkways or edgings around the pool count as impervious.

**4. Is a gravel parking lot or a grass lot considered impervious?**

Gravel used in parking lots are not designed to allow water to infiltrate into the soil. Most surfaces when driven on continuously, even grass and dirt, become compacted over time rendering them impervious.



**5. Is there a process to confirm whether or not a surface is impervious?**

A procedure will be in place for DWSD customers who dispute the extent of impervious surfaces on their property. An onsite inspection may be considered if the property owner has provided justification.

**6. What is a Combined Sewer System?**

A Combined Sewer System is designed to collect both sanitary sewage and stormwater runoff. Like many older communities in the U.S., Detroit has a combined sewer system. Storm water runoff flows into the same pipe as wastewater and must be treated at the city's CSO and wastewater treatment plant before it can be released back into the environment. DWSD is obligated to incur these costs in compliance with the federal and state Clean Water Acts. For more information, watch this brief video.



**7. Will the city consider separating the sewer system?**

Detroit's combined sewer system includes nearly 3,000 miles of sewer collection piping. The costs to effectively separate the sewer system would be highly cost prohibitive. While selective sewer separation may be an option in some parts of the City, widespread implementation is not anticipated.

**8. With regard to rainfall, how much rain falls in a 100-year 24-hour storm event?**

The 100-year 24-hour rainfall amount is 5.15 inches.

**9. How is the term "conveyance" being defined as it is applied to city streets?**

City streets, which are lower than parcels, are part of the conveyance infrastructure for facilitating the flow of storm water from Detroit properties into the catch basins, then into the combined sewer system, and then finally terminating at the wastewater treatment plant.

**10. What is the total acreage of city owned/controlled property that will be characterized as a conveyance?  Is the conveyance exception being applied to any other property other than city owned streets?**

City owned parcels will not be characterized as conveyance. This term only applies to city streets, i.e. areas common to all that serve as storm water conveyance.

**11. What are CSO costs? Is the drainage fee intended to cover the cost of building the CSO facilities?**

In compliance with EPA regulations and to stop excessive pollution into our waterways, DWSD invested over $1 billion in Combined Sewer Overflow (CSO) control facilities. The CSO control facilities were built to help prevent untreated, combined sewer overflows from entering into waterways and to help preserve water quality. The cost was financed almost entirely through bonds which are being repaid by the drainage fee. Direct CSO costs have two components: $25.7 million for annual CSO bond debt, and $6.2 million in annual operating costs specific to the control facilities.



**12. Can businesses disconnect from the city's system?**

DWSD recognizes that there are parcels where runoff goes directly to the river through a private system. Customers who are able to verify that their parcels are completely disconnected from the DWSD system will not be charged for drainage services.

**13. What can be done with offsite storm water management?**

Off-site storm water credit options present a number of legal, financial and administrative complexities. In order to successfully launch DWSD's base credit program, development of offsite credit options were deferred. DWSD is in the process of developing off-site credit options. Once this process is completed, information will be made available on www.detroitmi.gov/drainage and communicated through our drainage charge customer engagement program.

**14. How much money is saved by diverting drainage out of the sewer system?**

According to a study conducted for the Southeast Michigan Council of Governments, published in 2014, using green infrastructure to reduce 20 percent of stormwater runoff from major roads in the city of Detroit can reduce treatment costs by approximately $2 million annually.

**15. Can DWSD include the costs for drainage infrastructure in my taxes instead of my monthly drainage bill?**

No. Drainage infrastructure provides parcel owners a service where costs are most equitably recovered through billings from DWSD based on the factors that cause the costs to be incurred. Detroit City Charter authorizes the Board of Water Commissioners to set rates for drainage.

## Drainage Credits and Green Infrastructure

**1. What is green Infrastructure and how does it relate to drainage?**

Green infrastructure refers to the systems and practices that mimic natural processes to infiltrate and return storm water into the atmosphere. It also refers to reuse of storm water or runoff on a site where it is generated. Green infrastructure reduces the amount of storm water that exits from properties and into DWSD's combined sewer system.

By implementing green infrastructure and storm water control measures, DWSD customers can reduce the runoff that occurs on their property. Removing impervious cover reduces the amount of storm water leaving your property  and running into the combined sewer system. Green infrastructure examples include disconnecting downspouts, rain gardens, bioretention practices, installing permeable pavement, green roof designs, detention and subsurface detention and other approved practices that manage storm water volume.

Vacant lots in Detroit also offer opportunities for green infrastructure controls. DWSD is working to recognize green infrastructure efforts and will make adjustments to customer bills to reflect credits toward green infrastructure measures.



Credits are based on the components of the drainage charge and up to an 80% drainage credit can be earned based on measures used.  Customers can earn up to 40% for controlling their annual volume of drainage into the city's combined sewer system each year.  A maximum of 40% can also be earned by controlling peak flow rate, slowing the rate at which water leaves a surface site and enters the sewer. Credits apply only to the managed area of a parcel and do not include the 20% for fixed costs associated with maintaining the drainage charge system. The maximum drainage credit for an individual property is 80%. For more information on drainage credits, visit DWSD's Drainage Charge Credits manual at: www.detroitmi.gov/drainage.

### 2. How can drainage charges be reduced?

Customers should first carefully verify property and billing data to ensure all information is correct. To assist in understanding green infrastructure credits, customers should visit DWSD's Drainage Charge Credits manual at: www.detroitmi.gov/drainage. The manual will assist customers by identifying options for property owners. For example, customers may reduce storm water runoff by disconnecting downspouts, installing rain gardens, and installing permeable pavement, bioretention or detention ponds. Up to 80% credit on drainage can be applied. Residential customers will receive an automatic 25% credit on their drainage charge beginning with their move to the impervious rate in October 2017 assuming downspouts have been disconnected and storm water runoff flows into their lawn.

### 3. When will the drainage credit become available and applied on customer bills?

Customers can apply for drainage charge credits beginning October 1, 2016. Drainage credits for existing storm water practices will be applied to customer's account once an application has been completed and documentation required has been submitted. Applications can be found on the DWSD website at www.detroitmi.gov/drainage. For new construction, drainage credits will be applied to the customer's account as of the date of construction completion and certification. Credits will be applied for customers whose bills are based on impervious acreage.

### 4. How do I sign up for a credits workshop?

Non-residential workshops began October, 2016. Residential workshops are expected to begin in early 2017. Check on the DWSD website at: www.detroitmi.gov/drainage for workshop dates, times and registration details.

### 5. Will credits be available for low income communities?  Will grants be offered?

DWSD is providing credits to recognize storm water management practices to all customers independent of a customer's financial circumstances. DWSD is working on external funding resources and grants to assist low-income customers and community groups with storm water management implementation costs. In compliance with state law, credits based on income are not available.

### 6. What other benefits are available from implementation of storm water management practices?

In addition to earning credits for stormwater management, green infrastructure can also increase property values and reduce the risk of flooding. How much an individual storm water management practice yields in financial returns will depend on each individual customer's specific situation including their current drainage bills, potential costs of storm water management, potential credits, applicable interest rates, etc.



Customers who are considering investment in storm water management practices should perform a financial return analyses as part of their investment evaluation process. DWSD is working to develop a simplified financial analysis model.

### 7. Who approves green infrastructure projects?

DWSD and its technical partners approve the green infrastructure projects for drainage charge credits. Owners must meet eligibility requirements and fulfill on-going operations and maintenance requirements. Approved practices must reduce annual runoff volume and/or control peak flow rate. Applying customers must document acceptable design and performance and comply with all applicable codes and permits. Practices must be fully installed and functioning properly to ensure they do not create a safety hazard or nuisance. All properties must be located in the DWSD's service area.

### 8. Can adjacent land owners partner together on large scale green infrastructure projects?  Will credits be offered for managing storm water on the public right of ways?

Yes. Adjoining property owners may implement a shared storm water practice. DWSD is also interested in working with customers who wish to explore credit options on their property including partnering with others on green infrastructure projects and offsite storm water management options. Use of the street right of way for private property storm water management is not permitted. Additional information for customer clarity is being developed.

### 9. Is DWSD sponsoring any green infrastructure projects?



DWSD will invest $15 million in its green Infrastructure program between years 2013-2017 to reduce 2.8 million gallons (MG) of storm water flow. A number of projects have been completed including bioretention on vacant lots in the Cody Rouge neighborhood and in Viola Liuzzo Park (watch video). DWSD also partnered with The Greening of Detroit to plant over 4,000 trees, and has hosted 64 workshops to disconnect downspouts for 440 participants. DWSD is currently working with the Detroit Department of Public Works on street projects that include permeable pavement and bioswales. Visit the Green Infrastructure projects webpage for more information at www.detroitmi.gov/dwsd.

### 10. Is the drainage charge credit program coordinated with codes and ordinances plus other City initiatives?



DWSD and its technical partners are implementing a comprehensive program for improved storm water management that includes three components: (1) sponsored green infrastructure projects; (2) drainage charge credits to provide incentives for implementation of storm water management practices; and (3) adoption of a post construction storm water ordinance regulating development activities.

DWSD has held stakeholder meetings including city staff, developers, planning agencies, environmental groups and others to ensure feasible concepts. The city is working to establish a sustainability office to



assist in coordination of city initiatives and DWSD is supporting the implementation of this office and related coordination efforts.

The post construction storm water ordinance or "greening" of the code is projected to be implemented in early 2017. Together with the drainage charge credits program, DWSD is looking for city developers to increasingly implement green infrastructure in new and updated development projects.

### 11. Is disconnecting a downspout safe for the home?

Not only is disconnecting downspouts safe, Michigan law requires Detroit residents to disconnect downspouts from sewer drains. During heavy rain storms, each down spout on a home can deliver 12 gallons a minute to the sewer system. Residential customer downspout disconnections were among the considerations that supported a 25% automatic credit applied to residential customers' billings beginning October, 2017. Consult the Drainage Charge Credits manual on the DWSD website at: www.detroitmi.gov/drainage for information on additional credit opportunities.

### 12. Will a credit trading model be adopted?

A credit trading option is one of several frameworks that DWSD is exploring for forthcoming phases of its drainage charge credit system. As DWSD's drainage credit program evolves, information will be available on the website.

### 13. Are there approved contractors for green infrastructure projects?

DWSD is working with local organizations in the city to procure technical assistance resources. Those interested should email DWSD at: drainage@detroitmi.gov or call 313-267-8000 and follow the prompts to speak with a customer care representative.

### 14. Will DWSD provide an online credit calculator?

DWSD is developing a credit calculator to provide information on eligible practices and the potential drainage bill credits that may be applied. Once available, it will be posted on the website.

### 15.  Will DWSD showcase green infrastructure projects?

DWSD is planning the use of several forms of communication including social media channels to showcase projects that can help make Detroit become one of the greenest cities in America. Photographs and a brief description of individual greening projects can be sent to: drainage@detroitmi.gov.

### 16. Can donations to entities involved in storm water management contribute to a credit on my drainage bill?

No. Charitable contributions cannot be used as credits in DWSD drainage program. Consult your tax expert or preparer for tax deduction possibilities.



## General Information

**1. Where can I find answers to questions on billing?**

For questions related to DWSD billing, contact www.detroitmi.gov/dwsd. For questions on DWSD drainage, visit: www.detroitmi.gov/drainage or send an email to: drainage@detroitmi.gov. Documents related to drainage can be faxed to: 313-964-9110 or call: 313- 267-8000 and follow the prompts for drainage. DWSD encourages customers to make an appointment to ensure your individual concerns are addressed. DWSD will not accept walk-ins for drainage inquiries.

**Website**:
www.detroitmi.gov/drainage

**Email** (recommended):
drainage@detroitmi.gov

**Phone Number:**
313-267-8000, follow prompts

**2. How do I update my parcel information?  How can we help DWSD improve the accuracy of billing records?**

 Working with the City Assessor, DWSD is transitioning its billing system to a parcel-based system. The city assessor processes more than 1,000 property affidavits a week and DWSD is continually working to update ownership and property data. It is encouraged that customers ensure individual data is correct at the city assessor's office. For additional information, visit the drainage website at: www.detroitmi.gov/drainage to obtain the necessary forms to update parcel information or to submit the drainage survey form regarding parcel(s). Customers can also send an email to DWSD at: drainage@detroitmi.gov or call 313-267-8000 and follow the prompts to speak with a drainage customer care specialist.

**3. What if there is a disagreement regarding individual impervious acreage calculation or belief that the impervious acreage is wrong?**

Customers may be eligible for an account adjustment if the measurement of individual impervious acreage is inaccurate. If there has been a modification to impervious surface or a direct discharge to surface waters such as the Detroit or Rouge rivers, customers can seek an adjustment. To dispute the measure of an impervious acreage, customers will need to complete an area survey of the property or properties using the form at www.detroitmi.gov/drainage. Customers can also contact DWSD to discuss the concern.

**4. Are payment assistance programs available?**

While there are no formal assistance program specifically for drainage charges, the 10/30/50 Payment Plan is available to all customers who have fallen behind on their bill. For low-income residential customers who are eligible, the Water Residential Assistance Program (WRAP) is offered. The assistance programs are amongst the most robust of utility programs in the country. Visit www.detroitmi.gov/dwsd for more information.




**5. Are there any consequences for a customer who refuses to pay for drainage?**

DWSD has several collection options available. Water service can be terminated for failure to pay for any portion of your bill, including drainage. State and local law provides that any unpaid water, sewer, or drainage bill is a lien on the property. DWSD may also institute a legal action to recover unpaid fees. Additionally, a City of Detroit license to do business may be suspended or revoked for failure to pay a DWSD bill.



**6. Are there penalties for not filing a property transfer affidavit?**

Filing the property transfer affidavit is mandatory. The completed affidavit must be led by the new owner with the assessor for the city or township where the property is located within 45 days of the transfer. Owners may be subject to a penalty of $5.00 or $20.00 per day for each separate failure beginning after the 45 days have elapsed, up to a maximum of $20,000 depending on the sale price of the property and its classification. Contact the City Assessor's office for more information.

*The Detroit Water and Sewerage Department is continuously working to improve customer experiences with the drainage program.  If you believe there are errors on this Q&A, please contact DWSD by email at: [drainage@detroitmi.gov](mailto:drainage@detroitmi.gov) or call 313-267-8000 to speak with a drainage customer care specialist. DWSD retains the right to modify all information as contained in this section.*



# EXHIBIT D

Sign In

Detroit Water and Sewerage Department

BOARD OF WATER COMMISSI

Home    Legislation    Calendar

Share   RSS   Alerts

Details    Reports

| | | | |
|---|---|---|---|
| **File #:** | 17-0075   **Version:** 1 | **Name:** | |
| **Type:** | Resolution, BOWC | **Status:** | Approved |
| | | **In control:** | Office of the Director |
| **On agenda:** | | **Final action:** | 4/19/2017 |
| **Title:** | The Board of Water Commissioners for the City of Detroit, Water and Sewerage Department authorizes the Director to implement a five (5) year drainage fee policy, and also authorizes the Director to take such other actions as may be necessary to accomplish the intent of this vote. | | |
| **Indexes:** | Board of Water Commissioners | | |
| **Attachments:** | 1. Board Policy for Drainage Charge - 5 Year Plan, 2. Drainage PPT, 3. DWSD Policy - PropertyClassification for Drainage Billing v1 EPR | | |

History (1)     Text

**Title**
The Board of Water Commissioners for the City of Detroit, Water and Sewerage Department authorizes the Director to **implement a five (5) year drainage fee policy,** and also authorizes the Director to take such other actions as may be necessary to accomplish the intent of this vote.

**Body**
**Agenda of April 19, 2017**
**Item No. 17-0075**

**TO:**      The Honorable
         Board of Water Commissioners
         City of Detroit, Michigan

**FROM:**     Gary Brown, Director
         Water and Sewerage Department

**RE:**          **Adoption of the DWSD Five (5) Year Drainage Fee Policy**

**MOTION**
Upon recommendation of Gary Brown, Director, the Board of Water Commissioners for the City of Detroit, Water and Sewerage Department authorizes the Director to **implement a five (5) year drainage fee policy,** and also authorizes the Director to take such other action as may be necessary to accomplish the intent of this vote.

**BACKGROUND**
In 1972, the EPA passed the Federal Clean Water Act (CWA) which prohibits the discharge of untreated combined sewage/storm water into the Detroit or Rouge Rivers. In 1977, The City of Detroit ("City") was sued for failure to comply with the CWA- more than twenty billion gallons of untreated waste was dumped annually into the Detroit River and Rouge River. As a result, the federal courts placed the wastewater treatment system in federal receivership in 1977.

Over the years, the City has spent $1.5 billion building improvements to reduce illegal discharges. As a result, the Michigan Department of Environmental Quality (MDEQ) and the Environmental Protection Agency (EPA) has allowed the City until 2022 to comply with the NPDES permit, which in turn will allow the City to continue to invest in building new storm water retention basins in an effort to comply with the CWA's sewage/storm water treatment requirements.

While the City invests in green infrastructure projects and other improvements to reduce illegal discharges, the City must continue to store and transport billions of gallons of storm water runoff flowing from roofs, parking lots and similar hard, impervious surfaces into the City's combined sewer system. Currently the cost is $151 million.

Since 1975, most customers have been paying drainage fees to the City to contribute to the cost of treating storm water; however, there are some customers who have not and need to be phased into the billing process. Through the proposed drainage fee program, over a period of five (5) years, every customer will be charged its equitable share, and it will help customers reduce its monthly drainage charges.

**JUSTIFICATION**
Adoption of the proposed drainage fee policy will assist with:
1.    Ensuring that all property owners are billed accurately for drainage services;
2.    Equitably distributing cost responsibilities across property owners;
3.    Using green infrastructure practices to help customers reduce drainage charges;
4.    Compliance with the CWA; and
5.    Recovery of costs associated with the storage, collections, and treatment of storm water and snow melt in the City.

Enclosed for your approval is the DWSD's proposed Drainage Charge Policy which includes the DWSD's proposed Drainage Fee Property Classification Policy. A Power Point summarizing the drainage fee policy is also included for your reference.

# EXHIBIT E

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MICHIGAN WAREHOUSING GROUP LLC,
a Michigan limited liability company, and
MIDWEST VALVE & FITTING COMPANY,
a Michigan corporation,

       Plaintiffs,

v.

CITY OF DETROIT, a municipal corporation,
by and through its WATER AND SEWERAGE
DEPARTMENT,

       Defendant.

Case No.  15-010165-CB
Hon.  John A. Murphy

15-010165-CB

FILED IN MY OFFICE
WAYNE COUNTY CLERK
2/26/2016 2:00:23 PM
CATHY M. GARRETT

| | |
|---|---|
| Kickham Hanley PLLC | Sonal Hope Mithani (P51984) |
| Gregory D. Hanley (P51204) | Caroline B. Giordano (P76558) |
| Jamie K. Warrow (P61521) | Miller, Canfield, Paddock and Stone, P.L.C. |
| Edward F. Kickham Jr. (P70332) | 101 North Main Street, Seventh Floor |
| 32121 Woodward Avenue, Suite 300 | Ann Arbor, MI 48104 |
| Royal Oak, Michigan 48073 | (734) 668-7786 |
| (248) 544-1500 | *Attorneys for Defendant* |
| *Attorneys for Plaintiffs* | |

## PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Michigan Warehousing Group, LLC ("MWG") and Midwest Valve & Fitting Company, ("Midwest," collectively, with MWG, "Plaintiffs"), by their counsel, Kickham Hanley PLLC, individually and on behalf of a class of similarly situated class members, state the following for their Second Amended Class Action Complaint against Defendant City of Detroit (the "City"):

## INTRODUCTION

1.      Plaintiffs challenge one of the City's Retail Drainage Charges (the "Per-Acre Drainage Charge") imposed by the City's Water and Sewerage Department ("DWSD") upon Plaintiffs' property located in the City.  The City imposes the Per-Acre Drainage Charge for the alleged purpose of recovering the City's costs of managing "stormwater" – rainfall and snowmelt that enters the City's sewer system from the surface of the land.

2.      The Per-Acre Drainage Charge has been disproportionately foisted upon a particularized and narrow subset of the City's property owners (including Plaintiffs) – i.e., those owners of certain commercial properties that are being billed on an "acreage basis" based upon the "average imperviousness" of their properties (the "Per-Acre Properties").  Specifically, there are approximately 12,000 acres of private property that are subject to DWSD's "per acre" billing practice — out of a total of 89,343 acres in the entire City.

3.      DWSD persists in the exaction of the Per-Acre Drainage Charge from the owners of the Per-Acre Properties, even though "the nature of a stormwater management system, which benefits the public without providing any individualized, measurable benefit to individual property owners, does not lend itself to a system of funding based on user fees." *Dekalb County v. U.S.*, 108 Fed. Cl. 681 (U.S. Court of Claims 2013).

4.      The Per-Acre Drainage Charge constitutes a "tax" that has not been authorized by the City's voters in violation of Article 9, Section 31 of the Michigan Constitution of 1963 (the "Headlee Amendment") and is precisely the type of exaction the Michigan Supreme Court found

2

was an unconstitutional tax in the seminal case of *Bolt v. City of Lansing*, 459 Mich. 152, 587 N.W.2d 264 (1998). The Per-Acre Drainage Charge also is an unlawful tax under MCL 141.91.

5.      The Per-Acre Drainage Charge — which is imposed to cover approximately $50 Million of the City's total $95 Million stormwater revenue requirement — imposes upon the owners of the Per-Acre Properties a disproportional financial burden of a governmental activity – stormwater disposal – which benefits the community at large.

6.      In this regard, the Per-Acre Drainage Charge is motivated by a revenue raising and not a regulatory purpose, and is grossly disproportionate to DWSD's actual costs of providing to Plaintiffs (and the other owners of the Per-Acre Properties) the purported benefits for which the Charges are ostensibly imposed upon them. Further, payment of the Per-Acre Drainage Charge is not voluntary because the amounts charged constitute a lien on the Per-Acre Properties and, if owners of the Per Acre Properties do not pay the Charges, they ultimately are added to the tax bills of the Properties.

7.      Moreover, the Per-Acre Drainage Charge violates: Equal Protection Guarantees contained in the Michigan Constitution (*see* Mich. Constitution 1963, Article 1, § 2), the City's own Charter (*see* § 7-1202, which requires that DWSD establish equitable water, drainage and sewerage service rates), the Prohibited Taxes by Cities and Villages Act (*See* MCL 141.91) and the Revenue Bond Act (*See* MCL 141.118). Here, the City's Drainage Charge is purportedly designed to ensure that "all customers pay their fair share of [stormwater] treatment costs." Yet, by imposing the Per Acre Drainage Charge upon the Per-Acre Properties, the City has failed to classify the Per-Acre Properties based upon naturally distinguishing characteristics.

8.      Further, in this regard, by imposing the Per-Acre Drainage Charges upon the Per-Acre Properties, the City has failed to include all persons and entities of the same class, and has

3

instead extended privileges to an arbitrary or unreasonable class which are denied to owners of the Per-Acre Properties. This is true for at least three reasons:

    a.   First, the City is treating similarly-situated non-residential property owners differently by imposing stormwater drainage charges ("Drainage Charges") upon the owners of the Per-Acre Properties that are dramatically higher than those imposed by the City on the owners of all other commercial properties.  The owners of the 12,000 commercial acres that are subject to the Per-Acre Drainage Charge are bearing the entire burden of DWSD's stormwater drainage treatment costs (approximately $50 Million) allocated to non-residential properties.  Specifically, there are a total of 41,237 acres in the City that are designated for non-residential use.  However, only the owners of the 12,000 acres are being assessed the Per-Acre Drainage Charge, while the owners of the remaining 29,237 non-residential acres not.  Thus, owners of the Per-Acre Properties, including Plaintiffs, are being charged differently than similarly situated owners of non-residential property in Detroit.  MWG in particular has incurred and paid a Per-Acre Drainage Charge that is as much as 31 times higher than the Drainage Charge incurred by other similarly-situated non-residential landowners.

    b.   Second, the City also treats the owners of the Per-Acre Properties differently than it treats governmental units which incur Drainage Charges.  Here, Plaintiffs and the majority of non-residential properties which incur Per-Acre Drainage Charges are being charged a rate of $518.11 per acre per month.  This number is calculated by applying "average impervious factors" based upon surveys of individual properties to a base cost rate to produce the monthly Drainage Charge.  However, this Drainage Charge is nearly five times the amount being charged to the State of Michigan and Wayne County to manage the stormwater that enters the City's sewer system from federal, state and county roads and highways.  Even though those governmental entities are similarly situated to the Per-Acre Properties, the City only charges

these governmental entities $113.85 per acre, per month.  Thus, owners of Per-Acre Properties, including Plaintiffs, are being charged at a highly inflated rate as compared to similarly situated owners of impervious property in Detroit.

c.  Third, the City treats all of its water and sewer customers which incur Drainage Charges ("Drainage Charge Customers"), including the owners of the Per-Acre Properties, differently than it treats itself—a governmental unit which *should* incur Drainage Charges, but does not.  Instead, the City foists the cost of treatment and disposal of hundreds of millions of gallons of stormwater that do not emanate from private lands but rather originate on the City's 21,000 acres of public streets upon the all of its Drainage Charge Customers, specifically including owners of Per-Acre Properties such as the Plaintiffs in this case.

## JURISDICTION AND VENUE

9.  Plaintiffs own commercial real property situated in the City of Detroit, Wayne County, Michigan, have been assessed, and paid, the Per-Acre Drainage Charge at issue in this case within one year of the filing of this action, and seek to act as class representatives for all similarly situated persons and entities.

10.  Defendant City is a Michigan home-rule city and is located in Wayne County, Michigan.

11.  Venue and jurisdiction are proper in the Wayne County Circuit Court because all parties are present in Wayne County, Michigan, and the actions which give rise to Plaintiffs' claims occurred in Wayne County, Michigan.  Venue and jurisdiction also are proper in the Wayne County Circuit Court under Article 9, Section 31 of the Michigan Constitution of 1963, and MCL 600.308a.

## GENERAL ALLEGATIONS

12.  Pursuant to its statutory authority, MCL 141.104, the City, through the Detroit Water and Sewerage Department ("DWSD"), maintains and operates a sewer system (the "Sewer

System") to provide sanitary sewage treatment and disposal services to inhabitants of the City and to collect snowmelt and rainwater ("stormwater") runoff.  DWSD's stormwater disposal services are of a general public nature and are furnished to the City at large.  Because DWSD is a department of the City and not an independent legal entity, references in this Complaint to "DWSD" include the City.

13.     DWSD establishes the rates for the Drainage Charges from time to time through legislative action, and revenues generated by the Drainage Charges are deposited into the DWSD sewer fund.  The City's current sewage and drainage rates are attached hereto as Exhibit A.

14.     Pursuant to the City's Charter, DWSD is required to establish equitable water, drainage and sewerage service rates.  *See* 2012 Charter of the City of Detroit at Article 7, Chapter 12, § 7-1202.

15.     For the Per-Acre Properties, the Drainage Charge is based upon the number of acres owned multiplied by an amount which varies based upon the size of the impervious surface area of the property.  *See e.g.* Exhibit B hereto (November 22, 2013 Memorandum authored by The Foster Group, including Illustration of the City's Drainage Charge Design).

16.     Plaintiff MWG currently owns commercial property (the "MWG Property") within the City's limits.

17.     Plaintiff Midwest currently owns commercial property (the "Midwest Property") within the City's limits.

## THE DISTINCTION BETWEEN
## SANITARY SEWAGE AND STORMWATER

18.     Like many older communities in Southeast Michigan, the City primarily has a combined sanitary and storm sewer system, which is a system that is designed to collect both (i) snowmelt and rainwater ("stormwater") runoff and (ii) domestic sewage and industrial wastewater ("sanitary sewage"), in the same pipe.

19. Sanitary sewage – i.e., spent water from a municipal water supply system which may be a combination of liquid and water-carried wastes -- enters a combined system directly from residences, commercial buildings, industrial plants, institutions and other structures. Owners and/or occupiers of such structures which generate the sewage are "users" of the sanitary sewage disposal services provided by the City.

20. Stormwater, in contrast, does not originate from any use of the water supply system or sanitary sewer system, and its presence in the combined system is wholly unrelated to the amount of tap water used, or sanitary sewage generated, by users of the system whose structures are physically connected to that system. Stormwater collects on both private and public land, roads and other physical, impervious surfaces during rainfall events, and the runoff enters the combined sewer system through catch-basins and other collection devices.

21. Even though they have different origins, both sanitary sewage and stormwater collected in a combined sewer system need to be disposed of. Here, the City's combined sewer system flows to the DWSD treatment plant for disposal and treatment.

**THE CITY'S METHODOLOGY FOR IMPOSING STORMWATER DRAINAGE CHARGES FORCES A SMALL SUBSET OF ITS NONRESIDENTIAL PROPERTY OWNERS TO FINANCE A GROSSLY DISPROPORTIONAL AMOUNT OF THE CITY'S PURPORTED COST OF STORMWATER MANAGEMENT AND DISPOSAL**

22. DWSD purportedly imposes Drainage Charges in order to recover the cost of treatment and disposal of stormwater on a monthly basis.

23. The process for determining the Drainage Charges involves six steps. *See* Exhibit B, November 13, 2103 Foster Group Memorandum, which describes the process by which the DWSD Drainage Charges were computed for 2013-2014.

24. Initially, DWSD calculates the percentage of the total combined sewer flows it treats that is attributable to stormwater, as opposed to sanitary sewage or infiltration waters. For 2013-2014, the City determined that stormwater constituted 28% of the total treated flow. *Id.*

25.     DWSD then determines the total revenue it needs to obtain from the City's customers in order to cover all of its sewer operations.  For 2013-2014, this amount was $203 Million. *Id.*

26.     Next, DWSD determines the portion of the total revenue requirement that will be recovered via Drainage Charges.  Here, the "Stormwater Revenue Requirement" includes 28% of the total cost of collection, treatment, and disposal of the total flow, 100% of the total capital and operating costs of CSO facilities,[1] and a pro-rata allocation of a "look back" adjustment. In its 2013-2014 calculation, DWSD determined that the total stormwater revenue requirement applicable to City customers was approximately $95 million for that fiscal year.

27.     The City's allocation of 28% of the total cost of collection, treatment and disposal of the total sewage flow to the City's Drainage Charge customers is grossly disproportionate to the actual costs of collection, treatment and disposal of stormwater flows.  As the City admits, "stormwater flows are less polluted than sanitary flows and therefore less costly to treat."  See Exhibit D hereto.  Accordingly, even if stormwater flows constituted 28% of the total **volume** of all types of flows that are treated and disposed of by DWSD, the City's actual cost of collecting, treating and disposing of those flows is far less that 28% of the total **cost** of collection, treatment and disposal of the total flow.

28.     DWSD then allocates responsibility for the grossly-inflated stormwater revenue requirement to the "major customer classes," which are defined as: (1) Residential, (2) Non-residential, and (3) State & County Classes.  *Id.*

---

[1]     "CSO" means combined sewer overflows.  Most of the time, combined sewer systems transport all of their sanitary sewage and stormwater to a sewage treatment plant, where it is treated and then discharged to a water body.  During periods of heavy rainfall or snowmelt, however, the sanitary sewage and stormwater flow rate in a combined sewer system can exceed the capacity of the sewer system or treatment plant.  For this reason, combined sewer systems were designed to overflow occasionally and discharge excess sanitary sewage and stormwater directly into nearby streams, rivers, or other water bodies.  Historically, combined sewer overflows ("CSOs") were among the major causes of beach closings and other water quality impairments.

29.     The City has approximately 89,343 acres. *Id.* Of this total number of acres, 46,892 acres are designated as residential. *Id.* Included in the 46,892 acres designated as residential are over 10,000 acres of public streets and roads.  See Exhibit C hereto at p. 60.  In its 2013-2014 calculation, DWSD allocated approximately $43 Million of the Stormwater Revenue Requirement to the Residential class, and based upon DWSD's rate methodology, 217,100 residential customer accounts were charged approximately $16.60 *per account per month* to meet the Residential class's allocation of the Stormwater Revenue Requirement.  *Id.*

30.     Out of the City's 89,343 acres, approximately 41,237 acres are designated as "Commercial" or "Non-residential."  *Id.*  The 41,237 acres includes over 11,700 acres of public streets and roads.  See Exhibit C hereto at p. 60.  In the 2013-2014 calculation, DWSD allocated approximately $50 Million of the Stormwater Revenue Requirement to the Non-residential Subset. *Id.*  However, based upon DWSD's rate methodology, which charges certain Non-residential customers – i.e., the owners of the Per-Acre Properties -- on a *per acre* basis, only 12,000 acres of the 41,237 acres were actually charged in order to meet the Non-residential class's allocation of the Stormwater Revenue Requirement.  *Id.*  This means that (for some reason) DWSD is allocating an already-inflated $50 Million revenue requirement against only 12,000 Non-residential acres—even though there are actually 41,237 Non-residential acres in the City including the 11,700+ acres of City streets and roads that the City has elected to allocate to the Non-residential category.  *Id.*

31.     Based upon DWSD's calculations, the 12,000 Non-residential acres are assessed a base cost of $350.80 per acre.  *Id.*  DWSD adjusts the base cost by factoring in an "average impervious factor" of 48% to yield a "per impervious acre" unit charge of $719.59 per month for the 12,000 Non-Residential acres being billed on this acreage basis.  *Id.*  DWSD then multiplies the "per impervious acre" unit charge of $719.59 by the estimated "average imperviousness" of the individual properties being charged in order to determine the per acre unit cost to be charged to

members of the Non-residential Subset. *Id.* DWSD's methodology establishes 5 classes of "average imperviousness" based upon surveys taken of the Non-residential properties. *Id.* Once the "average imperviousness" factor is calculated, the majority of owners of these 12,000 Non-residential acres are being disproportionately charged an average of $518.11/per acre for their share of the Stormwater Revenue Requirement. *Id.*

32.     The third "class" consists of the purported 1,214 acres owned by the State and County. *Id.* DWSD charges the State and County only $113.85/acre as their portion of the Stormwater Revenue Requirement. *Id.* The per-acre amounts actually paid by the State and County are even lower, because the City has grossly underestimated the number of acres encompassed by State and County highways in the City.

33.     The City does not allocate a Drainage Charge to itself for the 21,000 acres of City streets and impervious surfaces. *Id*

34.     DWSD has imposed—and plans to continue to impose—a disproportionate amount of the Drainage Charges upon a particularized and narrow subset of non-residential properties that represent only a fraction of the Non-residential Customer class.

35.     Specifically, out of a total of 89,343 acres in the entire City, with 41,237 acres designated as "non-residential," only approximately 12,000 commercial acres are subject to DWSD's "per acre" billing practice, and the owners of these acres, like Plaintiffs, bear a disproportionate cost allocation of the DWSD's Stormwater Revenue Requirement. Other non-residential properties are charged a monthly fee which ranges from $18.11 per month to $169.55 per month and is nonsensically based upon the size of the water pipes that service those properties.

36.     The City's method of imposing these Drainage Charges leads to grossly disparate Charges for similarly situated non-residential properties. A one acre parcel which incurs the Per-Acre Charge is charged a "standard rate" of $565.17 per month, while an identical parcel upon

which the City has not imposed the Per Acre Charge but rather has imposed a charge based upon the water meter size can pay as low as $18.11 per month.  The owners of the Per-Acre Properties therefore pay up to 31 times as much per month as similarly situated non-residential property owners.

37.     The Drainage Charge is being used to fund costs for services which provide a benefit to the City and *all* of its citizens, whether commercial or residential.  In addition to paying to dispose of stormwater, the Drainage Charge also finances 100% of the capital and operating expenses of the City's CSO facilities, which exceed $36 million per year.

38.     The portion of the Drainage Charge allocated to the Per-Acre Properties does not correspond to the benefits conferred upon this class for at least three reasons.  First, the revenues being derived from the Per-Acre Drainage Charges are clearly in excess of the direct and indirect costs of the current "use" of the stormwater disposal services by the narrow subset of non-residential properties paying those exactions – i.e., the owners of the Per-Acre Properties.

39.     Second, stormwater disposal services do not confer a unique benefit upon Plaintiffs or the other similarly situated non-residential property owners.  Stormwater collects on land, roads and other physical surfaces, and the runoff enters the combined sewer system through catch-basins and other collection devices.  Indeed, the stormwater collected in a combined sewer system are not "used" in any meaningful sense by any particular landowner or user.

40.     Third, any "benefit" of stormwater disposal conferred on the City's property owners is no different than the benefit conferred on the general public.  Storm water systems help prevent erosion, collect contaminated water for cleansing, keep roadways from flooding, and prevent the formation of standing pools of stagnant water.  The benefits resulting from this management are shared by nearly every member of the public.

41.     DWSD's use of the revenues generated by the Per-Acre Drainage Charge assessed against only the owners of 12,000 of the City's 41,000 non-residential acres to pay for stormwater disposal has the effect of forcing one subset of the citizenry to bear a disproportionate amount of the costs of a public service, even though there are other "users" of those services and even though the services benefit the general public.

## CLASS ALLEGATIONS

42.     Plaintiffs bring this action as a class action, pursuant to MCR 3.501, individually and on behalf of a proposed class consisting of the owners of the 12,000 commercial acres that are subject to DWSD's "per acre" billing practice which have incurred and/or paid the Per Acre Drainage Charge during the relevant class periods, excluding the plaintiff in Case No. 14-011369-CB.

43.     The members of the Class are so numerous that joinder of all members is impracticable.

44.     Plaintiffs' claims are typical of the claims of members of the Class.  Plaintiffs are members of the Class they seek to represent, and Plaintiffs were injured by the same wrongful conduct that injured the other members of the Class.

45.     The City has acted wrongfully in the same basic manner as to the entire class.

46.     There are questions of law and fact common to all Class Members that predominate over any questions, which, if they exist, affect only individual Class Members, including:

   a.     whether the Per Acre Drainage Charge is a tax;

   b.     whether the Per Acre Drainage Charge violates the Headlee Amendment;

   c.     whether the Per Acre Drainage Charge violates the Equal Protection Guarantees of the Michigan Constitution;

   d.     whether the Per Acre Drainage Charge violates the City's Charter Article 7,

12

Chapter 12, § 7-1202;

e.      whether the Per Acre Drainage Charge is "unreasonable,"

f.       whether the Per Acre Drainage Charge violates MCL 141.91;

g.     whether the Per Acre Drainage Charge violates MCL 141.118 and

h.      whether the City has been unjustly enriched by collecting the Per Acre Drainage Charge.[2]

47.     Plaintiffs will fairly and adequately protect the interests of the Class, and Plaintiffs have no interests antagonistic to those of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and have retained competent and experienced counsel to prosecute this action.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The prosecution of separate actions would create a risk of inconsistent or varying adjudications. Furthermore, the prosecution of separate actions would substantially impair and impede the ability of individual class members to protect their interests. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## COUNT I
## VIOLATION OF THE HEADLEE AMENDMENT

49.     Plaintiffs incorporate each of its preceding allegations as if fully set forth herein.

50.     The City is bound by the Michigan Constitution of 1963, including those portions commonly known as the Headlee Amendment.

51.     In particular, the City may not disguise a tax as a fee under Article 9, Section 31 of the Michigan Constitution of 1963, which provides:

---

[2]     Pursuant to MCR 2.112(M), Plaintiffs identifies subparts (a) through (f) of Paragraph 46 as "factual questions that are anticipated to require resolution by the Court."

Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. [Const. 1963, art. 9, § 31.]

52.     The Per-Acre Drainage Charge in a disguised tax and is intended to avoid the obligations of the Headlee Amendment, including the requirement that the Per-Acre Drainage Charge, as taxes, be approved by a majority of the electorate.

53.     The Per-Acre Drainage Charge has all relevant indicia of a tax:

    a.     It has no relation to any service or benefit actually received by the taxpayer;

    b.     The amount of the Per-Acre Drainage Charge is disproportionate to the cost incurred by the City in providing stormwater management services;

    c.     The Per-Acre Drainage Charge is designed to generate revenue—and in fact generates revenue for the City that exceeds the City's actual cost of providing stormwater drainage services to Plaintiffs and the Class by millions of dollars (the "Per Acre Drainage Overcharges");

    d.     The payers of the Per-Acre Drainage Charge benefit in no manner distinct from any other taxpayer or the general public;

    e.     Payment of the Per-Acre Drainage Charge is not discretionary, but actually or effectively mandatory;

    f.     Various other indicia of a tax described in *Bolt v. City of Lansing* are present.

54.     As a direct and proximate result of the City's implementation of the Per-Acre Drainage Charge, Plaintiffs and the Class have been harmed.

WHEREFORE, Plaintiffs seek an injunction prohibiting the City from imposing the Per-Acre Drainage Charges, and further seek a refund of all amounts to which they and the Class are entitled to under this claim, including attorneys' fees and costs as allowed by Article 9, Section 32 of the Michigan Constitution of 1963 and MCL 600.308a.

## COUNT II
## VIOLATION OF EQUAL PROTECTION GUARANTEES STATED IN THE MICHIGAN CONSTITUTION OF 1963, ARTICLE I, SECTION 2

55.    Plaintiffs incorporate each of their preceding allegations as if fully set forth herein.

56.    The Michigan Constitution of 1963 provides in pertinent part that "no person shall be denied the equal protection of the laws…" Mich. Constitution 1963, Article 1, § 2.  Plaintiffs are not asserting claims under the U.S. Constitution or other federal law.

57.    The City's practice of imposing the Per-Acre Drainage Charge only upon Plaintiffs and the other Per-Acre Properties is a constitutionally improper classification which violates Michigan equal protection guarantees in at least two ways.  First, there is no natural distinguishing characteristic between the 12,000 acres that are subject to the Per-Acre Drainage Charge and the 29,237 acres that are not subject to the Per-Acre Drainage Charge. Thus, Plaintiffs and the Class are irrationally being charged differently than the similarly situated owners of the 29,237 acres of commercial property that are not being assessed the Drainage Charge, including the City itself.

58.    The manner in which the Per-Acre Drainage Charge is imposed upon commercial properties unduly burdens Plaintiffs and the Class, and puts all Class members at a distinct financial disadvantage as compared to the owners of the 29,237 non-residential property acres which are not being charged in the same manner.  Thus, Plaintiffs and the Class are financing the entire portion of DWSD's Stormwater Revenue Requirement (approximately $50 Million) for non-residential properties.

59.     Additionally, the varying rates of the Per-Acre Drainage Charge also violate equal protection guarantees.  Here, the majority of commercial properties within the Class are being charged a rate of $518.11 per acre per month—which is nearly five times the amount being charged to the State of Michigan and Wayne County, entities who are similarly situated to Plaintiffs and the Class, as the same "impervious factors" apply—but for some reason, DWSD only charges the State and County $113.85 per acre, per month.  Thus, Plaintiffs and the Class are being charged at a highly inflated and disparate rate as compared to similarly situated owners of impervious property in Detroit.

60.     There is no legitimate governmental purpose being served through the City charging Plaintiffs and the Class a higher rate than it charges the State and County.

61.     The City has violated Mich. Constitution 1963, Article 1, § 2 by imposing the Per-Acre Drainage Charge upon Plaintiffs and the Class in violation of their constitutional equal protection guarantees.

62.     Plaintiffs and the Class have been financially harmed as a result of the City's violation of their constitutional equal protection guarantees.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Per Acre Drainage Charges imposed or collected by the City between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action, and during the pendency of this action, and refund all Per Acre Drainage Charges it has collected to Plaintiffs and the Class.

## COUNT III
## UNJUST ENRICHMENT – CHARTER VIOLATION

63.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

64.     § 7-1202 of the City's Charter requires that DWSD establish equitable water, drainage and sewerage service rates.

65.     The City has exceeded the authority stated in its Charter, § 7-1202, by imposing an inequitable drainage rate—the Per Acre Drainage Charge—upon Plaintiffs and the Class.

66.     As a direct and proximate result of the City's improper conduct, the City has collected millions of dollars to which it is not entitled (the "Per Acre Drainage Overcharges").  By paying the Per Acre Drainage Overcharges, Plaintiffs and the Class have conferred a benefit upon on the City.

67.     The City has been unjustly enriched because it received Per Acre Drainage Overcharges to which it was not entitled, and it would be unfair for the City to retain the Per Acre Drainage Overcharges under the circumstances.

68.     The City should be required to disgorge the amounts by which it has been unjustly enriched.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Per Acre Drainage Charges imposed or collected by the City between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action, and during the pendency of this action, and refund all Per Acre Drainage Charges it has collected to Plaintiffs and the Class.

## COUNT IV
## UNJUST ENRICHMENT – UNREASONABLE SEWER RATES

69.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

70.     Even if the Per Acre Charges are not taxes, they must still be "reasonable." *Mapleview Estates v. City of Brown City*, 258 Mich. App. 412 (2003).

71.     The Per Acre Drainage Charge is arbitrary, capricious and unreasonable.

72.     As a direct and proximate result of the City's improper conduct, the City has collected millions of dollars to which it is not entitled.  By paying the Per Acre Drainage Overcharges, Plaintiffs and the Class have conferred a benefit upon on the City.

17

73.     The City has been unjustly enriched because it received Per Acre Drainage Overcharges to which it was not entitled, and it would be unfair for the City to retain the Per Acre Drainage Overcharges under the circumstances.

74.     The City should be required to disgorge the amounts by which it has been unjustly enriched.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Per Acre Drainage Charges imposed or collected by the City between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action, and during the pendency of this action, and refund all Per Acre Drainage Charges it has collected to Plaintiffs and the Class.

## COUNT V
## UNJUST ENRICHMENT – VIOLATION OF MCL 141.91

75.     Plaintiffs incorporate each of the preceding paragraphs as if fully set forth herein.

76.     MCL 141.91 provides: Sec. 1.   "Except as otherwise provided by law and notwithstanding any provision of its charter, a city or village shall not impose, levy or collect a tax, other than an ad valorem property tax, on any subject of taxation, unless the tax was being imposed by the city or village on January 1, 1964."

77.     The City has violated MCL 141.91 by imposing and collecting the Per Acre Drainage Charges.  The Per Acre Drainage Charge is a tax that is not an ad valorem property tax and it was first imposed after January 1, 1964.

78.     As a direct and proximate result of the City's improper conduct, the City has collected millions of dollars to which it is not entitled.   By paying the Per Acre Drainage Overcharges, Plaintiffs and the Class have conferred a benefit upon on the City.

79.    The City has been unjustly enriched because it received Per Acre Drainage Overcharges to which it was not entitled, and it would be unfair for the City to retain the Per Acre Drainage Overcharges under the circumstances.

80.    The City should be required to disgorge the amounts by which it has been unjustly enriched.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Per Acre Drainage Charges imposed or collected by the City between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action, and during the pendency of this action, and refund all Per Acre Drainage Charges it has collected to Plaintiffs and the Class.

## COUNT VI
## UNJUST ENRICHMENT – VIOLATION OF MCL 141.118

81.    Plaintiffs incorporate each of its preceding allegations as if fully set forth herein.

82.    The Revenue Bond Act is clear in its prohibition that "free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality." MCL 141.118(1).  Under MCL 141.118(1), "[t]he reasonable cost and value of any service rendered to a public corporation, including the borrower [the City] by a public improvement shall be charged against the public corporation and shall be paid for as the service accrues from the public corporation's current funds or from the proceeds of taxes which the public corporation, within constitutional limitations, is hereby authorized and required to levy in an amount sufficient for that purpose, or both, …"

83.    The City has violated MCL 141.118 because it does not impose any Drainage Charge upon itself, but instead, imposes the cost of treatment and disposal of stormwater for the City's 21,000 acres of streets and impervious surfaces upon its Drainage Charge Customers, specifically including owners of Per-Acre Properties such as the Plaintiffs in this case.

84.     Thus, the City is receiving a free service that is prohibited by MCL 141.118 by imposing its costs for treatment and disposal of stormwater that originates from the City's own streets and roads upon its Drainage Charge Customers.

85.     As a direct and proximate result of the City's improper conduct, the City has collected millions of dollars to which it is not entitled.  By paying the Per Acre Drainage Overcharges, which necessarily includes charges for the City's impervious surfaces, Plaintiffs and the Class have conferred a benefit upon on the City.

86.     The City has been unjustly enriched because by paying the Per Acre Drainage Charge, Plaintiffs, and those similarly situated, have paid the City's cost of stormwater disposal.

87.     The City has been unjustly enriched because it has received the Per Acre Drainage Overcharges (which include charges for the City's impervious surfaces) to which it was not entitled, and it would be unfair for the City to retain the Per Acre Drainage Overcharges under these circumstances.

88.     The City should be required to disgorge the amounts by which it has been unjustly enriched and, pursuant to MCL 141.118, should be forced to impose a Drainage Charge upon itself for the acres of roads and impervious surfaces that it owns.

WHEREFORE, the City should be required to disgorge the revenues attributable to the Per Acre Drainage Charges imposed or collected by the City between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action, and during the pendency of this action, and refund all Per Acre Drainage Charges it has collected to Plaintiffs and the Class.

## COUNT VII
## DECLARATORY JUDGMENT INVALIDATING LIENS

89.     Plaintiffs incorporate each of its preceding allegations as if fully set forth herein.

90.     Pursuant to Michigan law and City's ordinances, unpaid Drainage Charges may become a lien against the property of certain members of the Class.  If left unpaid, the Charges are transferred to the tax roll of the property.

91.     The City may claim liens against the properties owned by Plaintiffs and the Class for unpaid Per-Acre Charges.

WHEREFORE, because the Per-Acre Drainage Charges are unconstitutional and unlawful, the Court should enter an order invalidating any municipal water or sewer liens or associated tax liens which have been imposed, or which may become imposed, against properties arising out of or relating to the Per-Acre Drainage Charges.

## **PRAYER FOR RELIEF**

Plaintiffs request that the Court grant the following relief:

A.     Certify this action to be a proper class action with Plaintiffs certified as Class Representatives and Kickham Hanley PLLC designated as Class Counsel;

B.     With respect to Count I, define the Class to include the owners of the 12,000 commercial acres that are subject to DWSD's "per acre" billing practice which have incurred and/or paid the Per Acre Drainage Charge at any time in the one year preceding the filing of this lawsuit or which incur and/or pay the Per Acre Drainage Charge during the pendency of this action;

C.     With respect to Counts II, III, IV, V and VI, define the Class to include the owners of the 12,000 commercial acres that are subject to DWSD's "per acre" billing practice which have incurred and/or paid the Per Acre Drainage Charge between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action or which incur and/or pay the Per Acre Drainage Charge during the pendency of this action;

21

D.     With respect to Count VII define the Class to include the owners of the 12,000 commercial acres that are subject to DWSD's "per acre" billing practice which have incurred and/or paid the Per Acre Drainage Charge between July 18, 2013 (or any earlier date permissible under federal and state law) and the date of the filing of this action or which pay the Per Acre Drainage Charge during the pendency of this action that have incurred liens on their property;

E.     With respect to Count I, enter judgment in favor of Plaintiffs and the Class and against the City, and order and direct the City to disgorge and refund all Per Acre Drainage Charges collected, and order the City to pay into a common fund for the benefit of Plaintiffs and all other members of the Class the total amount of Per Acre Drainage Charges to which Plaintiffs and the Class are entitled;

F.     With respect to Counts II through VI, enter judgment in favor of Plaintiffs and the Class and against the City, and order and direct the City to disgorge and refund all Per Acre Drainage Charges collected, and order the City to pay into a common fund for the benefit of Plaintiffs and all other members of the Class the total amount of Per Acre Drainage Charges to which Plaintiffs and the Class are entitled;

G.     Appoint a Trustee to seize, manage and distribute in an orderly manner the common fund thus established;

H.     Find and declare that the Per-Acre Drainage Charge violates the Headlee Amendment and permanently enjoin the City from imposing or collecting it;

I.     Find and declare that the Per-Acre Drainage Charge violates the Equal Protection Guarantees of the Michigan Constitution;

J.     Find and declare that the Per-Acre Drainage Charge violates the City's Charter § 7-1202 and  permanently enjoin the City from imposing or collecting it;

K.  Find and declare that the Per Acre Drainage Charge is "unreasonable" and violates MCL 141.91 and permanently enjoin the City from imposing or collecting it;

L.  With regard to County VII, enter an order invalidating any municipal water lien or associated tax liens which have been imposed, or which may become imposed, against the properties of all class members arising out of or relating to the Per Acre Drainage Charges.

M.  Award Plaintiffs and the Class the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

N.  Grant any other appropriate relief.

KICKHAM HANLEY PLLC

By: /s/ Gregory D. Hanley
    Gregory D. Hanley (P51204)
    Jamie Warrow (P61521)
    Edward F. Kickham Jr. (P70332)
32121 Woodward Avenue, Suite 300
Royal Oak, Michigan  48073
248-544-1500
Date: February 26, 2016    Attorneys for Plaintiffs
KH145405

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2016 I electronically filed the **Plaintiffs' Second Amended Class Action Complaint** with the Clerk of the Court using the electronic filing system which will send notification to all parties.

/s/ Kim Plets
Kim Plets

KH145405

23

# EXHIBIT F

IN THE STATE OF MICHIGAN

COURT OF APPEALS

**NICOLA BINNS, JAYNE CARVER, SUSAN MCDONALD, GOAT YARD LLC.,**
individually, and on behalf of other similarly situated, and **END OF THE ROAD
MINISTRIES, INC.**, a Michigan nonprofit corporation, individually
and on behalf of other similarly situated,

Plaintiffs

v.

**CITY OF DETROIT**, a Municipal Corporation, by itself and through its
**WATER AND SEWAGE DEPARTMENT,** its Agent,
the **DETROIT BOARD OF WATER COMMISSIONERS**,
and **GREAT LAKES WATER AUTHORITY**.

Defendants.

_____/

LISA WALINSKE (P62136)
KATHLEEN GARBACZ (P79901)
Attorneys for Plaintiffs
REDETROIT EAST COMMUNITY LAW CENTER, PLLC
14344 E. Jefferson
Detroit, MI 48215
lwalinske@redetroiteast.com
(313) 461-8440

## COMPLAINT FOR DECLARATORY,
## INJUNCITIVE, AND MONETARY RELIEF

NOW COMES PLAINTIFFS, NICOLA BINNS, JAYNE CARVER, SUSAN

MCDONALD, GOAT YARD LLC, and END OF THE ROAD MINISTRIES, INC., by and

through their attorneys, REDETROIT EAST COMMUNITY LAW CENTER, PLLC, and for it

Complaint under Michigan's Headlee Amendment states as follows:

1

## NATURE OF PLAINTIFFS' CLAIMS

1.      "When virtually every person in a community is a 'user' of a public improvement, a municipal government's tactic of augmenting its budget by purporting to charge a 'fee' for the 'service' rendered should be seen for what it is; a subterfuge to evade constitutional limitations on its power to raise taxes." Bolt v City of Lansing, 459 Mich 152, 166, 587 NW2d 264 (1998). This lawsuit arises from violations of Plaintiffs' rights under the Constitution of the State of Michigan of 1963.

2.      The People of the State of Michigan adopted the Headlee Amendment in 1978, which added Article 9 § 25 through 34 to the Michigan Constitution. Article 9, § 31 of the Michigan Constitution prohibits the enactment of a tax by a municipality without a vote of the electorate. Specifically, and in relevant part, § 31 provides as follows:

Units of Local Government are hereby prohibited from levying any tax not
authorized by law or charter when this section is ratified or from increasing the rate
of an existing tax above that rate authorized by law or charter when this section is
ratified, without the approval of a majority of the qualified electors of that unit of
Local Government Voting thereon.

Mich. Const. Art IX, § 31 (1978).

3.      Defendants have repeatedly violated art 9, § 31 each and every time that they have collected, or attempted to collect, the disguised municipal tax of a "Drainage Charge" from Plaintiffs and other Detroit landowners. "An application of § 31 is triggered by the levying of a tax." *Jackson Co v City of Jackson*, 302 Mich App 90, 98; 836 NW2d 903 (2013).

4.      "Section 31 prohibits units of local government from levying any new tax or increasing any existing tax   above authorized rates without the approval of the unit's

2

electorate." *Id.* at 98-99, quoting *Durant v Michigan*, 456 Mich 175, 183; 566 NW2d 272 (1997). While "a tax imposed without voter approval 'unquestionably violates' § 31 . . . a charge that is a user fee 'is not affected by the Headlee Amendment.'" *Jackson Co*, 302 Mich App at 99, quoting *Bolt v City of Lansing*, 459 Mich 152, 158-159; 587 NW2d 264 (1998).

5.      This case presents a tax, not a fee, because the property owner does not receive any direct benefit in exchange for the services purportedly conferred. In fact, Defendants cannot establish that a service is actually provided to Plaintiffs that supports the "drainage charge." Defendants have levied this fee against Plaintiffs' properties in conjunction with the City of Detroit's Assessor's Office. *See* Exhibit 1, *infra*. "Generally, a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Jackson Co*, 302 Mich App at 99, quoting *Bolt*, 459 Mich at 161.

6.      Beginning in October 2016, Defendants imposed a "drainage charge" on all parcels of property in the City of Detroit that "drain"[1] into the Defendant's combined sewer system. See (DWSD Letters to Plaintiffs Dated August 1, 2016, Exhibit 1). Defendants informed Plaintiffs in August 1, 2016 that it was working to "ensure all parcels that drain to the city's sewer system are billed for their fair share of drainage costs." Exhibit 1. However, Defendants never bothered to investigate, record, monitor or report as to whether each parcel, for which the charge was billed, was, in fact, a parcel that created or contributed potentially polluted runoff water that actually drained into the city's sewer system. In fact, it cannot be determined whether *any* parcel belonging to Plaintiffs, or any landowner, contributes to or creates runoff water that actively drains into and uses Defendants' outdated combined stormwater and sewage system. Defendants set out a new

---

[1] *See* http://www.detroitmi.gov/drainage , attached as Exhibit 3.

3

billing policy that it implemented, city-wide, to all property owners – regardless of actual usage of the storm sewage system by the particular landowner. Plaintiffs bring their Complaint individually, and on behalf of a proposed class of similarly situated persons who are also assessed this Drainage Fee by the City of Detroit, and its agent, the Detroit Water and Sewerage Department (DWSD).

7.  Defendants calculate the "drainage charge," not by how much service it provides to the property at issue, but based upon an arithmetic computation of impervious vs. non-impervious surfaces combined with assumed, potential, or suspected "runoff" amounts from the Plaintiffs' land. The "drainage charge" is also not directly correlated to any benefit that Plaintiffs receive by purportedly using Defendants' drainage services.[2] Defendant's published a Manual entitled, *A Guide to the Drainage Charge*, (attached as Exhibit 2). The Manual describes that the Drainage Charges are the equivalent of the total impervious surface area of the parcel multiplied by the $750.00 per impervious acre, per month charge. *See* Exhibit 3. Here, no relationship exists between the $750 "drainage charge" for impervious acre runoff and the value of the service or the benefit to the Plaintiffs landowners. *See* Exhibit 2. Consequently, the use of the word "charge" for this unjustly imposed *tax* is a misnomer.

8.  By Defendants' own admission, "Federal and State regulatory mandates required DWSD to invest more than $1 billion in combined sewer overflow control facilities to help prevent untreated overflows and preserve Detroit's water quality." ("DWSD Drainage" page attached as Exhibit 3). Over the last 40 years, Defendants have been in violation of the NPDES (National Pollutant Discharge Elimination System) Permit limits on numerous occasions over many periods

---

[2] As discussed *infra*, it is doubtful that the majority of Plaintiffs' land is impermeable surface that actually drains into the Defendants' system.

4

of time in the past. *See* Permit No MI00022802 Fact Sheet, Exhibit 4, p. 11. As a result of these violations, Defendants have "remained under an active federal consent judgment issued by the United States District Court for the Eastern District of Michigan." *Id.* Consistently, Defendants' sewage system violations are the result of a high inventory of solids in its waste water treatment plant ("WWTP"). *Id.*

     9.     Defendants' "drainage charge" is intended to raise revenue. According to Defendants, "the combination of [sewer overflow control facilities] investment plus drainage treatment costs account for the drainage charge." (Exhibit 3). Defendant DWSD's website goes on to state that "[r]evenue from drainage charges pays for the capital, operations and maintenance costs associated with Detroit's combined sewer overflow facilities as well as treating wet weather flows at the wastewater treatment plant."[3] *Id.*

     10.     Since October 2016, the "drainage charge"[4] imposed each month by Defendants, appears as a line item on monthly invoice statements to property owners and customers, including Plaintiffs. (Plaintiffs' DWSD Invoices collectively, Exhibit 5). The "'drainage charge' is not the reflection of a metered or monitored calculation of Plaintiffs'' runoff contributed to, or processed by, the drainage system. While average rainfall is taken into consideration; the potentially polluted contents existing in runoff water that may or may not be contributed to the sewage system by landowners is not accounted for in Defendants' "drainage charge" explanatory manual. *See* Exhibit 2, *passim*.

---

[3] *See* http://www.detroitmi.gov/drainage, also attached as Exhibit 3.

11. The "drainage charge" imposed by Defendants should be declared a tax for the

following specific reasons:

 a. The "drainage charge" is assessed by Defendants upon Plaintiffs, regardless of their actual usage or benefit of Defendants' drainage systems.

 b. Plaintiffs have paid, or are being required to pay to Defendants, these monthly "drainage fees" even though there is no mechanism by which Defendants could ever measure the amount of potential run-off water, or the amount of pollution contained in the potential runoff, from the parcel

 c. Defendants have no way of calculating, or metering, the amounts of each pollutant potentially contained in the amount of run-off water actually entering the Defendants' combined sewage system as a result of the impervious portions of land on each parcel. However, Defendants boldly charge an arbitrary and capricious amount of money as a "drainage fee' to landowners for this incalculable amount of potential runoff that may or may not be draining into Defendants' water or sewage service.

 d. Defendants' billing practice in implementing and collecting the "drainage charge" does not serve a regulatory purpose and is solely imposed upon landowners to generate the revenue needed by Defendants.

 e. Defendants' "drainage charge" is unsupported by the inability to measure the cost incurred by Plaintiffs, in actual costs, associated with drainage from any form of surface on Plaintiffs' lands.

 f. Defendants' "drainage charge" does not correlate with the cost incurred by Defendants for the actual costs associated with drainage from any form of surface on land from purportedly impervious surfaces throughout the City of Detroit.

 g. Defendants' "drainage charge" was unjustly imposed, across the board to landowners throughout the City, without any actual assessment or record indicating specific amounts of water drainage occurring on each specified parcel, or the cost incurred by Defendants' for the WWTP processes necessary to clean each amount of potential pollutants that may or may not be contained in runoff that may or may not be draining from Plaintiffs' land.

 h. Defendants "drainage charge" is compulsory by law and policy. Non-payment will result in a lien upon the land itself and disconnection of water to landowner's main residence.

 i. The "drainage charge" is compulsory because an individual or company's water service to main residence will be disrupted/disconnected if *any* "drainage charge" on *any* parcel is not timely paid.

6

    j.   The "drainage charge" is not voluntary because it mandates that landowners, like Plaintiffs, pay the "drainage charge" arbitrarily imposed upon each lot or have the option to pay for improvements that qualify for the green "credit" offered by Defendants. The credit is not comparable to the cost put forth by Plaintiff for said "green" improvements and does not, in any way, provide or reward landowners with a 100% reduction in the charge when they can demonstrate no usage of Defendants sewer system.

    k.   Defendants' green (tax) credit scheme does not actually provide the landowner with the ability to earn a complete deduction of the "drainage fee" in return for 100% permeability with improvements that mitigate all potential runoff even when it is shown that drainage is confined to the parcel itself through absorption or other green alternative to the Defendants' sewage system (i.e. where there is no actual drainage into the City's sewage system)[5].

12.    Defendants imposition of this disguised tax against Plaintiffs, and other Detroit property owners across the City of Detroit, violates § 31 of the Headlee Amendment because Defendants imposed the tax without a vote of the citizens of the City of Detroit. As a result, Plaintiffs bring this Complaint, under § 32, to enforce § 31 of the Headlee Amendment by seeking declaratory relief that the "drainage charge" is a tax, injunctive relief to stop the unconstitutional collection of this tax, and monetary relief in the form of return of tax payments, costs, and attorney fees.

## THE PARTIES

13.    Plaintiff Nicola Binns ("Ms. Binns") is a resident, landowner, and taxpayer of the City of Detroit. Ms. Binns owns three parcels of property in the City of Detroit. She owns her home located at 518 Marlborough, Detroit, MI 48215. Ms. Binns purchased the side lots to her property, 510 and 504 Marlborough, where she operates, among other things, a community garden. Defendants have charged Ms. Binns a "drainage charge" on her community garden side lots since

---

[5] Pursuant to MCR 2.112(M), Plaintiffs designate subparagraphs (a) through (k) of Paragraph 11 as "factual questions that are anticipated to require resolution by the Court."

7

October 2016. Defendants also charged Ms. Binns a "drainage charge" for her residence. It is important to note at the outset, that the "drainage charges" for Ms. Binns side lots (510 and 504 Marlborough) exceed the "drainage charge" on her home, which does have an impervious structure located upon it. (Exhibit 10)

14.     Plaintiff, End of the Road Ministries International, Inc. ("ETOR Ministries") is a Michigan non-profit corporation doing business in the City of Detroit through its operation of Hope House Detroit. ETOR Ministries operates Hope House Detroit, located at 840 Marlborough, Detroit, MI 48215. ETOR Ministries also purchased side lots at 833 and 841 Philip Street, Detroit, MI, from the Detroit Land Bank Authority, upon which a garden was created to accompany the newly designated hangout/picnic area and Playscape. Defendants have billed ETOR a "drainage charge" on its tax-exempt operation of Hope House Detroit, a non-profit for youth outreach, education, and a mentoring program. Defendants have charged ETOR a "drainage charge" for its playground and community gathering spaces, located adjacent to Hope House Detroit that provide enjoyment to the surrounding community. (Plaintiff ETOR Ministries Invoices, Exhibit 11)

15.     Plaintiff Jayne Carver is a resident of the City of Detroit, a Michigan taxpayer, and owns the real property located at 2476 Field Street, Detroit MI 48214. Defendants have charged Ms. Carver a "drainage charge" that exceeds her sewage and water actual usage, but that purportedly reflects cost to drain potential polluted run-off that drains from Plaintiff Carver's property (Plaintiff Jayne Carver's Invoices Exhibit 12)

16.     Plaintiffs Susan McDonald and the Goat Yard, LLC, operate a boat yard at 95 St. Jean. Defendants have charged these Plaintiffs a drainage fee in the amount of $697.50, despite the fact that it is located next to the river and again Defendants have no evidence that any

8

stormwater runs off of Plaintiffs' boat yard, with hazardous chemicals in tow, and enters the Defendants sewage system. (Exhibit 13, Plaintiffs McDonald and Goat Yard LLC Invoice).

17. Defendant CITY OF DETROIT is a Michigan municipal corporation located in Wayne County, Michigan. It is a "Home Rule" city organized under PA 279 of 1909, as amended, the Home Rule City Act, MCL 117.1, et seq. The CITY OF DETROIT, along with Defendants BOARD OF WATER COMMISSIONERS and the GREAT LAKES WATER AUTHORITY operate a combined sewage and storm water system in the City of Detroit, County of Wayne, State of Michigan and 76 suburban communities, through its agent the Detroit Water and Sewerage Department (DWSD). (see Exhibit 4, Permit No MI 0022802 Fact Sheet). DWSD, in rolling out its "drainage charge" has imposed, upon Plaintiffs and approximately 20,000 other real property parcels of customers and noncustomers alike, an unjustly levied and unconstitutional tax upon Detroit property owners, including Plaintiffs herein.

## JURISDICTION

18. Plaintiffs bring this action against Defendants under Michigan's Headlee Amendment, Mich. Const. Art. 9, §§ 25- 34, challenging a mandatory stormwater drainage charge imposed by Defendants. Original Jurisdiction is proper in the Michigan Court of Appeals under MCR 7.206(E). *See also* Mich Const Art 9, § 32; MCL 600.308a.

## COMMMON FACTS

19. Stormwater is water from rain. When rain falls to the earth in agricultural and other undeveloped areas, it is either slowly runs off and dissipates, or is absorbed. Rooftops and paved areas prevent the water from being absorbed and contributes to much more run-off. (DWSD, Frequently Asked Questions Publication, p. 1, Exhibit 6).

9

20. As a result, stormwater can accumulate around, on, or because of, impervious services (roads and sidewalks) clogging drains and causing nuisance flooding possible threatening to public health and safety.[6] *Id* at p. 1-2.

21. Due to age, Defendants' current drainage infrastructure needs repair and replacement. A proactive replacement program is necessary to keeping the systems functioning correctly. Unfortunately, the failing drainage infrastructure, is only a part of the problem that needs to be fixed. *See* Permit Fact Sheet, Exhibit 4.

22. As the rain falls onto our streets and sidewalks, water accumulates, containing potential pollutants such as gasoline, oil, and heavy metals into the city's overwhelmed drainage system. *Exhibit 6*. Pesticides, herbicides, and fertilizers can potentially wash away from lawns or other green spaces. *Id.* Over time the potential for pollutants to build in our waterways and underground drainage systems, damaging our streams, rivers, and lakes, increases with passage of time. *Id.* There exists no dedicated funding for the city's system in Detroit, unlike water and sewer services, and prior to the adoption of the utility, this system was supported by general funds.

23. However, the City of Detroit is now faced with increasing costs and Defendants have decided that a fair and more equitable way to fund the stormwater program needs to been explored. (Exhibit 1) In the Summer of 2016, DSWD launched their "drainage charge" awareness campaign, but did not begin imposing the 'charge' until October 2016. *Id*. If the fee is not paid by the landowner, the landowner risks a lien being placed resulting in a shut-off to the necessary water utility service at their home or primary business location. Det. Ord. Nos. 26-3-13 (allowing the

---

[6] In fact, Plaintiffs Binns and ETOR Ministries both experienced the perpetually flooding of Detroit's lower Jefferson Corridor (specifically Jefferson Chalmers neighborhood) in the past five years because of the accumulation of more stormwater than Defendants' antiquated system is able to handle.

10

city to have a lien for sewage service charges) and 26-3-14 (allowing that lien to be based upon records of the DWSD). Exhibit 7. Water service can, and will, be disconnected *to residence of land owner* regardless of which parcel's "drainage charge" remains unpaid.

24.     Defendants' stormwater "drainage charge" provides the necessary revenue needed, by Defendants, to maintain and improve existing stormwater infrastructure to implement the comprehensive stormwater quality management plan as required by the United States Environmental Protection Agency and the Michigan Department of Environmental Quality. "Federal and State mandates have required DWSD to invest more than $1 billion in combined sewer overflow control facilities (CSOs) to help prevent untreated combined sewer overflows into waterways..." DWSD Drainage Charge Q & A, Exhibit 6, Q #3. "Fees from drainage charges pay for capital, operations and maintenance costs for the CSOs, wastewater treatment plant and combined sewer system components." *Id.*

25.     Defendants calculate the "drainage charge" by using the following formula:

DRAINAGE CHARGE =     PARCEL IMPERVIOUS SURFACE AREA

X

IMPERVIOUS ACRE RATE

*See Id* at Q #4.

26.     By using the City of Detroit's Assessor's data and "flyover views" Defendants began billing Plaintiffs and other similarly situated Detroit property owners, at a charge of "$750 per impervious acre or $.017 cents per impervious square foot..." *Id.* "The new drainage rate is based solely on impervious acreage." *Id* at Q#7.

11

27.     Defendants admit that portions of the drainage charge will be used to retire bad debt. *Id* at Q #s 24-26. According to Defendants, "[i]f everyone pays their share of the drainage charge, DWSD can decrease the rate and help customers pay less [of DWSD's bad debt]." As a result of bad debt retirement, DWSD, projects that the rate is going "to decline 32% through fiscal year 2019." *Id* at Q#26. Contrary to these statements by DWSD, Detroit, City Charter provides that "[a]ll moneys paid into the city treasury form fees collected for water, drainage or sewage services shall be used exclusively for the payment of expenses incurred in the provision of these services…." Detroit City Charter, Art 7, ch. 12, § 7-1203 (Exhibit 8).

28.     Under City of Detroit Municipal Ordinance 56-3-12, the Board of Water Commissioners is only empowered to set rates for "sewage services" "on the basis of the quantity of water used thereon, or therein, as the same measured by the city water meter there in use, or by such other equitable method…" Det. Ord. 56-3-12(a) (Exhibit 7). Defendants' current rate scheme for the "drainage charge" is *ultra vires* because Defendants' "drainage charge" is based upon a mathematic equation computed with an arbitrary assessment of an unmeasured costs at the exorbitant rate of $750 per impervious acre per month.

29.     While Defendants are currently attempting to levy this assessment upon property owners throughout the City of Detroit, including Plaintiffs, Defendants have engaged in no metering of any of the assessed parcels or conducted an actual assessment of the parcel's use of the sewage system as required by Det. Ord. 56-3-12(b). In fact, Detroit's current ordinances require that "[m]eters or other means for gauging or metering as above provided shall be installed by the property served, where applicable, and/or the user of the sewage system as required by and under the supervision of the director of the water and sewerage department, as a condition to the use of

12

the sewage system." Det. Ord. 56-3-12(b). Nonetheless, there are no meters, measurements, or any quantifiable data collected that shows a correlation to the cost of an unknown amount of potentially polluted storm runoff to the "drainage charge" imposed by Defendants against each respective parcel. Exhibit 2. Instead, there is no basis to support which this "charge" as constitutional or constitutionally imposed. Defendants are informing customers that the water supply to their homes will be shut off if they do not pay all "drainage charges" on each of their side lots. *See* Plaintiff Nicola Binns DWSD bills, Exhibit 9.

30.    Defendants are overreaching with this "drainage charge" in more ways than just by violating the City's own ordinances. Defendants are also not acting in conformance with Chapter 12 of Article 7 of the Charter of the City of Detroit. Chapter 12 requires Defendant Board of Water Commissioners to "establish equitable rates to by paid" by a parcel "using water, drainage, or sewerage services." Detroit Charter, art 7, Ch. 12, § 7-1202 (Exhibit 8). Here, Defendants miss the key elements needed to assess and determining whether or not the Plaintiffs actually used the drainage or sewage services in relationship to their specific parcels. Things that must be considered in order to determine a real fee for drainage, do the side lots that belong to the landowner create, or contribute, additional and potentially polluted runoff, and how much? And, does this potentially polluted runoff, that may or may not drain in the system, create enough additional wastewater runoff to support the imposed cost for services? The charge is unsupported by facts, involuntary, punishable, unjust, and unconstitutional.

31.    Instead, Defendants charge a disproportionate and unrelated fee for the non-existent service it provides to Plaintiffs' parcels. There is a benefit conferred by the improvement of Defendants failing management systems and infrastructure; however, absent a vote of this

electorate, this "drainage charge" for the good of the public at large should be declared an unconstitutional municipal tax upon landowners in violation of Michigan's Headlee Amendment. The "nature of a stormwater management system, which benefits the public without providing any individualized, measurable benefit to individual property owners does not lend itself to a system of funding based on user fees." *Dekalb County v U.S.*, 108 Fed. Cl. 681 (U.S. Court of Claims, 2013).

32.     Defendants' "drainage charge" scheme does include credit for green improvements and other alternatives to prevent stormwater from draining from parcels of property into Defendants' combined sewage system. However, a review of Defendants' publication, *A Guide to Drainage Charge Credits* (Exhibit 10) reveals that even if a landowner, such as Plaintiff Binns, who mitigates all runoff on her property with rain catchment systems, rain gardens, and impervious cover reduction[7], Defendants will only issue drainage charge credits up to the maximum of 80% of the total drainage charge. *See* Exhibit 10, pp 3-5.

33.     "Drainage charge" Credits are "a reduction in the drainage charge to a property based on the implementation and continuing proper operation of a storm water management practice." Exhibit 10, p. 1. "While multiple credits can be given to eligible properties, the total credit to any property cannot exceed 80 percent of the drainage charge for that property." Exhibit 10, p. 11. These means that the "drainage charge" Credit scheme does not offer the opportunity for any property owners to challenge or otherwise avoid the imposition of this tax in full.

---

[7] "Because the drainage charge is calculated using the amount of impervious cover on a site, the removal of impervious cover is not considered a drainage charge credit but rather an adjustment to the impervious area." Exhibit 11, p. 3.

14

34.     By billing this stormwater Drainage Charge to Plaintiffs and other similarly situated Detroit landowners, the charge does not reflect actual costs of stormwater disposal services, metered with relative precision in accordance with available technology and including an appropriate capital investment.

35.     The Drainage Charge also lacks a significant element of regulation. The stormwater "drainage charge" does not take into consideration the presence of pollutants on each parcel that contaminate to such runoff and contribute to the need for treatment before discharge into navigable waters.

## CLASS ALLEGATIONS

36.     The named Plaintiffs bring this action, under MCR 3.501, on their own behalf, and on behalf of the class of all others persons similarly situated who are property owners in the City of Detroit.

37.     The proposed class consists of all persons who have been charged the unconstitutional "drainage charge" by Defendants and who own property in the City of Detroit, County of Wayne, State of Michigan.

38.     The named Plaintiffs and the members of the proposed class all have typical tangible and legally protectable interests at stake in this action. The claims of the Plaintiffs and proposed class members have a common origin and basis. Their claims originate from the same policy, procedures and actions of the Defendants in charging a "drainage charge" that does not correlate to actual drainage or run off fees incurred by Defendants for each respective parcel charged for the utility service.

39. The Defendants act in the same way toward the Plaintiffs and the proposed class members. As such, the named Plaintiffs and proposed class members have each been the victim of illegal practices of the Defendants as stated in Counts I through III of this Complaint.

40. The Plaintiffs claims for relief are typical of the claims of each of the absent class members. If brought and prosecuted individually, the claims of each proposed class member would necessarily require proof of the same material and substantive facts, rely upon same remedial theories, and seek the same relief.

41. The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the proposed class will be prosecuted with diligence and care by the Plaintiffs as representatives of the class.

42. The members of the proposed class are so numerous that joinder of all the individual members is impracticable. The proposed class is in excess of 20,000 parcels that have improperly been added to Defendants billing and collection enforcement system. *See* Exhibit 1.

43. If individual actions were required to be brought by each injured or affected member of the class, the result would be a multiplicity of actions creating a hardship to Plaintiffs and all others similarly situated, to the Defendants, and to the resources of the Court. Since individual refunds may be relatively small for most members of the Class, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the class would prosecute individual actions.

44. A class action is an appropriate method for fair and efficient adjudication of this

16

lawsuit and distribution of the common fund to which the Class is entitled. Plaintiffs anticipate no difficulty in the management of this action as a class action.

45. The named Plaintiffs will fairly and adequately represent the interests of the class, because the named Plaintiffs are members of the class and the claims of the named Plaintiffs are typical of the claims of those in the class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent and experienced counsel to prosecute this action.

## COUNT I

## DECLARATORY RELIEF

46. Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-46 as if fully included herein.

47. As a direct and proximate result of the Defendants' custom, policies and actions, Plaintiffs and all other persons similarly situated have suffered and will continue to suffer a loss of their constitutionally-protected rights to be free from real property taxation unilaterally imposed by a municipality. In particular, Defendants may not disguise a tax as a "fee."

48. The stormwater drainage charge are a disguised tax intended to avoid the obligations of the Headlee Amendment, including the requirement that the Stormwater Charges, as taxes, be approved by a majority of the electorate.

49. Defendants Drainage Charge aimed at stormwater has all the relevant indicia of a tax:

a. They have no relationship to any service of benefit actually received by the taxpayer;

17

b.      The amount of the Drainage Charge is disproportionate to the cost incurred by Defendants in providing sewage disposal services;

c.      The Drainage Charge is designed to raise revenue.

d.      Plaintiffs, and other payers of the Drainage Fee benefit in no manner distinct from any other taxpayer or the general public;

e.      Payment of the Stormwater Charges are not discretionary, but mandatory;

f.      Various other indicia of a tax described in *Bolt v Lansing, supra*, are present[8].

50.      Plaintiffs seek an Order from this Honorable Court, consistent with *Bolt v City of Lansing*, 459 Mich 152, 587 NW2d 264 (1998), and its progeny, that the "fee" imposed here by Defendants amounts to an unconstitutional taxation of real property by Defendants.

## COUNT II

## INJUNCTIVE RELIEF

51.      Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-50 as if fully included herein.

52.      As a direct and proximate result of the Defendants' custom, policies and actions, Plaintiffs and all other persons similarly situated have suffered and will continue to suffer a loss of their constitutionally-protected rights to be free from real property taxation unilaterally imposed by a municipality.

---

[8] Plaintiffs also designate (a) thru (f) of Paragraph 49 as "factual questions that are anticipated to require resolution by the Court" under MCR 2.112(M).

18

52.     Plaintiffs will suffer immediate and irreparable harm including threats to health and safety, if Defendant is not enjoined from executing its policy of mass water shut offs in violation of due process and equal protection.

54.     Plaintiffs ask this Honorable Court to permanently enjoin Defendants from imposing or collecting this Drainage Fee.

## COUNT III

### MONETARY DAMAGES

55.     Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-55 as if fully included herein.

56.     As a direct and proximate result of the Defendants' custom, policies and actions, Plaintiffs and all other persons similarly situated have suffered and will continue to suffer a loss of their constitutionally-protected rights to be free from real property taxation unilaterally imposed by a municipality.

57.     Plaintiffs ask this Honorable Court to refund all Drainage Charges paid and Order the Defendants to pay into a common fund for the benefit of Plaintiffs and all other members of the Class the total amount of refunded charges for this illegal tax that they are entitled and appoint a Trustee to seize, manage, and distribute in an orderly manner the common fund established. .

### GENERAL PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.      Issue a temporary restraining order (TRO), to stop all "drainage charge" collection

19

from Plaintiffs and other similarly situated property owners and schedule an evidentiary hearing for a preliminary and permanent injunction;

B.      Provide declaratory relief finding that Defendant's policies, procedures and actions relating to "drainage charge", violates § 31 of Michigan's Headlee Amendment;

C.      Refund all moneys collected from Plaintiffs, and other similarly situated landowners.

D.      Award reasonable attorneys' fees and costs; and

E.      Award any further relief as is just and equitable.

Dated: March 25, 2017

Respectfully submitted,
**REDETROIT EAST COMMUNITY LAW CENTER**

/s/ Lisa C. Walinske

BY:_____

**LISA WALINSKE (P62136)**
**Attorney for Plaintiffs**
14344 E. Jefferson
Detroit, MI 48215
lwalinske@redetroiteast.com
(313) 461-8440

20

# EXHIBIT G



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C.  20460

OFFICE OF
WATER

February 17, 2000                                                          **CWSRF 00-08**

**MEMORANDUM**

SUBJECT:  User Charge System Requirements for Treatment Works Constructed under Title II
of the Clean Water Act and the Clean Water State Revolving Fund Program

FROM:      Michael B. Cook, Director
Office of Wastewater Management

TO:          Water Division Directors
Regions I-X

This is in response to recurring questions from various parties concerning the length of time user charge system requirements apply to wastewater treatment works constructed with grant funds awarded under Title II of the Clean Water Act and treatment works  constructed with funds made available through the Clean Water State Revolving Fund Program.  A discussion of the user charge system requirements under each of the programs is set forth below:

**User Charge Requirements for Treatment Works Constructed With Grant Funds Awarded
Under Title II of the Clean Water Act**

Section 204(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1284(b)(1)(A), requires, as a condition of receiving Federal funding for wastewater treatment works, that the applicant:

. . .has adopted or will adopt a system of charges to assure that each recipient of
waste treatment services within the applicant's jurisdiction... will pay its
proportionate share...of the costs of operation and maintenance (including
replacement) of any waste treatment services provided by the applicant;

Regulations implementing Section 204(b)(1)(A) require that grantees as a condition of Title II funding adopt, implement, and maintain a user charge system.  The regulations set forth the requirements for such user charge system(s).  Under 40 CFR 35.925-11 (1974) "the applicant must agree that such system(s) will be maintained"...and under 40 CFR Part 35, Subpart E, Appendix B at (f)(1974) "The user charge system...shall be maintained by the grantee in accordance with the following requirements:"

2

We have been asked by states, grantees, and rate payers whether the Title II user charge system requirements continue to apply even though the Title II construction grant was awarded many years ago.  The answer is yes.  The Clean Water Act does not place a time limit on how long the user charge system requirements must be maintained.  Early Title II construction grant regulations indicated that user charge system requirements were to be maintained for the service life of the treatment works [40 CFR 35, Subpart E, Appendix B at (d) (1)].  Service life has been interpreted by the Agency as the useful life of the treatment works.  Subsequent Title II construction grant regulations stated specifically that user charge system requirements must be implemented for the "useful life of the treatment works" [ 40 CFR 35.2208 (1984)].  "Useful life" is defined as the "period during which a treatment work operates" [40 CFR 35.2005(b)(51) (1984)].  Therefore, so long as the grant-funded treatment works have not been abandoned, or the Federal interests disposed, the Title II construction grant requirements for the user charge system remain as long as the treatment works are operational.

In order for user charge systems to meet the Title II construction grant requirements, each user (or user class) must pay its proportionate share of operation and maintenance (including equipment replacement) costs of the waste treatment services based on the quantity and character of its discharges [40 CFR 35.929-1(a)].  While the statute and regulations permit the establishment of classes of users, the classes that are established must be based on the "users having similar flows and wastewater characteristics; *i.e.*, levels of biochemical oxygen demand, suspended solids, etc." [40 CFR Part 35, Subpart E, Appendix B, at (e)].  Generally, most wastewater treatment grantees establish four user classes having similar wastewater flow and  characteristics:  residential, commercial, industrial, and governmental/institutional.  When such user classes are established,  each class is assigned its share of the waste treatment works operation and maintenance (including equipment replacement) costs based on the  proportional contribution of the class to the total treatment works loading.  Each user within a user class pays its proportionate share of the costs attributed to the user class.  When the costs of wastewater treatment increases or decreases, the grantee must proportionately increase or decrease the wastewater treatment rates for each class of users.  The one exception to the proportionality requirement is for low income residential users provided in Section 204(b)(1).

**User Charge Requirements for Treatment Works Constructed With Funds Made Available Through the Clean Water State Revolving Fund (CWSRF) Program**

Section 602(b)(6) of the Clean Water Act, 33 U.S.C. 1382(b), requires that treatment works constructed in whole or part before October 1, 1994, with funds made directly available by capitalization grants (known as "CWSRF equivalency funds") from the state water pollution control revolving fund must also comply with the user charge system requirements set forth in      Section 204(b)(1)(A) of the Clean Water Act.  However, the CWSRF statute and regulations        (40 CFR Part 35, Subpart 31) require only that states meet the statutory requirements, not the federal regulatory requirements promulgated for the Title II construction grants program.  The CWSRF regulations at 40 CFR 35.3135 allow states to develop their own procedures for implementing the statutory provisions.  The statutory requirements for the CWSRF program do not specify a time frame for the imposition of the user charge system.  Therefore, states can use the federal regulatory definition for the "useful life" of the facilities, the duration of the loan, or any other criteria to

3

establish the applicable time period for the user charge system requirements under their CWSRF programs.  Each state's CWSRF agency is responsible for establishing its specific user charge system implementation procedures which will be accepted by the Regional Administrator if the procedures adequately assure compliance with the statutory requirements.

In the situations where treatment works received funding from both Title II construction grants and CWSRF loans, the recipients as a minimum must adhere to the user charge system requirements of the Title II construction grants program.

**Compliance Under Title II and CWSRF**

The normal course of action for non-compliance with user charge requirements is for EPA and the state to provide the grantee/loan recipient with technical assistance plus an opportunity to correct its user charge system in order to avoid grant annulment or compliance action.

In the case of  Title II grant recipients, the failure to meet the user charge requirements discussed above can ultimately result in the annulment of their construction grant(s) and repayment of all construction grant funds [40 CFR 30.920-5 (1979)].  With regard to CWSRF loan recipients, a state would be expected to bring a compliance action against the loan recipient pursuant to Section 605 of the Clean Water Act and 40 CFR 35.3170 for failure to satisfy the terms of its loan agreement and the state capitalization agreement with regard to user charges system as required by Section 602(b)(6) of the Clean Water Act.

If you have any questions on how user charge requirements apply to these programs, please call me at (202)260-5850 or Haig Farmer at (202)260-7279.

cc:   Regional Branch Chiefs
      CWSRF Coordinators